**Gregory F. DANIEL, M.D., et al., Plaintiffs,**

v.

**AMERICAN BOARD OF EMERGENCY MEDICINE, et al., Defendants.**

**No. 90–CV–1086A.**

United States District Court, W.D. New York.

Nov. 19, 1997.

Jaeckle, Fleischmann & Mugel, Buffalo, NY (Ralph L. Halpern, of counsel), Shearman & Sterling, New York, NY (James T. Halverson, Kathleen M. Comfrey, of counsel), for plaintiffs.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY (Robert E. Glanville, of counsel), for American Board of Emergency Medicine, Henry A. Thiede, Frank A. Disney, Council of Emergency Medicine Residency Directors.

Petree Stockton, LLP, Winston–Salem, NC (Denise M. Jennings, George L. Little, of counsel), for Forsyth Memorial Hospital.

Magner, Love & Morris, Buffalo, NY (William J. Love, Jr., of counsel), for Johns Hopkins Hospital, Part of the Johns Hopkins Health System.

Collidge, Wall, Womsley & Lombard, Dayton, OH (Terence L. Fague, of counsel), for Kettering Medical Center.

Schnader, Harrison, Segal & Lewis, Philadelphia, PA (Sam Silver, of counsel), for Mercy Catholic Medical Center, Misericordia Division.

Kohrman, Jackson & Kranz, Cleveland, OH (Donald S. Scherzer, of counsel), for Ohio State University Hospitals.

Keck, Mahin & Cate, Washington, DC (Philip O'Neil, of counsel), for Riverside Methodist Hospitals.

Hinshaw & Culbertson, Chicago, IL (Robert E. Nord, of counsel), for St. Francis Medical Center.

Rushfeldt, Shelley & Drake, Sherman Oaks, CA (Doreen Wener Shefeld, Gail A. Reisman, Jerry R. Sparks, of counsel), for Tri–City Medical Center.

Dennis C. Vacco, Atty. Gen., State of NY, Buffalo, NY (Douglas S. Cream, Asst. Atty. Gen., of counsel), for State University of New York at Stony Brook Medical Center.

LeBeouf, Lamb, Greene & Macrae, New York, NY (Molly S. Boast, Sara C. Kay, of counsel), for Children's Hospital of Michigan, Children's Hospital and Health Center (San Diego), Detroit Receiving and University Health Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Medical College Hospitals, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Inc., Oregon Health Sciences University Medical Center, St. Anthony Hospital, University of California (Irvine) Medical Center, University of California (Los Angeles) Medical Center, University of California (San Diego) Medical Center, University of Massachusetts Medical Center, University Medical Center, (Tucson), and University of New Mexico, University Medical Center.

Paul A. Crotty, Corp. Counsel, Bob Bailey, Asst. Corp. Counsel, City of New York Law Depart., New York, NY, for Lincoln Medical and Mental Health Center.

Kelley, Drye & Warren, New York, NY (Richard E. Donovan, Lynne M. Glass, of counsel), for Our Lady of Mercy Medical Center.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on April 24, 1991. Defendants filed various motions to dismiss the Second Amended Complaint on grounds of immunity, lack of personal jurisdiction, improper venue and improper service of process. On January 16, 1996, Magistrate Judge Foschio filed a Report and Recommendation regarding the various motions.[1]

---

1. Defendants American Board of Emergency Medicine ("ABEM"), Council of Emergency Medicine Residency Directors ("CEMRD"), Lutheran General Hospital, and Mercy Hospital and Medical Center moved before Magistrate Judge Foschio for reconsideration of his Report

Plaintiffs and several of the defendants have filed objections to the Report and Recommendation.[2] Oral argument on the objections was held on October 17, 1996.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions of the parties and hearing argument from counsel, the Court adopts the proposed findings of the Report and Recommendation.

The Court finds the analysis of Magistrate Judge Foschio to be extremely thorough and well-reasoned. The Court will take this opportunity, however, to expand on Magistrate Judge Foschio's analysis regarding venue in light of two recent cases, *Paper Sys., Inc. v. Mitsubishi Corp.*, 967 F.Supp. 364 (E.D.Wis. 1997) and *Icon Indus. Controls Corp. v. Cimetrix, Inc.*, 921 F.Supp. 375 (W.D.La.1996).

■ Under 15 U.S.C. § 22:
Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The Court finds that the worldwide service of process clause in § 22 is totally independent from the venue clause. *See Paper Systems Inc. v. Mitsubishi Corp.*, 967 F.Supp. 364, 366–67 (1997). There is nothing in the legislative history of § 22 nor Supreme Court precedent suggesting that the venue clause is supposed to serve as a limitation on the worldwide service of process clause. *Id.* at 367 (citing *Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1410–11 (9th Cir.1989)). As the court stated in *Paper Sys.:*

Personal jurisdiction defines a court's power; if § 22 provides for worldwide service without exception, Congress has extended the federal court's powers to their constitutional limit to enforce the antitrust laws. Perhaps more than any other law, the antitrust laws are national in scope and impact. The antitrust laws define the rules of the free market economy; like the weather, the economy respects no state or natural boundaries.

\* \* \* \* \* \*

If the antitrust laws are to be effective, district courts' jurisdiction must reach the limits of the power of the United States of America. In the case of antitrust laws, it makes no sense to tie a district court's jurisdiction to the state in which it sits; it neither promotes the enforcement of antitrust law nor the management of litigation.

*Id.* at 368.

28 U.S.C. § 1391(b) provides, in pertinent part, that venue is proper in a federal question case in "a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(c) provides that "a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." Because all the

---

and Recommendation. In a Decision and Order filed February 14, 1996, Magistrate Judge Foschio denied these motions.

**2.** The defendants who filed objections include: ABEM; CEMRD; Forsythe Memorial Hospital ("Forsythe"); Lutheran General Hospital; Mercy Hospital and Medical Center; Mercy Catholic Medical Canter–Misericordia Division; Johns Hopkins Hospitals; Riverside Methodist Hospitals; Children's Hospital–San Diego; Children's Hospital of Michigan; Detroit Receiving Hospital and University Health Center; Loma Linda University Medical Center; Medical College of Pennsylvania/Medical College Hospitals–Main Clinical Campus; Methodist Hospital of Indiana, Inc.; Oregon Health Sciences University; The Regents of the University of California (identified in the Second Amended Complaint as UCLA Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center); St. Anthony Hospital–Central; The Regents of the University of New Mexico (identified in the Second Amended Complaint as the University Hospital at the University of New Mexico School of Medicine); University of Massachusetts Medical Center; University Medical Center Corporation (identified in the Second Amended Complaint as the University Medical Center (Tucson, Arizona)); St. Francis Medical Center; and Tri–City Hospital District d/b/a Tri–City Medical Center.

corporate defendants in this case are subject to personal jurisdiction in New York, by virtue of their amenability to worldwide service of process under § 22, they all "reside" in New York for venue purposes under § 1391(b).

The Second Circuit's decision in *Goldlawr, Inc. v. Heiman,* 288 F.2d 579 (2d Cir.1961), rev'd on other grounds, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), does not bar this result. In *Goldlawr,* the Second Circuit stated, incidental to concluding that a transferor court lacked personal jurisdiction over the defendants, that "the extraterritorial service privilege [of § 22] is given only when the other [venue] requirements are satisfied." *Id.* at 581. This statement, however, was merely dictum. *See Go–Video,* 885 F.2d at 1411. Further, *Goldlawr* was decided in 1961, when the general venue provisions for domestic corporations contained in 28 U.S.C. § 1391(c) were more restrictive than § 22. Thus, the *Goldlawr* court had no occasion to consider whether the worldwide service of process clause in § 22 could apply if grounds for venue were provided by another statute. *See General Elec. Co. v. Bucyrus–Erie Co.,* 550 F.Supp. 1037, 1041–42 (S.D.N.Y.1982).

The Court rejects defendants' argument that application of the general venue provisions contained in 28 U.S.C. § 1391 in conjunction with the worldwide service of process clause in § 22 renders superfluous the special venue provisions contained in § 22. Defendants argue against such an application on the premise that Congress presumably intended the venue provisions contained in § 22 to have some meaning. This argument overlooks, however, the fact that § 22 was enacted in 1914, decades before Congress expanded the general venue provisions in 1988. Thus, at the time § 22 was enacted, the special venue provisions contained therein served a definite purpose. It may well be that the 1988 amendments to § 1391 made those provisions superfluous, but if so, such was the prerogative of Congress.

The Court also rejects defendants' argument that it would be unfair to allow antitrust plaintiffs to obtain personal jurisdiction and venue over corporate defendants in any district in the United States. That is a policy issue best left to Congress. Had it desired to do so, Congress could have prevented this result in 1988 by providing that § 1391(c), as amended, did not apply to antitrust actions, but it failed to do so. Even if Congress did not consider the impact that the amendment would have on antitrust cases brought against corporate defendants, it is certainly free to restrict antitrust venue through new legislation if desired. In the meantime, there are other safeguards against the filing and prosecution of an antitrust action in a district which has no meaningful connection to the location of the parties or the underlying controversy, including the doctrine of *forum non conveniens* and the right to seek a change of venue for the convenience of the parties and witnesses under 28 U.S.C. § 1404(a). *See Icon Indus. Controls Corp.,* 921 F.Supp. at 383.

■ The policies underlying the Clayton Act are "designed to expand the reach of the antitrust laws and make it easier for plaintiffs to sue for antitrust violations." *Go–Video, Inc.,* 885 F.2d at 1413. What defendants are attempting to do here, however, is to narrow the scope of § 22, thereby making it more difficult for antitrust plaintiffs to sue multiple defendants in a single action in the same district. This position is not supported by the language of § 22, its legislative history, or the policies underlying it. Rather, the more well-reasoned interpretation of § 22 and its relation to the general venue provisions in § 1391 is that of Magistrate Judge Foschio.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation and this Order, defendants' motions to dismiss are granted in part and denied in part as set forth at pages 278–79 of the Report and Recommendation.

■ In its objections, defendant Forsythe requests that, if the Court decides to adopt the Report and Recommendation, that the Court certify the following issues to the Second Circuit Court of Appeals for immediate review and determination: (1) does § 12 of the Clayton Act, 15 U.S.C. § 22, provide for "automatic" *in personam* jurisdiction and venue over any domestic corporation without

regard to whether the domestic corporation maintains "minimum contacts" with the forum; and, if so, (2) is § 12 of the Clayton Act constitutional in doing so.

Although no authority is cited by Forsythe for such relief, the Court construes its request as a motion for certification for purposes of immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Section 1292(b) provides, in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he [or she] shall so state in writing in such order.

The Second Circuit has repeatedly cautioned that "use of this certification procedure should be strictly limited because only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *In re Flor*, 79 F.3d 281, 284 (2d Cir.1996) (citations and internal quotations omitted).

Forsythe has failed to persuade the Court that there exist exceptional circumstances warranting an interlocutory appeal in this case. Although Forsythe asks for the Court's certification for an interlocutory appeal, it provides no legal argument in support of its request. It states simply that "important legal issues" are involved and that the Court should therefore certify the case to the Second Circuit. Simply put, the issue of venue has been thoroughly considered by both Magistrate Judge Foschio and this Court and certification to the Second Circuit at this point would not best serve the interests of justice. There are approximately 176 plaintiffs and 30 defendants in this case. Magistrate Judge Foschio's Report and Recommendation was 347 pages long. The case is already over seven years old. An immediate appeal from this Order will not materially advance the ultimate termination of this litigation and will result instead in piecemeal litigation and further delay.

With regard to Forsythe in particular, the questions that it asks to be certified will not necessarily be dispositive. In an Order being filed concurrently with this Order, the Court affirms Magistrate Judge Foschio's Decision and Order filed January 16, 1996, holding that Forsythe and several of the other defendants waived the defense of improper venue by failing to initially include it in their motion to dismiss. Thus, even if Forsythe were to prevail on the question of whether venue was proper, it would still face the hurdle of having to show that it did not waive the defense of improper venue.

Accordingly, defendant Forsythe's motion for certification for interlocutory appeal is denied. Moreover, the Court will not consider or grant any motion for reconsideration of this order or any other motion for certification for interlocutory appeal. The matter is hereby referred back to Magistrate Judge Foschio for further proceedings.

IT IS SO ORDERED.

**REPORT and RECOMMENDATION**

FOSCHIO, United States Magistrate Judge.

## TABLE OF CONTENTS

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
 I. Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
 a. Eleventh Amendment Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
 1. Ohio State University Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
 2. Oregon Health Sciences University Hospital . . . . . . . . . . . . . . . . . . . . 162
 3. University of California Medical Centers . . . . . . . . . . . . . . . . . . . . . . . 165
 4. University Hospital at State University of New York at Stony Brook . . . 171
 5. University Hospital at the University of New Mexico School of Medicine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

146

 6. University of Massachusetts Medical Center ...........................178
Summary of Findings on Eleventh Amendment Defenses .......................181
 b. State Action Doctrine ..................................................181
 1. Lincoln Medical and Mental Health Center .......................184
 2. Ohio State University Hospital ...................................185
 3. Oregon Health Sciences University Hospital ......................186
 4. Tri–City Medical Center .........................................187
 5. University of California Medical Centers .........................188
 6. University Hospital at State University of New York at Stony Brook...189
 7. University Hospital at the University of New Mexico School of Medicine ...........................................................190
 8. University of Massachusetts Medical Center .......................190
 c. Local Government Antitrust Act Immunity...............................191
 1. Lincoln Medical and Mental Health Center .......................192
 2. Oregon Health Sciences University Hospital, University of California Medical Centers, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center .................................................................194
 3. Tri–City Medical Center .........................................196
II. Personal Jurisdiction .......................................................197
 a. Jurisdiction Under Clayton Act Section 12 ..............................197
 b. Jurisdiction under New York State Law .................................201
 1. New York Civil Practice Law and Rules Section 301 ...................202
 a. Johns Hopkins Hospital, Part of the Johns Hopkins Health System ...........................................................205
 b. Children's Hospital (San Diego).................................206
 c. Children's Hospital of Michigan.................................206
 d. Detroit Receiving Hospital and University Health Center ...........207
 e. Forsyth Memorial Hospital .....................................207
 f. Kettering Medical Center ......................................208
 g. Loma Linda University Medical Center ..........................208
 h. Lutheran General Hospital......................................209
 i. Medical College of Pennsylvania and Hospital ...................209
 j. Mercy Catholic Medical Center—Misericordia Division .............210
 k. Mercy Hospital and Medical Center .............................211
 l. Methodist Hospital of Indiana .................................211
 m. Ohio State University Hospital .................................212
 n. Oregon Health Sciences University Hospital.....................213
 o. Riverside Methodist Hospitals .................................213
 p. Saint Francis Medical Center ..................................214
 q. St. Anthony Hospital ..........................................215
 r. Tri–City Medical Center (San Diego) ...........................215
 s. University of California (Los Angeles) Medical Center ..............215
 t. University of California (Irvine) Medical Center ...................216
 u. University of California (San Diego) Medical Center................216
 v. University Hospital at the University of New Mexico ..............216
 w. University of Massachusetts Medical Center .....................216
 x. University Medical Center, Tucson, Arizona .....................217
 Council of Emergency Medicine Residency Directors.....................227
 2. Jurisdiction for Transacting Business under Section 302(a)(1) ...........228
 3. Conspiracy Jurisdiction under Section 302(a)(2) .....................230
 a. Tortious Act Within New York ..................................231
 b. Factual Showing of a Conspiracy in Restraint of Trade .............233
 i. Corrupt Agreement.........................................234
 ii. Overt Act in Furtherance of Agreement ......................246
 iii. Parties' Intentional Participation in Furtherance of Plan or Purpose ................................................246
 iv. Resulting Damage or Injury ................................249
 c. Specific Facts Alleged Warranting Inference that Each Defendant is a Member of the Conspiracy ..................................250
 d. Imputing Conduct to Out-of-State Co-conspirators .................250
 i. Defendants' Awareness that its Activity had Effects in New York ...............................................250

 ii. Benefit of the Activity in New York ........................... 251
 iii. Exercise of Discretion or Control ............................. 251
 4. Jurisdiction Based on Tortious Acts under Sections 302(a)(3)(i) and 302(a)(3)(ii) ......................................................... 252
 Summary of Findings Regarding Personal Jurisdiction .......................... 255
III. Venue ...................................................................... 255
 a. Venue in Antitrust Actions ............................................. 256
 1. American Board of Emergency Medicine ............................. 259
 2. Council of Emergency Medicine Residency Directors.................. 263
 3. Children's Hospital (San Diego) ................................... 264
 4. Children's Hospital of Michigan ................................... 264
 5. Detroit Receiving Hospital and University Health Center.............. 265
 6. The Johns Hopkins Hospital, Part of the Johns Hopkins Health System ............................................................ 265
 7. Loma Linda University Medical Center ............................. 266
 8. Lutheran General Hospital ........................................ 266
 9. Medical College of Pennsylvania and Hospital....................... 267
 10. Mercy Catholic Medical Center–Misericordia Division .................. 268
 11. Mercy Hospital and Medical Center ............................... 268
 12. Methodist Hospital of Indiana...................................... 269
 13. Oregon Health Sciences University Hospital ......................... 269
 14. St. Anthony Hospital ............................................. 270
 15. University Medical Center (Tucson) ................................ 270
 b. Venue under the General Venue Provisions............................... 271
 1. Section 1391 ..................................................... 271
 2. Section 1406 ..................................................... 276
IV. Service of Process ......................................................... 277
CONCLUSION ................................................................. 278

## JURISDICTION

This matter was referred to the undersigned on April 24, 1991 by the Honorable Richard J. Arcara for report and recommendation. The matter is presently before the court on the "hospital Defendants' "[1] motions to dismiss the Second Amended Complaint on grounds of immunity, lack of personal jurisdiction, improper venue, and improper service of process;[2] Defendant American Board of Emergency Medicine's motion to dismiss the Second Amended Complaint on the ground of improper venue; and, Defendant Council of Emergency Medicine Residency Directors' motion to dismiss the Sec-

---

1. The "hospital Defendants" include Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital of North Carolina, the Johns Hopkins Hospital, Part of the Johns Hopkins Health System of Maryland, Kettering Medical Center of Ohio, Lincoln Medical and Mental Health Center of New York, Loma Linda University Medical Center of California, Lutheran General Hospital of Illinois, the Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center–Misericordia Division of Pennsylvania, Mercy Hospital and Medical Center of Illinois, Methodist Hospital of Indiana, Ohio State University Hospital, Oregon Health Sciences University Hospital, Riverside Methodist Hospitals of Ohio, Saint Francis Medical Center of Illinois, St. Anthony Hospital of Colorado, Tri–City Medical Center of San Diego, the University of California Medical Centers at Los Angeles, Irvine and San Diego, the University Hospital of the State University of New York at Stony Brook, the University Hospital at the University of New Mexico School of Medicine, the University of Massachusetts Medical Center, and the University Medical Center at Tucson, Arizona.

2. Defendants American Board of Emergency Medicine, Council of Emergency Medicine Residency Directors, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Lincoln Medical and Mental Health Center, Mercy Catholic Medical Center—Misericordia Division, Ohio State University Hospital, Our Lady of Mercy Medical Center, Riverside Methodist Hospitals, Saint Francis Medical Center, Tri–City Medical Center, and University Hospital at the State University of New York at Stony Brook, have filed motions to dismiss the Second Amended Complaint under Rule 12(b)(6), however, as the Decision and Order, filed April 29, 1994, indicates, these motions are not before the court at this time. These motions will be addressed, as will the motion for certification of the class, in accordance with the scheduling order issued simultaneously with this Report and Recommendation.

ond Amended Complaint on grounds of lack of personal jurisdiction, improper venue, and improper service of process.

## BACKGROUND

Plaintiff, an emergency medicine physician, filed this action on September 25, 1990, following the American Board of Emergency Medicine's ("ABEM") refusal to permit Plaintiff to take its examination as a prerequisite to certification as an ABEM Diplomate. Plaintiff filed an amended complaint ("the First Amended Complaint") on February 7, 1991, asserting causes of action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 et seq., and seeking relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 12 et seq. On January 13, 1994, the Second Amended Complaint was filed, adding one hundred and seventy-five additional Plaintiffs, all individual physicians who allege to have similar claims, and thirty Defendants, including the Council of Emergency Medicine Residency Directors ("CORD") and twenty-eight teaching hospitals whom Plaintiffs allege are co-conspirators with Defendant ABEM. Specifically, in the Second Amended Complaint, Plaintiffs allege that ABEM conspired with CORD and the hospital Defendants to unreasonably restrict competition between ABEM certified and non-certified emergency physicians, including

Plaintiffs, by eliminating ABEM's prior alternative qualification for eligibility to sit for ABEM's certification examination on the basis of years of practice in the field of emergency medicine (referred to as the "practice-track"), under which Plaintiffs may have been eligible to sit for and successfully pass the examination thereby requiring ABEM's certification. Plaintiffs allege that ABEM and the hospital Defendants perpetuated this restraint through a conspiracy involving various professional organizations in the field of emergency medicine, including CORD, as a result of the activities of various physicians whom had achieved ABEM certification under the "practice-track" and were either employed or affiliated with the hospital Defendants' residency programs in emergency medicine. Familiarity with the further proceedings and orders of this court, addressing the sufficiency of the First Amended Complaint, Daniel v. American Board of Emergency Medicine, 802 F.Supp. 912 (W.D.N.Y. 1992), and various issues related to Plaintiffs' discovery requests, is presumed.

Defendants subsequently, in March, April, and May of 1994, moved to dismiss or for summary judgment[3] for lack of personal jurisdiction, improper venue, on grounds of immunity, and for insufficient service of process.[4] Following five months of jurisdictional

3. As the court may consider material outside the pleadings in ruling on a motion to dismiss, including affidavits, depositions, and other documentary proof, see Bruan, Gordon & Co. v. Hellmers, 502 F.Supp. 897 (S.D.N.Y.1980), and substantial discovery has taken place with respect to the jurisdictional issues, but Plaintiffs failed to respond to Defendants' Statements of Undisputed Facts, this court will not convert these motions to dismiss to motions for summary judgment. See, e.g., Timberlane Lumber Co. v. Bank of America Nat. Trust & Savings Assoc., 749 F.2d 1378, 1381–82 & 1381 n. 1 (9th Cir.1984) (in case alleging illegal antitrust behavior, trial court properly analyzed defendant's motion under Rule 12(b)(1) without affording summary judgment treatment, notwithstanding plaintiff's contention that the question of jurisdiction is so closely intertwined with the merits that summary judgment was appropriate), cert. denied, 472 U.S. 1032, 105 S.Ct. 3514; 87 L.Ed.2d 643 (1985). As Plaintiffs have had jurisdictional discovery regarding the issues discussed in their Report and Recommendation, they have the burden of demonstrating jurisdiction by a preponderance of the evidence. See Landoil Resources v. Alexander &

Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir.1990); Chrysler Capital Corp. v. Century Power Corp., 778 F.Supp. 1260, 1266 (S.D.N.Y.1991) (citing Marine Midland Bank N.A. v. Miller, 664 F.2d 899, 904 (2d Cir.1981)). However, as no hearing or trial on the merits has been heard by the court, all pleadings and affidavits must be construed in the light most favorable to Plaintiffs. See Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir.1985).

4. Defendants Our Lady of Mercy, Henry A. Thiede, and Frank A. Disney, did not move to dismiss on jurisdictional grounds, therefore these Defendants will not be discussed in this Report and Recommendation. Additionally, as Porter Memorial Hospital's settlement with the Plaintiffs, under which the action was dismissed as to Porter, was approved by Judge Arcara on September 21, 1994, Porter is no longer a party to this action. As will be discussed, various Defendants, which are governmentally sponsored hospitals, assert immunity under the Eleventh Amendment, the state action doctrine, and the Local Government Antitrust Act, 15 U.S.C. §§ 34–36.

discovery,[5] Plaintiffs file, on December 12, 1994, a memorandum in opposition to Defendants' motions to dismiss or for summary judgment. Defendants subsequently filed both joint and individual memoranda in support of the motions. Oral argument was held on March 13, 1995.

Based upon the discussion which follows, Defendants Ohio State University Hospital, Oregon Health Sciences University Hospital, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital of the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center should be dismissed from this action on grounds of Eleventh Amendment immunity. Alternatively, Defendants Lincoln Medical and Mental Health Center, Ohio State University Hospital, Oregon Health Sciences University Hospital, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital of the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine and University of Massachusetts Medical Center, should be dismissed from the suit as they are exempt from federal antitrust laws under the state action doctrine. The action against Lincoln Medical and Mental Health Center and Tri–City Medical Center should be dismissed insofar as money damages are requested under the Local Government Antitrust Act.

This court also finds that under Section 12 of the Clayton Act, 15 U.S.C. § 22, each of the Defendants which are domestic corporations should be subject to personal juris-diction in this district, including CORD, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center–Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Oregon Health Sciences University Hospital,[6] Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital, and University Medical Center (Tucson, Arizona). Thus, as to these Defendants, the motions to dismiss for lack of personal jurisdiction should be denied.

Alternatively, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, should be subject to personal jurisdiction, pursuant to Section 301 of the New York Civil Practice Law and Rules ("N.Y.CPLR"), as the court finds it is doing or soliciting business in New York. However, the court finds that Plaintiffs have failed to demonstrate that CORD and the other hospital Defendants which have moved to dismiss for lack of personal jurisdiction are soliciting business pursuant to Section 301, or that they should be subject to personal jurisdiction, pursuant to New York's long-arm statute, N.Y. CPLR Section 302(a)(1), (2) or (3), for transacting business, or committing a tortious act within the state, or committing a tortious act outside the state causing injury within the state.

Therefore, even if, based on the District Judge's determination of the asserted immunity claims, if remaining as parties to this action, the motions to dismiss for lack of personal jurisdiction, made by Ohio State

---

5. By Order entered April 29, 1994, this court stayed general merit-based discovery but permitted discovery limited to jurisdiction and immunity to be completed by August 12, 1994. On July 26, 1994, the court ordered, upon Plaintiffs' motion to compel, the scope of permitted discovery was modified to permit Plaintiffs discovery related to its conspiracy based jurisdictional theory. On August 8, 1994, the overall period for jurisdiction discovery was extended to September 16, 1994.

6. Should the District Judge not find, as recommended, *see* Discussion Sections I(a)(2) and I(b)(3), that Oregon Health Sciences University Hospital is immune from suit under the Eleventh Amendment or the state action doctrine, then it is subject to personal jurisdiction pursuant to Section 12 of the Clayton Act.

University Hospital, Tri–City Medical Center, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center, should be granted as the court finds personal jurisdiction under Section 12 of the Clayton Act and N.Y. CPLR Sections 301, 302, or 303, does not exist over these Defendants.

The court also finds that proper venue as to ABEM and Johns Hopkins Hospital, Part of the Johns Hopkins Health System exists pursuant to Section 12 of the Clayton Act, however, those Defendants which are not domestic corporations, if remaining as parties, are not subject to venue under this section. However, should the District Judge accept the Report and Recommendation regarding Eleventh Amendment immunity, the state action doctrine, the Local Government Antitrust Act, or lack of personal jurisdiction, Defendants Tri–City Medical Center, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the University of New Mexico School of Medicine, and the University of Massachusetts Medical Center will have been dismissed from the action as parties, leaving the remaining Defendants—Children's Hospital (San Diego), Children's Hospital of Michigan, CORD, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital, and University Medical Center (Tucson)—as subject to venue in this district pursuant to 28 U.S.C. § 1391(b)(1). The motions to dismiss pursuant to 28 U.S.C. § 1406(a) should, nevertheless, be granted with respect to University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center and University of California (San Diego) Medical Center, but denied as to ABEM. CORD and Mercy Catholic Medical Center-Misericordia Division's motions to dismiss for improper service of process should be denied.

## DISCUSSION

On a motion to dismiss, the court looks to the four corners of the complaint and is required to accept a plaintiff's allegations as true and to construe those allegations in the light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Association*, 423 F.2d 188, 191 (2d Cir.1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970). The complaint will be dismissed only if "it appears beyond doubt" that the plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985). The court is required to read the complaint with great generosity on a motion to dismiss. *See Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 558 (2d Cir.1985).

Defendants argue that Plaintiffs' Second Amended Complaint should be dismissed for lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and improper service of process pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (3) and (5). These contentions will be discussed in this Report and Recommendation.

### I. *Subject Matter Jurisdiction*

This court has authority to examine and resolve the issues surrounding any motions challenging the jurisdiction of the court. *Thornhill Publishing v. General Telephone & Electronics*, 594 F.2d 730, 733 (9th Cir. 1979). The party asserting jurisdiction bears the burden of proving that the case is in the proper forum. *United Food & Commercial Workers Union, Local 919, AFL—CIO v. CenterMark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir.1994).

In evaluating a Rule 12(b)(1) motion to dismiss challenging the court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits. *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *cert. granted and judgment vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *Sheahan v. Brady,* 866 F.Supp. 770, 771 (S.D.N.Y.1994). The court has broad authority and discretion in resolving jurisdictional issues, and can receive affidavits, interrogatories, depositions, oral testimony, or any combination in making such a determination. *Washington v. Norton Manufacturing, Inc.,* 588 F.2d 441, 443 (5th Cir.), *cert. denied,* 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979). Based on the extensive discovery conducted relating to the jurisdictional issues presented on the motions and the voluminous and detailed affidavits and exhibits submitted in this case, no hearing was deemed necessary.

Defendants Ohio State University Hospital, Oregon Health Sciences University Hospital, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital of the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and the University of Massachusetts Medical Center, assert that, as hospitals connected with their respective state university medical schools, they qualify for Eleventh Amendment immunity, and that this court therefore lacks subject matter jurisdiction over them. Defendants Oregon Health Sciences University Hospital, Tri–City Medical Center, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital of the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center also assert that the state action

doctrine prohibits this court from enforcing federal antitrust laws against these Defendants. Further, Defendants Lincoln Medical & Mental Health Center, Oregon Health Sciences University Hospital, Tri–City Medical Center, University of California (Los Angles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center argue that they are immune from suit pursuant to the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34–36. Lincoln Medical & Mental Health Center and Tri–City Medical Center are units of municipal health care facilities located, respectively, in New York City and San Diego.

### a. *Eleventh Amendment Immunity*

The Eleventh Amendment commands that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Its immunity extends to entities created by state governments that operate as instrumentalities of the state.[7] *Hess v. Port Authority Trans–Hudson Corporation,* 513 U.S. 30, 30–31, 115 S.Ct. 394, 396, 130 L.Ed.2d 245 (1994); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979). In determining whether a governmental body may invoke the Amendment's immunity from suit in federal court, the court will assess whether the entity constitutes an arm of a state by evaluating the degree of control and supervision over the entity, including the state's power of appointment and removal of officers or directors, any authority to approve or disapprove the actions of the entity, including its capacity to raise revenue for its own purposes, whether the entity is financially independent from the state, whether the state is responsible for the

---

7. Eleventh Amendment immunity can be waived, *see Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305, 110 S.Ct. 1868, 1872–73, 109 L.Ed.2d 264 (1990), however, Plaintiffs have not raised the issue of waiver.

entity's obligations and liabilities, and the character of its functions, *i.e.,* state-wide or local,[8] are performed or served by the entity.[9] *Lake Country Estates, Inc. v. Tahoe Regional Planning,* 440 U.S. 391, 400–402, 99 S.Ct. 1171, 1176–1178, 59 L.Ed.2d 401 (1979); *Baxter v. Vigo Cty. School Corp.,* 26 F.3d 728, 732–33 (7th Cir.1994); *Feeney v. Port Authority Trans–Hudson Corporation,* 873 F.2d 628, 629–30 (2d Cir.1989), *aff'd,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). Each factor must be evaluated to determine whether a state is actually or effectively being sued in the proceeding. *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350–351, 89 L.Ed. 389 (1945). If, based on this analysis, the state is found not to be the real party in interest, the protections afforded pursuant to the Eleventh Amendment are unavailable to the defendant. *Ford Motor Company, supra,* at 464, 65 S.Ct. at 350–51.

Courts have also examined the legal powers of the entity, including its capacity to sue or be sued independently from the state, enter into contracts in its own name, acquire property, enjoy immunity from state taxation, or having a distinct corporate status.

*See, e.g., Fitzpatrick v. Bitzer,* 519 F.2d 559, 564–65 (2d Cir.1975), *rev'd on other grounds,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). However, neither the Supreme Court nor the Second Circuit have discussed these latter factors in any recent case employing an arm-of-the-state inquiry. *See Hess, supra; Lake Country Estates, supra; Mount Healthy City School District, supra; Feeney v. Port Authority Trans–Hudson Corporation,* 873 F.2d 628 (2d Cir.1989), *aff'd,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). "When [these] indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain the prime guide," *Hess, supra,* at 47, 115 S.Ct. at 404, namely preventing threats to the state's dignity by requiring the entity to defend suit in federal court and avoidance of federal court judgments which must be paid out of a state's treasury.[10] *Hess, supra,* at 47–48, 115 S.Ct. at 404.

Here, eight of the moving hospital Defendants are sponsored by state-created public universities.[11] The overwhelming majority of courts which considered the question of Eleventh Amendment immunity as to such institutions, found state universities share in their

---

**8.** Public higher education is a purpose of state government of each of the states sponsoring the public hospital Defendants as established by state constitutional or legislative mandate, thus, each of the entities involved in the immunity analysis is carrying out an incident of the state's sovereign power, as opposed to the functions carried out in *Hess, supra* (a local transportation facility) and *Lake Country Estates, supra* (regional land use controls), where the functions were municipal or local in nature.

**9.** The Supreme Court has indicated that political subdivisions of the state, such as cities, towns, and counties, are distinct legal entities which, although territorially within the state, function as independent governmental units and are not entitled to Eleventh Amendment immunity. *See Hess, supra,* at 42–44, 115 S.Ct. at 402 (citing *Port Authority Trans–Hudson Corporation v. Feeney,* 495 U.S. 299, 313, 110 S.Ct. 1868, 1876–77, 109 L.Ed.2d 264 (1990) (Brennan, J., concurring in part and concurring in judgment)); *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977).

**10.** Several courts have taken the position that protection of the state's treasury is the most important element in deciding whether Eleventh

Amendment immunity should be afforded to a defendant, *see, e.g., Baxter, supra,* at 732–33 (most significant factor is whether entity has the power to raise its own funds); *Hutsell v. Sayre,* 5 F.3d 996, 999 (6th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994) (most important factor is whether a judgment will be paid from the state treasury); *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority,* 991 F.2d 935, 942–43 (1st Cir. 1993) (inability to use state treasury or pledge credit leaves entity un-shielded by the Eleventh Amendment). The Second Circuit has also indicated that "[i]n cases where doubt has existed as to the availability of Eleventh Amendment immunity, the Supreme Court has emphasized the exposure of the state treasury as a critical factor." *Feeney, supra,* at 631.

**11.** These hospital Defendants include Ohio State University Hospital Medical Center, Oregon Health Sciences University Hospital, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center.

respective state's Eleventh Amendment immunity. *See Sherman v. Curators of University of Missouri,* 16 F.3d 860, 863 n. 3 (8th Cir.1994) (citing cases). However, as no one factor is dispositive in determining· whether an entity is entitled to Eleventh Amendment immunity, and as each state university "exists in a unique governmental context ... each must be considered on the basis of its own peculiar circumstances." *Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 302 (6th Cir.1984), *cert. denied,* 469 U.S. 1113, .105 S.Ct. 796, 83 L.Ed.2d 789 (1985) (quoting *Soni v. Board of Trustees,* 513 F.2d 347, 352 (6th Cir.1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976)). *See also Kashani v. Purdue University,* 813 F.2d 843, 845 (7th Cir.), *cert. denied,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987) ("Although state universities have consistently been found to be entitled to immunity, courts reexamine the issue with regard to the facts of each case 'because the states have adopted different schemes ... in constituting their institutions of higher learning.'") (quoting *United Carolina Bank v. Board of Regents,* 665 .F.2d 553, 557 (5th Cir.1982)).

In this case, Plaintiffs contend that Defendants asserting Eleventh Amendment immunity are not entitled to it as they are "independently operated and financially self-sufficient businesses engaged in *commercial activities,* not governmental organizations involved in legislative or regulatory functions." Plaintiffs' Memorandum of Law in Opposition to Jurisdictional and Immunity Motions, filed December 12, 1994, at p. VI–2 ("Plaintiffs' Memorandum of Law") (emphasis in original). Therefore, Plaintiffs contend, that the court should not allow these Defendants to evade responsibility in federal court for their conduct under the guise of Eleventh Amendment immunity. ˙ Further, Plaintiffs argue that if Defendants are granted immunity, they will be deprived of any remedy for the alleged antitrust violations.[12] *See* Plaintiffs' Memorandum of Law at p. VI–2.

As an initial matter, Plaintiffs' argument, Plaintiffs' Memorandum of Law at VI–2, VI–17 – VI–38, that the Eleventh Amendment should not be applicable to the hospital Defendants as they operate as independent businesses is beside the point.[13] Many state agencies provide services that may also be readily available from, and· perhaps .even more efficiently provided by, commercial private enterprises whether or not operated for profit. However, the Eleventh Amendment's protection does not turn on whether the activity in question is one ·that predominantly is associated with goods or services traditionally produced or purveyed in the private sector such as health care, but rather whether the entity providing such service is the state. Thus, the issue must, as stated in *Hess, supra,* at 47–48, 115 S.Ct. at 404, and *Feeney,* 873 F.2d at 629–30, ultimately depend on whether the sovereign power of the state is so involved in the organization and operation of the entity as to directly implicate the fundamental policy of federalism secured by the Eleventh Amendment. The fact that the state chooses to involve itself in a service readily available from private enterprises which do not, normally, enjoy immunity from prosecution. of

12. The court notes that Eleventh Amendment immunity protects a state or the arm or instrumentality of a state where a plaintiff seeks damages and/or injunctive relief. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). However, certain types of prospective injunctive relief are not barred by the Eleventh Amendment, including an order that reinstatement be granted or that a reinstatement hearing be conducted. *Russell v. Dunston,* 896 F.2d 664, 668 (2d Cir.), *cert. denied,* 498 U.S. 813, 111 S.Ct. 50, 112 L.Ed.2d 26 (1990). Further, if Congress was concerned that no remedy would be available for antitrust violations, it could abro-' gate the immunity provided by the Eleventh Amendment. *Feeney,* 495 U.S. at 304, 110 S.Ct. at 1871–72. *See, e.g., Dellmuth v. Muth,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989).

13. *Bank of .United States v. Planters' Bank of Georgia,* 22 U.S. 904 (9 Wheat. 904) (1824); *Briscoe v. Bank of Kentucky,* 36 U.S. 257 (11 Pet. 257) (1837); *Ohio v. Helvering,* 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307 (1934), as relied upon by Plaintiffs' Memorandum of Law, at VI–10–14, are not to the contrary. In *Planters' Bank,* the state became a· shareholder in private enterprise, in *Briscoe,* the court addressed the constitutionality of· the bank of the commonwealth and its notes, and in *Ohio,* no Eleventh Amendment issue was involved.

antitrust claims in federal court does not displace this basic constitutional principle.

■ Any remedy to perceived unfairness to injured litigants is not to be found in bending the Eleventh Amendment beyond its contours to accommodate such arguably valid concerns, but with the legislatures which make important choices on behalf of the states they govern, including an election to waive the Amendment's protection. *See Hess, supra,* at 48–51, 115 S.Ct. at 405 (a state does not waive its Eleventh Amendment immunity by consenting to suit only in its own state courts, the state must specify its intention to subject itself to suit in federal court). Adopting Plaintiffs' argument would, except in cases involving the state itself, effectively repeal the Eleventh Amendment's broad protection afforded the states as many activities and services organized or provided under state law are analytically well within Plaintiffs' concept of "financially self-sustaining" business entities.

Another premise underlying the Plaintiffs' position that the public hospital Defendants are outside the Eleventh Amendment's protection is that, as the majority of their respective revenues derive from patient fees and are held in accounts separate from the general treasury accounts of the sponsoring state itself, a money judgment in this action would not be one against the state and thus would not contravene the second of the "twin reasons," *Hess, supra,* at 47–48, 115 S.Ct. at 404, for the Amendment, "the prevention of federal court judgments that must be paid out of a state's treasury." *Id.* This premise is dependent on characterizing the operating accounts of these hospital Defendants not being a part of their respective state treasuries, and is invalid for several reasons.

Initially, *see* Discussion Section I(a), *infra,* each such hospital Defendant is a public entity created either by state statute or constitution as an agency, arm or instrumentality of the state. Although only Ohio has specifically so stated by legislation, Ohio Rev.Code Ann. §§ 117.01 and 3345.05 (Baldwin 1995), the record supports a finding that these funds as generated by the hospitals are public monies. The court's attention has been directed to no case supporting a finding that

the term "state treasury" for Eleventh Amendment purposes is limited only to funds held in accounts controlled by a state officer, such as a comptroller or treasurer, and this court has found none. Indeed, as discussed, *see* Discussion Section I(a), *infra,* the hospital Defendants claiming Eleventh Amendment immunity are subject to financial audits by other state officials. Such general auditing power strongly suggests a degree of interest in these funds equivalent to that as may be expected with respect to the state's accounts for more common types of revenue sources such as income and sales taxes. *See, e.g., Rothstein v. Wyman,* 467 F.2d 226, 236–37 (2d Cir.1972), *cert. denied,* 411 U.S. 921, 93 S.Ct: 1552, 36 L.Ed.2d 315 (1973) ("reparations" for delayed payment of federal public assistance benefits involved "substantial expenditures from *public funds* of the state" thereby requiring Eleventh Amendment protections) (McGowan, J.) (emphasis added). Nor does the fact that the source of monies held by the public hospital Defendants are patient fees rather than general tax revenues alter this result. "[W]hen the action is *in essence* one for recovery of money *from the state,*" the Eleventh Amendment applies. *See Ford Motor Car Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1944) (action in federal court for refund, by state officers constituting board of Indiana Department of Treasury, of illegally collected sales taxes precluded by Eleventh Amendment) (emphasis added); *Jain v. University of Tennessee,* 670 F.Supp. 1388 (W.D.Tenn.1987), *aff'd,* 843 F.2d 1391 (6th Cir.), *cert. denied,* 488 U.S. 827, 109 S.Ct. 78, 102 L.Ed.2d 54 (1988) (fact that two-thirds of state university funding derived from non-legislated sources did not preclude Eleventh Amendment immunity).

Further, the question of whether state public funds would respond to a federal judgment depends on a careful examination of the entity's relationship to the state and, in particular, whether the entity has the power to raise its own funds. See *Hess, supra; Baxter, supra,* at 732–33 (county department of welfare, as part of county having taxing power independent of state, not protected by Eleventh Amendment). Here, although each

public hospital Defendant has authority to set patient fees, such power clearly is not exercised independently of state approval and oversight. *See* N.Y. Educ. L. § 355(8) (McKinney 1997) (State University of New York funds subject to regulation by the state comptroller); Plaintiffs' Memorandum of Law at VI–26, VI–28 – VI–29, VI–30 – VI–31, VI–33 – VI–34; Appendix Volume 5, Exhibit 6, Doc. Nos. LL11 1063, LL11 1092; Appendix Volume 6, Exhibit 1, Doc. Nos. LL12 1415– 111451; Exhibit 2, Doc. Nos. LL13 432–LL13 433, LL13 453–LL13 459; Appendix Volume 14, Exhibits 1–3, 5–9, Interrogatory Response Nos. 2, 5, 14; Ohio State University Hospital's Memorandum of Law in Support of Motion to Dismiss, filed May 2, 1994, Exhibit B, § 3335–93–02. Moreover, in no case has the state which created the respective hospital Defendants, divorced itself from all financial responsibility for any liabilities incurred. *Compare Lake Country Estates v. Tahoe Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (noting that bi-state agency's enabling legislation expressly provided that neither creating state would be liable for agency's obligations—agency held not within Eleventh Amendment). As discussed, *infra,* neither is any public hospital Defendant authorized to pay any judgment from funds it may lawfully retain in accounts held separate from the state treasury. Therefore, because it cannot be found as to any public hospital Defendant that a judgment for money damages in this case will not be paid "both legally and practically," by the state, *Hess, supra,* at 51–53, 115 S.Ct. at 406, the Eleventh Amendment's "core concern is implicated." *Id.* However, as required by *Hess,* the specific factors relating to each public hospital Defendant's organization and relationship to the respective states must nevertheless be analyzed.

### 1. *Ohio State University Hospital*

■ To determine whether Eleventh Amendment immunity applies to Ohio State University Hospital, Ohio statutory law, the bylaws of Ohio State University, and the bylaws of the Medical Staff of the Ohio State

University Hospitals which includes Defendant University Hospital must be reviewed. University Hospital has requested that the court take judicial notice of its bylaws. Exhibit B of Ohio State University Hospital's Memorandum of Law in Support of Motion to Dismiss, filed May 2, 1994. As the bylaws describe the powers and duties granted to University Hospital's board of trustees and medical staff, their consideration is necessary to determine whether the hospital is an independent entity with respect to its degree of legal autonomy from the Ohio State University of which it is a unit and any other state governing bodies. Plaintiffs do not oppose this request. The court therefore takes judicial notice of the bylaws, as presented in Exhibit B. *See* Fed.R.Evid. 201(d) (court may take judicial notice as requested by a party).

■ When an action is brought against an entity or institution claiming immunity under the Eleventh Amendment, application of the amendment turns on whether the entity can be characterized as an arm of the state, or whether it should be treated as a non-immunized political subdivision of the state. *Mount Healthy City School District, supra,* at 280, 97 S.Ct. at 572–73 ("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations") (citations omitted). In determining whether the University Hospital is entitled to immunity, this court will examine the relationship among Ohio State University, its board of trustees, and the state of Ohio, as well as several factors relating to the autonomy, financial independence, and function of the University Hospital.

The Ohio State University was created as a state educational institution for higher education by the Ohio General Assembly; a board of trustees was simultaneously created to govern the university. Ohio Rev.Code Ann. §§ 3335.01, 3335.02, 3345.011 (Baldwin 1995).[14] The Ohio State University Board of Trustees ("the OSU Trustees") consists of

---

14. Unless otherwise indicated, all Ohio Revised Code references are to the 1995 edition of the

Baldwin Ohio Revised Code Annotated.

eleven members. Ohio Rev.Code Ann. § 3335.02(A). The OSU Trustees are appointed by the governor of Ohio and confirmed by the state senate [15] for nine year terms.[16] Ohio Rev.Code Ann. § 3335.02(A). *Cf. United Carolina Bank, supra,* at 558 (where an institution's governing body is elected by local voters rather than being appointed by the governor with the advice and consent of the state senate, it is more likely a political subdivision than an arm of the state). Through its plenary appointment authority, the state of Ohio exercises significant influence over the operations of the OSU Trustees and, through the Trustees,. Ohio State University.

The Ohio legislature has granted the OSU Trustees the ability to sue and be sued,[17] the authority to contract, and the power to make and use a common university seal, to enable the board of trustees to effectively operate the university. Ohio Rev.Code Ann. § 3335.03. These powers are, however, specifically defined and limited by the state legislature. For example, Ohio statutes prescribe the number of trustees necessary for a quorum, Ohio Rev.Code Ann. § 3335.06, the duration of fire protection contracts, Ohio Rev.Code Ann. § 3345.09, and even the penalty for the unauthorized duplication of keys, Ohio Rev.Code Ann. §§ 3345.13, 3345.99.

"The trustees are also given the power to adopt rules and regulations, Ohio Rev.Code Ann. § 3335.08, but it is not suggested that the state could not statutorily modify or invalidate such rules." *Bailey v. Ohio State University,* 487 F.Supp. 601, 604 (S.D.Oh. 1980). "This structure demonstrates that, as to general powers, Ohio State [University] is much less autonomous in its relation to the state than other universities which have been held not to be instrumentalities of the state." *Bailey, supra,* at 604.

University Hospital was created by the OSU Trustees on September 13, 1963 as part of a program to establish a college of medicine. Ohio Rev.Code Ann. § 3335.15; Ohio State University Hospital's Memorandum in Support of Motion to Dismiss, filed May 2, 1994, Exhibit B, Bylaws of Medical Staff of Ohio State University Hospitals, § 3335–43–01 (1993) ("Hospital Bylaws"). The hospital is governed by a board ("Hospital Board"), selected by the OSU Trustees. Hospital Bylaws § 3335–93–01(A)(1). The Hospital Board consists of fourteen members, including two members of the OSU Trustees and twelve citizen members who are appointed by the OSU Trustees in consultation with the president of Ohio State University. Hospital Bylaws § 3335–93–01. The citizen members of the Hospital Board can be removed or suspended by the OSU Trustees, thus circumscribing· the independence of the Hospital Board. Hospital Bylaws § 3335–93–07(A).

---

**15.** *University of Rhode Island v. A.W. Chesterton Company,* 2 F.3d 1200, 1207 (1st Cir.1993) (when the governor appoints members of the board with the advice and consent of the senate, courts often view this legislative design as evidence of an entity's lack of independence from state control). *See, e.g.,. Lewis v. Midwestern State University,* 837 F.2d 197, 198 (5th Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988); *Harden v. Adams,* 760 F.2d 1158, 1163 (11th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 462 (1985); *Hall, supra,* at 306; *Gay Student Services v. Texas A & M,* 737 F.2d 1317, 1333 n. 28 (5th Cir.1984).

**16.** Two of the eleven trustees are students at the Ohio State University. These members have no voting power and are not considered as members of the board in determining whether a quorum is present. The two student members are also appointed for two year terms by Ohio's governor, with the advice and consent of the state's senate, from a group of five candidates selected by the student government and approved by the OSU Trustees. Ohio Rev.Code Ann. § 3335.02(B).

**17.** The bare power to sue or the capacity to be sued is unlikely to control the threshold determination in Eleventh Amendment immunity cases. *See Kashani, supra,* at 847 (power to sue and to be sued is not conclusive of autonomy). However, the power to sue or be sued in the entity's own name, when combined with other powers such as the power to contract, buy, sell, or hold property, undeniably afford the entity some additional independence from the state. *University of Rhode Island, supra,* at 1207 n. 11.

Additionally, a statute granting a state university the power to "sue and be sued" has been held insufficient to waive Eleventh Amendment immunity, and is interpreted as permitting only suits in state court. *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.,* 647 F.Supp. 190 (D.Idaho 1985), *aff'd on other grounds,* 848 F.2d 976 (9th Cir.1988). *Compare Hess, supra,* 513 U.S. at 39–42, 115 S.Ct. at 401.

The Hospital Board is responsible for oversight of patient care services and the University Hospital's support of the Ohio State University health sciences academic programs. Hospital Bylaws §§ 3335–93–01(A), 3335–99–01. The powers of the Hospital Board are specifically enumerated in the Hospital Bylaws, Sections 3335–93–01 through 3335–93–10. The OSU Trustees did not grant the Hospital Board the power to sue or be sued or to acquire or own property in the hospital's name. Ohio Rev.Code § 3335.15(B). However, the hospital is empowered to enter into contracts without prior approval of the state, although these contracts are of a limited nature and all must ultimately be approved by other university officials.[18] Plaintiffs' Memorandum of Law at VI–34; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 19, pp. 79–82.

It appears that the delegation of some of the OSU Trustees' powers to the Hospital Board was necessary for the College of Medicine and University Hospital to properly function. However, despite the myriad responsibilities of the Hospital Board, it remains ultimately subject to the authority of the OSU Trustees. Hospital Bylaws §§ 3335–93–02, 3335–93–03. Significantly, the powers expressly enumerated in the Hospital Bylaws can be amended or withdrawn at any time by the OSU Trustees. Hospital Bylaws § 3335–103–01.

Ohio State University has not granted the University Hospital separate corporate existence; further, the Ohio State University was not created as a corporation with perpetual existence. See Bailey, supra, at 604. Moreover, the hospital itself has no employees, as all members of its medical staff are faculty members of the Ohio State University College of Medicine, an academic unit of the Ohio State University. Hospital Bylaws § 3335–43–04(A)(2).

Title to all land used by the Ohio State University and the University Hospital is held in the name of the state of Ohio. Ohio Rev.Code Ann. § 3335.13; 1995 Oh. Laws § 3345.12(P). Only property held for investment purposes or in the university's endowment portfolio is held in trust by the OSU Trustees for Ohio State University. Ohio Rev.Code Ann. § 3335.13. Further, the OSU Trustees must "[n]egotiate for and receive conveyances and transfers of property, both real and personal, to be used by [the college of medicine]." Ohio Rev.Code Ann. § 3335.15(B).

Additionally, Ohio Rev.Code Ann. § 2743.01(A) provides that an Ohio state university, such as the Ohio State University, Ohio Rev.Code Ann. § 3345.011, is an instrumentality of the state, and is amenable to suit in the state's court of claims.[19] Ohio Rev.Code Ann. § 3335.03(B).

The various powers delegated to the OSU Trustees and the Hospital Board indicate a

18. Construction, supply and service, and renovation contracts are all signed by the appropriate authority within the Ohio State University. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 19, pp. 79–80. inter-hospital based education contracts are initially signed by the executive director of the University Hospital, along with other appropriate officials within the university, on behalf of the University Hospital. Id. at 80–81.

19. The state of Ohio has not waived, as to the Ohio State University, the protection of the Eleventh Amendment by subjecting itself to suit in the state's court of claims. A waiver of Eleventh Amendment immunity by a state or state agency must be clear and unequivocal. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The only basis upon which Plaintiffs could argue, as to the University Hospital, such waiver is Ohio Rev. Code Ann. § 3335.03(B), which provides for suits against the OSU Trustees in Ohio's court of claims, and Ohio Rev.Code Ann. § 3335.03(A), which grants the OSU Trustees the ability to sue and be sued. See Footnote 16, supra. However, neither statute evidences a clear and unequivocal waiver of suit in federal court. "[A] state's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." Pennhurst, supra, at 100, 104 S.Ct. at 907–908 (citing Florida Department of Health & Rehabilitative Services v. Florida Nursing Home Association, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) and Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944)). See also Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc., 810 F.2d 869, 874 (9th Cir.1987) (a state's statutory waiver of tort liability "cannot even remotely be considered an 'unequivocal indication' of consent to suit in federal court on antitrust claims"). Compare Hess, supra.

degree of independence from the state of Ohio itself, however, that appearance is diluted by the fact that the entire OSU Board of Trustees, which, as noted, chooses the members of the Hospital Board, is selected by the governor of Ohio with the advice and consent of the Ohio senate. Moreover, the OSU Trustees expressly retained the power to amend or repeal the duties and powers· of the Hospital Board, and the Trustees must make annual reports regarding the Ohio State University and the University Hospital to the Ohio General Assembly. Ohio Rev.Code Ann. § 3335.07. From that perspective, the functions granted to both the Hospital Board and the OSU Trustees appear less like the independent powers of a municipality, such as a city or county, and more like the scope of authority legislatively delegated to an agency or other instrumentality of the state thereby sparing the state's legislature of the obligation to ratify its every action.

The court must next determine whether relevant case law treats the entity at issue as independent or as a surrogate of the state. *Feeney, supra,* at 629–30. Several Ohio cases have addressed the question of whether Eleventh Amendment immunity applies to the state colleges and universities of Ohio and have clearly held Ohio's state colleges and universities, including the Ohio State University, to be arms of the state entitled to the amendment's protection. *See Weaver v. University of Cincinnati,* 758 F.Supp. 446 (S.D.Oh.1991) (Eleventh Amendment barred suit against the University of Cincinnati as it is an arm of the state); *Dillion v. University Hospital,* 715 F.Supp. 1384, 1386–87 (S.D.Oh. 1989) (university hospital is an agent of the University of Cincinnati and therefore an arm of the state of Ohio entitled to Eleventh Amendment immunity); *Bailey, supra,* at 604 (Ohio State University is an instrumentality of the state entitled to Eleventh Amendment immunity); *Thacker v. Board of Trustees,* 31 Ohio App.2d 17, 285 N.E.2d 380 (1971), *aff'd,* 35 Ohio St.2d 49, 298 N.E.2d 542 (1973) (Ohio State University and Ohio State University Hospitals are instrumentalities of the state), *overruled in part on other grounds, Schenkolewski v. Cleveland Metroparks System,* 67 Ohio St.2d 31, 426 N.E.2d 784, 787 n. 3 & 4 (1981); *Wolf v. Ohio State*

*University Hospital,* 170 Ohio St. 49, 162 N.E.2d 475 (1959) (Ohio State University Hospital and the Board of Trustees of Ohio State University are instrumentalities of the state), *overruled in part on other grounds, Schenkolewski, supra,* at 787 n. 3 & 4. *See also Hall, supra,* at 303 (Ohio considers its colleges and universities to be part of the state for purposes of sovereign immunity).

As the degree of control over the University Hospital by the OSU Trustees and, through the OSU Trustees, the governor of Ohio is fairly substantial, and the Ohio courts, both federal and state, have determined Ohio State University and the Defendant University Hospital to be instrumentalities of the state, the court finds that the autonomy factor weighs in favor of according Eleventh Amendment immunity to the University Hospital.

■ Plaintiffs vigorously argue, as discussed, *supra,* that any judgment which might be obtained in this action would not necessarily be paid from the state treasury, but could be satisfied from the University Hospital's self-generated revenue, its trust fund, or commercial insurance carried by it. Plaintiffs' Memorandum of Law at VI–31 – VI–32. The University Hospital maintains an insurance trust fund to meet its liabilities for malpractice claims, which was established and funded pursuant to the authority of Ohio Revised Code Section 3345.201. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 19, pp. 93, 97, 101. The hospital also maintains private insurance coverage in case the insurance trust fund is expended. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 19, pp. 101-102. The Executive Director of. the University Hospital stated that this insurance policy was intended for general liability claims. *Id.*

Plaintiffs contend, in an attempt to demonstrate that Eleventh Amendment immunity does not apply, that a judgment against the University· Hospital could be paid from its insurance policies. However, Plaintiff cites no authority to support its argument that the presence of insurance displaces immunity afforded by the Eleventh Amendment. To the contrary, several courts which have consid-

ered the effect of insurance on the question of waiver of immunity hold that the presence of insurance does not defeat a claim of Eleventh Amendment immunity. *See, e.g., Bockes v. Fields,* 999 F.2d 788, 790–791 (4th Cir.1993) (where Commonwealth of Virginia's Public Officials Liability Self–Insurance Plan would be required to pay a judgment against the defendants, and the Commonwealth funds eighty percent of the self-insurance plan, the Eleventh Amendment nevertheless bars recovery); *Wallace v. State of Oklahoma,* 721 F.2d 301, 305 (10th Cir.1983) (Oklahoma statute which waived sovereign immunity for a claim covered by liability insurance did not waive Eleventh Amendment immunity in federal court); *Gressley v. Deutsch,* 890 F.Supp. 1474, 1488 (D.Wy.1994) (even if the University of Wyoming had insurance policy to cover the civil rights claims asserted by the plaintiff, such policies would not result in waiver of Eleventh Amendment immunity); *Mohammed v. Farney,* 832 F.Supp. 103, 106 (S.D.N.Y.1993) (the state did not waive its Eleventh Amendment immunity by purchasing liability insurance); *Hobbs v. Georgia Department of Transportation,* 785 F.Supp. 980, 984 (N.D.Ga.1991) (mere creation of an insurance fund to protect state treasury does not act as an implicit waiver of a state's Eleventh Amendment immunity); *Ragosta v. State of Vermont,* 556 F.Supp. 220, 224 (D.Vt.1981) (insurance policy purchased by state did not amount to a waiver of immunity under the Eleventh Amendment). Based upon this authority, even assuming that the University Hospital has insurance coverage for the antitrust claims asserted by Plaintiffs, this fact does not bar application of Eleventh Amendment immunity.

University Hospital maintains that its trust fund money consists of public funds as defined by Ohio law, Ohio Rev.Code Ann. § 117.01, and, therefore, any judgment against the hospital constitutes a judgment against the state. Ohio law also provides that any money received, collected by, or owed to a representative, officer, or employee of a state agency,[20] public institution, po-

litical subdivision, or other office pursuant to any order, resolution, or authority constitutes public money. Ohio Rev.Code Ann. § 117.01. The hospital continues the analysis to conclude that any damage award imposed by a federal court and paid from the hospital's operating funds or funds allocated by the state, constitute Ohio public funds and would violate the Eleventh Amendment. Ohio State University Hospital's Memorandum of Law at pp. 14–15. Thus, it concludes, a federal money judgment in this action against the University Hospital could result in the depletion of Ohio's public funds.

In determining whether a state university is entitled to Eleventh Amendment immunity, courts also consider the extent of state funding, the state's oversight and control of the university's fiscal affairs, the university's ability to independently raise funds, whether the state taxes the university, and whether a judgment against the university would result in the state increasing its appropriations to the university. *Kashani, supra,* at 845.

Ohio State University's College of Medicine only qualifies for state funding if it meets the legal requirements for state funding, including operating an accredited program of medical education in the state, and maintaining a department of family practice, including courses of study, clinical experience, preceptorships, and residencies in family practice. Ohio Rev.Code Ann. §§ 3333.10, 3333.11, 3335.15(A). The OSU Trustees are required to prepare and file a detailed statement regarding the condition of the university, all expenditures and disbursements made, the number of professors, staff, and students in each department, an estimate of expenses for the following year, a statement demonstrating progress of the university, and other such information. Ohio Rev.Code Ann. § 3335.07. A necessary component of this budget is the operating budget for the University Hospital. Defendant's Reply Memorandum of Law, filed May 2, 1994, at p. 40. These statements are then submitted to the Ohio legislature for approval. *See Harden, supra,* at 1163 ("Where the budget of an

---

**20.** A state agency is any organized body, agency, institution, or other entity established by the laws of the state for the exercise of any function of state government. Ohio Rev.Code Ann. § 117.01.

entity is submitted to the state for approval, this suggests that the entity is an agency of the state [for the purpose of determining the degree of state control over the entity and the fiscal autonomy of the entity]"). Further, all aspects of the economic life of Ohio State University and, therefore, the operation of University Hospital, are subject to state audit and other forms of scrutiny. Ohio Rev.Code Ann. § 3345(B) (trustees' annual report shall include "amounts of receipts and disbursements"); Ohio Rev.Code Ann. § 3345.03 (university must pay cost of inspection of accounts by state bureau of inspection and supervision of public offices); Ohio Rev.Code Ann. § 3345.05 ("all receipts and expenditures are subject to the inspection of the auditor of the state").

By contrast with the state's community colleges, school districts, and other political subdivisions of Ohio such as its counties, towns and villages, the Ohio State University and the University Hospital do not have the power to levy taxes to service a bond issue. *Cf. Mount Healthy, supra,* at 280, 97 S.Ct. at 572–573. The absence of the authority to tax is a strong indication that an entity is more like a direct arm of the state government than a county or a city, as such enablement gives the entity an important degree of fiscal and operational autonomy. *Kashani, supra,* at 846. *Compare Mackey v. Stanton,* 586 F.2d 1126, 1131 (7th Cir.1978), *cert. denied,* 444 U.S. 882, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979) (the county department and the school board have the power to raise their own funds by tax levy and by bond issuance, providing a manner for payment of judgments without resort to the state treasury); *United Carolina Bank, supra,* at 558 ("Most telling is the power of junior colleges to levy ad valorem taxes [as] . . . [u]nder Texas law, political subdivisions are sometimes defined as entities authorized to levy taxes."); *Hall, supra,* at 304 ("[N]one of the [Ohio] state universities or colleges . . . have power to levy taxes to service such bond issues or otherwise provide revenue independent of state appropriations."). Thus, although the University Hospital has, as described below, sources of revenue, which under Ohio law are classified as public funds, other than appropriations from the legislature, it lacks the capacity typically granted local governments to require payments in the form of taxation or fees to fund the services they provide to the public.

The University Hospital receives the majority of its revenue from payment for services provided to patients, however, funds for the hospital may also be raised through the issuance of bonds by the OSU Trustees, but the limited ability to issue bonds and other obligations is regulated in detail by state law. 1995 Oh. Laws § 3345.12 (provides in-depth explanations of how obligations are authorized, prepared and secured). The debt obligations authorized by the OSU Trustees are secured by a pledge of and lien upon the available receipts of Ohio State University, as provided for in the bond proceedings, excluding money raised by taxation and state appropriations. 1995 Oh. Laws §§ 3345.12(B), (C). Significantly, payment of a judgment is not one of the purposes for which the Ohio State University is authorized to issue bonds. 1995 Oh. Laws §§ 3345 .12(B), (C). Further, the OSU Trustees and the Hospital Board are prohibited from contracting "a debt not previously authorized by the general assembly [the Ohio legislature]." Ohio Rev.Code Ann. § 3335.10.

Plaintiffs emphasize the fact that the University Hospital can avail itself of self-generated income from its own hospital charges for services it may provide and donations, and that any judgment rendered against the hospital could be paid by funds not appropriated from the Ohio General Assembly. However, "[b]y statute, the Ohio legislature permits the state colleges and universities to retain [self-generated] funds, rather than require them to be paid into the treasury and then appropriated back to the schools as needed, but it could just as easily amend that statute to require the converse." *Hall, supra,* at 304.

Plaintiffs argue that the most relevant financial factor weighing against finding Eleventh Amendment immunity for the University Hospital is that the hospital's operating funds do not come predominantly from the state. For example, for the hospital's 1992 – 1993 fiscal year, only 2.8% of the

hospital's total revenues were attributable to direct state appropriations.[21] Plaintiffs' Memorandum of Law at VI–31 – VI–32. However, no statutory limitation exists restricting the amount of money that the University Hospital may receive from the state. *See* Ohio Rev.Code § 3335.01 *et seq.* Moreover, in assessing the Eleventh Amendment claim, " 'the nature of the state's [legal] *obligation* to contribute may be more important than the size of the contribution.' " *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 660 (3d Cir.1989) (quoting *Blake v. Kline,* 612 F.2d 718, 723 (3d Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980)) (emphasis added). Thus, although the University Hospital has received, currently, a relatively small percentage of its total operating budget from state appropriations, in the future the hospital may require or receive larger appropriations to address its needs. Therefore, the extent of direct state financial support at a given point in time is not determinative of the hospital's financial independence for purposes of Eleventh Amendment immunity analysis.

■ Here, the key question for Eleventh Amendment purposes is whether the funds which would used to satisfy the potential federal court judgment will come directly from the state treasury, or whether, if the hospital's financial resources are insufficient or non-existent, the state must, under state law, reimburse the hospital, thereby effectively paying the obligation. *Fitchik, supra,* at 660. Although it appears that a judgment in this case would in all likelihood be paid from the hospital's trust fund, which constitutes public money, or the university's excess liability insurance policy, the judgment would be paid using public money, as Ohio has not specifically stated that it will not be liable for the debts and obligations incurred by the university. Ohio Rev.Code § 3335.01 *et seq.* Thus, the *funding* consideration favors University Hospital's claim that it is entitled to immunity from suit in federal court.

■ The primary purpose of the university hospital is the advancement of higher education by providing research and training support as part of the Ohio State University College of Medicine. Ohio Rev.Code Ann. § 3335.15. Federal courts have long provided that university and professional education is recognized as a function of state government. *See Skehan v. State System of Higher Education,* 815 F.2d 244, 248 (3d Cir.1987). *See also Stewart v. Baldwin County Board of Education,* 908 F.2d 1499, 1511 (11th Cir. 1990) (public primary and secondary schools, unlike state colleges and universities, limit enrollment to city or county residents, thereby suggesting a "local" or municipal function); *Miller v. Rutgers,* 619 F.Supp. 1386, 1391 (D.N.J.1985); *Handsome v. Rutgers,* 445 F.Supp. 1362, 1367 n. 7 (D.N.J.1978).

In *Mount Healthy School District v. Doyle,* the Supreme Court looked not only to whether the entity at issue was formed with independent powers from the state but also to whether it served the state as a whole, or a particular region. *Mount Healthy School District,* 429 U.S. at 280, 97 S.Ct. at 572–573 ("Petitioner is but one of many local school boards within the State of Ohio"). In this case, University Hospital provides educational and health care services for individuals state-wide, although patients located in the vicinity of the hospital's facilities at Columbus, Ohio are more likely to use the hospital on a regular basis than those persons who live at a greater distance. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 19, pp. 85–86.

■ Moreover, the powers and duties granted to the Hospital Board to enable the Ohio State University Hospital to carry out its primary purpose of providing medical education together with the Ohio State University Medical School, contrasts to those of a city or county whose exercise of their far more extensive police powers, are their very reason for existence. Therefore, the University Hospital is distinguishable from public entities which perform only local government functions, and this factor weighs in favor of granting the hospital sovereign immunity. *Compare Hess, supra,* at 42–44, 115 S.Ct. at

---

**21.** The court notes that no restrictions are placed on the use of funds appropriated by the state of Ohio. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 19, p. 90.

**162**

402 (Port Authority Trans–Hudson Corporation denied Eleventh Amendment immunity); *Baxter, supra,* at 732–33 (Eleventh Amendment did not bar claim against county department of public works) (citing *Mackey v. Stanton,* 586 F.2d 1126, 1131 (7th Cir.1978), *cert. denied,* 444 U.S. 882, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979)).

As the autonomy, financial independence, and function indicators point toward a finding of immunity, this court need not assess whether a judgment in this case against the hospital would potentially deplete the Ohio state treasury, and whether the sovereign dignity of the state is preserved, as discussed in *Hess, supra,* 513 U.S. at 51–53, 115 S.Ct. at 406 (1994).

Accordingly, applying the factors bearing on the availability of Eleventh Amendment immunity, the court finds that the Defendant University Hospital is an arm of the state of Ohio and entitled to Eleventh Amendment immunity from suit in this court.

### 2. *Oregon Health Sciences University Hospital*

Oregon Health Sciences University and its University Hospital[22] were created as educational institutions for higher learning by the Oregon legislature. The Oregon Health Sciences University consists of a medical school, a dental school, a school of nursing, a hospital, and research centers. Or.Rev.Stat. § 352.055(1) (1993); Plaintiffs' Memorandum

of Law, Appendix Volume 11, Exhibit 47, p. 8. The university was originally part of the Oregon State System of Higher Education, Or.Rev.Stat. § 352.002 (1993), however, in 1995, the Oregon legislature transformed Oregon Health Sciences University into a "public corporation." 1995 Or.Laws ch. 162 §§ 1(2), 1(3). Under Oregon law, a public corporation is an entity "created by the state to carry out public missions and services ... [by] participat[ing] in activities or provid[ing] services that are also provided by private enterprise."[23] 1995 Or.Laws ch. 162 § 1(2).

■ The Board of Directors ("the Board") which governs the university consists of seven members[24] appointed by the governor of Oregon and confirmed by the state senate.[25] 1995 Or.Laws ch. 162 §§ 1(2), 4(1). The terms of office are four years for nonstudent members, and two years for student members. 1995 Or.Laws ch. 162 § 4(2). The governor may remove any member of the Board at any time for cause, after notice and public hearing. 1995 Or.Laws ch. 162 § 4(7). Thus, the state of Oregon exercises superincumbent authority over the Board, Oregon Health Sciences University, and the University Hospital.

The Oregon legislature granted the Board the power to appoint and employ personnel, make and enter contracts, purchase, control, or dispose of title to real and personal property,[26] sue or be sued in its own name in any

---

**22.** Oregon Health Sciences University Hospital is a unit within the Oregon Health Sciences University. Or.Admin.R. § 580–30–005 (1993) ("[t]he function of the University Hospital of the Oregon Health Sciences University is to augment the teaching, research, and health care programs of the institution.... In carrying out all of its functions, [the University Hospital] will operate as an integral part of the Oregon Health Sciences University.").

**23.** The separate incorporation of a state university does not detract from its status as an alter ego of the state for Eleventh Amendment purposes where the university was incorporated to pursue "the ends of higher education." *Ciba–Geigy Corporation v. Alza Corporation,* 804 F.Supp. 614, 624 (D.N.J.1992) (citing *Jain v. University of Tennessee,* 670 F.Supp. 1388 (W.D.Tenn.1987), *aff'd,* 843 F.2d 1391 (6th Cir.), *cert. denied,* 488 U.S. 827, 109 S.Ct. 78, 102 L.Ed.2d 54 (1988)).

**24.** One member of the State Board of Higher Education, one student representative, and the president of the University constitute three of the Board members. 1995 Or.Laws ch. 162 § 4(3)(a)–(d).

**25.** *See* Footnote 14, *supra,* explaining that appointments effected in this manner are viewed as evidence of an entity's lack of independence from state control. *University of Rhode Island,* 2 F.3d at 1207 (when the governor appoints members of the board with the advice and consent of the senate, courts often view this legislative design as evidence of an entity's lack of independence from state control). *See, e.g., Lewis,* 837 F.2d at 198; *Harden,* 760 F.2d at 1163; *Hall,* 742 F.2d at 306; *Gay Student Services,* 737 F.2d at 1333 n. 28.

**26.** The title to real property acquired prior to July 1, 1995 will remain in the state of Oregon, however, the university has exclusive care, custody, and control of the property and facilities.

forum,[27] hold and control all funds, and borrow funds as needed by the university.[28] 1995 Or.Laws ch. 162 § 8. Further, Oregon statutes pertaining to eminent domain procedures, intergovernmental cooperation, public records policy, and governmental standards and practices for officers and employees, Or. Rev.Stat. chs. 35, 190, 192, 244, apply to Oregon Health Sciences University upon the same terms which apply to public bodies other than the state. 1995 Or.Laws ch. 162 § 9. However, the provisions of several other Oregon statutes, including those dealing with state administrative agencies, procedures and rules of state agencies, personnel relations law, and state real property, Or.Rev.Stat. chs. 182, 183, 240, 270, do not apply to the university. 1995 Or.Laws ch. 162 § 9(2).

Oregon Health Sciences University may also issue and sell revenue bonds, however, the statute providing the procedure for a municipality to issue such bonds does not apply to revenue bonds issued by the University. 1995 Or.Laws ch. 162 § 59; Or.Rev. Stat. § 288.815 (1993). Also, the university's enabling act provides that "[n]o obligation of any kind incurred under [Oregon Revised Statute Sections] 288.805 to 288.945 shall be [considered] . . . an indebtedness of the State of Oregon." 1995 Or.Laws ch. 162 § 59.

Moreover, if there is a shortfall of university funds, secured by university generated revenues or property, available to satisfy state general bond obligations issued for university purposes, the state legislature may provide funds to satisfy the shortfall. Except for the requirement of Or.Rev.Stat. 291.445, that general obligation bonds to be paid from general fund appropriations, the legislature has no legal obligation to provide funds for bond obligations issued by the university. 1995 Or.Laws ch. 162 § 61a.

Although the Oregon legislature provided that the university "shall not be considered a unit of local or municipal government or a state agency for purposes of state statutes or constitutional provisions," 1995 Or.Laws ch. 162 § 2, which results in the fact that the Board maintains considerable authority over university affairs, Oregon law states that the university is a "government entity performing governmental functions and exercising governmental powers." 1995 Or.Laws ch. 162 §§ 2, 8. Further, the university receives funding from the state, it is controlled by the state, and it performs state-wide educational and health care functions. 1995 Or.Laws ch. 162 §§ 1(2), 1(3), 3(1)(a), 3(3)(a)–(f). Thus, the University Hospital as a component of Oregon Health Sciences University retains more of the characteristics of an arm or instrumentality of the state than a political subdivision.

Prior federal and state cases involving Oregon Health Sciences University in Oregon have accorded both Oregon's state universities and the Oregon State Board of Higher Education immunity as instrumentalities of the state of Oregon.[29] *Brinkley v. Oregon Health Sciences University,* 94 Or.App. 531, 766 P.2d 1045, 1047 (1988), *review denied,* 307 Or. 571, 771 P.2d 1021 (1989) (Oregon Health Sciences University treated as a public body); *Davis v. Harris,* 570 F.Supp. 1136, 1137 (D.Or.1983) ("Eleventh Amendment immunizes the State Board of Higher Education from action in federal court"); *Penk v. Oregon State Board of Higher Education,* 93 F.R.D. 45, 53 (D.Or.1981) ("Oregon State Board of Higher Education is the state"); *James & Yost, Inc. v. State Board of Higher Education,* 216 Or. 598, 340 P.2d 577, 578 (1959) (Oregon State Board of Higher Education is an instrument or arm of the state).

1995 Or.Laws ch. 162 § 23(2). This property cannot be sold by the university, and may only be obligated in a manner which will not impair the financial condition of the university or the rights of holders of any obligations of the university. 1995 Or.Laws ch. 162 § 34.

27. *See* Footnote 16, *supra,* explaining that the power to sue is not conclusive of autonomy, and does not waive Eleventh Amendment immunity.

28. All rights and obligations pertaining to Oregon Health Sciences University entered into by the Oregon State Board of Higher Education before July 1, 1995, were transferred to the Board of Directors of Oregon Health Sciences University. 1995 Or.Laws ch. 162 §§ 44, 46.

29. Prior to the July 1, 1995 effective date of Oregon's amendments to Or.Rev.Code § 352.002, the State Board of Higher Education was responsible for programs conducted by the Oregon Health Sciences University.

However, since the current statutes governing Oregon Health Sciences University and the University Hospital became effective on July 1, 1995, 1995 Or.Laws ch. 162 § 95, no case interpreting the status of the university or its affiliated hospital as an Oregon public corporation, in relation to Eleventh Amendment immunity, has been decided.

Plaintiffs have argued that any judgment against the Oregon Health Sciences University Hospital would not be paid from the state treasury. Plaintiffs' Memorandum of Law at VI–27—VI–29. Specifically, Plaintiffs assert that the University Hospital is not dependent on the state for funding, in that the University Hospital is financially self-sufficient as it "generated an operating profit of over $10 million for [the period ending May 31, 1993]," Plaintiffs' Memorandum of Law at VI–28, and only 5.6% of its revenues were attributable to state funding for the period ending May 31, 1994. Plaintiffs' Memorandum of Law at VI–27; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 23, p. 27. However, no statutory limitations exist that restrict the amount of funding that the university and University Hospital can receive from the state. It is generally recognized that the state's obligation to contribute to the revenues of the university is more important than the amount of the contribution. *Fitchik*, 873 F.2d at 660.

In determining whether the University Hospital should receive Eleventh Amendment immunity, the court must consider not only the extent of state funding, but also the state's oversight and control of the Health Sciences University's fiscal affairs, the university's independent ability to raise funds, whether Oregon taxes the university, and whether a judgment against the university would result in the state increasing its appropriations to the university. *Kashani*, 813 F.2d at 845.

In this case, Oregon Health Sciences University, with the approval of its Board, may enter into financing agreements which would be advantageous to the university. 1995 Or. Laws Ch. 162 §§ 17–21. However, there is no indication that money can be borrowed in order to pay a judgment against the universi-

ty. Further, the university may issue revenue bonds, which are to be considered "obligations of a political subdivision of the state," rather than obligations of the state itself. 1995 Or.Laws ch. 162 § 60. There is no evidence in the record that money raised through the issuance of these bonds could not be used to pay a judgment against the University Hospital.

Although these considerations point away from granting Eleventh Amendment immunity, the factors presented here relating to autonomy and control by the state persuasively point toward granting immunity. Oregon Health Sciences University must, pursuant to the statutes in effect on July 1, 1995, submit a funding request to the Oregon Department of Administrative Services and the Legislative Assembly, the Oregon State Legislature, as part of the governor's budget every other year. 1995 Or.Laws ch. 162 § 13(1). Included within this budget is an allocation for the University Hospital, which is submitted by the various departments to the hospital administration, and then to the university. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 23, pp. 6–10. Any request approved by Oregon's Legislative Assembly is appropriated to the Department of Administrative Services for direct allocation to the university. 1995 Or.Laws ch. 162 § 13(1). Thus, the fact that the Oregon Health Sciences University Hospital must submit a budget to the state for approval suggests that it is an agency of the state for Eleventh Amendment purposes. *See Harden*, 760 F.2d at 1163.

The mission of Oregon Health Sciences University and the University Hospital is to serve the people of Oregon as the primary provider of education in the health professions for students of the state of Oregon and the northwest region of the country. 1995 Or.Laws ch. 162 § 3(1)(a). The courts have considered education, particularly professional education, to be a recognized function of state government, so long as the educational entity does not limit enrollment to city or county residents. *See Skehan, supra*, at 248. As Oregon Health Sciences University and the University Hospital are intended to serve all residents of the state of Oregon, they

function more like an arm of the state in this respect.

On the other hand, despite the fact that the university must submit a budget to the Oregon Department of Administrative Services and the Oregon legislature and, as a result, receives some state appropriations, the remaining aspects of Oregon Health Sciences University and the University Hospital's economic life are largely independent of the state. The property owned or leased by the University is not subject to property taxes. 1995 Or.Laws ch. 162 § 21; Or.Rev. Stat. § 307.090(1) (1993) ("all property of the state and all public or corporate property used or intended for corporate purposes of the several counties, cities, towns, . . . and all other public or municipal corporations in this state, is exempt from taxation"). However, as under Oregon law both state and local entities are exempt from taxation, this factor does not facilitate a decision as to whether Oregon Health Sciences University Hospital is an arm of the state or a political subdivision.

As the relevant indicators of Eleventh Amendment immunity as to the University Hospital appear to point in different directions, the court must determine whether a judgment against the Oregon Health Sciences University Hospital would burden the state treasury, and ensure that the dignity of the state is preserved. *Hess, supra,* at 51–53, 115 S.Ct. at 406.

Oregon Health Sciences University maintains the authority to issue bonds to raise revenue and without pledging the full faith and credit of the state, but the hospital itself does not share the university's authority to use these procedures to raise capital, as only the Board possesses this power. The University Hospital does generate an operating profit, however this fact does not demonstrate that a judgment against the University Hospital would not require the expenditure of state resources as the purpose of immunity is that its protection does depend upon the actual outcome of the litigation, rather, it operates to bar litigation and exposure to any liability at the outset. Given the direct state control over the university's budget and overall operation in providing the people of Oregon with educational opportunities and health care, such a judgment would nevertheless offend the dignity of the state of Oregon. 1995 Or.Laws ch. 162 §§ 1(2), 1(3), 3(1)(a), 3(3)(a)–(f). The court therefore finds Oregon Health Sciences University Hospital is an arm or instrumentality of the state of Oregon, entitled to Eleventh Amendment protection.

### 3. *University of California Medical Centers*

Plaintiffs argue that the University of California Medical Centers at Los Angeles, Irvine, and San Diego, are "financially self-sustaining" business entities which should not be granted Eleventh Amendment immunity. Plaintiffs' Memorandum of Law at VI–17—VI–18, VI–21, VI–24. The medical centers contend that the Regents of the University of California ("the Regents") own and operate each of the California state universities and their respective medical centers, which are part of the University of California, and therefore arms of the state of California for purposes of the Eleventh Amendment. Defendants' Reply Memorandum of Law at p. 15; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, p. 8.

In determining whether the University of California Medical Centers sued are agencies of the state of California such that the state is the real party in interest, the court must review the powers, characteristics and relationships among the Regents, the University of California, and the medical centers.

Each of the California state universities and their respective Defendant medical centers are owned and operated by the Regents of the state of California, a public corporation established by the California constitution, which administers the University of California, a public trust under the California State Constitution. Cal. Const. of 1879, art. IX, § 9; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, p. 9. Accordingly, California courts have considered the Regents as an arm of the state or "fourth branch of [state] government." *See Regents of University of California v. City of Santa*

*Monica,* 77 Cal.App.3d 130, 134, 143 Cal. Rptr. 276 (2d Dist.1978) (Regents constitute a "branch of the state itself ... a constitutionally created arm of the state").

The Regents consist of a twenty-five member board, with seven *ex-officio* members, including the state's governor, lieutenant governor, the speaker of the California assembly, superintendent of public instruction, president and vice-president of the alumni association of the university, and the acting president of the university, who is appointed by the trustees of the university, and eighteen members appointed by the governor and approved by the senate. Cal. Const. of 1879, art. IX, § 9(a). Each appointed member of the Regents serves a twelve year term. Cal. Const. of 1879, art. IX, § 9(b). Thus, the state of California is empowered to exercise significant direction over the operations of the Regents through its constitutional officers and the University of California system including the university medical centers. *See Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1349–50 (9th Cir.1981) (Board of Regents of University of Arizona was protected by the Eleventh Amendment where the board of regents was composed of government officials or people appointed by the governor and where the regents had to submit annual reports to the governor). *See also* Footnote 14, *supra.*

The California constitution gives the California Regents "full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the universi-

ty and such competitive bidding procedures as may be applicable...." Cal. Const. art. IX, § 9(a); Cal. Public Contract Code § 10500 *et seq.* (requiring competitive bidding for projects in excess of fifty thousand dollars). These powers include holding legal title to all real and personal property of the university,[30] the power to sue or be sued,[31] to use a seal, and to delegate authority to committees or faculty as the Regents may deem appropriate. Cal. Const. art. IX, § 9(f). *See* Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 6, 19; Volume 10, Exhibit 39, pp. 46, 65, 66–67, 71, 75, 83; Volume 11, Exhibit 63, pp. 22, 65, 70–71, 78, 79, 94; Volume 11, Exhibit 67, pp. 23, 26. Similarly, the Regents have by statute the power to make contracts,[32] leases, and agreements including with any "state or federal agency." Cal.Educ.Code §§ 92436, 92437 (West 1989).[33]

Moreover, the California Regents have complete power over construction projects. The Regents can issue revenue bonds to finance construction projects, and structure the terms of the bonds, including using its property to secure the bonds and redeem them. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, pp. 39, 67. Further, the Regents can invest any bond proceeds in a construction fund as it desires, subject to limitations included in indentures relating to the issuance of revenue bonds. *See* Cal.Educ.Code §§ 92441, 92482, 92525, 92532. Additionally, surplus money from revenue bonds can be used by the Regents for any purpose.[34] Cal.Educ.Code § 92533.

---

**30.** The California Supreme Court determined that the property of the Regents is the property of the state. *Estate of Royer,* 123 Cal. 614, 621, 56 P. 461 (1899); *In re Bacon,* 240 Cal.App.2d 34, 47, 49, 49 Cal.Rptr. 322 (Cal.App.1st Dist.1966).

**31.** *See* Footnote 16, *supra,* explaining that such a general waiver of sovereign immunity is insufficiently particular to support an Eleventh Amendment waiver. *See also Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 940 (Fed.Cir.1993) (although the California constitution provides that the University of California can sue and be sued, this does not effect a waiver of Eleventh Amendment immunity).

**32.** The medical centers may enter into limited monetary contracts in the name of the Regents for hospital purchases. Plaintiffs' Memorandum

of Law, Appendix Volume 10, Exhibit 31, pp. 18–19, 21–22, 25–26; Exhibit 39, pp. 46, 65–67, 69–71, 75, 79, 86; Volume 11, Exhibit 63, p. 22; Exhibit 67, pp. 8–9, 23–26.

**33.** Unless otherwise indicated, all California Education Code references are from the 1989 edition and 1995 supplement to West's Annotated California Education Codes.

**34.** Despite the broad language of the statute, all bonds issued by the Regents on behalf of the universities of California or their respective medical centers are considered to be capital bonds to create funds for the construction of buildings, Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, p. 39, therefore, it is reasonable to infer that a bond could not be issued for

However, neither the principal nor the interest on any bonds issued can create liability against the state, or the Regents, or the property or funds of either, except to the extent of the pledge of revenues in relation to which the bonds were issued. Cal.Educ. Code § 92470.

The Regents must submit reports to each house of the California legislature on "matters pertaining to and affecting salaries, wages, hours of work, conditions of work, and other matters relating to personnel under the jurisdiction of the Regents and the employees of the University of California." *Ciba–Geigy Corporation, supra,* at 623.

In view of the plenary authority of the Regents over the University of California, the California courts have concluded "that the University has quasi-judicial powers over its own personnel disputes, and that the state courts must show deference when reviewing the factual findings of a University adjudicatory officer." *Unix System Laboratories, Inc. v. Berkeley Software Design, Inc.,* 832 F.Supp. 790, 795 (D.N.J.1993) (citing *Apte v. Regents of the University of California,* 198 Cal.App.3d 1084, 244 Cal.Rptr. 312, 315–316 (Cal.App.1st Dist.1988); *Ishimatsu v. Regents of the University of California,* 266 Cal.App.2d 854, 72 Cal.Rptr. 756, 763 (Cal. App.1st Dist .1968)). The "University [Regents] also has legislative powers in the sense that its policies and procedures attain 'the status of statutes in its internal governance.'" *Unix System Laboratories, Inc., supra,* at 795 (quoting *Apte, supra,* 244 Cal. Rptr. at 315). Thus, the Regents "constitutes a branch of the state government equal and coordinate with the legislature, judiciary, and the executive branch." *Ciba–Geigy Corporation, supra,* at 622 (quoting 30 Ops.Cal. Atty.Gen. 162, 166 (1957)). Moreover, the University of California is defined as a "state agency" in the California Government Code Section 3202(b) (West 1995), whereas the counties, cities, political subdivisions, and municipal corporations are all defined as local agencies. Cal.Gov.Code § 3202(a) (West 1995).

In administering the trust of the University of California, the Regents were granted "all the powers necessary or convenient for the effective administration of its trust, including the power ... to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise...." Cal. Const. art. IX, §§ 9(a), (f). Thus, the Regents have granted the medical centers the power to administer their day to day operations. *See* Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 28, p. 6, Exhibit 31, pp. 6, 10–11, Exhibit 39, pp. 40, 46, 58–59, 66–67, 70, 86; Volume 11, Exhibit 63, pp. 19, 21, 66–67, 69–70, 79, Exhibit 67, pp. 8–9, 22, 26.

In contrast to the Regents, the medical centers of the various universities of California are not independent legal entities, rather, they are physical extensions of the Regents existing under their sole aegis. *Lujan v. Regents of the University of California,* 69 F.3d 1511 (10th Cir.1995) (suit against the regents is barred by Eleventh Amendment immunity); *Selman v. Harvard Medical School,* 494 F.Supp. 603, 614, 616 (S.D.N.Y.), *aff'd,* 636 F.2d 1204 (2d Cir.1980) (the University of California Medical Schools at Los Angeles, San Diego, and San Francisco are all part of the Regents of the University of California and are entitled to Eleventh Amendment immunity absent waiver). Moreover, neither the state universities of California, nor their medical centers are separately incorporated from the Regents of the University of California. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, pp. 8, 15, 26, 75; Volume 11, Exhibit 63, p. 19.

The University of California medical centers generate substantial income through patient revenues, however, state appropriations to the Regents and the university's medical centers are used to pay for teaching faculty, leasing equipment, and tort and contract judgments against the Regents.[35] Plaintiffs'

the sole purpose of paying a judgment against the medical centers. *See Ciba–Geigy,* 804 F.Supp. at 624 (the Regents "can only issue revenue bonds for its construction projects and not to pay its judgments"); *Vaughn v. Regents of*

*the University of California,* 504 F.Supp. 1349, 1353 (E.D.Ca.1981) (the Regents is not authorized to issue bonds to pay for claims against it).

**35.** The Annual Reports of the University of California (Los Angeles) Medical Center indicate that

Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 16, 18, Exhibit 39, pp. 13, 28–29. Although the medical centers did not receive the greatest percentage of their total funding from direct state appropriations, the amount of funding by the state is not dispositive on the issue of Eleventh Amendment immunity. *See Jain*, 670 F.Supp. at 1390–91. *See also Fitchik*, 873 F.2d at 660 (quoting *Blake*, 612 F.2d at 723) (in assessing an Eleventh Amendment claim, " 'the nature of the state's [legal] obligation to contribute may be more important than the size of the contribution.' "). Additionally, the medical centers have no assets or property of their own as all property and bank accounts are in the name of the Regents. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 21, 25–26; Exhibit 39, p. 71; Volume 11, Exhibit 63, pp. 75, 78; Exhibit 67, p. 8.

Although the medical centers govern their own day to day operations, they remain accountable to the Regents, and do not possess the authority to enter any necessary contracts, to sue, issue bonds, or own or hold property. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 12, 18–19, Exhibit 39, pp. 11, 15, 17–22, 26, 40, 61, 66–67; Volume 11, Exhibit 63, pp. 8, 21, 22, 78, Exhibit 67, pp. 7–8, 19. Further, the medical centers cannot be sued in their own name, rather, they must be sued in the name of the Regents. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, p. 83; Volume 11, Exhibit 63, p. 94. Thus, as the medical centers lack the degree of autonomy from the state necessary to function independently of the Regents and the state as to legal matters affecting them, in an action against the medical centers the true party in interest is the Regents, indisputedly an arm of the state of California.

Plaintiffs argue nevertheless that the medical centers, in their day to day activities, operate as independent business entities. Plaintiffs' Memorandum of Law at VI–17 – VI–25. However, the medical centers do not have employees, and do not hire or fire any persons who work in the centers, rather "[a]ll persons who provide services to [the medical centers] are either employees of or contractors with The Regents of the University of California." Defendants' Immunity Reply Memorandum at p. 17; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 36, p. 23, Exhibit 39, p. 61; Volume 11, Exhibit 53, p. 7. Moreover, university or state approval is required in order to hire or fire employees of the medical centers, as these employees are employed by the university. *Id.*

Although each medical center maintains its own financial records and statements, Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 10–11, 13; Exhibit 39, p. 40; Volume 11, Exhibit 63, pp. 19, 66–67; Exhibit 67, pp. 8–9, these statements are compiled with those of the particular university of which it is a part, which forwards a complete proposed budget to the Regents and, ultimately, the California state legislature for appropriations. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, pp. 17–22. Moreover, the medical centers do not function as entities separate from their respective universities and the Regents. Even though each medical center is responsible for proposing, reviewing, evaluating, and approving their own policies regarding patient admissions, fee scheduling, and physician credentialing, these policies are reviewed at the university level. Plaintiffs' Memorandum at VI–21, VI–23; Appendix Volume 10, Exhibit 28, p. 6; Exhibit 32, p. 8; Exhibit 39, pp. 58–59, 61; Volume 11,

in fiscal year 1991–1992, 97.2% of the annual gross operating revenue for its medical center came from patient revenues, and the state contributed 1.9% of the operating budget in the form of clinical teaching support. Plaintiffs' Memorandum of Law at VI–18. In fiscal 1992–1993, 97.3% of University of California (Los Angeles) Medical Center's gross operating revenue was from patient revenues, and 1.7% came from the state. Plaintiffs' Memorandum of Law at VI–18. In fiscal 1991–92 and 1992–93 respectively, Uni-

versity of California (San Diego) Medical Center's patient revenues covered 97.2% and 97.3% of the gross operating budget, and the state appropriated 2% and 1.8% of the budget for clinical teaching support. Plaintiffs' Memorandum of Law at VI–21 –VI–22. In both fiscal 1991–92 and 1992–93, University of California (Irvine) Medical Center covered 96% of its gross operating budget through patient revenues, and the state contributed 2%. Plaintiffs' Memorandum of Law at VI–24.

Exhibit 53, p. 35. *See also* Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 6, Doc. No. LL11 1078; Volume 6, Exhibit 2, Doc. No. LL13 00497.

Plaintiffs assert that University of California (Los Angeles) Medical Center and University of California (Irvine) Medical Center have accumulated several million dollars in excess revenues, which, Plaintiffs maintain, supports their view that these hospitals are financially independent. Plaintiffs' Memorandum of Law at VI–19, VI–24. The state, however, retains authority to appropriate any excess revenues generated by the medical centers. Plaintiffs' Memorandum of Law at VI–19 n. 10. Such "excess" is often administratively "loaned" to the medical center's affiliated university, without obligation to repay. Plaintiffs' Memorandum of Law, Volume 11, Exhibit 67, pp. 15, 22. Further, upon deposit, excess revenues become assets of the Regents. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, p. 21; Exhibit 39, p. 75; Volume 11, Exhibit 63, p. 66. The medical centers may, however, retain such excess revenues to pay their expenses. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 22–25; Volume 11, Exhibit 63, pp. 69–70; Exhibit 67, p. 22.

The Regents delegated some duties to the chancellors of the medical centers including management of patient care facilities, implementation of operating policies, reviewing hospital operations policies, as well as serving as chief administrator of their respective medical centers. Plaintiffs' Memorandum of Law at VI–21, VI–24—VI–25. However, the medical centers have only a limited right to contract without the approval of the Regents or the president of the University of California; they may enter contracts up to $250,000 to purchase equipment, and are authorized to pay personnel, or pay for services or other capital expenditures. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, p. 19; Exhibit 39, pp. 66–67; Volume 11, Exhibit 63, pp. 22, 79; Exhibit 67, p. 26.

The Regents delegated the authority to approve and execute contracts on behalf of the university to the president of the University of California. Defendants' Immunity Reply Memorandum at p. 16. However, the president must obtain specific authorization from the Regents prior to entering into certain contracts involving exceptions to approved university programs and policies, and construction contracts in excess of approved funds. Defendants' Immunity Reply Memorandum at p. 16. Thus, the medical centers have limited fiscal autonomy in fact and law, and must report to the University of California or the Regents for approval of expenditures.

The University of California system and its medical centers were created under the California constitution, and were intended to be governed by the authority of the Regents. *See* Cal. Const. art. IX, § 9. Several federal court decisions have, consistent with this statement of fundamental California law, dismissed cases involving the Regents finding the Regents to be an arm or instrumentality of the state of California, entitling the Regents to Eleventh Amendment immunity from suit in federal court. *See, e.g., Mascheroni v. Board of Regents of the University of California,* 28 F.3d 1554, 1559 (10th Cir.1994); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443 (9th Cir.1989); *Mitchell v. Los Angeles Community College District,* 861 F.2d 198, 201 (9th Cir.1988), *cert. denied,* 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989) (California cases demonstrate that California state universities are "dependent instrumentalities of the state") (citing *Slivkoff v. California State University and Colleges,* 69 Cal.App.3d 394, 400, 137 Cal. Rptr. 920, (1977)); *BV Engineering v. University of California, Los Angeles,* 858 F.2d 1394, 1395 (9th Cir.1988); *Unix System Laboratories, supra,* at 796; *Ciba–Geigy,* 804 F.Supp. at 622; *Moxley v. Vernot,* 555 F.Supp. 554, 561 (S.D.Oh.1982); *Vaughn, supra,* at 1354. *See also Hamilton v. Regents,* 293 U.S. 245, 257, 55 S.Ct. 197, 201–202, 79 L.Ed. 343 (1934) (University of California held to be a department of the state of California). *Compare Doe v. Lawrence Livermore National Laboratory,* 65 F.3d 771 (9th Cir.1995) (court held that in the unique situation where a particular state department, and not the state of California, pays for any judgment rendered against the uni-

versity in its management of the laboratory, there is no immunity under the Eleventh Amendment).

California has exempted the state universities of California from taxation by state or local authorities, Cal.Educ.Code § 92443, a special status which some courts find indicative that an entity is an arm of the state rather than a subdivision. *Kashani, supra,* at 846. The Regents and its universities are also exempt from local building codes, municipal and zoning regulations, permit fees, and inspection fees for construction improvements solely for educational purposes. Cal. Gov.Code §§ 6103, 6103.6, 6103.7; *City of Santa Monica, supra,* at 136, 143 Cal.Rptr. 276; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, p. 9. Additionally, revenue bonds issued by the Regents are exempt from state taxation. *Ciba–Geigy Corporation, supra,* at 622. Further, the Regents are protected under California's tort claims act.[36] *See* Cal.Gov.Code § 811.2. As these protections apply to the medical centers as well as the Regents *Keller v. State Bar of California,* 47 Cal.3d 1152, 1164 n. 10, 255 Cal.Rptr. 542, 767 P.2d 1020 (1989), *rev'd on other grounds,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d· 1 (1990), they strongly indicate that the Medical Centers are arms or instrumentalities of the state entitled to Eleventh Amendment immunity.

The autonomy of the Regents from other branches of state government, and its incorporation as a public entity, stems from the mandate in the California constitution· to ensure that the Regents performs its governmental mission, to engage in higher education, without political or sectarian influence. Cal. Const. art. IX, § 9(f). *See also Jain,* 670 F.Supp. at 1392 (separate incorporation of state university did not detract from its status as an alter-ego of the state under Eleventh Amendment where the university was incorporated in order to pursue "the ends of higher education."). As the

medical centers serve the governmental objective of providing medical training and education to undergraduate and graduate students on a state-wide basis, Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit. 53, pp. 36–37, this state purpose also weighs in favor of granting Eleventh Amendment immunity.

Finally, the court must consider whether a judgment against the medical centers would be paid from state funds. The medical centers maintain a self-insurance fund, professional liability insurance, general liability insurance, and a trust fund through the university. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 31, pp. 33–34; Volume 11, Exhibit 67, pp. 24–26. The medical centers contribute to payment of the premiums on these policies. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 67, pp. 25–26. The self-insurance program is intended to pay for liability to the extent that sovereign immunity as to state law claims is waived pursuant to the California tort claims act. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, pp. 75–76. Both the general liability policy and trust fund were intended to pay for campus related claims, such as torts or accidents. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, pp. 77–78. The trust fund, however, which is held by the Regents, is generated from several sources, including the medical centers, student health services fees, and state appropriations. *Id.* at pp. 75–79. As the resources in the trust fund include funds from state appropriations, any judgment against the fund could ultimately consume financial resources from the state treasury. *See Vaughn, supra,* at 1353 (the Regents could not satisfy a judgment from its funds, as the property of the Regents is the property of the state, and the Regents was not authorized to· issue bonds to pay for claims

---

**36.** The California tort claims act partially waives sovereign immunity as to claims based on state law; however, if the medical centers are entitled to the protection of the Eleventh Amendment, this partial waiver does not eliminate Eleventh Amendment immunity. For a state to waive its Eleventh Amendment immunity, it must expressly provide that the state may be sued in federal

court. *See Florida Department of Health & Rehabilitative Services v. Florida Nursing Home Association,* 450 U.S. 147, 149–50, 101 S.Ct. 1032, 1033–35, 67 L.Ed.2d 132, *reh'g denied,* 451 U.S. 933, 101 S.Ct. 2008, 68 L.Ed.2d 319 (1981) (waiver of sovereign immunity for state agency does not constitute waiver of Eleventh Amendment immunity). ·

against it). Additionally, as discussed in Section I(a)(1), the presence of insurance policies does not remove the immunity otherwise granted by the Eleventh Amendment. *See, e.g., Bockes,* 999 F.2d at 790–91; *Wallace,* 721 F.2d at 305; *Gressley,* 890 F.Supp. at 1488; *Mohammed,* 832 F.Supp. at 106. Moreover, the medical centers could not use their earned surplus or excess net revenues to pay a judgment against them, as the Regents require that these funds be used for hospital purposes only. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 39, pp. 86–87.

Further, California has not disclaimed liability for the debts of the University of California or its medical centers. Instead, the California constitution mandates the state to ensure the "security of the University of California's funds." Cal. Const. art. IX, § 9(a); *Ciba–Geigy Corporation, supra,* at 624. Also, demonstrating the close financial link between the state and the Regents is the extent of direct control which the state exercises over the finances of the Regents and the University of California. For example, the legislature oversees the University of California's budgets and may limit the uses for state moneys appropriated to the University of California. *Ciba–Geigy Corporation, supra,* at 624. The California "legislature has 'prohibited the [Regents] from expending funds for new large-scale computers . . . and has required the [Regents] to use certain funds . . . to support additional primary care medical residences.' " *Ciba–Geigy Corporation, supra,* at 624 (quoting *Autonomy and Accountability: The University of California and the State Constitution,* 38 Hastings L.J. 933–34 (1987) (citations omitted)). Likewise, the Regents must submit reports to the State Public Works Board of any state money that it allocates for a construction project. Cal. Educ.Code § 92101. If the Regents fail to use the money allocated for construction projects, the unused funds revert to the state's General Fund. Cal.Educ.Code § 92101. Additionally, the Regents "can only issue revenue bonds for its construction projects and not to pay its judgments." *Ciba–Geigy Corporation, supra,* at 624.

Finally, the Regents are subject to state audits, and its financial statements, including funds that it receives from non-state sources, are part of the annual financial report of the Auditor General of California. *See Harden,* 760 F.2d at 1163–64 (state university protected by Eleventh Amendment where university must submit its budget to the state and received appropriations from the state); *Jagnandan v. Giles,* 538 F.2d 1166, 1175 (5th Cir.1976), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977) (University of Mississippi protected by Eleventh Amendment in part where University had to prepare an annual report of its "gross receipts and disbursements" including funding from sources other than the state).

" 'The power of the Regents to operate, control, and administer the University is virtually exclusive.' " *City of Santa Monica, supra,* at 135, 143 Cal.Rptr. 276 (citing 30 Ops.Cal.Atty.Gen. 162, 166 (1957)). The Regents possess a great degree of operational autonomy over the affairs of the University of California and its constituent member institutions including the Defendant medical centers and hospitals. The medical centers are dependent on the Regents and the University of California in several key aspects of their existence and the Regents of California are clearly an arm of the state. Thus, the court finds that the Defendant medical centers are likewise arms of the state of California and that the University of California Medical Centers at Los Angeles, Irvine, and San Diego are protected by the Eleventh Amendment. As all of the indicators of immunity point towards granting immunity to the medical centers, no additional analysis under *Hess, supra,* is required.

### 4. *University Hospital at State University of New York at Stony Brook*

██ The State University of New York ("SUNY") was established in 1948 by Chapter 695 of the Laws of 1948, as amended (New York Education Law § 352) (McKinney 1988).[37] SUNY currently consists of, among other general and specialized edu-

---

**37.** Unless otherwise indicated, all New York Education Law references are from the 1988 edition and 1995 Supplement to McKinney's Consolidated Laws of New York.

cational institutions of higher learning, four university centers, including one located in Stony Brook, New York. The New York legislature provided for the addition of other universities, colleges, institutions, facilities, and research centers which could be acquired, established, operated, or contracted to be operated by the state through the State University Trustees. N.Y.Educ.L. § 352(3). Section 351 of the New York Education Law provides that the "mission of the State University system [is] to provide the People of New York [with] educational services of the highest quality ... in a complete range of academic, professional and vocational post-secondary programs...." In fulfilling this purpose, SUNY was to provide a "full range of graduate and professional education ... [by strengthening] its educational and research programs in the health sciences through the provision of high quality care at its hospitals, clinics and related programs....." N.Y.Educ.L. §§ 351(a), (d). The State University at Stony Brook, its medical school and its related hospital were established and are maintained and operated in furtherance of the purposes as set forth in New York Education Law Section 351(d). Defendant State University of New York at Stony Brook Hospital's Memorandum of Law in Support of Motion to Dismiss, filed May 12, 1994, at p. 8.

SUNY is governed by a Board of Trustees consisting of sixteen members. N.Y.Educ.L. § 353. Fifteen of the members are appointed by the governor with the advice and consent of the state senate.[38] N.Y.Educ.L. § 353. The trustees are responsible for administration, supervision, and coordination of state operated institutions, programs of higher education, the provision of standards and regulations covering the organization and operation of their programs, setting tuition charges and fees, establishing health and medical centers, professional and graduate schools, research centers and other facilities. N.Y.Educ.L. § 355(1). The trustees are required to submit their proposed long-range plan for SUNY to the state Board of Regents[39] and the governor every four years, as well as reporting to the Board of Regents, the governor, and the legislature on the progress of SUNY. N.Y.Educ.L. § 354(1), (2), (3).

The SUNY trustees may "take, hold and administer ... real and personal property ... either absolutely or in trust for any educational or other purpose within the jurisdiction and corporate purposes of the state university." N.Y.Educ.L. § 355(2)(a). Real property may be acquired or purchased, including through eminent domain, by the trustees. N.Y.Educ.L. §§ 307(1), 355(2)(a). Additionally, the trustees are authorized to expend appropriations made for SUNY by the Comptroller of the state, an elected state officer, from the funds specifically appropriated for that purpose by the state legislature. N.Y.Educ.L. §§ 355(4)(b), (4)(c), (8).

The trustees are also empowered to establish health and medical centers, as well as graduate and professional schools. N.Y.Educ.L. § 355(1)(d). The trustees may appoint a head for each state operated institution, and prescribe the functions, powers and duties of the head of the institution, as well as providing for the appointment of the instructional and administrative staff. N.Y.Educ.L. § 355(2)(g).

The trustees may also enter contracts and perform other acts which are necessary or appropriate to effectively carry out the objects and purposes of SUNY. N.Y.Educ.L. §§ 355(2)(n), (2)(p), (6). Moreover, the trustees are required to make an annual report of its activities and recommendations to the

---

**38.** *See* Footnote 15, *supra*, explaining that when the governor appoints the members of the governing board of a public entity with the advice and consent of the state's senate, courts view this as being indicative of an entity's lack of independence from state control. The remaining member is the president of the student assembly of the SUNY *ex-officio*. N.Y.Educ.L. § 353.

**39.** The Board of Regents is the head of the University of the State of New York, a state constitutional entity, as distinct from SUNY, having plenary authority over all education matters within the state. Section 352 of the New York Education law creates SUNY as a corporation within the state Department of Education, a state agency headed by the state commissioner of education appointed by the Regents, and within the University of the State of New York. *See* McKinney's Const. Art. XI, § 2; N.Y.Educ.L. § 352.

Board of Regents, governor, state comptroller, and legislature, including operations and accomplishments, revenues and expenditures. N.Y.Educ.L. § 359.

Further, the trustees are required to review and coordinate the budget and appropriation requests of all state operated institutions within SUNY, and combine these requests with the fiscal requirements for institutions of higher education into a university budget for submission to the governor. N.Y.Educ.L. § 355(4)(a); Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 63–64, 66–67.

The State University at Stony Brook Hospital and School of Medicine were created pursuant to New York Education Law Section 355(1)(d), with the university hospital's activities in support of the educational and research mission of the university. N.Y.Educ.L. § 351(d). Stony Brook University Hospital is therefore an integral part of the University at Stony Brook, and, as such, of the SUNY system. The hospital is also subject to general oversight and control by the governor and the legislature, as all appropriations to Stony Brook and its hospital are approved by both the governor and legislature. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 63–64, 66–67.

Additionally, hospital activities, such as purchasing and contracting, are subject to audit by the state comptroller. *Id.* at 55, 70–71, 77–79. All contracts entered by Stony Brook are contracts of the state, and contracts which exceed $50,000 for goods or $35,000 for services must be approved by the state comptroller and the attorney general, also an elected state officer. N.Y.Educ.L. § 355(5)(a); Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, p. 55. Further, all contracts of the University Hospital must be approved by the Director of the Stony Brook Medical Center and are subject to the approval of the state. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 55, 71.

The University Hospital itself has no independent right to hold title to property and no bank accounts or insurance, and the hospital's funds are controlled by the state, pursuant to New York Education Law and the New York State Finance Law. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 15, 32–35, 68. The payments for services are received by the hospital and then deposited in New York state accounts. *Id.* at 15, 32–35.

The Stony Brook University Hospital is not separately incorporated from SUNY, rather, SUNY manages, administers, and oversees the University Hospital as a unit of the University at Stony Brook. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 37-40. Persons who perform services for Stony Brook University Hospital are all state employees, rather than employees of the hospital. N.Y.Educ.L. § 355a; Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 12–13, 40, 49–50. Members of the hospital's medical staff have been delegated the responsibility of hiring lower level employees for the hospital. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 51, pp. 48–52. However, the physicians at the University Hospital are all members of the Stony Brook medical faculty appointed by the president of the State University of New York at Stony Brook. *Id.* at p. 50.

Plaintiffs argue that the University Hospital is financially self-sufficient, as New York state provides a small percentage of the hospital's net operating costs.[40] The hospital maintains its own financial statements, and prepares its own budget. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 6, Volume 11, Exhibit 51, pp. 16, 63–64. However, the University Hospital's budget is submitted for approval to the Dean and Director of the Stony Brook Medical Center, the university vice-president of Health Sciences, the president of the university, and the chancellor of SUNY. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhib-

---

**40.** In 1993, the New York state approved $9.7 million in net operating transfers to Stony Brook University Hospital from the state's general fund, which represented approximately 3.3% of the hospital's $294 million in total revenue. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 6, Doc. No. 1098.

it 51, pp. 64, 66–68. The SUNY trustees provide fiscal review and coordinate the budget for all of the state operated institutions, including the hospital's, for submission to the governor. N.Y.Educ.L. § 355(4)(a).

As stated, the primary purpose of Stony Brook University Hospital is to provide "educational and research programs in the health sciences through the provision of high quality health care at ... [the] hospital[s]...." N.Y.Educ.L. § 351(d). As such, the hospital provides an important state governmental function. *See Skehan*, 815 F.2d at 248.

Several courts have granted SUNY entities the protection of Eleventh Amendment immunity. *See, e.g., Yoonessi v. State University of New York*, 862 F.Supp. 1005, 1012 (W.D.N.Y.1994), *lv. to appeal denied*, 56 F.3d 10 (2d Cir.1995) (claims against State University of New York entities were dismissed on Eleventh Amendment grounds); *Dube v. State University of New York*, 900 F.2d 587, 594 (2d Cir.1990) (SUNY is an integral part of the government of the state of New York and when it is sued New York is the real party in interest), *cert. denied sub nom., Wharton v. Dube*, 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Meadows v. State University of New York at Oswego*, 160 F.R.D. 8, 9 (N.D.N.Y.1995) (dismissing civil rights claims against SUNY at Oswego on Eleventh Amendment grounds); *Wright v. State University of New York Health Science Center at Brooklyn*, 1990 WL 213062, *1 (S.D.N.Y.1990) (Eleventh Amendment immunity bars suit against the SUNY Downstate Health Science Center Medical School as it is an entity of the state); *Derechin v. State University of New York at Buffalo*, 731 F.Supp. 1160, 1163 (W.D.N.Y.1989) (dismissing suits against SUNY and the University at Buffalo on Eleventh Amendment grounds); *Cassells v. University Hospital at Stony Brook*, 1987 WL 3717, *3 (E.D.N.Y. 1987) (Eleventh Amendment bars suit against both the State University at Stony Brook and the University Hospital). Other decisions support this conclusion by holding that the state's limited waiver of sovereign immunity requires that actions against SUNY based upon state law must be sued in the state's court of claims. *Turner v. State*

*of New York*, 49 A.D.2d 269, 374 N.Y.S.2d 731, 732–33 (3d Dep't. 1975) (Research Foundation of SUNY conducting programs at SUNY Stony Brook is an arm of the State University of New York authorized to carry out fiscal duties of the State University, thus, as part of the state university, which constitutes part of the state government, the state is the real party in interest and must be sued in the state court of claims); *State University of New York v. Syracuse University*, 206 Misc. 1003, 137 N.Y.S.2d 916, 917 (Sup.Ct. Albany Cty. 1954) (the legislature intended SUNY to be a mere subordinate agency within the state's department of education to carry out certain of its governmental functions with respect to higher education, as such, SUNY is immune to suit in state supreme court), *aff'd*, 285 A.D. 59, 135 N.Y.S.2d 539 (3d Dep't. 1954).

All SUNY entities, including Stony Brook University Hospital, are broadly controlled by the trustees; such entities lack the requisite degree of legal autonomy from the state government to be considered political subdivisions of New York state and thereby outside the ambit of the Eleventh Amendment. Indeed, although SUNY has some attributes of self-governance, its fiscal affairs are substantially intertwined with those of the state as to make such autonomy illusory. Also, as noted SUNY legally exists as a corporation within the University of State of New York, a state constitutionally created entity, headed by the Regents of New York, a body which is unquestionably an arm of the state. As such, SUNY must similarly be cast as an extension of this arm of the state. Moreover, SUNY entities including Stony Brook University Hospital have been protected from suit in federal court by extending Eleventh Amendment immunity to them. These factors weigh strongly in favor of granting Eleventh Amendment immunity to Stony Brook University Hospital in this action.

Further, it is clear that any judgment against SUNY or one of its constituent units in excess of insurance coverage or an uninsured claim would be paid out of the judgment and claims account of the state of New York, funded by legislatively appropriated

funds.[41] Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 6, Doc. No. 1112, ¶ 8(a), (b), Volume 11, Exhibit 51, pp. 86–87. Thus, as New York State's treasury is a potentially direct target of this action, should Plaintiffs prevail, this factor also strongly points in favor of granting Eleventh Amendment immunity to Stony Brook University Hospital.

Balancing all of the relevant factors, the court finds the State University of New York at Stony Brook University Hospital is immune from suit in this court under the Eleventh Amendment. As each of the factors indicative of Eleventh Amendment immunity supports granting such immunity, the court need not apply the *Hess* analysis, as it would reach the same conclusion.

### 5. *University Hospital at the University of New Mexico School of Medicine*

■ The University of New Mexico is a state educational institution created by the New Mexico state constitution. N.M. Const. art. XII, § 11; N.M.Stat.Ann. § 21–7–1 (Michie 1994).[42] Control and management of the university and University Hospital is vested with the Board of Regents ("the Regents"), whose seven members are nominated by the governor of New Mexico, and confirmed by the state senate.[43] N.M. Const. art. XII, § 13; N.M.Stat.Ann. § 21–7–3. The Regents are responsible for the "care and preservation of all [university] property, the erection and construction of all buildings necessary for [university] use and the disbursements and expenditures of all money." N.M.Stat.Ann. § 21–7–3. The Regents also retain the power to sue [44] and to contract. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 29, pp. 37, 43. However, the Regents "may delegate authority or functions to officers or subordinate

bodies within the state educational institutions ... for the efficient functioning of their respective educational institutions." 1995 N.M. Laws Ch. 167, § 21–1–10. New Mexico University Hospital is one of the institutions of higher learning created by the New Mexico Constitution, Article XII, Section 11. The hospital is defined as a state agency under to Section 11–4–2.1 of the New Mexico Statutes Annotated, which states that a state agency includes "any department, institution, board, bureau, commission, district or committee of government...." *See Korgich v. Regents of the New Mexico School of Mines,* 582 F.2d 549, 551 (10th Cir.1978) ("[i]t is clear that New Mexico considers its institutions of higher learning as state agencies and a state function").

Thus, the Regents appointed a president for the University of New Mexico as its chief executive officer, and created a Board of Trustees to operate the University Hospital. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 42, pp. 5–6, 14–15. The trustees are authorized to adopt bylaws and policies for the management of the property and business of the hospital. Plaintiffs' Memorandum of Law at VI–30.

The chief executive officer of the University Hospital is responsible for fiscal planning, budgeting and management, as well as the hiring and firing of hospital employees. Plaintiffs' Memorandum of Law at VI–30. The employees of the hospital are employees of the University of New Mexico. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 29, p. 15. Moreover, the hospital's chief executive officer has been granted the authority to incur capital expenditures for the hospital, and fix the fees to be charged to patients for services it provides. Plaintiffs' Memorandum of Law at VI–30—VI–31. However, all expenditures of the University

---

**41.** As noted, several courts have recognized that the presence of insurance does not displace the immunity accorded by the Eleventh Amendment. *See, e.g., Bockes,* 999 F.2d at 790–91; *Wallace,* 721 F.2d at 305; *Gressley,* 890 F.Supp. at 1488; *Mohammed,* 832 F.Supp. at 106.

**42.** All references to the 1994 edition of Michie's New Mexico Statutes Annotated.

**43.** *See* Footnote 15, *supra,* explaining that when the governor appoints members of the board

with the advice and consent of the state's senate, court's view this legislative design as evidence that the entity lacks independence from state control.

**44.** *See* Footnote 17, *supra,* explaining that the bare power to sue or be sued does not control the threshold determination regarding the applicability of the Eleventh Amendment.

of New Mexico and its constituent institutions for the purchase of real property, construction or major remodeling of buildings must be approved by state authorities outside the university. N.M.Stat.Ann. § 21–1–21.

Although the hospital's trustees and chief executive officer are authorized to manage and administer its daily business and administrative affairs, Plaintiffs' Memorandum of Law at VI–30, they remain ultimately responsible to the Regents. Plaintiffs' Memorandum of Law at VI–30. Thus, the state of New Mexico retains a significant degree of influence over the operations of the Regents and, through the Regents, the university.

Although the University Hospital maintains its own separate records and financial statements, and has dedicated bank accounts in the name of the university, Plaintiffs' Memorandum of Law at VI–31, Appendix Volume 10, Exhibit 29, pp. 17, 30–31, the hospital's financial affairs are controlled by the New Mexico State Commission on Higher Education. N.M.Stat.Ann. § 21–1–26. The university's budget, including the hospital's budget, is also subject to review and adjustment by the State Commission on Higher Education, N.M.Stat.Ann. §§ 21–1–26 A, B, prior to its submission to the state budget subdivision of the Department of Finance and Administration for final approval. N.M.Stat.Ann. § 21–1–26 A(3). The Commission on Higher Education must also conduct annual audits of New Mexico's institutions of higher education, the results of which are reported to the state Department of Finance and Administration and the legislative Finance Committee. N.M.Stat.Ann. § 21–1–26.3. Further, the commission considers the audit findings in making its recommendations to the state's executive and legislature for higher education funding. N.M.Stat.Ann. § 21–1–26.3.

The University Hospital is located on land which it leases from the County of Bernalillo, a political subdivision of New Mexico. However, as discussed, the hospital is administered by the University of New Mexico and the Regents, not the county. Defendants' Immunity Reply at p. 24.

New Mexico has exempted the University of New Mexico and its institutions from taxation, a status that some courts find indicative that an entity is an arm of the state rather than a subdivision. *Kashani, supra,* at 846. N.M.Stat.Ann. § 7–9–13 A(2). New Mexico, however, also extends that status to its political subdivisions, so as to this Defendant, such exemption is of less significance. N.M.Stat. Ann. § 7–9–13 A(2).

As the University Hospital lacks the authority to initiate legal action, Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 29, p. 37, the Regents therefore must file suit on its behalf. Also, all contracts which the hospital wishes to make must be reviewed by both the university and the state's Department of Health Sciences counsel. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 29, at pp. 43–44.

"In determining whether an action brought against a governmental institution is actually a suit against the state within the meaning of the Eleventh Amendment, state law is decisive." *Korgich, supra,* at 551 (citing *Harris v. Tooele County School District,* 471 F.2d 218 (10th Cir.1973)). Both federal and state courts have held that the University of New Mexico and its institutions are state agencies immune from suit in federal court. *Korgich, supra* (University and its institutions are treated as arms of the state of New Mexico for purposes of the Eleventh Amendment); *Eisenberg v. University of New Mexico,* No. 87 Civ. 787, slip op. at pp. 1–2 (D.N.M. October 11, 1989) (*see* Defendants' Immunity Reply Memorandum, Exhibit B) (University of New Mexico is an arm of the state and immune from suit in federal court under the Eleventh Amendment); *Bernalillo County Medical Center Employees Association v. Johnson,* No. 82 Civ. 281, slip op. at p. 2 (D.N.M. June 23, 1982) (*see* Defendants' Immunity Reply Memorandum, Exhibit C) (New Mexico University Hospital is an arm of the state entitled to Eleventh Amendment immunity). *See also Clothier v. Lopez,* 103 N.M. 593, 711 P.2d 870 (1985) (University of New Mexico Hospital/Bernalillo County Medical Center is a state educational institution); *Livingston v. Regents of New Mexico College of A. & M.A.,* 64 N.M. 306, 328 P.2d 78 (1958)

(action against Board of Regents is one against the state). *Cf. United States ex rel. Santa Ana Indian Pueblo v. University of New Mexico,* 731 F.2d 703, 704 n. 2 (10th Cir.) (the University of New Mexico and the regents of the university are instrumentalities of the state that may assert Eleventh Amendment immunity, however, the Eleventh Amendment does not preclude an award of damages on grounds that the ultimate benefit would be for Indians, as the United States acted under its fiduciary obligation in bringing the claim), *cert. denied,* 469 U.S. 853, 105 S.Ct. 177, 83 L.Ed.2d 111 (1984). "It is clear that New Mexico considers its institutions of higher learning as state agencies and a state function." *Korgich, supra,* at 551.

Additionally, the New Mexico Tort Claims Act, which authorizes suits against the state and its agencies by limiting the application of sovereign immunity as to certain state law claims, applies to the university and its employees, including the employees of the University Hospital. *Clothier, supra,* at 871–72 (University of New Mexico Hospital is the principal teaching hospital of the university, thus, the doctors and staff of the hospital are public employees which may be liable under the state's tort claims act). Further, the exclusive jurisdiction for any claim under the state's tort claims act is in the district state courts of New Mexico.[45] N.M.Stat.Ann. § 41–4–18 A. This factor, along with the fact that the University Hospital retains only limited autonomy from the Regents, weighs in favor of granting the hospital Eleventh Amendment immunity.

The primary purpose of the University of New Mexico and its various institutions is to "provide the inhabitants of the state of New Mexico with the means of acquiring a thorough knowledge of the various branches of literature, science and arts." N.M.Stat.Ann. § 21–7–2. Further, the University of New Mexico was to develop and maintain programs of research, scholarship, and cultural innovation, as well as programs of direct public services which derive from these edu-

cational efforts, for the post-secondary student. *See* Defendants' Immunity Reply Brief, Exhibit F. As the principal teaching hospital of the University of New Mexico, the hospital is a state educational institution whose state-wide purposes reflect the exercise of sovereign state power, an attribute justifying the application of the Eleventh Amendment.

Plaintiffs argue that the University Hospital is financially self-sufficient as only 8.4% of the hospital's net operating budget comes from sources other than patient revenue, including funding from both the state and county, and that as any judgment achieved in this case would therefore not appreciably affect the state's treasury, Eleventh Amendment immunity is unwarranted. Plaintiffs' Memorandum of Law at VI–29. However, the hospital states that the costs of this suit, and any judgment resulting from it, would be paid by the Risk Management Division of the New Mexico General Services Department, an agency of the state, rather than any independently generated revenues. N.M.Stat. Ann. § 15–7–1 *et seq.;* Defendants' Immunity Reply at p. 25; Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 29, at p. 44.

Although the University Hospital may retain its excess revenues, it must obtain permission from the Regents and its trustees before using these funds, as they are considered state funds. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 29, pp. 16–17, 41–42. The hospital also maintains a self-insurance trust fund through the Risk Management Division of the University of New Mexico. The Risk Management Division receives funds from the New Mexico legislature, and is responsible for paying any settlement or judgment resulting from a claim against the University or New Mexico University Hospital. 1995 N.M.Laws Ch. 173, § 1.

As each of the relevant indicia demonstrate that New Mexico University Hospital is subject to significant controls by the state and thus acts as an arm of the state, and as

---

**45.** *See* Footnote 18, *supra,* explaining that a state statute granting a university the power to sue or be sued does not in itself waive Eleventh Amend-

ment immunity, and is interpreted as permitting only suits in state court.

the state's funds would pay an award if obtained in this case, such would interfere with the fiscal autonomy and sovereignty of New Mexico, thereby impairing the dignity of the state. Therefore, New Mexico University Hospital is entitled to Eleventh Amendment immunity from suit in this action.

### 6. *University of Massachusetts Medical Center*

█ The University of Massachusetts was created by state statute as a "state university." Mass.Gen.L. ch. 75, § 1 (West 1994).[46] The university is governed by a board of nineteen voting trustees, seventeen of whom are appointed by the governor of Massachusetts to serve a five year term.[47] Mass.Gen.L. ch. 75, §§ 1, 1A. The two remaining members are full-time students of the university, who each serve a one year term. Mass.Gen.L. ch. 75, § 1A.

The Massachusetts legislature granted the university's Board of Trustees the responsibility of establishing the policies necessary for the administrative management of personnel, staff services, and the general business of the university. The trustees were also granted the duties of managing and administering, on behalf of the Commonwealth of Massachusetts, the university and all real and personal property belonging to the commonwealth and used or occupied by the university. Mass.Gen.L. ch. 75, § 12. The trustees may sell or lease commonwealth property to any professor, instructor, employee, or society or association, after the conveyance has been approved by the governor and the Higher Education Coordinating Council.[48] Mass.Gen.L. ch. 75, §§ 25–27. Additionally, the trustees have the authority to make purchases for $100,000 or less, or to purchase, without limitation, library books, educational and scientific supplies and equipment. Mass.Gen.L. ch. 75, § 13.

The trustees may delegate some authority or responsibility to the president of the university, or other officers of the university.[49] Mass.Gen.L. ch. 75, §§ 1A, 3A. Further, the trustees were given the authority to establish schools or colleges of the university to meet the needs of the commonwealth in the field of public higher education. Mass.Gen.L. ch. 75, § 2. Each campus, including the University Medical Center, has a council appointed by the trustees, which advises the campus president and the trustees. Mass.Gen.L. ch. 75, § 14B. Thus, the Commonwealth of Massachusetts exercises significant influence over the operations of the trustees and the university's medical center.

The trustees appoint the chancellor of the medical center, who in turn fills the senior management positions. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 43–45. However, the trustees may reject someone whom the chancellor has selected or appointed in a leadership position. *Id.* at p. 45. All officers and employees of the medical center, professional and non-professional, are employees of the commonwealth, irrespective of the source from which their salaries or wages are paid. Mass. Gen.L. ch. 75, § 14. These employees retain the same retirement benefits, group insurance, industrial accident coverage, and other coverage as all other commonwealth employees retain. Mass.Gen.L. ch. 75, § 14.

The medical center was created by state statute, which required the trustees to maintain a medical school for the University of Massachusetts. Mass.Gen.L. ch. 75, § 34.

---

**46.** Unless otherwise indicated, all statutory references are to West's 1994 edition of the Massachusetts General Laws.

**47.** *See* Footnote 14, *supra,* explaining that appointment to the board by the state's governor, with the advice and consent of the state's senate, demonstrates an entity's lack of independence from state control.

**48.** The Higher Education Coordinating Council is composed of eleven voting members, consisting of the secretary of education, *ex-officio,* and ten members appointed by the governor, including a student enrolled in a state-funded institution. Council members are appointed for five year terms, except for the student, who receives a one year term. Mass.Gen.L. ch. 15A, § 4. The Council is responsible for defining the mission of Massachusetts' system of higher education. Mass.Gen.L. ch. 15A, § 1(c).

**49.** The trustees have complete authority with respect to the election or appointment of the president and other officers of the university. Mass. Gen.L. ch. 75, § 14.

The medical center is considered a "state institution" as it is operated and administered by the commonwealth through the dean and the trustees. Mass.Gen.L. ch. 6A, § 31. The trustees are authorized to work with state and federal agencies and to accept grants or funding from the federal government or other sources for constructing, equipping, financing, improving or expanding the medical school. Mass.Gen.L. ch. 75, § 34. The trustees also elect the dean, officers, and professional staff of the medical school. Mass.Gen.L. ch. 75, § 35.

In order to provide the university medical center some degree of autonomy, Massachusetts law requires that the budget estimates and annual financial forecasts for the medical school are to be submitted to the trustees separately from those of the university. Mass.Gen.L. ch. 75, § 36. The trustees then submit the medical school budget to the Higher Education Coordination Council, which submits the budget, along with its recommendations and comments, to the Commonwealth's Secretary of Administration and Finance, the Massachusetts legislature's house and senate committees on ways and means, and the legislature's joint committee on education, arts, and humanities. Mass. Gen.L. ch. 15A, § 15B. The trustees of the university subsequently receive the state appropriation directly, in one lump sum. Mass. Gen.L. ch. 15A, § 15.

All university accounts, including the medical center's, under the direction and control of the trustees, are audited annually by the state auditor. Mass.Gen.L. ch. 75, § 6. The trustees are required to prepare and submit a detailed budget for the university, including the medical center, to the governor. Mass.Gen.L. ch. 75, § 7. Further, monthly statements of the receipts and expenditures of the university, including medical center, must also be made to the state comptroller, and a complete financial report covering all university receipts and expenditures is given annually to the governor and the legislature. Mass.Gen.L. ch. 75, § 10. Thus, the funds of both the medical center and the university are regulated through the trustees, acting on behalf of the governor and legislature.

The university medical center may enter into contracts on its own behalf, however, this authority is restricted. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, p. 46. The medical center cannot enter into contracts for professional services or consultation (non-medical) services. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 46–47. However, the trustees are often involved in authorized contract negotiations to provide guidance, and the trustees may disapprove any contract that the medical center is authorized to enter. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 47–48.

Although only about 7%[50] of the medical center's funding comes from state appropriations, whereas two-thirds of the funding represents patient services revenue, these funds are used to support the hospital's physical maintenance and pay faculty salaries. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 8–9. Plaintiffs argue that the commonwealth's "insignificant contribution to [the medical center's] operations proves that the State does not bear significant financial responsibility for the medical center under *Hess*." Plaintiffs' Memorandum of Law at VI–25. However, in determining whether Massachusetts bears financial responsibility for the medical center, the court must consider more than the amount of aid received in the form of direct state appropriations. *Fitchik*, 873 F.2d at 660 (the nature of the state's obligation to contribute is more important than the size of the contribution).

The University of Massachusetts Medical Center cannot issue bonds to raise revenue. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, p. 20. Although the medical center received eleven million dollars in tax-exempt financing from the Massachusetts Health and Education Administration, there is no indication in the record that the medical center could obtain financing to satisfy a judgment against it. Plaintiffs' Memo-

---

**50.** In 1992, commonwealth funding amounted to approximately 6%, of the medical center's budget, and in 1993, the commonwealth's appropria-

tions constituted 5.5% of the operating budget. *Plaintiffs' Memorandum of Law at VI–25.*

randum of Law, Appendix Volume 10, Exhibit 26, pp. 20–21.

The patient revenues received by the medical center are not paid over to the Massachusetts treasury, rather, they become part of an account into which all funds generated by the University of Massachusetts campuses are placed. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, p. 24. The trustees control this account, and any request, including one from the medical center, to receive finances from the account for expenses, must be approved by the trustees. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 24–28.

The medical center cannot sue or be sued in its own name, and state case law makes clear that the medical center is financially accountable to the commonwealth. *See McNamara v. Honeyman*, 406 Mass. 43, 546 N.E.2d 139, 142 (1989). Further, the medical center has no authority to issue bonds. All of these factors indicate that the university, and especially the medical center, are agencies of the commonwealth, rather than separate entities.

Relevant case law also indicates that the University of Massachusetts is an arm of the state. *Robinson v. Commonwealth*, 32 Mass. App.Ct. 6, 584 N.E.2d 636, 638 (1992) (the University of Massachusetts is an agency of the Commonwealth), *review denied*, 412 Mass. 1101, 588 N.E.2d 691 (1992); *McNamara*, *supra*, 546 N.E.2d at 142 (the university is an agency of the Commonwealth of Massachusetts, not a separate entity); *Cantwell v. University of Massachusetts*, 551 F.2d 879, 880 (1st Cir.1977) (University of Massachusetts as a state entity dismissed from action on ground of sovereign immunity); *Hannigan v. New Gamma–Delta Chapter of Kappa Sigma Fraternity, Inc.*, 367 Mass. 658, 327 N.E.2d 882, 883 (1975) (the University of Massachusetts trustees are the same as the commonwealth).

Although courts have rendered judgments against the medical center, there is no fund separate from the state treasury to pay such judgments except for a separate fund for payment of medical malpractice judgments. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 51–54. Any other judgment rendered against the medical center must be submitted to the commonwealth's Secretary of Administration Finance, a member of the governor's cabinet, for determination as to how to pay the judgment. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 26, pp. 53–54, 65.

The university's enabling statute provides that the Commonwealth shall settle the affairs of the corporation, and shall be subject to its legal obligations and liable for its lawful debts. Mass.Gen.L. ch. 75, § 1. As the statute requires the commonwealth to pay the university's legal obligations and lawful debts, it is clear that any money judgment achieved against the university and its medical center in this action would be against the university and ultimately the commonwealth. This fact amply supports the finding that medical center is an instrumentality of the commonwealth.

Finally, Plaintiffs contend that the medical center is not entitled to Eleventh Amendment immunity because it is engaged in a commercial, rather than a governmental function. Plaintiffs' Memorandum of Law at VI–26. However, Plaintiffs' argument fails to recognize that the medical center was created solely as an public educational institution, to provide research facilities and quality care to the residents of Massachusetts. The primary purpose of the medical center is to "promote high standards of health care within the Commonwealth by providing high quality patient services to the public and by supporting the clinical education programs of the Medical School." Plaintiffs' Memorandum of Law, Appendix Volume 6, Exhibit 3, Doc. No. LL14 00181. Providing education is considered a governmental, rather than a proprietary, function. *Hall*, *supra*, 742 F.2d at 305; *Rutledge*, *supra*, 660 F.2d at 1349. As discussed, *see* Discussion Section I(a), *supra*, that the nature of the public service provided by the entity at issue may be viewed as one also having characteristics similar to that provided by a private sector commercial business is not a ground to deny Eleventh Amendment protection.

Based upon the factors relevant to an Eleventh Amendment inquiry discussed, the

court finds that the University of Massachusetts Medical Center is entitled to Eleventh Amendment immunity.

### Summary of Findings on Eleventh Amendment Defenses

Upon review of the legal organization and powers of the foregoing hospital Defendants in determining whether each is more like an arm or instrumentality of a state or a political subdivision, the degree of control and state supervision over each entity, their respective degree of financial autonomy and the state's obligations and liabilities with respect to each, *see Lake Country Estates,* 440 U.S. 391, 99 S.Ct. 1171; *Feeney,* 873 F.2d 628, the court finds that hospital Defendants Ohio State University Hospital, Oregon Health Sciences University Hospital, the University of California (Los Angeles) Medical Center, the University of California (Irvine) Medical Center, the University of California (San Diego) Medical Center, University Hospital at the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center should be dismissed from the action as they are immune from suit in this court under the Eleventh Amendment.

### b. *State Action Doctrine*

Plaintiffs assert that Defendants have engaged in unlawful anticompetitive conduct, and seek a judgment from this court for damages and enjoining the Defendants from the continuing violation of both the Sherman Act and the Clayton Act. Second Amended Complaint at ¶ 1. Several of the hospital Defendants created by state law—Lincoln Medical and Mental Health Center, Ohio State University Hospital, Oregon Health Sciences University Hospital, Tri–City Medical Center, the University of California (Los Angeles) Medical Center, the University of California (Irvine) Medical Center, the University of California (San Diego) Medical Center, University Hospital at the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center,—counter that they are entitled to an exemption from federal antitrust laws because they are acting as an arm of state government, for and on behalf of their respective states, in their sovereign capacity, and that their requirements that emergency physicians be ABEM certified or eligible for certification is therefore not actionable. These Defendants rely upon the landmark case of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and subsequent cases interpreting it.

*Parker* and its progeny established the general proposition that states acting in their sovereign capacities are exempt from federal antitrust laws, the so-called state action doctrine. To qualify for this judicially created exemption from the antitrust laws, amendment must demonstrate either that it is the state [51] acting in its sovereign capacity or that it is acting pursuant to a "clearly articulated and affirmatively expressed state policy." *Hoover v. Ronwin,* 466 U.S. 558, 568–69, 104 S.Ct. 1989, 1995–96, 80 L.Ed.2d 590, *reh'g denied,* 467 U.S. 1268, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984).

It is clear under the state action doctrine that the legislative and judicial branches of state government act as the state in its sovereign capacity. *See Parker, supra,* at 351, 63 S.Ct. at 313–14 (legislature acts as the state); *Hoover, supra* at 573, 104 S.Ct. at 1997–98 (state supreme court which maintained sole authority to determine who

---

51. The Supreme Court has also applied the *Parker* doctrine to anticompetitive actions of political subdivisions. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). In order for a political subdivision to obtain state action immunity, it must show (1) that it is a political subdivision of the state, (2) that, through statutes, the state generally authorizes the political subdivision to perform the challenged action, and (3) that, through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct. *See Town of Hallie, supra; Federal Trade Commission v. Hospital Board of Directors of Lee County,* 38 F.3d 1184, 1187–92 (11th Cir.1994) (county hospital board was protected by state action immunity as the anticompetitive effects of the board's proposed purchase of a private hospital was reasonably anticipated by the legislature).

should be admitted to practice law, despite delegation of the administration of the admissions process, was acting in a sovereign capacity and was entitled to exemption from federal antitrust laws under the state action doctrine); *Bates v. State Bar of Arizona*, 433 U.S. 350, 360, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810 (1977) (state supreme court acting in legislative capacity acts as the state). Further, both the Fifth and Ninth Circuits have held that the executive branch of state government is entitled to an exemption from federal antitrust laws. *See Charley's Taxi Radio Dispatch v. SIDA of Hawaii*, 810 F.2d 869, 874–76 (9th Cir.1987) (Hawaii Department of Transportation entitled to an exemption from federal antitrust laws as part of executive branch); *Deak–Perera Hawaii, Inc. v. Department of Transportation*, 745 F.2d 1281, 1282 (9th Cir.1984), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 820 (1985) (similar conclusion); *Saenz v. University Interscholastic League*, 487 F.2d 1026, 1027–28 (5th Cir.1973) (division of University of Texas entitled to an exemption from the federal antitrust laws under the state action doctrine). *See also Pharmaceutical and Diagnostic Services, Inc. v. University of Utah*, 801 F.Supp. 508, 514 (D.Utah 1990) (state university and its officials exempt from federal antitrust liability for operating radiopharmacy since university constituted state acting in its sovereign capacity).

▪ The Supreme Court has stated that when anticompetitive conduct is undertaken by the sovereign itself, for example, through its legislature or its supreme court, that activity is *ipso facto* immune from federal antitrust laws, regardless of the state's motives in taking the action. *Hoover, supra,* at 579–580, 104 S.Ct. at 2001. However, "[w]hen a state agency, municipality, or other state subdivision claims a state immunity from federal law, it must first identify a 'clearly expressed state policy' that authorizes its actions." [52] *Cine 42nd Street The-*

*ater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1043 (2d Cir.1986) (citing *Town of Hallie, supra,* at 40, 105 S.Ct. at 1717) (the court interpreted the clear articulation standard broadly; if the legislature "contemplated the kind of action complained of," it is sufficient to satisfy the standard). *See also Montauk–Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 95 (2d Cir.1986) ("It is not necessary for the state legislature to have stated explicitly that it expected a municipality to engage in conduct having anticompetitive effects") citing *Town of Hallie, supra.*

However, to avoid the argument that the entity's actions fall outside the actual scope of delegation of state power to an agency, municipality, or other state subdivision, a claimed reliance upon broad legislative authority to regulate free of antitrust challenge in a specific area must foreseeably result from an entity's properly exercising anticompetitive power. *See, e.g., Town of Hallie, supra* (where the municipality's anticompetitive conduct in providing sewage collection and transportation services were authorized by the state). *Cf. Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (state regulation applied only to the distribution of electric power, thus, as the light bulb market was completely separate from the business of providing electric power, the right to monopolize one could not, without a clearly articulated state policy, transfer to the other as the actions of the utility in selling light bulbs were neither authorized nor foreseeable).

▪ The Second Circuit has concluded that to provide a basis for application of the state action doctrine the enabling legislation need not explicitly authorize the precise actions undertaken, rather, it is only necessary that the permitted actions produce anticompetitive consequences that foreseeably flow from the grant of general state authority to the entity in question. *Cine 42nd Street,*

---

52. "The *Parker* doctrine is not so broad as to constitute an automatic 'status' exemption for state agencies ... [as] [s]ome acts of state agencies are not acts of the government by the state as sovereign." *Cowboy Book, Ltd. v. Board of Regents for Agriculture and Mechanical Colleges*, 728 F.Supp. 1518, 1520 (W.D.Okla.1989). *See,*

*e.g., Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572, *reh'g denied*, 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975) (the Court found that a minimum fee schedule for legal services promulgated by a county bar association was subject to antitrust challenge).

*supra*, at 1043. Thus, the enabling statute must affirmatively designate a particular area to be regulated, provide methods of regulation, and create grounds within the regulatory scheme for a reasoned belief that some anticompetitive activity could be envisioned. *Cine 42nd Street, supra*, at 1043–44. "The clarity of such policy is often a function of how broadly the legislation is drawn, with the existence of such policy being more readily discernable in narrowly drawn legislation. The legislation must contain an affirmative showing of intent, though it need do no more than authorize the challenged conduct." *Cine 42nd Street, supra*, at 1043 (citing *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 61–62, 105 S.Ct. 1721, 1728–1729, 85 L.Ed.2d 36 (1985)). "So long as the resulting anticompetitive activities are a foreseeable consequence of the state delegation, the 'clear articulation' standard has been met." *Cine 42nd Street, supra*, at 1043 (citing *Town of Hallie, supra*, at 43–44, 105 S.Ct. at 1718–19). To meet this requirement the party claiming the state action defense must show that the "legislature contemplated the action complained of." *Town of Hallie, supra*, at 43–44, 105 S.Ct. at 1718–1719 (quoting *City of Lafayette, Louisiana v. Louisiana Power & Light Company*, 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978)).

▮ The second requirement, active state supervision, is no longer required in the case of a municipality, as, unlike a private party, municipalities are considered to have no incentive to act other than in the public interest. *Town of Hallie, supra*, at 45–46, 105 S.Ct. at 1719–1720. *Cine 42nd Street, supra*, at 1043; Likewise, "in cases in which the actor is a state agency, it is likely that the active state supervision would also not be required." *Town of Hallie, Supra*, at 46 n. 10, 105 S.Ct. at 1720 n. 10. *Cf. Federal Trade Commission v. Ticor Title Insurance Company*, 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) (where the state has articulated a clear and affirmative policy to allow anticompetitive conduct and provides active supervision of anticompetitive conduct by private actors, state law can provide a basis for an exemption from federal antitrust laws); *California Liquor Dealers v. Midcal*

*Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (challenged restraint must be clearly articulated and affirmatively expressed as state policy, and actively supervised by the state itself).

▮ None of the hospital Defendants can claim that it is *ipso facto* immune as the state simply because it exits and operates by action of the state. Rather, each hospital Defendant must demonstrate that its alleged anticompetitive actions were authorized by the state. *Goldfarb, supra*, at 792, 95 S.Ct. at 2015–2016; *Cine 42nd Street, supra*, at 1044. For example, in *Hoover*, an exemption from federal antitrust laws for state action was granted for an adjunct committee to the state supreme court which graded state bar examinations. *Hoover, supra*, at 558, 104 S.Ct. at 1989. The court created the committee, it selected the subjects to be tested, and permitted direct appeals by unsuccessful applicants. This high degree of state involvement signalled, according to the Supreme Court, that the activities of the committee were those of the court and consequently those of the state. *Hoover supra*, at 569–74, 104 S.Ct. at 1995–98. *Compare Ticor Title Insurance Co., supra*, (as actual state involvement is a prerequisite to protection under the state action doctrine, this defense was not available under the regulatory schemes in Montana and Wisconsin with respect to their title insurance companies); *Westborough Mall, Inc. v. Cape Girardeau*, 693 F.2d 733 (8th Cir.1982) (court found no state action where a conspiracy to thwart normal zoning procedures and to directly injure the plaintiffs by illegally depriving them of their property was not in furtherance of any clearly articulated state policy).

▮ In the instant case, the high level of direct participation or control by the legislative or executive branch of state government in the affairs of each hospital Defendant is absent, and thus militates against finding that the hospital Defendants were directly acting in a sovereign capacity when they are alleged to have violated federal antitrust laws. Therefore, it is necessary to evaluate whether the anticompetitive conduct attribut-

able to the Defendants was authorized by their respective states.[53]

## 1. *Lincoln Medical and Mental Health Center*

■ In 1969, the New York State legislature authorized the New York Health and Hospital Corporation ("the HHC") to operate Lincoln in the interest of providing and maintaining medical services, research, education, and training programs for the residents of New York state. N.Y.Unconsol.L. §§ 7382, 7385(8), (11) (McKinney 1979 & 1995 Supp.).[54] The HHC is a public corporation created and empowered by New York State to operate a public hospital system in New York City, including Lincoln Medical and Mental Health Center. *See Bryan v. Koch,* 492 F.Supp. 212, 215–16, 216 n. 1 (S.D.N.Y.), *aff'd,* 627 F.2d 612 (2d Cir.1980) (discussing the HHC and New York City's municipal hospital system). *See also* Lincoln Medical and Mental Health Center's Motion to Dismiss, filed May 2, 1994, Exhibit B.

The HHC is empowered to "operate, manage, superintend and control" the hospitals under its authority. N.Y.Unconsol.L. § 7385(7). The corporation also has the capacity to sue or be sued, make contracts, borrow money, acquire or sell property, and adopt, alter, or repeal rules and regulations for the management, organization, and regulation of its affairs. N.Y.Unconsol.L. §§ 7385(1)–(6). Moreover, the HHC was intended to provide continuous medical services, and sponsor and conduct research, educational and training programs, in connection with its purpose of providing quality care and treatment through adequately trained and qualified personnel. N.Y.Unconsol.L. §§ 7382, 7385(8). In fulfilling these purposes, the HHC was also granted the authority to determine, in accordance with standards established by the New York City Department of Health, "the conditions under which a physician may be extended the privilege of practicing within a facility under the jurisdiction of [the HHC]," as well as "[t]o cooperate with any organization, public or private ... the objects of which are similar to the purposes of [the HHC]." N.Y.Unconsol.L. §§ 7385(10), (12), (18).

The HHC is governed by a sixteen member Board of Directors consisting of five New York City officials, ten persons appointed by the Mayor and City Council, and the remaining director is the chief executive officer of the corporation. N.Y.Unconsol.L. § 7384(1). All of the hospitals, including Lincoln Medical and Mental Health Center, operated by HHC are subject to supervision by the New York State Department of Health, inspection by various New York City agencies, and are obligated to conform their respective services and regulations with the New York City Department of Health's policies. N.Y.Unconsol.L. §§ 7384(9), 7386(7).

From its inception, the HHC was structured to operate independently of both the state and city governments. As a public benefit corporation, the HHC exercises governmental authority, and interacts with the City of New York in providing medical services through HHC hospitals. *See* N.Y.Unconsol.L. §§ 7386(1)(a), (3)(c); Lincoln Medical and Mental Health Center's Motion to Dismiss, filed May 2, 1994, Exhibit B. In determining whether Lincoln is entitled to the state action doctrine defense, the court must find that Lincoln, which is concededly not a state agency, is a political subdivision[55] of the State of New York and that the state has authorized the political subdivision to perform the challenged action by clearly articulating a state policy authorizing anticom-

---

53. The fact that defendant is not considered, for state action doctrine purposes, as the state itself is not inconsistent with a finding of the availability of Eleventh Amendment immunity as the state action doctrine which focuses on the question of whether the challenged activity is authorized by the state, potentially includes a broader range of governmental actions. An Eleventh Amendment analysis concentrates on the relationship of the defendant to the state, not whether a challenged action is authorized by it. Thus, for example, a

local government as a political subdivision would likely not be accorded immunity but may assert a state action doctrine defense.

54. Unless otherwise indicated, references to McKinney's New York Unconsolidated Laws will refer to the 1979 edition and 1995 Supplement.

55. There is no dispute that Lincoln Medical and Mental Health Center is a municipal hospital.

petitive conduct. *Town of Hallie, supra; Community Communications Company, Inc. v. City of Boulder, Colorado,* 455 U.S. 40, 52–54, 102 S.Ct. 835, 841–42, 70 L.Ed.2d 810 (1982); *Lafayette, supra,* at 411–13, 98 S.Ct. at 1136–37; *Cine 42nd Street, supra,* at 1041–43.

■ Lincoln asserts, correctly, that it was authorized to determine what credentials were necessary for a physician to receive privileges to practice, and to cooperate with organizations which pursue purposes similar to those of the HHC. N.Y.Unconsol.L. §§ 7385(10), (12), (18). Therefore, the court finds that the New York legislature has granted the HHC authority to establish accreditation standards for its physicians. However, Lincoln and the HHC must also demonstrate that the state statutes provide a clearly expressed state policy authorizing the anticompetitive conduct or from where the conduct at issue was reasonably foreseeable. *Cine 42nd Street, supra,* at 1043.

■■ The New York legislature clearly expressed concerned about hiring a highly qualified and trained medical staff to provide services for the residents of New York City. *See* N.Y.Unconsol.L. §§ 7382, 7385(10). Thus, it is probable that the legislature envisioned in creating the HHC that anticompetitive effects could result from its legislation. Further, as it was reasonably foreseeable that anticompetitive consequences would result from a requirement for well-trained physicians, the statute must be considered a clearly articulated state policy authorizing anticompetitive behavior. Thus, Lincoln Medical and Mental Health Center is exempt in this action from antitrust liability pursuant to the state action doctrine.

## 2. *Ohio State University Hospital*

■ The Ohio state legislature has vested in the Ohio State University substantial powers to supervise, regulate and control the University Hospital and its staff. As Ohio State University and the Ohio State University Board of Trustees are not the sovereign, to claim the defense of state action doctrine the University Hospital must show that its alleged anticompetitive conduct, the requirement of board certification for all medical staff members, was required pursuant to a clearly articulated state policy.

The Ohio State University Hospital was established and structured to provide high quality health care for its patients, and educational training services for its students. Hospital Bylaws § 3335–43–02(A)–(D).[56] The Ohio State University Trustees granted the hospital's board responsibility for the oversight of the hospital's accreditation process, Hospital Bylaws § 3335–93–02(E), and approval of medical appointments and clinical privileges, Hospital Bylaws § 3335–93–02(F), including the requirement that all applicants for medical staff positions be board certified in a medical specialty. Hospital Bylaws § 3335–43–04(A)(4). For purposes of this inquiry, the most significant power granted to the hospital board is the power to oversee medical faculty accreditation issues, demonstrating that the trustees envisioned that the hospital board would set the standards for the medical staff at the hospital. By granting the hospital board the ability to direct the credentialling process for the hospital's medical staff,[57] the trustees likely envisioned a health care and educational facility with a highly competent staff having excellent professional qualifications.

Certainly, the Ohio legislature contemplated the hiring of physicians for the medical school when it granted the trustees the authority to "[c]reate, establish, provide for, and maintain ... a college of medicine...." Ohio Rev.Code Ann. § 3335.15(A). It is unreasonable to assert that the legislature would not conceive any resulting anticompetitive effect upon physicians seeking employ-

---

56. The Hospital Bylaws are attached as Exhibit B of Ohio State University Hospital's Memorandum of Law in Support of its Motion to Dismiss, filed May 2, 1994.

57. The court notes that although the University Hospital, its clinical departments, medical director, credentialling committee, and the hospi-

tal board are all involved in the appointment of staff members, the trustees of the Ohio State University make the ultimate determination on this matter, after receiving the recommendations of the hospital board. Hospital Bylaws § 3335–43–04(E).

ment at one of its medical school facilities without board certification as required for such employment; even more farfetched is the contention that the Ohio legislature would not perceive any anticompetitive conduct as the result of establishing a medical school, or, for that matter, a governmentally operated hospital. In this case, any anticompetitive consequences resulting from the University Hospital's exercise of its power to determine what qualifications would be required for placement on the medical staff of the University were a reasonably foreseeable consequence of the legislature delegation of authority to the Ohio State University trustees. *See Cine 42nd Street, supra,* at 1042, 1047.

As anticompetitive conduct was a foreseeable result of legislatively empowering the trustees to create a school of medicine,[58] the statute clearly contemplated that Ohio State University Hospital could engage in anticompetitive conduct in employing physicians to provide high quality health care for its patients and excellent instruction for its students. Thus, a clearly articulated state policy exists which resulted in foreseeable consequences based on the legislature's delegation of power to the Ohio State University Trustees. As the challenged actions of the University Hospital were foreseeable consequences of the state's delegation of the power to the trustees, Ohio State University Hospital is entitled, in this action, to exemption from federal antitrust laws.

### 3. *Oregon Health Sciences University Hospital*

■ Oregon Health Sciences University Hospital is part of a public corporation formed to provide educational and health care services to the people of Oregon. 1995 Or.Laws ch. 162, §§ 1(2), (3). Although the university's enabling statute indicates that it is a "government entity performing governmental functions and exercising governmen-

tal powers ... [the University] shall not be considered a unit of local or municipal government or a state agency for purposes of state statutes or constitutional provisions." 1995 Or.Laws ch. 162, §§ 2, 8.

The university exercises several powers which were delegated by the Oregon legislature to its Board of Directors. Discussion Section I(a)(2), *supra.* The university is highly autonomous, but, although, for Eleventh Amendment purposes, properly considered as an arm or instrumentality of the state of Oregon, *see* Discussion Section I(a)(2), *supra,* it is clearly not the state itself. As such, to successfully invoke the state action defense, the university hospital must demonstrate that the state has generally authorized the challenged action by clearly articulating a state policy reasonably contemplating anticompetitive conduct. *See Town of Hallie, supra.*

As noted, the Oregon legislature granted Oregon Health Sciences University significant autonomy in achieving its purpose of serving the people of Oregon as the state's primary center for health sciences education. Discussion Section I(a)(2), *supra.* The state legislature vested in the Oregon Health Sciences University Board of Directors substantial powers to regulate and control Oregon Health Sciences University, the university hospital and its medical staff. 1995 Or.Laws ch. 162, § 8(2) (Board of Directors [of the university] shall appoint and employ instructional, administrative and professional personnel as necessary and appropriate to carry out the mission of the University). To achieve the purpose of providing the people of Oregon with high quality health care and related education, the legislature could have foreseen that the Oregon Health Sciences University Hospital and medical school would require highly qualified faculty members with board certification. Therefore, the Oregon legislature did clearly articulate a state policy authorizing anticompetitive conduct,

---

**58.** It is not necessary that the Ohio legislature explicitly state that it expects Ohio State University Hospital to engage in conduct with anticompetitive effects. *Cine 42nd Street, supra,* at 1043. *See also Southern Motor Carriers Rate Conference, Inc., supra* (the state need not describe the implementation of its program in detail in order to

avoid antitrust constraints); *Porter Testing Laboratory v. Board of Regents for the Oklahoma Agriculture and Mechanical Colleges,* 993 F.2d 768, 771 (10th Cir.1993). Moreover, the court notes that the broad regulatory powers granted to Ohio State University are strongly in keeping with the university's educational goals.

and it was reasonably foreseeable that a requirement of board certification for the hospital's physicians would result in anticompetitive consequences. Thus, Oregon Health Sciences University Hospital is, in this action, entitled to immunity from federal antitrust laws under the state action doctrine.

### 4. *Tri–City Medical Center*

■ In order to determine whether, as Tri–City Medical Center has asserted, the state action doctrine and Local Government Antitrust Act, 15 U.S.C. §§ 34–36, apply to it, the court must review California statutory and caselaw, and the rules and regulations of the medical center's Department of Emergency Medicine. Tri–City Medical Center has requested that the court take judicial notice of California statutes and the rules and regulations of the Department of Emergency Medicine, *see,* Tri–City Medical Center's Request for Judicial Notice, filed March 21, 1994; Tri–City Medical Center's Supplemental Request for Judicial Notice, filed January 30, 1995. As the California statutes and law describe the powers and duties granted to the medical center's board of directors and medical staff, their consideration is necessary to determine whether the hospital is an entity entitled to interpose either defense. Plaintiffs have not submitted any opposition to these requests. The court therefore takes judicial notice of the California statutes and Tri–City Medical Center's rules and regulations, as presented in Exhibits A through I, *see* Fed.R.Evid. 201(d), and will first consider whether the medical center is entitled to an exemption from federal antitrust law under the state action doctrine. Whether the medical center is also immune from jurisdiction for antitrust damage claims under the Local Government Antitrust Act will be considered in the next section of this Report and Recommendation. *See* Discussion Section I(c), *infra.*

Tri–City Medical Center was established in 1957 as a hospital district by the California Health & Safety Code §§ 32000 – 32313 (Deering 1986 & 1992 Supp.) [59] (providing for formation of a hospital district and organiza-tion and powers of the board of directors). Tri–City Medical Center's Request for Judicial Notice, filed March 21, 1994, Exhibit B. Tri–City Medical Center is a hospital district with the primary purpose of providing hospital services and health care in areas where hospital facilities are inadequate. *Talley v. Northern San Diego Hospital District,* 41 Cal.2d 33, 257 P.2d 22, 25 (1953), *overruled on other grounds, Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988); Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 35, p. 17. The medical center's board of directors consists of five members who are elected by the registered voters in the hospital district. Cal. Health & Safety Code § 32100. The board of directors has several powers, including the ability to use a corporate seal, sue or be sued, buy, receive, or lease property, acquire property through eminent domain, establish trusts for the benefit of the district, employ counsel, officers, and employees, establish, maintain and operate health facilities for the benefit of the district, establish and adopt rules and regulations as necessary for the exercise of these powers and duties, and do all things necessary for the advancement of the hospital and nurse's training school. Cal. Health & Safety Code §§ 32104, 32121, 32126.5, 32127.2. Further, the board of directors is empowered to enter into contracts with health provider groups, community service organizations, and independent physicians for health services, and more specifically, contract for professional services for the medical center emergency department with private physicians and surgeons. Cal. Health & Safety Code §§ 32126.5(a), 32129.5.

In fulfilling its purposes, Tri–City Medical Center's medical staff, executive committee, and ultimately its board of directors have the authority to determine the conditions under which a physician may be extended the privilege of practicing at the medical center. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 4, pp. 3, 5; Volume 10, Exhibit 20, pp. 16–19. The rules and regulations of the Department of Emergency Medicine currently require physicians practicing

---

59. Unless otherwise indicated, all references to California's Health and Safety Code are to the 1986 edition and 1992 Supplement of Deering's California Health and Safety Code.

emergency medicine to be "certified by the American Board of Emergency Medicine, or have completed an approved residency in Emergency Medicine, (or its equivalent, as determined by the Department of Emergency Medicine), and are Board eligible and actively pursuing Board Certification in Emergency Medicine." Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 4, p. 3.

■ Tri–City Medical Center has asserted that it is entitled to an exemption from federal antitrust law pursuant to the state action doctrine. However, at the deposition of Karen L. Ladley, the interim Chief Executive Officer of Tri–City Medical Center, counsel for the medical center assured Plaintiffs that Tri–City's defenses in this action were limited to the Local Government Antitrust Act of 1984 and lack of personal jurisdiction, thereby preventing the deponent from answering relevant questions at the deposition. Further, defense counsel indicated that she would not raise a state action defense.[60] Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 35, p. 21. Therefore, as Tri–City Medical Center waived its state action defense,[61] and Plaintiffs would be prejudiced by the addition of this defense at this time, the medical center is not entitled to the protection under the state action doctrine.

Should the district court, alternatively, find that no waiver occurred, Tri–City Medical Center should be dismissed under the state action doctrine as it was foreseeable that through exercise of its medical staff credent-

ialling power the asserted antitrust effect would occur.

### 5. *University of California Medical Centers*

■ The University of California Medical Centers at Los Angeles, Irvine, and San Diego are entities governed by the Regents of California, which itself is created by the California state constitution, having all powers necessary and convenient for administration of the trust of the University of California. Cal. Const. art. 9, § 9.

As discussed in connection with the application of the Eleventh Amendment to the Defendant University of California medical centers, California courts have recognized that the California Board of Regents is a "branch of the state itself . . . a constitutionally created arm of the state." *City of Santa Monica,* 77 Cal.App.3d at 135, 143 Cal.Rptr. 276. *See* Discussion Section I(a)(3), *supra.* Thus, the policies and procedures the Regents established to govern the University and its constituent institutions attain " 'the status of statutes in [the Regents'] internal governance [of the University of California and the Medical Centers].' " *Unix System Laboratories,* 832 F.Supp. at 795 (quoting *Apte,* 198 Cal.App.3d at 1092, 244 Cal.Rptr. 312). *See also Hamilton,* 293 U.S. at 257, 55 S.Ct. at 201–02 (the acts and orders of the Regents are legislative in character and are considered as statutes of a state). Thus, the Regents constitute a "branch of the state government equal and coordinate with the legislature, judiciary, and the executive

---

**60.** The court notes that Tri–City Medical Center's notice of joinder for the state action defense was filed on July 25, 1994, and the deposition of Ladley took place on August 8, 1994, after the medical center's request to add the state action doctrine as a defense.

**61.** The state action doctrine confers an exemption from federal antitrust law upon the state, state agencies, and municipalities which act pursuant to a clearly articulated and affirmatively expressed state policy. *See Parker, supra.* As the state action doctrine provides an exemption for certain actions of the state, and those acting according to the state's policy, including municipalities, the relief provided by the state action doctrine does not present the same type of limitation on the power of the federal courts that is

carried by other defenses which may result in a lack of subject matter jurisdiction, and which are not waivable by the parties. Thus, as Eleventh Amendment immunity can be waived without destroying subject matter jurisdiction *see Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662, *reh'g denied,* 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974); *Petty v. Tennessee–Missouri Bridge Commission,* 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959), *a fortiori* state action immunity can also be waived. *See, e.g., Bolt v. Halifax Hospital Medical Center,* 874 F.2d 755, 756 (11th Cir. 1989) (hospital and medical staffs waived any immunity from antitrust liability where they formally withdrew any claim of immunity in oral argument before the en banc court).

branch." *Ciba–Geigy Corporation,* 804 F.Supp. at 622.

Although the medical centers exercise powers delegated from the Regents, and the Board of Regents is recognized as the state by California courts, the related medical center hospital Defendants—Los Angeles, Irvine, San Diego—themselves cannot claim that they are identical with the state for the purposes of a state action doctrine defense absent a showing of more direct control and oversight by the Regent. *Compare Hoover, supra.*

As the medical centers are not the sovereign, itself, they must demonstrate that the alleged anticompetitive conduct, the requirement of board certification for all medical staff members, was required pursuant to a clearly articulated legislative policy. *Cine 42nd Street, supra,* at 1044. The medical centers were established by the Regents and granted the power to administer their day to day operations, including the responsibility for evaluating and approving policies regarding physician credentialling. *See* Discussion Section I(a)(3), *supra.* Because each of the medical centers was delegated authority by the Regents to develop a credentialling process, through the credentialling process the Regents likely envisioned health care and educational facilities with highly qualified medical staff. *See, e.g.,* Plaintiffs' Memorandum of Law, Appendix Volume 6, Exhibit 1, Doc. Nos. LL12 1257 – LL12 1259; Exhibit 2, Doc. No. LL13 1973.

In providing the medical centers with such authority and as the decision to require board certification was incident to the exercise of the credentialling power, it was a foreseeable consequence that the medical centers would require that their respective physicians be board certified in a specialty. As any anticompetitive effects stemming from the medical centers' credentialling policies for their physicians including emergency physicians were foreseeable as a consequence of the delegation of power by the California Regents, a clearly articulated state policy exists as to the medical centers in this case. Therefore, the medical centers and their respective teaching hospital Defendants are entitled to an exemption, in this action, from federal antitrust laws under the state action doctrine.

### 6. *University Hospital at State University of New York at Stony Brook*

■■■ Stony Brook University Hospital as a constituent institution within the State University of New York ("SUNY") was created pursuant to statute to provide the people of New York state with high quality educational services, health care, and programs. N.Y.Educ.L. § 351(a) (SUNY shall exercise care to develop and maintain a balance of its resources that recognizes the role of its responsibilities in undergraduate education and provides a full range of graduate and professional education), § 351(d) (SUNY shall strengthen its educational and research programs in the health sciences through the provision of high quality health care at its hospitals, clinics, and related programs), § 355(1)(d) (SUNY trustees are responsible for the establishment of health and medical centers, professional and graduate schools, research centers and other facilities). The SUNY trustees have delegated some authority to the University at Stony Brook, however, the University Hospital remains ultimately responsible to the SUNY trustees, who are accountable to the state legislature. *See* Discussion Section I(a)(4), *supra.* Given the SUNY structure and organization as a corporation within the State Education Department headed by the Board of Regents, its connection to the state is sufficiently removed from the executive and legislative branches to find that Stony Brook is not acting as the state itself. *See* Discussion Section I(a)(4), *supra.* Thus, Stony Brook University Hospital must demonstrate that, in requiring that its medical staff physicians be board certified, the alleged anticompetitive conduct, it was acting pursuant to a clearly articulated policy of the state.

The Stony Brook Medical School and University Hospital were created to provide "educational and research programs in the health sciences through the provision of high quality health care at its hospitals." N.Y.Educ.L. § 351(d). To accomplish the state legislature's stated purpose, the New York legislature delegated power to the

SUNY trustees to maintain and operate the medical school and university hospital. N.Y.Educ.L. §§ 351(d), 352(1), 353, 355(1)(d). As Stony Brook is licensed by the New York State Department of Health, pursuant to Article 28 of the New York Public Health Law, *see* N.Y.Pub. Health L. § 2800 *et seq.* (McKinney 1993 & 1995 Supp.), all of Stony Brook's operations and functions must comply not only with the rules and regulations of the SUNY trustees, but also the New York Public Health Law, and the regulations of the Commissioner of the New York State Department of Health. Therefore, all emergency physicians at Stony Brook must meet the minimum qualifications listed in Section 405.19(d)(1)(i)(a) or (b) of the New York State Department of Health's regulations. 10 N.Y.C.R.R. Chapter 5, § 405.19(d)(1)(i)(a) or (b). N.Y.C.R.R. Section 405.19(d)(1)(i)(a) requires that an attending physician must be board certified in emergency medicine, surgery, internal medicine, pediatrics, or family practice; subsection (b) states that a physician must have, within the past five years, 7000 documented patient contact hours or hours of teaching medical students or physicians, and have acquired in each of the last three years, an average of fifty hours or more per year of continuing medical education pertinent to emergency medicine or to the specialties of practice which contributed to meeting the 7000 hours requirement. 10 N.Y.C.R.R. Chapter 5, § 405.19(d)(1)(i)(b).

Based on the grant of authority from the state legislature, the requirements of the applicable New York regulations, and the SUNY system's mission to provide the highest quality education and health care services, it was reasonably foreseeable that SUNY would require its staff physicians at Stony Brook to be highly skilled in the fields in which they practice medicine, including the university hospital's decision to require board certification as a prerequisite to hiring of medical staff members. Thus, any anticompetitive effect resulting from the establishment of the certification requirement was a foreseeable consequence of the legislature's delegation of power to the SUNY trustees.

As the legislature intended that Stony Brook would provide the best education and health care if it was staffed with well-qualified physicians, a clearly articulated state policy for the challenge requirement exists, and Stony Brook University Hospital is entitled, in this action, to an exemption from the federal antitrust laws under the state action doctrine.

### 7. *University Hospital at the University of New Mexico School of Medicine*

The University of New Mexico is a constitutionally created entity under the New Mexico state constitution governed by the Regents of New Mexico. N.M. Const. art. XII, § 11 (creating the University of New Mexico as a state educational institution), § 13 (creating the Board of Regents to provide for the control and management of the university). The University of New Mexico is defined as a state agency pursuant to Section 2242.1 of the New Mexico state statutes, *see* Discussion Section I(a)(5), thus, to obtain state action immunity, the hospital must identify a clearly expressed state policy authorizing its alleged anticompetitive actions. *Cine 42nd Street, supra,* at 1043.

The medical staff and medical director at the University of New Mexico propose, review, and evaluate, and the trustees of the University approve the standards for credentialling physicians. Plaintiffs' Memorandum of Law at VI31, Appendix Volume 10, Exhibit 29, p. 40. By authorizing the university hospital to decide, through action of the trustees of the University, what credentials would be required of its staff physicians, the New Mexico legislature could have reasonably foreseen the university hospital's requirement that its physicians acquire and maintain board certification in a specialty, the anticompetitive activity complained of in the instant case. Therefore, as the state legislature's broad delegation of power to the trustees of the University of New Mexico included the anticompetitive consequence of hiring only board certified physicians, New Mexico University Hospital is entitled, in this action, to an exemption from federal antitrust laws under the state action doctrine.

### 8. *University of Massachusetts Medical Center*

The University of Massachusetts Medical Center was created by the trustees

of the University of Massachusetts pursuant to state statute. Mass.Gen.L. ch. 75, §§ 2, 34. Although the trustees maintain broad control of the medical center, they granted the university authority to allow the medical center to manage its day to day affairs. *See* Discussion Section I(a)(5), *supra.* As the medical center is too far removed from the Massachusetts legislature to be considered the state itself, the medical center must demonstrate that a clearly expressed state policy authorizes its anticompetitive requirement of board certification for appointment to the medical center's staff. *Cine 42nd Street, supra,* at 1043; Plaintiffs' Memorandum of Law, Appendix Volume 6, Exhibit 3, Doc. No. LL14 00210.

In this case, the Massachusetts legislature authorized the university trustees to create schools or colleges to meet the needs of the Commonwealth of Massachusetts in the field of public higher education, including a medical school. Mass.Gen.L. ch. 75, §§ 2, 34. Further, the legislature indicated that the medical center's purpose was to provide "public service, research, and education programs" in professional areas which require more than an undergraduate education, such as medicine. Mass.Gen.L. ch. 75, § 2. This enabling statute is sufficiently broad to allow the medical center to set the standards required for physicians to practice and teach at the medical center. As the requirement of board certification for physicians is a reasonably foreseeable consequence of the legislature's broad delegation of power, the legislature's authorization constitutes a clearly articulated state policy. Thus, as the result of the legislative grant of authority to the University of Massachusetts trustees, the challenged actions of the medical center were foreseeable consequences, and the medical center is, in this action, protected by the state action doctrine.

In this case, Lincoln Medical and Mental Health Center, Ohio State University Hospi-

tal, Oregon Health Sciences University Hospital, the University of California Medical Centers, Stony Brook University Hospital, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center all have demonstrated that a clearly articulated and affirmatively expressed state policy existed which made each respective hospital's requirement of board certification for its medical staff members foreseeable. Therefore, the court finds that each of these hospital Defendants are exempt, in this action, from federal antitrust law by application of the state action doctrine.

### c. *Local Government Antitrust Act Immunity*

■ The Local Government Antitrust Act of 1984 ("the LGAA"), 15 U.S.C. §§ 34–36, was enacted by Congress "in order to broaden the scope of antitrust immunity applicable to local governments." *Sandcrest Outpatient Services, P.A. v. Cumberland County Hospital System, Inc.,* 853 F.2d 1139, 1142 (4th Cir.1988) (citing H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.Code Cong. & Admin. News 4602, 4603); *Capital Freight Services, Inc. v. Trailer Marine Transport Corporation,* 704 F.Supp. 1190, 1197 (S.D.N.Y.1989). The LGAA provides immunity to any defined local government from monetary damages, costs, and attorney's fees under Sections 15, 15a, and 15c in an antitrust case.[62] 15 U.S.C. § 35(a). "Congress prohibited the recovery of antitrust damages against local governments based on the policy that 'tax payers should not be forced to bear the treble damage remedies recoverable from local governments under extant law, and on the belief that local governments should not be forced to spend public funds in defending baseless antitrust suits.'" *Zapata Gulf Marine Corporation v. Puerto Rico Maritime Shipping Authority,* 682 F.Supp. 1345, 1350 (E.D.La.1988) (quot-

---

62. However, Plaintiffs can be awarded attorney's fees if the antitrust action for injunctive relief is successful, as the LGAA only precludes the recovery of damages, costs, or attorneys fees on the basis of 15 U.S.C. §§ 15, 15a, or 15c. 15 U.S.C. § 35(a). The provision which mandates that costs and attorneys fees be awarded to plaintiffs who "substantially prevail" in actions for injunctive relief is 15 U.S.C. § 26, which is unaffected by 15 U.S.C. § 35(a). *See Lancaster Community Hospital v. Antelope Valley Hospital District,* 940 F.2d 397, 404 n. 14 (9th Cir.1991); *Palm Springs Medical Clinic, Inc. v. Desert Hospital,* 628 F.Supp. 454, 462–63 (C.D.Cal.1986).

ing *Palm Springs, supra,* at 461–462). However, the LGAA does not extend its immunity to injunctive relief. 15 U.S.C. § 35; *Cohn v. Bond,* 953 F.2d 154, 158 (4th Cir.1991); *Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 95 (2d Cir.1986).

 In determining whether an entity is entitled to immunity from damages under the LGAA, the court must first ascertain whether the entity is a "local government," as defined by the LGAA. The LGAA defines "local government" as "a city, county, parish, town, township, village, or any other general function governmental unit established by State law, or ... a school district, sanitary district, or any other special function governmental unit established by State law in one or more States...." 15 U.S.C. § 34(1). The special function governmental unit provision is "designed to protect those political subdivisions of the state, which though they do not have broad governmental powers, nonetheless serve a public function in the provision of a particular service." *Capital Freight, supra,* at 1198. For example, the Massachusetts Port Authority serving the City of Boston area was determined to be a "special function governmental unit" as the Massachusetts legislature created it as a public instrumentality and deemed the exercise of its powers to be an "essential governmental function." *Trustees of A.J. Bremen Realty Trust v. City of Boston,* 1985 WL 6083, *3 (D.Mass.1985). Moreover, the court in that case observed that the legislative history of the LGAA indicated that Congress intended entities such as local airport authorities to be protected by the statute. *Id.* at *3 (House Committee Report on the LGAA states that "[e]xamples of special purpose political subdivisions included within the definition are planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts. Such a subdivision would have a geographic jurisdiction that is not contiguous [sic] with, and is generally substantially smaller than, that of the State that established it. The

definition, however, would encompass special purpose governmental units that operate in more than one State. For example, regional planning boards, environmental organizations, or airport or port authorities....") (citing H.R.Rep. No. 965, 98th Cong.2d Sess. 1920 (August 8, 1984)). Similarly, in *Palm Springs Medical Clinic, supra,* at 456–57, the court found that a hospital district established by the California Health and Safety Code was a "special function governmental unit" for purposes of the LGAA. The hospital district performed a public function by "protecting public health and welfare in areas with inadequate care." *Palm Springs Medical Clinic, supra,* at 457 n. 2.

 Additionally, a local government covered by the LGAA is immune from attack for any antitrust action undertaken in an official capacity, 15 U.S.C. § 35, regardless of whether it acted within its lawful regulatory authority.[63] *Montauk–Caribbean Airways, supra,* at 94; *Zapata Gulf Marine, supra,* at 1350 (citing *Palm Springs Medical Clinic, supra,* at 458–64). Thus, so long as the actions of the entity "do not violate any criminal laws," its conduct is exempted from federal antitrust law by the LGAA. *Capital Freight, supra,* at 1200 (citing *Montauk–Caribbean Airways, supra,* at 94–95).

Several hospital Defendants, Lincoln Medical and mental Health Center, Oregon Health Sciences University Hospital, TriCity Medical Center, the University of California Medical Centers, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center, assert that they are protected from paying damage awards under federal antitrust laws under the LGAA and are therefore entitled to have, to that extent, Plaintiffs' claims dismissed as to them.

### 1. *Lincoln Medical and Mental Health Center*

 The HHC is a "body corporate and politic constituting a public benefit corpora-

---

**63.** "Congress 'rejected the commercial-governmental distinction, adopting a definition for eligibility for immunity based on status as a governmental instrumentality and effect on taxpayers rather than purpose.'" *Tarabishi v. McAlester*

*Regional Hospital,* 951 F.2d 1558, 1564 (10th Cir.1991), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992) (quoting *Capital Freight, supra,* at 1199).

tion" created by the New York State legislature to operate New York City's public hospital system, including Lincoln Medical and Mental Health Center.[64] N.Y.Unconsol.L. ch. 5, §§ 7382, 7384(1), 7385(8), (11). The HHC provides continuous medical services, sponsors and conducts research, educational, and training programs in connection with its purpose of providing quality medical treatment, and "the protection and promotion of the health, safety and welfare of the inhabitants of the state of New York and the city of New York." N.Y.Unconsol.L. ch. 5, §§ 7382, 7385(8). As Lincoln Medical and Mental Health Center is one of the municipal hospitals under the jurisdiction and control of the HHC, this court must determine whether the center and the HHC qualify as a general or special function governmental units under the LGAA.

Lincoln Medical and Mental Health Center is a municipal hospital operated by the HHC, which provides medical services to the inhabitants of New York City, including those who cannot afford medical care. N.Y.Unconsol.L. ch. 5, § 7382. The center itself does not have broad governmental powers typical or a municipality and therefore would not qualify as a general function governmental unit, however, the HHC has powers necessary to carry out and effectuate the special health care purposes and provisions of the New York City Health and Hospital Corporation Act in providing for the efficient administration of Lincoln Health Center. See N.Y.Unconsol.L. ch. 5, § 7385. Further, the legisla-

ture has provided that the HHC's operation of Lincoln Medical and Mental Health Center serves a "state, city and public purpose," and in exercising its powers, the HHC performs "an essential public and governmental function." N.Y.Unconsol.L. ch. 5, § 7382. See Zapata Gulf Marine, supra, at 135–152 (shipping authority held to be a special function governmental unit after court found the entity to be "[a] corporate and political body constituting a public corporation" whose exercise of powers "constitutes an essential governmental function," payment of an antitrust judgment against the entity would ultimately be borne by the Commonwealth of Puerto Rico, and the entity performed a special function by maintaining the maritime transportation system for the benefit, protection and welfare of the people of Puerto Rico); Palm Springs Medical Clinic, supra, at 456–57 (court reviewed legislative history of the LGAA and the manner of creation and regulation of the hospital district before holding that it was protected by the LGAA); Trustees of A.J. Bremen, supra, at *3 (same).

Neither New York State nor New York City are liable for the HHC's bonds, notes, or other obligations. N.Y.Unconsol.L. ch. 5, § 7396. However, the City of New York is responsible for judgments against HHC, including judgments against Lincoln Medical and Mental Health Center, which are paid from city funds. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 48, pp. 1519; Lease Agreement, Art. VI, § 6.1.[65]

64. Although the HHC operates and administers Lincoln Medical and Mental Health Center, the hospital is owned by the City of New York. N.Y.Unconsol.L. ch. 5, § 7406; Lincoln Medical and Mental Health Center's Motion to Dismiss, filed May 2, 1994, Exhibit B, Art. I, § 1 ("Lease Agreement").

65. Plaintiffs argue that lease Section 6.1, stating that the "City agrees to keep, save and hold harmless the [HHC] from any and all liability, loss or damage arising from or in connection with the provision and delivery of health services, including any liability under the Workmen's Compensation Law," Lease Agreement § 6.1, provides only for indemnity from New York City in malpractice cases. Plaintiffs' Memorandum of Law at VIII–5 – VIII–6, VIII–6 n. 3. Further, Plaintiffs assert that the relevant provision appears in Section 6.2(3), which indicates that New York City is not obligated to indemnify

the medical schools, hospitals, or employees associated with the HHC as a result of any act committed by them, tortious or otherwise, other than an act of malpractice or act arising out of the treatment of patients. However, Section 6.2 indicates that New York City "agrees to keep, save and hold harmless the [HHC] and its physicians and dentists, as well as the medical schools and voluntary hospitals with whom the [HHC] has an affiliation agreement ... from any and all liability, loss or damage for malpractice of the [HHC], its physicians and dentists, arising from the operation or supervision of the hospitals transferred to the [HHC]...." Lease Agreement Section 6.2. As Section 6.2 clearly provides financial protection to the HHC by New York City for malpractice by HHC physicians, Section 6.1 must be read as providing indemnity by the City of New York for other HHC liabilities arising "in connection with the provision and delivery of health services." Thus, it is unpersuasive for the

As the HHC's purposes and actions in controlling and managing several New York City municipal hospitals, including Lincoln Medical and Mental Health Center provide a local public service dependent upon local funding, it operates as a special function governmental unit, and is immune, in this action, from any antitrust money judgment rendered pursuant to 15 U.S.C. §§ 15, 15a, or 15c. *See Sweeney v. Athens Regional Medical Center,* 705 F.Supp. 1556, 1561–1562 (M.D.Ga.1989) (public hospital authority servicing the city of Athens, Georgia, was a local governmental unit within the meaning of the LGAA).

**2. *Oregon Health Sciences University Hospital, University of California Medical Centers, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center***

■ The LGAA, as noted, shields municipalities and general and special function governmental units established by state law from monetary claims arising under antitrust laws. 15 U.S.C. § 35. In order for the LGAA to shield the Oregon Health and Sciences University Hospital, University of California Medical Centers, New Mexico University Hospital, and University of Massachusetts Medical Center from liability for antitrust damages, the court must determine whether the LGAA was intended to protect these entities from such damage claims.

By enacting the LGAA, Congress intended to "broaden the shield protecting *municipalities* from antitrust claims for damages." *Montauk–Caribbean Airways, supra,* at 94 (emphasis added). The Oregon Health and Sciences University Hospital, University of California Medical Centers, New Mexico University Hospital, and the University of Massachusetts Medical Center are not mu-

nicipalities, rather, they are arms of their respective states which serve state purposes and functions, and receive state funding. *See* Discussion Sections I(a)(2)(3), (5), (6), *supra.* As the LGAA was clearly intended to protect the interests of municipalities or political subdivisions of a state such as cities, counties, and other general special function governmental units, rather than the interests of the state and its agencies and instrumentalities such as state universities and their related hospitals, or medical centers, its protections do not apply to Oregon Health and Sciences University Hospital, the University of California Medical Centers, New Mexico University Hospital, or University of Massachusetts Medical Center. *See, e.g., Capital Freight, supra,* at 1197–1201 (discussing applicability of the LGAA to local government units, including special function governmental units); *Palm Springs Medical Clinic, supra,* at 456–64 (discussing Congress' motivations and intentions in enacting the LGAA.) Here, Oregon Health and Sciences University Hospital, the California Medical Centers, New Mexico University Hospital, and the University of Massachusetts Medical Center are all instrumentalities of the state, serving state-wide needs and concerns, and are funded by state funds. The fact that these medical centers may receive a predominant portion of revenue to support their university hospitals' operations from fees paid by local or regional patients, does not outweigh their essential character as instrumentalities of state government.

■ Although both *Trustees of A.J. Bremen, supra,* and *Capital Freight, supra,* found the state-created authorities in those cases to be special function governmental units within the scope of the LGAA, the court does not read Section 34(a) so expansively. Under the *ejusdem generis* principle

---

Plaintiffs to assert that Section 6.1 also refers to indemnification for malpractice and thus excludes liability for damages arising from the instant action as to construe these provisions as Plaintiffs suggest would render one surplusage, contrary to general canons of contractual or statutory construction which require that all provisions of the body of a contract or legislation be given effect. *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62–64, 115 S.Ct. 1212,

1219, 131 L.Ed.2d 76 (1995); *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

Further, when New York City's indemnity to the HHC varies as to entities or employees "associated" with HHC as addressed in Section 6.2(3), as compared to its obligations with respect to medical schools and hospitals covered under an affiliation agreement, is not explained in the record.

of statutory construction, *see Norfolk and Western Ry. Co. v. American Train Dispatchers Association*, 499 U.S. 117, 129, 111 S.Ct. 1156, 1163–64, 113 L.Ed.2d 95 (1991); *Hughey v. United States*, 495 U.S. 411, 419, 110 S.Ct. 1979, 1984, 109 L.Ed.2d 408 (1990); *Samuels, Kramer & Company v. Commissioner of Internal Revenue*, 930 F.2d 975, 980 n. 2 (2d Cir.1991), it is clear to the court that the statute's use of the general category "special function governmental unit" must be understood and applied with reference to the specifically articulated examples of special function governmental units which precede it in the statute. This conclusion is consistent with the legislative purposes of the LGAA which pointedly refer to the need to protect *local* taxpayers from the risk of large antitrust damage awards as well as the list of other examples of such special function governmental units described in the legislative history. *See Palm Springs Medical Clinic, supra*, at 457, 459 n. 4, 463; *Trustees of A.J. Bremen Realty Trust, supra*, at *3.

Thus, unless the entity in question is charged with providing public services of an essentially local or regional, as opposed to state-wide, nature, and is funded directly or indirectly by locally generated revenues such as in *Sandcrest, supra* and *Palm Springs Medical Clinic, supra*, application of the LGAA to state-created agencies or authorities with essentially state-wide service obligations would extend the exemption granted beyond the purposes of Congress. Such a

result would blur the well-established distinctions between the state action doctrine antitrust exemption which is limited to actions taken by the sovereign, state agencies, or municipalities pursuant to a clearly articulated and expressed state policy, *Town of Hallie*, 471 U.S. at 40, 105 S.Ct. at 1717, and the LGAA which broadly exempts from antitrust damage claims *any* action by a defined local, general or special function governmental unit. This interpretation is also consistent with the principle that exemptions from the antitrust laws are to be narrowly construed. *Capital Freight, supra*, at 1194.

Moreover, Congress did not specifically indicate that the LGAA was intended to exempt states and state agencies; if Congress' aim was to provide the states and their agencies or instrumentalities with protection under the LGAA, it would have explicitly included the states and state agencies or instrumentalities within the Act.[66] Indeed, the very words of the LGAA itself, as chosen by Congress, belie the suggestion that such broad relief was intended.

Therefore, Oregon Health and Sciences University Hospital, the University of California Medical Centers, New Mexico University Hospital, and University of Massachusetts Medical Center being neither municipalities nor political subdivisions of their respective states, are not, for the reasons discussed, general or special function governmental units as defined by the

---

**66.** This interpretation is also consistent with the fact that some entities may be state created and gubernatorially appointed yet retain an essentially local or regional focus of service or responsibility with attendant reliance on revenues generated solely or primarily from within such areas of operation. *See, e.g., Trustees of A.J. Bremen, supra*. Thus, although created by state law, the port authority in that case served an essentially local function, supported by revenues generated largely from within its service area.

To the extent that *Zapata Gulf Marine, supra*, may be said to have held that the Puerto Rico Maritime Shipping Authority ("PRMSA") is a special function governmental unit under the LGAA, such holding appears, to this court, contrary to the express purposes and definitions of the LGAA. As noted, the agencies considered in *Trustees of A.J. Bremen, supra*, and *Palm Springs Medical Clinic, supra*, although created by or pursuant to state law (as are all local units of

government) served only local or regional interests, and were funded accordingly. Moreover, as the court in *Zapata* had already found the PRMSA to be immune under the Eleventh Amendment, its discussion of the LGAA applicability to the PRMSA may be fairly characterized as dicta. Further, should the Supreme Court determine in the future that, contrary to the holding in *Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694 (1st Cir.1983), upon which *Zapata* relied, that Puerto Rico is *not* a state for Eleventh Amendment or state action doctrine purposes (an issue that remains an open one, *see Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 140–42 n. 1, 113 S.Ct. 684, 686 n. 1, 121 L.Ed.2d 605 (1993)), the PRMSA could be considered a unique example of a special function governmental unit with an area of service congruent or coextensive with the boundaries of the Commonwealth of Puerto Rico, its creating jurisdiction.

LGAA, and are not exempt from antitrust damage awards under the LGAA.

### 3. *Tri–City Medical Center*

██ Tri–City Medical Center is a public not-for-profit corporation created by the California legislature to provide hospital and health care services. *See* Discussion Section I(b)(4), *supra.* In determining whether the medical center Tri–City qualifies as a "local government," under the LGAA the court notes that a hospital district, like Tri–City Medical Center, established by the California Health and Safety Code has been held to be a "special function governmental unit" for purposes of the LGAA.[67] *Palm Springs Medical Clinic, supra,* at 456–57. Likewise, the medical center has asserted that, as such a hospital district, it comes within the LGAA's definition of "local government" and is thus entitled to the protections of the LGAA. Tri–City Medical Center's Memorandum of Law, filed March 21, 1994, at pp. 3–7. Plaintiffs have not seriously disputed this contention in their opposing papers. Plaintiffs' Memorandum of Law at VIII–1 – VIII–6. Plaintiffs do, however, indicate that local government immunity is unavailable against injunctive relief, and therefore Tri–City Medical Center must remain in this action.[68] Plaintiffs' Memorandum of Law at VIII–6.

The LGAA defines "local government" as including school districts, sanitary districts,

---

67. Plaintiffs do not make any argument that Tri–City Medical Center should not be considered a local government unit immune from damages for monetary relief as prescribed by the LGAA. Plaintiffs' Memorandum of Law at VIII–1 – VIII–6.

68. In Discussion Section II of this Report and Recommendation, *infra,* this court has determined that Tri–City Medical Center should be dismissed from this action as this court lacks personal jurisdiction over the medical center. However, if the district judge does not dismiss Tri–City Medical Center from this action, this court must address the medical center's argument that it should be dismissed from the action completely as, even if an injunction is issued against Tri–City Medical Center, the hospital cannot *"unilaterally* determine the credentials of its Medical Staff." Tri–City Medical Center's Reply Memorandum in Support of Motion to Dismiss, filed January 30, 1995, at p. 4 (emphasis in original). Tri–City Medical Center is therefore contends that it is powerless to comply with an injunction issued against it, as its medical staff is responsible for the credentialling of its physicians, but, under California law, the medical staff is not employed by the hospital and so cannot be directed by it.

Assuming that Tri–City Medical Center remains a party in this action and the court has jurisdiction over this party, the Supremacy Clause drains the medical center's contention of its force. Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, a state statute can be preempted or superseded by federal law. Among state statutes thus subject to displacement are those which stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Because Congress expressly authorized the federal courts to grant injunctive relief in furtherance of the purposes of federal antitrust law, federal law, including any final remedial or compensatory judgment of this court, will override any conflicting state law.

Tri–City Medical Center also states that any injunction issued will not be enforceable against its medical staff, as the medical staff is not named as a party in this action. However, Fed. R.Civ.P. 65(d) provides that an injunction may bind the "parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

Consonant with the language and purpose of Rule 65(d), an injunction may bind a non-party who acts on behalf of, or in concert with a named party. *See Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir.1930) ("the only occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party"). As the medical staff of Tri–City acts, through its contract with the medical center, as the medical center's exclusive agent for purposes of credentialling the medical staff members, but not for other purposes, this significant relationship between Tri–City Medical Center and its medical staff should be sufficient to allow any injunction issued against the medical center to be binding upon the medical staff as its agent for this limited purpose or as persons acting in concert with Tri–City Medical Center regarding the question of which physicians will be permitted to practice within the hospital.

Moreover, as the nature and scope of any injunctive relief which could be issued by this court in the future is at this juncture, speculative, Tri–City Medical Center's assertion is premature and does not aid in making a determination regarding the medical center's motions to dismiss on grounds of immunity pursuant to the LGAA or lack of personal jurisdiction. For this reason also, it may be disregarded.

or any other special function governmental unit established by state law. 15 U.S.C. § 34(1). As noted, the Report of the House Committee of the Judiciary on the LGAA states that other "[e]xamples of special purpose political subdivisions included within the definition are planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts." H.R.Rep. No. 98–965, 98th Cong., 2d Sess, *reprinted in* 1984 U.S.Code Cong. & Ad. News 4602, 4620, 4621. This language is "explicitly inclusive, not exclusive, ... and thus may include hospital districts in the definition of 'local governments.'" *Palm Springs Medical Clinic, supra,* at 457.

As Tri–City Medical Center was created and is regulated by the California Health and Safety Code in its performance of a localized public function, protecting the health and welfare of individuals in California by providing medical treatment in areas with inadequate care, and the medical center is funded through the fees it receives and taxes assessed on property within the hospital district, Cal. Health & Safety Code §§ 32127, 32200, 32202, Tri–City Medical Center qualifies as a "special function governmental unit," for purposes of the LGAA. Therefore, Tri–City Medical Center is entitled to immunity from damage awards under the LGAA, and so, to that extent, the action against the medical center should be dismissed.

## II. *Personal Jurisdiction*

■ Personal jurisdiction is a question typically decided prior to a decision regarding proper venue, which is primarily a matter of choosing a convenient forum. *Leroy v. Great Western United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2714–2715, 61 L.Ed.2d 464 (1979) (citing 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3801, pp. 5–6

(1976)). However, both personal jurisdiction and venue are personal privileges of the defendant, rather than strictures on the power of the court, such as subject matter jurisdiction, and both may be waived by the parties. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703–705, 102 S.Ct. 2099, 2104–2106, 72 L.Ed.2d 492 (1982); *Leroy, supra,* at 179–180, 99 S.Ct. at 2714–2715.

In this case, Plaintiffs assert that personal jurisdiction in this district was properly obtained pursuant to Clayton Act Section 12, 15 U.S.C. § 22, over those Defendants which are domestic corporations, *i.e.,* incorporated within the United States,[69] and, alternatively, as to all Defendants, along with the domestic corporation Defendants, pursuant to Fed. R.Civ.P. 4(e)(1), (h)(1) and New York State's personal jurisdiction statute, New York Civil Practice Law and Rules Sections 301 (doing or soliciting business) and 302 (long-arm).

All Defendants, except for ABEM, Lincoln Medical & Mental Health Center, Our Lady of Mercy Medical Center, and the University Hospital of the State University of New York at Stony Brook, move to dismiss or for summary judgment based on lack of personal jurisdiction.

### a. *Jurisdiction Under Clayton Act Section 12*

■ Section 12 provides that

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found. 15 U.S.C. § 22.

Where Congress has authorized nationwide federal jurisdiction, as under Section 12

---

69. These corporate Defendants include Cord, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Part of Johns Hopkins Health System, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Oregon Health Sciences University Hospital, Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital and University Medical Center (Tucson).

of the Clayton Act, the district court's jurisdiction is "co-extensive with the boundaries of the United States." *Kingsepp v. Wesleyan University*, 763 F.Supp. 22, 24 (S.D.N.Y. 1991) (citing *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir.1974)); *Federal Trade Commission v. Jim Walter Corp.*, 651 F.2d 251, 256 (5th Cir.1981). *Scriptomatic, Inc. v. Agfa–Gevaert, Inc.*, 1973 WL 830, *2 – *3 (S.D.N.Y.1973).[70] Although Section 12 of the Clayton Act "authorizes out of state service on a corporate defendant in an antitrust action, Section 12 does not specifically mention the exercise of personal jurisdiction. However, the statute's authorization of service outside the state has been interpreted as authorizing the federal courts to exercise nationwide personal jurisdiction over corporate antitrust defendants." *Kingsepp, supra,* at 24 (citations omitted); *General Electric Company v. Bucyrus–Erie Company*, 550 F.Supp. 1037, 1038 (S.D.N.Y.1982).

■ Therefore, a corporation which resides within the boundaries of the United States is "subject to personal jurisdiction under nationwide service of process without regard to state jurisdiction statutes." *Kingsepp, supra,* at 24 (citing *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 65 (S.D.N.Y.1980)). Further, the corporation need not have minimum contacts with the state in which the district court that would exercise jurisdiction sits. *See Jim Walter Corp., supra,* at 256 ("a resident corporation necessarily has sufficient contacts with the United States to satisfy the requirements of due process"); *Mariash, supra,* at 1143 (a United States resident subject to nationwide service of process need not have minimum contacts with the state in which the federal court will exercise jurisdic-

tion); *Bucyrus–Erie Co., supra,* at 1043 (the forum with which the defendant must have the minimum contacts required by due process is the United States, not the district or the state) (citing *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir.1972) (Friendly, C.J.)). Thus, "when a defendant resides in the United States and is subject to nationwide service of process under a federal statute, the defendant is subject to personal jurisdiction in federal court without regard to state long-arm statutes and due process requirements are satisfied by the defendant's contacts with the United States." *Kingsepp, supra,* at 25.

■ Defendants which are domestic corporations argue that Section 12 of the Clayton Act must be interpreted to require Plaintiffs to comply with its special venue provisions as a precondition to invoking the statute's nationwide service of process provision. Defendants' Joint Reply Memorandum, filed February 1, 1995, at pp. 84–85, 91–93 ("Defendants' Joint Reply Memorandum").[71] Otherwise, Defendants maintain, in federal antitrust actions, any domestic corporation may be sued in any district in the United States.[72] Defendants argument fails to persuade this court.

First, although Defendants' interpretation of Section 12 has been accepted by some courts, *see Michelson v. Merrill Lynch, Pierce, Fenner & Smith*, 709 F.Supp. 1279 (S.D.N.Y.1989); *see also Bucyrus–Erie Co., supra,* at 1041 n. 6 (citing cases), other and better reasoned authority, in analogous cases, rejects it. *See Go–Video, Inc. v. Akai Electric Company, Ltd.*, 885 F.2d 1406, 1408, 1413–15 (9th Cir.1989);[73] *Mariash v. Mor-*

---

70. Fed.R.Civ.P. 4(e) allows service of process on an out-of-state party when authorized by a federal statute.

71. Section 12 of the Clayton Act also applies to not-for-profit corporations. *Kingsepp, supra* at 25.

72. This extension of Defendants' core argument assumes the application of 28 U.S.C. § 1391(c) under which a corporation is deemed to reside for venue purposes in any district in which personal jurisdiction may be obtained.

73. The court notes that Defendants did not discuss *Go–Video, Inc. v. Akai Electric Company,*

*Ltd.*, 885 F.2d 1406 (9th Cir.1989). Further, in most of the cases referenced by the court in *Bucyrus–Erie Co., supra,* the decisions provide no authority or reasoning in support of their conclusions that Section 12's service of process is dependent upon first satisfying its venue requirements. *See, e.g., Chromium Industries, Inc. v. Mirror Polishing & Plating Co.*, 448 F.Supp. 544, 550 (N.D.Ill.1978). *Academy of Ambulatory Foot Surgery v. American Podiatry Ass'n.*, 516 F.Supp. 378 (S.D.N.Y.1981), *J. & B. & S. Restaurant Corp. v. Henry's Drive–In, Inc.*, 353 F.Supp. 389 (W.D.N.Y.1973), and *Friends of Animals, Inc. v. American Veterinary Medical Assoc.*, 310 F.Supp. 620 (S.D.N.Y.1970) rely on a statement in *Gold-*

*rill,* 496 F.2d 1138, 1142–44 (2d Cir.1974); *Leasco, supra,* at 1340 (service of process clause in Section 27 of Securities Exchange Act of 1934, 15 U.S.C. § 78aa, as modeled upon Section 12 of the Clayton Act, is wholly independent of its venue clause stating "the second sentence [of § 27] and the first portion of the third deal with venue; the last portion of the third speaks expressly only to service of process"); *McCracken v. Automobile Club of Southern California,* 891 F.Supp. 559, 562–63 (D.Kan.1995) (court found that venue was proper in district in which plaintiff filed ERISA action against corporate defendants even though defendants had "no apparent contacts or ties to district," as under general venue statute, corporations "reside" in any district in which they are subject to personal jurisdiction, and defendants were subject to personal jurisdiction under federal statute, 29 U.S.C. § 1132(e)(2), authorizing nationwide service of process as they had sufficient minimum contact with United States); *Kingsepp, supra,* 24–25; *Bucyrus-Erie Co., supra,* at 1041–42 ("[S]ection 12 venue ... is not a predicate to the availability of section 12 personal jurisdiction"). *See also Arrowsmith v. United Press International,* 320 F.2d 219, 227–28 (2d Cir.1963); C.S. Ryan, *The Expansion of Patent Venue under the Judicial Improvements and Access to Justice Act,* 77 J. Pat. & Trademark Off. Soc'y 85, 98 (February 1995) (under the Clayton Act, when a corporation is subject to nationwide service of process pursuant to Section 12, suit can be brought in any district of the United States, thereby broadening a plaintiff's venue choices).

Second, by providing as it did in Section 12 for nationwide service of process in antitrust cases, Congress clearly intended to extend the jurisdiction of federal courts over domestic corporations and to permit antitrust actions to be venued in any district court as permitted by Section 12. *See Go–Video, supra,* at 1410–11; *Leasco, supra,* at 1340. Although the section's legislative history is inconclusive on the issue, *see Go–Video, supra,* at 1410, this interpretation is more consistent with Congress' expressed intention to substantially broaden antitrust claimants' ability

to sue in federal courts. *Go–Video, supra,* at 1413. For example, during final House debate, Representative Webb of North Carolina, who succeeded Representative Clayton as Chairman of the House Judiciary Committee and as floor manager of the Clayton Bill, stated that in enacting Section 12 Congress would be "liberalizing the procedure in the courts in order to give the individual who is damaged the right to get his damages" anywhere—*anywhere you can catch the offender* .... 3 Kintner, *Legislative History of the Federal Antitrust Laws and Related Statutes,* at 2772 (1978) (emphasis added).

The Second Circuit's discussion of Section 12, following *Goldlawr,* supports the view that by enacting the Clayton Act in 1914 Congress extended federal judicial power and thus *in personam* jurisdiction over all domestic corporations in antitrust cases. In *Leasco,* the plaintiffs asserted jurisdiction over the non-resident defendants on the basis of Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa. *Leasco, supra,* at 1339. Chief Judge Friendly, noting that Section 27 of the Securities Exchange Act of 1934 was modeled after Section 12 of the Clayton Act. *Leasco, supra,* at 1340 n. 10, stated that Congress, in granting nationwide service of process to federal antitrust plaintiffs, "was doubtless thinking mainly in terms of exercising its power to 'provide that the process of every District Court shall run into every part of the United States,' ... and although [Section 27] does not deal specifically with *in personam* jurisdiction, it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States ... [but only to the extent] permitted by the due process clause of the Fifth Amendment." *Leasco, supra* at 1340 (quoting *Robertson v. Railroad Labor Board,* 268 U.S. 619, 45 S.Ct. 621, 69 L.Ed. 1119 (1925)).

 *Leasco* makes clear that when Congress provides nationwide service of process in connection with a federal cause of action it also grants to district courts nationwide *in personam* jurisdiction as with respect to the

---

*lawr, Inc. v. Heiman,* 288 F.2d 579, 581 (2d. Cir.1961). The present vitality of the *Goldlawr*

statement as relied upon by Defendants and these latter decisions is discussed *infra.*

Clayton Act (corporations) and the Securities Exchange Act (any defendant), the "forum" or jurisdiction with which the defendant must have the minimum contacts required by due process is the United States, not, as is implicit in Defendants' argument, a specific federal judicial district, or, for that matter, any particular state. *See Leasco, supra,* at 1341. As a defendant need only, for due process purposes, have minimum contacts with the United States, rather than the state of New York, a district court exercises personal jurisdiction over domestic corporations in cases where nationwide service of process is authorized, as they reside within the territorial boundaries of the United States, and therefore have the required minimum contacts to justify the exercise of federal judicial power over them. *Mariash v. Morrill,* 496 F.2d 1138, 1143 (2d Cir.1974). *See also Kingsepp, supra.*

In *Mariash v. Morrill,* 496 F.2d 1138 (2d Cir.1974), the court unanimously upheld jurisdiction in a case also involving a violation of the Securities Exchange Act of 1934. Reaffirming the holding in *Leasco,* the court stated that when defendants reside within the United States, the minimal contacts "required to justify the federal government's exercise of power over them are present." *Mariash, supra,* at 1143. The court stated that the minimum contacts analysis "does not . . . seem particularly relevant in evaluating the constitutionality of in personam jurisdiction based on nationwide . . . service of process." *Mariash, supra* at 1143.

In *Kingsepp,* the court found it unnecessary to discuss whether service of process under Section 12 depended on meeting its venue rules as, based upon the analysis in *Bucyrus–Erie Co., supra,* at 1042, it was clear that, under a correct understanding of the structure and meaning of Section 12, service of process in antitrust cases was not conditioned on compliance with that section's venue provision. In *Bucyrus–Erie Co.,* the court explained that Section 12's phrase "in such cases" must properly be read to refer to the earlier phrase in the section " 'any suit, action or proceeding under the antitrust laws against a corporation,' " and "not to anything else in section 12's first clause." *Bucyrus–Erie Co., supra,* at 1042 n. 7. Judge Friendly's analysis, in *Leasco,* as discussed, also supports this conclusion. *Leasco, supra* at 1340. *See also Go–Video, supra,* at 1412 (reaching same conclusion by application of canon of statutory construction *reddendo singula singulis* —resolve ambiguity by reference to the context and purpose of the statute as a whole).

Defendants rely on the statement in *Goldlawr, Inc. v. Heiman,* 288 F.2d 579, 581 (2d Cir.1961), *rev'd on other grounds,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) that under Section 12, "the extraterritorial service privilege is given only when the other [venue] requirements are satisfied." Joint Reply Memorandum at 92. However, in *Bucyrus–Erie Co.,* the court found the statement to be dicta and not conclusive,[74] 550 F.Supp. at 1041–42, and distinguished *Goldlawr.* The court also determined that *Goldlawr* required only that "*some* applicable venue statute must be met before Section 12's service and personal jurisdiction clause may be invoked . . .," and determined that *Leasco's* holding was the more correct interpretation of Section 12. *Bucyrus–Erie Co., supra,* at 1041 (emphasis in original). Following *Leasco,* the court held that the "section 12 venue . . . requirement is not a predicate to the availability of section 12 personal jurisdiction." 550 F.Supp. at 1042. This court therefore finds that the *Goldlawr* statement regarding Section 12's venue provision, as relied upon by Defendants, does not require that Defendants' argument, as to the availability of Section 12 to establish jurisdiction in this case, be accepted.

■ Here, as noted, several of the moving Defendants are domestic corporations, including CORD, incorporated in Michigan, Children's Hospital (San Diego), incorporated as a non-profit organization in California, Children's Hospital of Michigan, incorporated in Michigan as a not-for-profit organization, Detroit Receiving Hospital and University Health Center, incorporated as a not-for-profit organization in Michigan; Forsyth Memorial Hospital, a nonprofit organization in-

---

**74.** *See also Go–Video, supra,* at 1411.

corporated in North Carolina; Johns Hopkins Hospital, part of the Johns Hopkins Health System, a Maryland corporation; Kettering Medical Center, an Ohio corporation; Loma Linda University Medical Center, a non-profit organization incorporated in California; Lutheran General Hospital, an Illinois not-for-profit corporation; Medical College and Hospital of Pennsylvania, a Pennsylvania not-for-profit corporation; Mercy Catholic Medical Center—Misericordia Division, a Pennsylvania non-profit corporation; Mercy Hospital and Medical Center, an Illinois not-for-profit corporation; Methodist Hospital of Indiana, an Indiana not-for-profit corporation; Riverside Methodist Hospitals, an Ohio not-for-profit corporation; Saint Francis Medical Center, an Illinois not-for-profit corporation; St. Anthony Hospital, a Colorado non-profit corporation; and University Hospital (Tucson), a non-profit Arizona corporation. Plaintiffs' Memorandum of Law at I–3 – I–4. As such, these Defendants are subject to personal jurisdiction under Section 12. *Community Blood Bank of Kansas City Area, Inc. v. Federal Trade Commission*, 405 F.2d 1011, 1017–18 (8th Cir.1969).

The court notes that Oregon Health Sciences University and University Hospital were transformed into a "public corporation" by the Oregon legislature in July of 1995. 1995 Or.Laws ch. 162 §§ 1(2), 1(3). As a public corporation, Oregon Health Sciences University was intended to "participate in activities or provide services that are also provided by private enterprise." 1995 Or. Laws ch. 162 § 1(2). As Section 12 makes no distinction between a private corporation and a public corporation. *Community Blood Bank, supra*, at 1017–18. Therefore, Oregon Health Sciences University and University Hospital is also a corporation subject to jurisdiction under the Clayton Act.

In summary, as each of these Defendants is a domestic corporation, each has minimum contacts with the United States, and is subject to personal jurisdiction in this district pursuant to Section 12 of the Clayton Act. As such, each of these Defendants' are subject to jurisdiction under Section 12. Therefore, these Defendants' motions to dismiss and/or for summary judgment based upon lack of personal jurisdiction should be denied.

**b. *Jurisdiction under New York State Law***

In deciding a motion to dismiss for lack of personal jurisdiction, the court has discretion to proceed either upon written submissions or through a full evidentiary hearing. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). Prior to discovery, a plaintiff may defeat a motion to dismiss by pleading "legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). At that preliminary stage, a plaintiff must make a prima facie showing of jurisdiction, which may be established solely by allegations. *Ball, supra*, at 197. However, as the court has allowed the parties in this case to conduct several months of jurisdictional discovery, Plaintiffs bear the burden of proving that personal jurisdiction exists by a preponderance of the evidence. *Landoil Resources v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir.1990). However, as no hearing or trial on the merits has been heard by the court, all pleadings and affidavits must be construed in the light most favorable to Plaintiffs. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985). *See also Ball, supra*, at 196–97.

Because nationwide service of process under Section 12 of the Clayton Act does not extend to Defendants State University of California (Los Angeles) Medical Center, State University of California (Irvine) Medical Center, State University of California (San Diego), University of Massachusetts Medical Center, New Mexico University Hospital, Ohio State Medical Center, or Tri–City Medical Center, Plaintiffs must look to New York state's statutory law to provide a basis for personal jurisdiction as to these Defendants.[75] The relevant New York law

---

75. The court will also discuss New York law relating to personal jurisdiction with respect to the corporate Defendants as an alternative to the Clayton Act Section 12 personal jurisdiction analysis.

consists of Sections 301 and 302 of New York's Civil Practice Law and Rules ("N.Y.CPLR"), *see* N.Y.Civ.Prac.L. & R. § 301 *et seq.* (McKinney 1990), as interpreted and applied by New York's courts.

### 1. *New York Civil Practice Law and Rules Section 301*

■ Section 301 of the N.Y. CPLR provides for the exercise of "such jurisdiction over such persons, property, or status as might have been exercised heretofore." [76] N.Y.Civ.Prac.L. & R. § 301 (McKinney 1990). This section has been interpreted to permit the exercise of personal jurisdiction over foreign corporations doing business in New York, *i.e.*, where a defendant is operating in New York on a continuous and systematic basis so that it would not offend fair play and substantial justice to subject defendant to jurisdiction in that forum. *Landoil Resources, supra,* at 1043. *See also Vendetti v. Fiat Auto S.p.A.,* 802 F.Supp. 886, 889 (W.D.N.Y.1992) (defendant engaged in a continuous and systematic course of doing business in New York sufficient to warrant a finding of presence in the jurisdiction, is subject to personal jurisdiction pursuant to Section 301); *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 265–268, 115 N.E. 915, 917 (1917) (jurisdiction may be acquired over a foreign corporation under N.Y.Code of Civ. Proc. § 1780(4), an earlier predecessor statute to Section 301, if it is doing business "not occasionally or casually, but with a fair measure of permanence and continuity"). Doing business does not require the primary activities of a business to be carried on in the state, rather, it is sufficient that the foreign corporation has an agent or employee who solicits business in New York continuously and systematically; solicitation alone, however, is insufficient to constitute doing business within the state. *International Shoe Co. v. Washington,* 326 U.S. 310, 314, 66 S.Ct. 154, 157, 90 L.Ed. 95 (1945); *Cohen v. Vaughan Bassett Company Inc.,* 495 F.Supp. 849, 850–851 (S.D.N.Y.1980) (citing *Miller v. Surf Properties, Inc.,* 4 N.Y.2d 475, 176 N.Y.S.2d 318, 320–322, 151 N.E.2d 874, 876 (1958)).

■ In applying Section 301, New York courts emphasize several factors, including existence of an office, solicitation of business, presence of bank accounts and other property, presence of employees of the foreign defendant, whether defendant lists a phone number, public relations and publicity work, and sales within the state. *Hoffritz for Cutlery, Inc., supra,* at 58; *Vendetti, supra,* at 890; *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.,* 657 F.Supp. 1040, 1044 (S.D.N.Y.1987). Solicitation of business alone may not be sufficient to constitute doing business, solicitation plus additional business activities related to the defendant's operative or financial structure usually satisfies the test. *See Elish v. St. Louis Southwestern Ry. Co.,* 305 N.Y. 267, 269–270, 112 N.E.2d 842, 843 (1953); *Scanapico v. Richmond, Fredericksburg & Potomac R. Co.,* 439 F.2d 17, 20–21 (2d Cir.), *aff'd en banc,* 439 F.2d 25 (1970). Also, while not sufficient in themselves, other factors such as advertising within the state, conducting litigation, planning and executing business tactics and strategy, and obtaining commercial credit arrangements may, when considered together with other relevant contacts and activities, provide a basis for establishing jurisdictional presence. *Vendetti, supra,* at 890. The time frame relevant for a jurisdictional inquiry under Section 301 is the time of the summons and complaint. *Andros Compania Maritima, S.A. v. Intertanker Ltd.,* 714 F.Supp. 669 (S.D.N.Y.1989).

In this case, Plaintiffs assert that the Defendants are subject to personal jurisdiction pursuant to the "solicitation plus" doctrine of Section 301. Plaintiffs' Memorandum of Law at III–1. Although, as noted, solicitation alone is insufficient to confer jurisdiction over a non-domiciliary, "once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.'" *Aquascutum of London, Inc. v. S.S. American Champion,* 426 F.2d 205, 211 (2d Cir.1970) (Friendly, J.). Beyond solicitation, all that is required is that a defendant

---

**76.** Corporate defendants, partnerships, unincorporated associations, other business entities, and non-resident individuals can be subject to jurisdiction under Section 301. *Kingsepp, supra,* at 26 (citations omitted).

have engaged in some "activities of substance" in the state, in order for jurisdiction to be obtained. *See Landoil Resources, supra,* at 1043–44.

No specific formula has been devised for determining the nature or quality and quantity of contacts necessary to satisfy this test, rather, the courts look to the particular facts and circumstances of each case. *See, e.g., Landoil Resources, supra,* at 1044–46 (personal jurisdiction did not exist over a corporation whose employees took short business trips involving several different accounts, and, in some instances, concerning contacts that were not related to New York in any way, and, noting that the solicitations occurred sporadically over a period of eighteen months, the court concluded "these contacts are insufficient to establish the systematic and continuous presence within the state that New York law requires") (citing *Aquascutum, supra,* at 211–12); *Hoffritz for Cutlery, supra,* at 57–58 (fifty-four visits to New York to discuss business with plaintiff insufficient); *Kingsepp, supra,* at 27 (despite the fact that Dartmouth College was not licensed to do business in New York, had no offices in New York, and did not list a phone number in New York, the court held that the college was doing business in New York as it engaged in a systematic and continuous course of conduct within New York, including sending representatives to forty-four New York schools annually, engaging in substantial commercial activity in the state, maintaining two bank accounts, issuing four bond offerings through a New York investment banking firm, and owning a remainder interest in real property in the state); *New World Capital Corp. v. Poole Truck Line, Inc.,* 612 F.Supp. 166, 172 (S.D.N.Y.1985) (eight visits over four years insufficient); *Savoleo v. Couples Hotel,* 136 A.D.2d 692, 524 N.Y.S.2d 52 (1988) ("occasional" business trips to New York insufficient).

Plaintiffs assert that the method by which all of the hospital Defendants have continuously and systematically solicited business in New York state is through their participation in the National Residency Match Program ("MATCH")and the Fellowship and Residency Electronic Interactive Database Access System ("FREIDA"). Plaintiffs Memorandum of Law at III–8. Defendants, however, assert that these programs do not render them present in New York within the meaning of Section 301.

Plaintiffs state that the "central means through which all of the hospital Defendants have continuously and systematically solicited business in New York State is through their participation in the [MATCH] and [FREIDA]." Plaintiffs' Memorandum of Law at III–8. Specifically, Plaintiffs argue that each hospital purposefully and actively recruits medical students from New York for its residency programs by using the MATCH, and each hospital provides "on-line information [through FREIDA] regarding its residency programs to medical students in connection with its recruitment efforts." Plaintiffs' Memorandum of Law at III–8.

The MATCH, the National Residency Match Program, is an "independent, nonprofit organization located in Washington, D.C." which "facilitates the nationwide resident selection process for students as well as residency programs." [77] Randlett Affidavit No. 1 at ¶ 3. This service is offered, for a fee, to residency programs in the United States and prospective residents throughout the world. Randlett Affidavit No. 2 at ¶ 4.

A prospective resident must request all application materials from the residency programs in which he or she is interested.

---

**77.** Several of the Defendants do not participate in MATCH, including Children's Hospital (San Diego), Forsyth Memorial Hospital, St. Anthony Hospital, and Tri–City Medical Center. Affidavit of Richard R. Randlett, dated January 25, 1995, ¶¶ 8(y), (z), (ab), (ac) ("Randlett Affidavit No. 2"). However, some of these hospitals may receive residents from affiliated hospital Defendants for rotations through their respective programs. Plaintiffs' Memorandum of Law, Appendix Volume 1, Exhibit 2, ¶¶ 5, 6(j), (k), (m), (n), (u), (v), (w), (x) ("Randlett Affidavit No. 1"). Additionally, other hospital Defendants do not participate in MATCH with respect to residency programs in emergency medicine, including Mercy Hospital and Medical Center, Lutheran General Hospital, Our Lady of Mercy, Riverside Methodist Hospitals, Kettering Medical Center, Mercy Catholic Medical Center—Misericordia, and University of Massachusetts Medical Center. Randlett Affidavit No. 2 at ¶¶ 8(e), (g), (m), (o), (p), (r), (v).

Randlett Affidavit No. 2 at ¶ 5. "The service performed by the Match occurs at the close of the residency application process after all research, application, interviewing and preference decisions have been made by residents and residency programs." Randlett Affidavit No. 2 at ¶ 5. Thus, "[t]he sole purpose of the Match is sorting the preference rankings of prospective residents and residency programs to provide both ... with their highest mutual preferences after completion of the recruitment process." Randlett Affidavit No. 2 at ¶ 5. Moreover, the residency programs cannot solicit prospective residents, nor can prospective residents communicate with or contact the residency programs, through the MATCH. Randlett Affidavit No. 2 at ¶ 5. Given that the actual receipt of the preferences expressed by applicants and programs occurs in Washington D.C., a New York applicant must therefore initiate the process with the MATCH to receive any benefit from this service. Randlett Affidavit No. 1 at ¶ 3. As the MATCH merely ranks applicants and programs in order of preference, Randlett Affidavit No. 1, ¶ 3, and no hospital or residency program has any control over or responsibility for the MATCH, Randlett Affidavit No. 2 at ¶ 3, the court finds that the use of this program by certain hospital Defendants in facilitating the determination as to which residents will fill available spaces in the residency programs and which occur in the District of Columbia does not constitute solicitation for purposes of finding personal jurisdiction under Section 301.

FREIDA, the Fellowship and Residency Electronic Interactive Database Access System, is a "computerized database designed to help students, residents and [academic or research] fellows find the graduate medical education programs ... most suited to their needs." [78] Plaintiffs' Memorandum of Law, Appendix Volume 1, Exhibit 3, ¶ 2 ("Grenholm Affidavit"). The American Medical Association ("AMA") created FREIDA in 1990 at the request of the student section of the AMA, and continues to produce the database today. Affidavit of Dr. Hannah Hedrick, dated January 27, 1995, at ¶ 4 ("Hedrick Affidavit"). FREIDA, however, is not an "on-line" information system, as characterized by the Plaintiffs, rather, FREIDA is an informational database in the medium of a computer disk, for use with an ordinary personal computer, which must be purchased by the user. Hedrick Affidavit at ¶¶ 3, 5.

The AMA performs all activities related to FREIDA in Illinois, including the collection of information, publication, marketing, and sales. Hedrick Affidavit at ¶ 7. FREIDA disks are sold nationwide, and are currently accessible from at least twelve locations in New York. Hedrick Affidavit at ¶ 6; Grenholm Affidavit at ¶ 8. While FREIDA may aid participating hospitals, including most of the hospital Defendants, in disseminating information regarding their residency programs, no hospital or residency program has any control over or responsibility for FREIDA. Hedrick Affidavit at ¶ 7. *See also Maresca v. Holiday Inns, Inc.*, 1993 WL 8166, 1993 U.S. Dist. LEXIS 57, at *8 (S.D.N.Y.1993) (Virginia hotel that participates in a national franchise system which includes a nationwide database and "800" reservations telephone number was not amenable to jurisdiction in New York). Therefore, the court also concludes that Defendants' participation in FREIDA cannot be considered a means of soliciting business in New York for purposes of Section 301.

Even if the MATCH and FREIDA were contacts with New York, the low incidence of recruitment of residents through these mediums would be insufficient to constitute solicitation. *See* Randlett Affidavit Nos. 1 and 2.

Plaintiffs further assert that each hospital Defendant has solicited in New York patients

---

**78.** The court notes that Lincoln Medical and Mental Health Center, Our Lady of Mercy Medical Center, and Stony Brook University Hospital do not participate in FREIDA relative to their emergency medicine programs. Grenholm Affidavit at ¶ 7. Also, several other programs, including Children's Hospital (San Diego), Forsyth Memorial Hospital, Kettering Medical Center, Lutheran General Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Riverside Methodist Hospitals, St. Anthony Hospital, and Tri–City Medical Center, are all listed in FREIDA as affiliates of other residency programs. Grenholm Affidavit at ¶ 7.

and faculty or staff members through recruitment, advertisement, or other means. Plaintiffs' Memorandum of Law at III–13 – III–86. To establish personal jurisdiction under the solicitation plus doctrine, Plaintiffs rely on several contacts, other than the Defendants' listings in the MATCH and FREIDA. Plaintiffs' Memorandum of Law at III–13 – III–86. The court will list the asserted specific contacts pertaining to each Defendant, and address these contacts by category.[79]

### a. *Johns Hopkins Hospital, Part of the Johns Hopkins Health System*

█ The record reveals that Johns Hopkins has several contacts with this forum, including (1) a contract with a New York City radio station which provided for advertising five days a week for one year, and involved projected billings of $77,000 to $84,500,[80] (2) advertisements in the *New York Times* and the *Wall Street Journal*, costing approximately $35,000, including an advertisement in the Sunday edition of the *New York Times* in August of 1993(3) advertising in a publication distributed to audiences at each performance of every play in New York City, (4) advertisements for faculty positions in the *Annals of Emergency Medicine*, (5) receiving, from 1988 through 1993, between $2.8 and 3.9 million from treatment of New York patients each year, and treating at least 265 New York patients, (6) mailing its own publications, including a physician's update and a medical newsletter, to the 1,250 New York state addresses on its mailing list, (7) receiving over $10 million in charitable contributions from corporations, foundations, and organizations located in New York state in 1993, (8) establishing a letter of credit relationship with Fuji Bank in New York in 1992 to support a loan it received from the Maryland Health & Higher Education Facility Authority, (9) using New York underwriters and a New York company to manage its investments, (10) having residents in Johns Hopkins' Department of Emergency Medicine take rotations at Bellevue Hospital in New York to obtain experience in toxicology, (11) having its vice-president for finance travel to New York twice in the last year to upgrade credit rating agencies, and to attend a meeting of the Council for Teaching Hospitals chief executive and chief financial officers, (12) having one employee travel to New York five times in the past three years, including two trips to Rochester, and (13) having Dr. Kelen, director of the Division of Emergency Medicine at Johns Hopkins Hospital, travel to New York with an emergency department administrator for a meeting of eight emergency departments in 1992, and to the Long Island Jewish Hospital in New York in 1991 or 1992. Plaintiffs' Memorandum of Law at III–15 – III–19.

Additionally, Johns Hopkins Hospital has, as noted, maintained a development office in New York City for the past twenty years which employs two individuals. Sekulow Affidavit at ¶¶ 2–3, 6. The development office

---

79. The court notes that none of the Defendants arguing lack of personal jurisdiction are authorized to do business in New York, maintain offices or employees, or telephone numbers in New York; have not designated agents for service in New York, nor employed agents under their control to solicit business in New York.

The only exception to this general statement is Johns Hopkins Hospital, which, for the past twenty years, has maintained a development office, employing two individuals, in New York City to solicit donations on behalf of Johns Hopkins Hospital. Affidavit of Erwin M. Sekulow, filed March 15, 1995, at ¶¶ 2–3, 6–7 ("Sekulow Affidavit"). *See also* Discussion Section II(b)(1)(a), *infra*. As Johns Hopkins Hospital, when contrasted with any other hospital Defendant, appears to have the most significant contacts with New York state, the court will discuss personal jurisdiction over this defendant before addressing jurisdiction as to the remaining hospital Defendants and CORD.

80. The contract was to begin on January 17, 1994, and run through January 13, 1995. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 5. This contact occurred between the time the Second Amended Complaint was filed, on January 13, 1994, and the time that Johns Hopkins Hospital was served with the summons and complaint, as to which a waiver of service was returned executed on February 28, 1994. This contact with New York may therefore be considered in the determination of whether personal jurisdiction exists over Johns Hopkins Hospital. *Compare Greene v. Sha–Na–Na*, 637 F.Supp. 591, 595 (D.Conn.1986) (activities of a defendant subsequent to service of process of the complaint cannot form the basis of personal jurisdiction over the defendant).

manages fundraising on behalf of Johns Hopkins Hospital for the northeast region of the United States, including the solicitation of donations from Johns Hopkins Hospital patients who live in New York. Sekulow Affidavit at ¶¶ 7–8. The annual budget of this office is between $250,000 and $300,000, of which Johns Hopkins Hospital pays between $37,500 and $60,000 annually, and the development office maintains a bank account in New York. Sekulow Affidavit at ¶¶ 5, 10.

In *Zucker v. Baker*, 35 Misc.2d 841, 231 N.Y.S.2d 332 (Sup.Ct. Queens Cty.1962), the Massachusetts Institute of Technology solicited funds from within New York, but also leased and established a fund raising headquarters in New York. The court found that MIT was engaged in a systematic and regular course of business within New York, and that therefore, was subject to personal jurisdiction. *Zucker, supra*, 231 N.Y.S.2d at 335. The court also stated that "the fact that [MIT] solicited donations in New York for the advancement of its educational, scientific and research purposes in Massachusetts and that no such activities were performed in New York is immaterial." *Zucker, supra*, at 335.

Based on Johns Hopkins Hospital's contacts with this state, it is clear that Johns Hopkins Hospital is doing business for purposes of Section 301. Johns Hopkins Hospital maintains an office, a bank account, and employs two people in New York, as well as soliciting millions of dollars of contributions from New York donors through the development office. *See* Johns Hopkins Hospital's Memorandum of Law, filed January 30, 1995, Exhibit D (listing New York donors and the amounts of donations from fiscal 1989 through fiscal 1994). These contacts, in themselves, are sufficient to demonstrate that the hospital engages in a continuous and systematic course of doing business in New York sufficient to warrant a finding of presence in the jurisdiction. *See Landoil Resources, supra*, at 1043; *Vendetti, supra*, at

889; *Tauza, supra*, at 917. Therefore, Johns Hopkins Hospital is subject to personal jurisdiction pursuant to Section 301.[81]

### b. *Children's Hospital (San Diego)*

The Children's Hospital's (San Diego) contacts with this state include (1) advertising for medical and non-medical positions and patients in nationally distributed publications, (2) treatment of 111 patients from New York from October of 1991 through July of 1994, which produced approximately $370,000 in revenues from New York sources, (3) that fact that since 1991, fifteen graduates of New York medical schools have been granted staff privileges at Children's Hospital, (4) the fact that thirty-six physicians who graduated from New York medical schools currently enjoy privileges at the hospital, and (5) in 1990 and 1993, issuance of bond offerings by the hospital which raised $92,285,000 and $13,650,000, respectively.[82] Plaintiffs' Memorandum of Law at III–79 – III–80.

### c. *Children's Hospital of Michigan*

The Children's Hospital of Michigan's contacts with New York include (1) the receipt of $35 million of the proceeds from the sale of bonds, offered in 1988 and 1993 by Detroit Medical Center, Children's Hospital of Michigan's parent corporation, offered through Goldman Sachs & Co., a New York City investment house, which served as underwriter for these offerings, and with the assistance of the Depository Trust Company, also located in New York, which served as the securities depository for the 1993 offering, (2) treatment, between 1988 and 1993, by the hospital of 102 patients from New York, and deriving approximately $98,966 in revenue from these patients, (3) its possible acceptance of payments from New York state governmental programs, (4) sending correspondence and promotional materials to residency program applicants and medical schools in New York, including a copy of the hospital's

---

81. Johns Hopkins Hospital's remaining contacts will be discussed along with the other hospital Defendants' contacts with New York. *See* Discussion Section II(b)(1), *infra*.

82. The Depository Trust Company served as securities depository for the 1993 bonds, a New

York bank was used for the receipt of bond insurance payments, and Standard & Poor's and Moody's Investors Service, both New York entities, to provide bond ratings. Plaintiffs' Memorandum of Law at III–80.

recruiting video, (5) sending notices to the chairs of departments in medical schools throughout the country, (6) advertising of its residency programs and physicians, residents, and employee positions in national journals and publications that are or may be distributed in New York, (7) utilizing several other on-line databases through which it disseminates information regarding itself, (8) completion by two New York medical school graduates of the hospital's residency program in pediatrics, and (9) the fact that between 1991 and 1994, twenty-nine members of the current medical staff, and six former members of the medical staff either graduated from a New York medical school or resided in New York at the time they applied to the hospital. Plaintiffs' Memorandum of Law at III–50 – III–54.

#### d. *Detroit Receiving Hospital and University Health Center*

Detroit Receiving Hospital and University Health Center's contacts with New York include (1) participation of Dr. Brooks Bock, its emergency department chairman, on the Residency Review Committee for Emergency Medicine for a six year period which ended in June of 1994, Dr. Bock participated in the review of every New York emergency medicine residency program at least once during that period, (2) attendance by Dr. Brock at continuing medical education courses in New York, (3) Dr. Bock's indication that he believed that other physicians employed by the Medical Center Emergency Services, P.C. ("MCES"), the physicians contract group that staffs and maintains the hospital and health center's emergency department, have travelled to New York for business or professional purposes, (4) the fact that twenty-six physicians who practice at Detroit Receiving graduated from a New York medical school, some of which may have been recruited through advertisements, (5) issuance of bonds in 1993 by the Detroit Medical Center, of which both Detroit Re-

ceiving Hospital and University Health Center and the Children's Hospital of Michigan are wholly owned subsidiaries, $6,300,000 of the proceeds of which were used to finance the acquisition of patient beds, furniture, equipment, and for the renovation of facilities, (6) advertising in national publications which may be distributed in New York, (7) the fact that since 1991, two of the residents in the hospital's emergency medicine residency program were from New York,[83] and (8) its treatment of New York patients and receipt of from such treatment, however, the hospital believes that such revenues were "immaterial." Plaintiffs' Memorandum of Law at III–48 – III–50.

#### e. *Forsyth Memorial Hospital*

Forsyth Memorial Hospital's contacts with New York include (1) treatment of 329 New York patients between 1990 and 1994, which generated $322,497 for the hospital, (2) receipt of payments from a New York governmental agency, and at least seven insurers with central offices in New York, with respect to services rendered for New York patients, (3) raising, in 1991, by the North Carolina Medical Care Commission, $31 million through the issuance of tax-exempt revenue bonds for Carolina Medicorp, Inc., Forsyth Memorial's parent corporation, to fund the acquisition and improvement of real property at the hospital,[84] (4) attendance by hospital employees at clinical education seminars in New York, (5) its participation in a pension fund established by Carolina Medicorp, Inc., in connection with which Carolina Medicorp, Inc. engaged investment advisors in New York, (6) engaging by Carolina Medicorp of New York investment bankers to manage the combined reserves of the hospital and Carolina Medicorp, (7) advertising since 1991 for physician or non-physician job opportunities in five New York specific or eastern regional publications, including the *Buffalo News*, the *Rochester Democrat &*

---

**83.** Another resident from a New York medical school enrolled on July 1, 1994. Plaintiffs' Memorandum of Law at III–50.

**84.** Carolina Medicorp, Inc. used First Boston Corporation, Alex, Brown & Sons, and Wachovia

Bank and Trust Company as the investment bankers for the two offerings, also, John Gregory Beier, the vice-president of Forsyth Memorial Hospital and Carolina Medicorp, Inc., attended a closing in New York in connection with these bond offerings.

*Chronicle,* daily newspapers published in Buffalo and Rochester, New York, the New York Physical Therapy Association Newsletter, Physical Therapy Forum, and Occupational Therapy Forum, (8) advertising by the hospital in several national publications that may be distributed in New York, (9) providing information by the hospital concerning itself to the American Hospital Association's on-line database, and (10) participation by the hospital in a New York job fair for physical therapists. Plaintiff's Memorandum of Law at III–45 – III–48.

### f. *Kettering Medical Center*

Kettering Medical Center's contacts with New York include (1) a New York bank investment account valued at twelve million dollars, (2) the issuance of bonds in 1984 and 1989, where a portion of the 1984 offering was purchased by Merrill Lynch Capital Markets, an investment banking firm located in New York which provided service to the medical center in connection with the 1984 offering,[85] (3) contracting, in 1994, with Physicians International, a physician placement firm located in Buffalo, in order to recruit physicians for the hospital,[86] (4) use of a New York recruiting firm, Howe–Lewis, to recruit an executive director for the hospital's physician hospital organization, Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 54, at pp. 27–28, (5) services performed by New York consultants, lawyers, or accountants on behalf of the medical center, (6) utilizing the services of a New York architecture firm in connection with a hospital capital improvement project in 1991 or 1992,[87] (7) receipt of charitable contributions from New York sources between 1987 and 1994, totalling over $11,000, (8) generating revenue from the treatment of New York patients, (9) the fact that several medical center staff members have attended professional meetings in New York, (10) advertising in publications, which may have been distributed in New York, for employment, including positions as internal medicine residents, and (11) use of a mailing list from the American Medical Student Association to send recruitment materials to medical students. Plaintiffs' Memorandum of Law at III–13 – III–15.

### g. *Loma Linda University Medical Center*

Loma Linda University Medical Center's contacts with New York include (1) treatment of 293 New York residents from 1987 to 1994, resulting in gross revenues of $2,834,192, (2) receipt of $334,198 in charitable contributions from 147 New York donors between 1988 and 1994,[88] (3) listing its residency programs in the Green Book,[89] (4) advertising job opportunities in the Nursing 1994 Directory, as well as advertising for faculty positions and a medical director in nationally circulated publications and distributing a national flyer listing faculty openings, (5) maintaining an "800 number" in connection with its physician referral program, and which "800 number" is assumed to be accessible throughout the country, (6) the fact that eighty-seven of the hospital's medical residents between 1988 and 1994 attended New York medical schools, (7) the fact that forty-seven of the physicians on its medical staff attended New York medical schools or listed their residence as New York prior to practicing at the hospital, (8) receipt, from 1991 to 1994, of thirty-four applications from medical

85. The 1989 offering was for $76,900,000, and the 1984 offering was for $54,860,000. Plaintiffs' Memorandum of Law at III–13 – III–14.

86. In connection with this contract, five physicians were referred and applied to the medical center, none, however, were hired. Plaintiffs' Memorandum of Law at III–14, Appendix Volume 12, Exhibit 6, Response to Interrogatory No. 12.

87. The medical center's executive vice-president and former senior vice-president traveled to New York in connection with this architectural project. Plaintiffs' Memorandum of Law at III–14.

88. It is unclear whether this amount includes donations receives as the result of a national telephonic fundraising drive conducted in 1988 or 1989. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 15, at pp. 32–34.

89. The Green Book is a listing of all of the residency programs in the country. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 47, p. 49. The Green Book is published by the American Medical Association, and is made available to medical schools and training programs throughout the country. *Id.*

students and physicians, who were from New York or attended New York medical schools, interested in practicing in its emergency medicine residency program or its emergency department. Plaintiffs' Memorandum of Law at III–77 – III–79.

### h. *Lutheran General Hospital*

Lutheran General Hospital's contacts with New York include (1) the 1993 ·issuance of over $100 million in revenue bonds by the Illinois Health Facilities Authority on behalf of Lutheran General Health System,[90] Lutheran General Hospital's parent, in part for the benefit of Lutheran General Hospital,[91] (2) deriving revenues of $543,713 for the treatment of New York patients from 1987 to 1994, (3) possible receipt of funding for research projects and charitable contributions from New York sources, (4) purchasing x-ray film from the Eastman Kodak · Company, whose principal place of business is located in Rochester, New York, (5) leasing equipment and supplies from the Xerox Corporation, also a New York corporation,[92] (6) the fact that some of the companies who sell supplies to Lutheran General through the Voluntary Hospitals of America, a group to which the

hospital belongs, may be ·located in New York, (7) an application with Lutheran General Parkside Lodge of New York, a ·New York not-for-profit corporation, (8) sending medical personnel and other professionals to New York for continuing education meetings, (9) soliciting physicians, residents, employees, including emergency department positions, and patients from New York through several nationally distributed journals and other publications which may be distributed in New York, (10) listing its programs in the Green Book, (11) the fact that thirteen physicians currently practicing at the hospital attended New York medical schools, and (12) that since 1991, seventeen residents who practiced at Lutheran General attended New York medical schools. Plaintiffs' Memorandum of Law at III–19 – III–23.

### i.· *Medical College of Pennsylvania and Hospital*

The Medical College of Pennsylvania and Hospital contacts with New York include the fact· that (1) in 1989 and 1991 the Pennsylvania Higher Educational Facilities Authority issued $79,275,000 in revenue bonds on its behalf;[93] First Boston Corporation's New

**90.** The first 1993 public offering of $49,925,000, issued in two series, was underwritten by the New York office of Morgan Stanley & Co. The Depository Trust Company of New York served as the securities depository of the bonds, Cede & Co., upon the nomination of the Depository Trust Company, acted as registered owner of the securities, and Financial Security Assurance, a New York company, issued an insurance policy to guarantee the payment of obligations under the terms of the debenture for the bonds. The second 1993 public offering was for $50,695,000. This offering was underwritten by the First Boston Corporation of New York, and the Depository Trust Company acted as the securities depository. Lutheran General Health System also issued bond offerings in 1985 and 1989 in unspecified àmounts. Plaintiffs' Memorandum of Law at III–19; Appendix Volume 4, Exhibit 7, Doc. No. LL05 164.

The Depository Trust Company holds securities for its participants, electronically facilitates the settlements among participants of securities transactions, receives principal and interest payments from the bond trustee, and credits the accounts of its participants, who then direct the principal and interest payments to the beneficial owners. Plaintiffs' Memorandum of Law at III–20.

**91.** A portion of the proceeds was used to "acquire, construct, equip or remodel" the hospital

and health care facilities of the Lutheran General Health System. Plaintiffs' Memorandum of Law at III–20; Appendix Volume 4, Exhibit 7, Doc. Nos. LL05 580, LL05 589. The Lutheran General Health System maintains fifty-five operating companies, Plaintiffs' Memorandum of Law at III–19 n. 9; Appendix Volume .4, Exhibit 7, Doc. No. LL05 164, thus, the amount of funds acquired by Lutheran General Hospital as the result of the offering is unclear, however, Lutheran General Hospital is obligated with respect to the bonds issued. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 7, Doc. Nos. LL05 585 – LL05 588, LL05 636 – LL05 637. ·

**92.** Kenneth Rojek, the senior vice-president of operations at Lutheran General Hospital, indicated that the hospital leased Xerox equipment from a copying supply corporation, not Xerox itself, therefore, the hospital had no direct commercial ties to Xerox. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 60, pp. 11–12.

**93.** Forty-one million dollars of this bond issue, secured by the medical college and hospital's real and personal property, was used to provide funds for capital expenditures related to the acquisition and renovation of academic and research facilities, and for renovation of certain portions of the main clinical campus. Plaintiffs' Memorandum of Law at III–33.

York office served as the underwriter for these bond offerings, (2) between fiscal 1991 and fiscal 1994, the medical college and hospital derived $1,593,676 in revenue from the treatment of New York inpatients, $118,834 in charges from New York outpatients, and $203,090 in professional fees with respect to the treatment of New York patients, Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 8, pp. 35–36 and Exhibit 2, (3) the medical college and hospital verify and receive payments from insurance companies and other sources located in New York as the result of treating patients from New York, (4) between 1988 and 1993, it received $1,199,371 in charitable contributions from individuals and entities located in New York, (5) the medical college's Department of Development and Alumni Affairs solicits contributions from alumni and prior donors located nationwide, (6) in 1993, representatives of the medical college and hospital attended a job fair at the State University of New York at Buffalo in this district for the purpose of hiring nurses, (7) it sends out recruiting brochures to medical schools across the country, including New York, (8) Dr. James Roberts of Mercy Catholic Hospital Medical Center—Misericordia Division, which is affiliated with the medical college and hospital, engaged in several specific recruiting efforts, including phone calls to New York, for emergency physicians and an emergency department director its behalf, (9) the medical college and hospital purchased a mailing list from an emergency medicine professional organization and distributed recruiting materials to the individuals on the list, including those individuals with New York addresses, (10) it publishes notices in national medical journals, the Green Book, and other publications in connection with its recruitment efforts, (11) one hundred and forty members of the

medical college's current faculty, including sixty-one of its physicians and twenty-five medical residents attended medical school in New York, (12) since 1991, it has been involved in nine multi-center trials or joint research projects with New York hospitals or medical centers, (13) Dr. David Wagner, the director of its Department of Emergency Medicine, has served on the Residency Review Committee for Emergency Medicine since 1990, and has passed on the accreditation of several New York state medical facilities in connection with that position, and (14) Glenda Donahue, the medical college's Associate Dean for Post–Graduate Education has attended at least five professional meetings in New York since 1992. Plaintiffs' Memorandum of Law at III–32 – III–36.

### j. *Mercy Catholic Medical Center—Misericordia Division*

Mercy Catholic Medical Center—Misericordia Division's contacts with New York include (1) sending recruiting materials and informational brochures describing its residency programs to potential applicants located in New York, and Dr. Roberts' interviews of residency applicants, some of whom may reside in New York,[94] (2) advertising in the *Wall Street Journal* and the *New York Times,* as well as several national trade publications that reach New York, (3) treatment of 474 New York patients between 1991 and 1994,[95] (4) the fact that in 1992, 3.26% of the medical center's gross patient charges were attributable to New York patients, in 1993, this figure was 2.28%, and in 1994, 2.03% of its gross patient charges were from the treatment of New York patients, (5) the medical center received charitable donations from at least thirty-seven New York donors, (6) the hospital received third-party payments

94. Mercy Catholic Medical Center—Misericordia Division does not sponsor an emergency medicine residency program, rather, it allows residents from Medical College of Pennsylvania to rotate through its emergency department, thus, it is Medical College of Pennsylvania that sent informational brochures to potential applicants in the Western District of New York, not Mercy Catholic Medical Center—Misericordia Division. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 59, pp. 49–50 (Dr. James R. Roberts, chairman of the medical college's de-

partment of emergency medicine, stated that it mailed informational brochures regarding its emergency medicine residency programs to applicants, including applicants from New York).

95. From December 1991 to May 1994, Mercy Catholic Medical Center—Misericordia Division treated 392 New York inpatients, and from December 1992 to May 1994, the hospital treated eighty-two New York outpatients. Plaintiffs' Memorandum of Law at III–37.

from New York insurance companies for services rendered, (7) since 1991, the medical center has been involved in two bond sales involving underwriters with New York offices, and has also dealt with Smith Barney, the Municipal Bond Investors Assurance Corporation, Standard & Poor's and Moody's in connection with the offerings, (8) communications by medical center representatives and related travel to New York as the result of its involvement with the Community Benefit Standards Program, and (9) travel by Dr. Roberts to New York for association meetings and continuing medical education programs. Plaintiffs' Memorandum of Law at III–36 – III–38.

### k. *Mercy Hospital and Medical Center*

Mercy Hospital and Medical Center contacts in New York include (1) four bond offerings in 1983, 1985, 1986, and 1991, made to finance capital expansion and renovation projects, and to refinance existing debt, for which New York underwriters were utilized, and travel to New York by representatives of the hospital and medical center in connection with the ratings of the 1985 and 1991 offerings, (2) holding of a $1,000,000 certificate of deposit with the Bank of New York from November of 1990 to November of 1991, after which the account was closed in January of 1992, (3) possible holding of investment accounts in the 1980's at a bank located in New York, (4) receipt of $57,825 in charitable contributions from New York sources between 1988 and 1993, (5) the likely treatment of patients from New York in its emergency department, (6) a review of the application of the University of Rochester by Dr. Gary Strange, director of the emergency medicine residency program that included the hospital, until February of 1993, in con-

nection with his duties as a member of the RRC–EM, and related travel to Rochester, New York in connection with this application, (7) travel to New York by Dr. Strange in 1990 or 1991 to lecture at the Long Island Jewish Medical Center, (8) advertising for emergency physicians and other professionals, as well as its residency programs, in national medical journals and other publications that are or may be distributed in New York, (9) listing of the hospital and medical center in the Green Book, and (10) the fact that seven members of Mercy's current medical staff attended medical school in New York. Plaintiffs' Memorandum of Law at III–57 – III–59.

### l. *Methodist Hospital of Indiana*

Methodist Hospital of Indiana's contacts with New York state include (1) nearly $322 million in bonds which have been publicly issued on its behalf since 1986, either by a county or state issuing authority,[96] (2) utilizing the services of several professional organizations located in New York, including Baker, Nye Limited Partnership, a New York investment firm, B.E.A. Associates, a New York mutual fund company, and Fiduciary Trust International, New York money managers, in connection with the foregoing bond offerings (3) generation of $574,868 in hospital charges in connection with the treatment of New York patients from fiscal 1991 to fiscal 1994, (4) receiving payments, in connection with the treatment of New York patients, from third-party payors located in New York, including Blue Cross of New York, (5) the hospital's participation in a multi-center trial and joint research project with New York hospitals for which it makes arrangements for and administers patient

96. The four offerings made on behalf of the hospital include (i) an offering for $80 million in 1992, part of the proceeds were earmarked for the construction of a new tower to house part of its emergency department, (ii) an offering of $90 million in 1992, (iii) an offering of $80 million in 1989, and (iv) an offering of $72 million in 1986. Plaintiffs' Memorandum of Law at III–39.

The First Boston Corporation served as the underwriter for each of these offerings, the New York office of Credit Suisse issued a standby purchase agreement with respect to at least one of the bond offerings and a letter of credit to

secure all or part of the hospital's $322 million obligation on the bonds, the Depository Trust Company served as securities depository for the bonds, and Standard & Poor's and Moody's, both located in New York, have rated some of the bonds issued for Methodist Hospital of Indiana. Plaintiffs' Memorandum of Law at III–39 – III–40.

In connection with the bond offerings, John Fox, the executive vice president and chief financial officer of the hospital, attended three meetings in New York with Standard and Poor's and Moody's in 1991 and 1993. *Id.*

tests, including one trial which began in 1992 and is continuing, sponsored by the University of Rochester, (6) the fact that Dr. Carey D. Chisholm, the emergency medicine residency director at Methodist Hospital of Indiana, has acted as a Special Site Surveyor for, and as a member of the Appeals Panel of the Residency Review Committee for Emergency Medicine since 1987 or 1988, for which Dr. Chisholm conducts on-site surveys and reviews emergency medicine residency programs,[97] (7) attendance by members of the hospital's professional staff at professional education meetings in New York, including a meeting in Buffalo in October of 1991, (8) placement of advertisements to solicit physicians, medical residents, employees and patients in several journals and other publications that are distributed in New York, (9) listing of the hospital in the Green Book, which is distributed nationally, (10) participation by the hospital in the "Practice Match" database, which provides information concerning primary care physicians across the country, (11) dissemination of information regarding its emergency medicine residency program in the Society of Academic Emergency Medicine residency catalogue, which is or may be distributed in New York, (12) the fact that the hospital has occasionally mailed materials to physicians using mailing lists compiled from the national "Practice Match" database, (13) attendance at New York medical schools by twenty-two members of its current medical staff, (14) receipt of twenty-five applications from physicians interested in practicing in its emergency department or its emergency medicine residency program who resided in New York or attended a New York medical school between 1991 and 1993, and two of these applicants have taken positions as medical residents at the hospital,

(15) participation of individuals from New York medical schools in an emergency medicine clerkship program the hospital offers, and (16) the fact that Dr. Chisholm is involved in the solicitation/recruitment process for the Emergency Medical Group, Inc., the physician contract group that employs the emergency physicians who practice at the hospital, which advertises in the Annals of Emergency Medicine and in emergency medicine newsletters to recruit emergency physicians (one New York physician who practiced in its emergency department until the summer of 1994 was recruited by the Emergency Medical Group, Inc.). Plaintiffs' Memorandum of Law at III–39 – III–45.

### m. *Ohio State University Hospital*

Ohio State University Hospital's contacts with New York include (1) use of New York's media and advertising, involving two segments on Good Morning America a national weekday television program, a *Wall Street Journal* article, and advertisements in the *New York Times* and *Wall Street Journal* for job openings, (2) use of a local advertising agency with a New York office, for purposes of utilizing the agency's relationship with the New York office, (3) receipt, from 1991 to 1993, of nearly $200,000 in gross revenues from the treatment of New York patients, (4) charitable contributions received from, New York sources,[98] (5) a contract with Supplemental Health Care Services Ltd., a New York agency, from 1989 to 1993, to provide temporary registered nurse staffing,[99] (6) defense of a lawsuit pending in Richmond County, New York; in connection with this suit, the university hospital retained the services of a New York attorney, (7) participation, in 1989 to 1990, by two of

---

**97.** Dr. Chisholm asserts that in connection with his membership in several professional emergency medicine organizations, he has had telephone conversations and corresponded with organization members from New York. Plaintiffs' Memorandum of Law at III–42. Additionally, Dr. Chisholm considered the accreditation appeal of the Metropolitan Hospital of New York in March of 1994 in connection with his RRC–EM duties. *Id.*

**98.** In the fiscal year ending June 30, 1993, Ohio State University Hospital received a total of $273,000 in gifts, grants, and contributions from New York sources, however, the hospital did not

indicate the amount which was derived from individual sources. Plaintiffs' Memorandum of Law at III–31.

**99.** Ohio State University Hospital paid between $1.2 and $3 million per year for the services of temporary nursing agencies between 1989 and 1993; thus, Plaintiffs' assert that the hospital expended approximately $138,000 to $200,000 per year for Supplemental Health Care's services. Plaintiffs' Memorandum of Law at III–29 n. 12.

the hospital's physicians in a multi-center trial (a medical study) which included a study site in Syracuse, New York, and travel by one of the physicians to New York in connection with this trial, and (8) travel to New York by Dr. Hagop Mekhjian, the medical director of Ohio State University Hospital, and some of his colleagues in connection with their professional activities. Plaintiffs' Memorandum of Law at III–28 –III–32.

Since July of 1990, Ohio State University Hospital has treated seventy patients from New York, from over 110,000 total patients. Ohio State University Hospital's Memorandum of Points and Authorities, filed May 2, 1994, p. 24.

### n. *Oregon Health Sciences University Hospital*

Oregon Health Sciences University Hospital's contacts with New York include (1) receipt of over $565,000 in charitable contributions from New York sources between 1987 and 1994, (2) gross revenues of $359,132 for the treatment of New York patients from 1987 to 1994, (3) the fact that the hospital may have received payment from third-party sources in New York for the treatment of New York patients, (4) the hospital's participation in four clinical studies with New York organizations, including the University of Rochester, and contractual relationships with each New York entity with respect to these studies,[100] (5) travel to New York by members of its faculty to attend professional meetings, (6) advertising job opportunities for physicians and faculty members in national medical journals and other publications that may be distributed in New York, (7) the

hospital's listing in the Green Book, (8) the fact that since 1991, seventeen residents who practiced at the hospital, and ten physicians hired by it attended a New York medical school or listed a New York home address, (9) receipt by the hospital, from 1992 to 1994, of ninety-six applications to its emergency medicine residency program from medical students in New York, and (10) the fact that from academic 1991/1992 through academic 1993/1994, five physicians from New York filed applications to its emergency department. Plaintiffs' Memorandum of Law at III–72 – III–73.

### o. *Riverside Methodist Hospitals*

Riverside Methodist Hospitals' contacts include (1) raising through New York underwriters over $189 million through bond offerings issued by the County of Franklin, Ohio,[101] (2) travel by the current president/chief executive officer, chief financial officer, and chair of the finance committee of the hospitals to New York and his presence on the trading floor at the First Boston Corporation in connection with the sale of the hospitals' 1990B bonds, (3) having a New York investment account with over $23 million in September of 1989; Oppenheimer Capital Corporation, located in New York City, served as the investment manager of the account, (4) treatment, between 1990 and 1994, of 174 outpatients who provided New York zip codes, and of seventy-four inpatients from New York, between 1988 and 1993; also, between 1988 and 1990, 193 New York patients were treated in the hospitals' emergency room,[102] (5) billing patients treat-

100. The principal investigator for these studies is a physician who practices at Oregon Health Sciences University Hospital. Plaintiffs' Memorandum of Law at III–72.

101. These bonds were issued in three offerings, one in 1988 and two in 1990. Plaintiffs' Memorandum of Law at III–23 – III–24. A fourth bond offering took place in 1993, and was apparently a refinancing of the bonds issued in 1990. *Id.* at III–23 – III–24 n. 10.

First Boston Corporation, through its New York office, served as one of the joint underwriters for each bond offering, the Depository Trust Company acted as the securities depository for all of the bonds, the MBIA, which is domiciled in New York, insured the payments required on the

1988 and 1990A bonds, Moody's provided bond rating services in connection with each offering, Standard & Poor's, another investor rating service headquartered in New York, provided such services for the 1988 and 1990A offerings. Riverside Methodist Hospitals is joint and severally liable for the payment of the obligations with respect to the bonds. Plaintiffs' Memorandum of Law at III–23 – III–25.

102. Riverside Methodist Hospitals' interrogatory responses indicate that emergency room visits are included in the outpatient records, thus, some or all of the sixty New York outpatient visits in 1990 may also be emergency room visits. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 1, Doc. Nos. 888–891; Appendix

ed from New York directly, (6) receipt of $50,193 in charitable contributions between 1988 and 1994 from 289 New York donors, (7) the fact that between 1988 and 1990, the hospitals' current president/chief executive officer and two other representatives visited New York to evaluate products, equipment and facilities design concepts, (8) travel by the hospitals' director of transitional residency to New York on its behalf for a meeting of the Alliance of Independent Medical Centers, (9) occasional contact and invitation of speakers from New York for weekly and monthly continuing medical education courses, (10) sending a representative in 1988, 1991, 1992, and 1993, from the hospitals' Human Resources Department to one or more job fairs or on-campus interview programs in the Western District of New York in order to recruit nurses, physical or occupational therapists, or technologists,[103] (11) sending recruiting materials concerning job opportunities to individuals who reside in New York through use of a national health professional society or a mailing list company, (12) advertising job opportunities for physicians and/or employees in the *New York Times* and the *Wall Street Journal,* as well as other medical journals and publications that are or may be distributed in New York, (13) listing its institution and residency programs in the Green Book, (14) the fact that since 1992, five graduates of New York medical schools have taken part in residency programs at Riverside, and (15) attendance at New York medical schools by two of the hospital's emergency department physicians. Plaintiffs' Memorandum of Law at III–23 – III–28.

Volume 13, Exhibit 16, Interrogatory Response No. 6.

**103.** These events took place at the State University of New York at Buffalo, Erie County Community College and the Niagara Frontier [sic] College. Plaintiffs' Memorandum of Law at III–27.

**104.** Saint Francis Medical Center negotiates master purchase agreements with suppliers and vendors on behalf of the Group Purchasing Organization's members that set the pricing and other terms for such members' purchases. Plaintiffs' Memorandum of Law at III–59. The members of the Group Purchasing Organization pay a fee to participate. *Id.*

## p. *Saint Francis Medical Center*

Saint Francis Medical Center's contacts with New York include (1) its participation in a Group Purchasing Organization, of which Olean General Hospital, located in the Western District of New York, has been a member since 1989, sponsored and administered by the medical center, pursuant to an agreement with the medical center,[104] (2) between 1987 and 1993, receipt by the center of at least $298,752 in revenues from the treatment of New York patients,[105] (3) issuance of $178,175,000 in bonds through New York facilities by the Illinois Health Facilities Authority for the Illinois institutions which comprise the OSF Healthcare System, including Saint Francis Medical Center,[106] (4) the fact that from 1983 to 1989, either the medical center or OSF Healthcare System maintained a bank account at Irving Trust to secure the bonds, the balance of this account ranged from $350,000 to over $600,000, (5) advertising for faculty positions in emergency medicine in national medical journals and the annual job and fellowship listing of the Emergency Residents Association, which is nationally distributed, (6) sending a direct mailing to potential candidates for emergency department faculty positions in 1988, (7) mailing its recruiting brochure to the deans of every medical school in the United States, (8) listing of the Saint Francis Medical Center and its residency programs in the Green Book, and (9) that fact that at least one resident who participated in a Saint Francis Medical Center residency program attended a New York medical school or was from New

**105.** These revenues do not include revenues derived from the hospital's treatment of New York outpatients between 1987 and 1989. Plaintiffs' Memorandum of Law at III–60.

**106.** St. Francis Medical Center is the OSF Healthcare Systems' largest hospital. Plaintiffs' Memorandum of Law at III–61. In 1986 and 1993, the bonds were delivered to the underwriters in New York and the Depository Trust Company acted as the securities depository for the 1993 offering. James Moore, the associate administrator of the medical center, who functions as its chief executive officer, traveled to New York to meet with Moody's and Standard and Poor's, who performed bond rating services in connection with the offerings.

York. Plaintiffs' Memorandum of Law at III–59 – III–63.

### q. *St. Anthony Hospital*

St. Anthony Hospital's contacts include (1) advertising medical and non-medical positions in nationally distributed publications, (2) recruiting for nursing positions through advertisements in the *Albany Times Union* and the *Buffalo News,* published in Albany and Buffalo, New York, respectively, (3) the fact that from 1991 to 1994, the hospital had four residents who attended New York medical schools, (4) the fact that fifty-two members of its current medical staff graduated from New York medical schools, (5) from 1991 to 1994, treatment of 540 New York patients, and from May of 1990 to 1994 generating $1,229,364 in revenues from patients residing in New York, and (6) receiving several charitable contributions from New York sources totalling $7,895. Plaintiffs' Memorandum of Law at III–71 – III–72.

### r. *Tri–City Medical Center (San Diego)*

Plaintiffs assert that Tri–City Medical Center (1) regularly advertises employment opportunities in national publications, (2) sent promotional materials regarding employment opportunities directly to New York, (3) treated seventy-three New York patients between 1987 to 1993, (4) allowed its interim chief executive officer to attend one seminar in New York, and (5) issued revenue bonds to the public at large, including New York residents. Plaintiffs' Memorandum of Law at III–81 – III–82.

### s. *University of California (Los Angeles) Medical Center*

Plaintiffs advance several contacts to demonstrate that the University of California (Los Angeles) Medical Center should be subject to jurisdiction under the solicitation plus doctrine, including (1) receipt of $5,486,286 in charges for services rendered to New York residents from fiscal 1991 to 1992 through fiscal 1993 to 1994, (2) attendance by its representatives at a nursing job fair in New York City in 1991, (3) sending materials describing its residency programs to New York medical schools, (4) advertising job opportunities in the *New York Times* and other national medical journals and publications, (5) receipt of $108,015 in charitable contributions from New York sources since 1988, (6) issuance of $136,530,000 in bonds in 1994 to refinance outstanding debt, including bonds issued in 1986 and 1990,[107] (7) serving as a founding member of the Academic Medical Center Consortium,[108] which was incorporated in New York in 1990 or 1991, and maintains its offices in Rochester, New York; contributing approximately $65,000 in annual dues to the consortium, and an additional $20–30,000 for its participation in specific studies,[109] and (8) service by Dr. Schultze, director of the medical center, chairman of the board of, and representing the medical center on the University Hospital Consor-

---

**107.** The Depository Trust Company, a New York company, acted as securities depository and, by its nominee, registered owner of the bonds. Plaintiffs' Memorandum of Law at III–74. The bonds were delivered to the Depository Trust Company in New York, and it facilitates electronic transfers of the bonds in New York. *Id.* Municipal Bond Investors Assurance Corporation ("MBIA") of New York issued the bonds, and Merrill Lynch, a leading New York-based stock brokerage, bought all of the 1994 medical center bonds. *Id.*

In connection with the 1986 bond offering, Smith Barney, another New York City brokerage firm, served as the underwriter. *Id.* These bonds were made available to Smith Barney in New York. *Id.* at III–75. Additionally, both the 1986 and 1990 bond offerings were used to finance the construction and equipping of parts of an ambulatory care complex and operating room suites, among other projects. *Id.* at III–74 – III–75.

**108.** The Academic Medical Center Consortium is a group of eleven academic medical centers that formed the consortium to carry out research in health services. Plaintiffs' Memorandum of Law at III–75. Dr. Raymond Schultze, the director of the University of California (Los Angeles) Medical Center, is vice chairman of the Academic Medical Center Consortium. *Id.*

**109.** University of California (Los Angeles) is currently participating in four studies, and recently concluded participation in another. Plaintiffs' Memorandum of Law at III–75. For each study, each research team selects an individual physician that participates on behalf of the institution; the members of the consortium periodically meet to discuss the results of studies. *Id.* at III–75 – III–76.

tium, which also performs marketing research for its member institutions.[110] Plaintiffs' Memorandum of Law at III-73 – III-77.

### t. *University of California (Irvine) Medical Center*

Plaintiffs assert that University of California (Irvine) Medical Center (1) has treated 334 patients from New York resulting in over $900,000 in total revenues for the hospital, as well as payments by third-party sources, (2) has placed at least eighty advertisements in nationally distributed journals and other publications to fill nurses, clinicians, technologists, and other employee positions, and (3) recruits physicians by placing advertisements in nationally distributed journals. Plaintiffs' Memorandum of Law at III-82 – III-83.

### u. *University of California (San Diego) Medical Center*

Plaintiffs contend that the University of California (San Diego) Medical Center (1) derives substantial revenues from providing services for New York patients, specifically, between fiscal 1990/1991 and fiscal 1993/1994, the medical center charged nearly $7 million to New York residents, (2) sends promotional materials to medical schools in New York, (3) advertised employment opportunities in the *New York Times* and other nationally distributed publications, (4) has two practicing physicians who are from New York or attended New York medical schools, and (5) received $67,929 in charitable contributions from New York donors between 1991 and 1994. Plaintiffs' Memorandum of Law at III-81.

### v. *University Hospital at the University of New Mexico*

Plaintiffs allege that the University Hospital at the University of New Mexico has several contacts with New York which allow personal jurisdiction under the solicitation plus doctrine, including the fact that, (1) its receipt of $4,797,792 in charitable contributions from New York sources between fiscal 1987/1988 and fiscal 1992/1993, (2) the hospital placed advertisements for physicians in nationally distributed medical journals, (3) its residency programs being listed in the Green Book, (4) since 1990, at least seventeen residents in the hospital's residency programs attended New York medical schools or resided in New York prior to participating in the program, (5) three physicians hired by the hospital in 1993 and 1994 resided in New York at the time they were hired, (6) forty-one individuals from New York or New York medical schools applied to its emergency medicine residency program or emergency department between 1991 and 1994, (7) the hospital's Board of Regents issued bonds to raise, among other projects, money for the construction of an ambulatory care facility and a parking structure at the hospital,[111] (8) the hospital's vice-president traveled to New York to meet with Moody's representatives in connection with rating the capital bonds,[112] (9) its faculty members have traveled to New York since January of 1991 to attend conferences, meetings, and for research purposes. Plaintiffs' Memorandum of Law at III-63 – III-66.

### w. *University of Massachusetts Medical Center*

Plaintiffs maintain that the University of Massachusetts Medical Center has significant contacts with New York, including the

---

**110.** Four New York hospitals are members of the University Hospital Consortium, SUNY Downstate (Brooklyn), Stony Brook University Hospital, Columbia University, and Albany Medical Center. Plaintiffs' Memorandum of Law at III-76. The Consortium also has a subsidiary corporation through which University of California (Los Angeles) purchases supplies and equipment. *Id.* University of California (Los Angeles) pays annual membership fees of $55,000, as well as costs incurred with particular studies. *Id.*

**111.** Moody's Investor Service located in New York City performed the bond rating services with respect to the offering. Plaintiffs' Memorandum of Law at III-64.

**112.** However, David McKinney, the vice president for business and finance at University of New Mexico, New Mexico Medical Center testified that he never traveled to New York in connection with the issuance of any bond offering. Plaintiffs' Memorandum of Law at III-64; n. 24; Appendix Volume 11, Exhibit 42, p. 38.

fact that (1) it generated $4,135,000 in revenues for treatment of New York patients between 1990 and 1993, (2) representatives of the medical center attended two job fairs in New York in 1988 to recruit for scientific research and nursing positions, (3) the medical center advertised job opportunities for professional and non-professional staff in the *New York Times,* the *Wall Street Journal,* and the Chronicle of Higher Education, as well as contracted in New York to receive advertising space, (4) the medical center lists its residency programs in the Green Book to recruit residents, (5) the medical center sent recruiting materials to each medical school in the country, and to New York residents based on a mailing list it purchased,[113] (6) two hundred and sixteen residents who have practiced at the center between 1991 and 1994 have attended medical school in New York, and forty-five additional residents from New York medical schools began their residencies at the medical center in July of 1994, (7) the medical center received one hundred and twenty-four applications from individuals in New York or from New York medical students for residency positions in its emergency medicine program, (8) sixty-six members of its current medical staff attended medical school in New York, (9) the medical center's foundation issued $20,500,000 in bonds in New York, through the Massachusetts Health and Educational Facilities Authority, to raise money for the purchase of a

research facility that the center leases from the foundation,[114] (10) it is a defendant in a lawsuit pending in the Northern District of New York, and retained counsel from New York in connection with the case, (11) Dr. Richard Aghababian, the medical center's emergency department chairman, attended a meeting in New York of American College of Emergency Physicians' New York affiliate, (12) Derrick Hollings, the chief financial officer of the medical center, attended a training seminar in New York on behalf of the center, and (13) Michael R. Green, a medical center professor, delivered the keynote address at a prestigious professional lecture, held annually at Rockefeller University in New York City. Plaintiffs' Memorandum of Law at III–54 – III–56.

### x. *University Medical Center, Tucson, Arizona*[115]

The University Medical Center's contacts with New York include the fact that (1) it is affiliated with D'Youville and Daeman colleges, located in Western New York, in the areas of physical and occupational therapy,[116] (2) an indication by Gregory Pivirotto, the medical center's current president and chief executive officer, that it obtains supplies from suppliers and vendors located in New York, (3) maintaining a pollution insurance policy with a New York company, (4) issuance, between 1991 and 1993, of $133,810,000 in public bond offerings,[117] (5) opening two

**113.** The number of persons in New York state to whom these mailing were sent is not provided in the record.

**114.** Goldman Sachs & Co., a New York based investment banking firm, served as one of the underwriters for this offering, and the Depository Trust Company served as a securities depository for the bonds. Plaintiffs' Memorandum of Law at III–54.

**115.** Plaintiffs' Memorandum of Law indicates that the University Medical Center is part of the University of Arizona. *See* Plaintiffs' Memorandum of Law at II–23, III–66, V–58, V–128. However, the University Medical Center merely has an affiliation agreement with the University of Arizona. Plaintiffs' Memorandum of Law, Appendix Volume 7, Exhibit 1, Doc. Nos. LL15 18–LL15 20.

**116.** Physical and occupational therapists from these schools perform clinical rotations at the medical center in connection with their training

programs. Plaintiffs' Memorandum of Law at III–66.

**117.** The proceeds of the 1992 offering of $28,405,000 and the 1993 offering of $54,750,000 were used to refinance outstanding bonds, however, the proceeds of the 1991 issue were used to finance the construction of improvements in the medical center, including a relocation and expansion of the emergency department, the construction of an imaging center, and a new patient tower. Plaintiffs' Memorandum of Law at III–66 – III–67.

The bonds were initially sold in New York to Dillon, Read & Co., Inc., the underwriter of the bond offerings, the Depository Trust Company acted as the securities depository, and, by its nominee, registered owner of all the bond offerings, the bond offerings were insured by the MBIA, and Moody's and Standard & Poor's performed rating services for each of the bond offerings. Plaintiffs' Memorandum of Law at III–66 – III–68.

bank accounts with the New York branch of Societe Generale, which held over $15 million in 1994 from the bond sale; these accounts remained open at least until August of 1994, at which time their balances were $11,071,555 and $4,243,000, (6) the fact that between 1988 and 1993, the medical center's gross charges with respect to the treatment of one hundred and forty-four New York patients totalled $1,951,516, (7) the fact that the center may have billed New York insurance companies or received payments from state government sources in connection with the treatment of these patients, (8) possible personal contact or contact through a collection agency with patients who have not paid their medical bills, (9) receiving, since July 1, 1992, over $32,000 in charitable contributions from New York sources, (10) sending representatives, for each of the past four years, to job fairs to recruit physician and occupational therapists at a fair sponsored by the Niagara Frontier [sic] College, at Trocaire College, the State University of New York at Buffalo, Daemen College and D'Youville College, in Western New York, (11) advertising job opportunities for physicians and other employees in several national medical and trade journals, and other publications, (12) sending national direct mailings to recruit employees, (13) paying the travel expenses of potential New York hirees to come to the center, (14) the fact that from the 1990/1991 academic year through the 1994/1995 academic year, between seven and sixteen residents and fellows who practiced at the center graduated from New York medical schools, (15) receipt of its emergency medicine department of ten to twenty applications from New York residents, and (16) the fact that eleven physicians from New York medical schools have practiced or applied for privileges at the center since 1991. Plaintiffs' Memorandum of Law at III–66 – III–71.

In determining whether any of these contacts with New York, alone or in combination, will satisfy the solicitation plus doctrine, the court must decide whether each

Defendant has sufficient contacts with the jurisdiction to reach the level of substantial solicitation, which requires that the solicitation be carried on with a considerable measure of continuity. *Landoil Resources,* 918 F.2d at 1044. Activities which are incidental to a defendant's primary business do not carry the same jurisdictional weight as the solicitation of such primary business itself. *Crucible Ventures, Inc. v. Futuresat Industries, Inc.,* 1990 WL 16140, at *2 (S.D.N.Y. 1990). *See also Bryant v. Finnish National Airline,* 22 A.D.2d 16, 253 N.Y.S.2d 215, 219–20 (1st Dep't.1964) ("As the term 'doing business' is used in reference to foreign corporations, it relates to the ordinary business which the corporation was organized to do.... It is not the occasional contact or simple collateral activity which is included."), *rev'd on other grounds,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965). In cases involving solicitation by a foreign corporation, courts determining questions of jurisdiction "examine the realities of the business done by a foreign corporation to determine whether there is 'a good reason for drawing the defendant into a suit away from its home state.'" *Katz Communications Agency, Inc. v. Evening News Assoc.,* 705 F.2d 20, 24 (2d Cir.1983) (quoting *Tauza,* 115 N.E. at 917–18). If any of the hospital Defendants' contacts with New York rise to this level, the court must then review the facts to ascertain whether additional contacts exist with New York, as mere solicitation is insufficient to establish personal jurisdiction under Section 301. *Cohen,* 495 F.Supp. at 850–51.

Plaintiffs assert that each hospital Defendant has advertised to recruit physicians, residents, and other medical staff in publications which are distributed nationally, including the *Wall Street Journal,* the *New York Times,* the Green Book, and other nationally distributed medical journals and materials. However, advertisements placed in "nationally distributed newspapers such as

---

In connection with the 1991 bond offering, the center's president/chief executive officer, the chief operating officer, and the former president and chief executive officer, traveled to New York four or five times to meet with Dillon, Read &

Co., Moody's, Standard & Poor's, and the MBIA regarding the offering, the terms and conditions thereof, the center's financial status, and ten center representatives and agents attend the closing. Plaintiffs' Memorandum of Law at III–68.

the New York Times do not play a substantial role in the determination of jurisdiction." *Russo v. Killington, Ltd.,* 1994 WL 320704 at *3, 1994 U.S.Dist. LEXIS 8882 at *8 (S.D.N.Y.1994). Thus, advertising in periodicals or journals with national circulation fails to constitute an activity of substance in any specific jurisdiction, and cannot be the basis for personal jurisdiction under Section 301. *See·Russo, supra,* at *8.

■ Plaintiffs also claim that some advertising was intended to solicit patients from New York, and the hospital Defendants received revenue from treating New York patients.[118] Even if the court assumes that all of the revenues derived from the treatment of New York patients by the hospital Defendants was solicited, such revenues do not amount to substantial solicitation. Generally, when New York, courts have focused on revenues derived from solicitation of business in New York to determine if the solicitation was substantial, they have considered the amount spent on in-state advertising and the degree of business generated by this advertising. *Lane v. Vacation Charters, Ltd.,* 750 F.Supp. 120, 123 (S.D.N.Y.1990); *Katz Agency, Inc. v. Evening News Assoc.,* 514 F.Supp. 423, 427–28 (S.D.N.Y.1981), *aff'd,* 705 F.2d 20 (2d Cir. 1983). However, courts have generally refused to find jurisdiction under the solicitation plus doctrine when revenues derived from solicitation in New York state comprise an insubstantial percentage of a defendant's total sales.[119] *Pellegrino v. Stratton Corporation,* 1989 WL 10726, *3 (N.D.N.Y.1989); *Dunn v. Southern Charters, Inc.,* 506 F.Supp. 564, 567 (E.D.N.Y.1981) (where defendant derived only one and one-half per-

cent of its total sales revenue from New York it was "doubtful" whether its "solicitation activities in New York [were] substantial enough to bring [the defendant] within the 'solicitation-plus' rule"); *Stark Carpet Corporation v. M–Geough Robinson, Inc.,* 481 F.Supp. 499, 505 (S.D.N.Y.1980) (plaintiff failed to demonstrate substantial solicitation where defendant derived only two percent of its total income from sales in New York); *New England Laminates Co., Inc. v. Murphy,* 79 Misc.2d 1025, 362 N.Y.S.2d 730, 733 (Sup.Ct. Nassau Cty.1974) (four percent of total income amounting to $400,000 of defendant's total sales was mere solicitation and not sufficient to constitute doing business under Section 301).

Children's Hospital (San Diego) derived over $370,000 from the treatment of 111 New York patients between October 1991 and October 1994. Plaintiffs' Memorandum of Law at III–80, Appendix Volume 4, Exhibit 4, Doc. No. LL04 429. The hospital received approximately $400,768,500 in net patient revenues for the same period, therefore, .09% of the hospital's revenues were generated from the treatment of New York patients.

The Children's Hospital of Michigan treated 102 New York residents between 1988 and 1993, thus, the Plaintiffs· estimated that the hospital derived $98,966 from New York patients. Plaintiffs' Memorandum of Law at III–51 – III–52. The hospital's total gross revenue for the same period of time exceeds one billion dollars, thus, even using the Plaintiffs' figure of $98,966, Children's Hospital of Michigan received less than .01% of its revenues from New York patients.

**118.** Plaintiffs did not make this claim with respect to Defendants Mercy Hospital and Medical Center, Riverside Methodist Hospitals, Tri–City Medical Center, or University Hospital at the University of New Mexico School of Medicine. Plaintiffs' Memorandum of Law at III–23 –III–28, III–57 – III–59, III–63 – III–66, III–81 – III–82. Additionally, Detroit Receiving Hospital and University Health Center was unable to provide the Plaintiffs with specific information regarding revenues from New York residents, as this information was not available. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 5, Doc. No. LL03 24. Thus, neither the court nor the parties can determine the percentage of revenues derived from the treatment of New York patients

with respect to Detroit Receiving Hospital and University Health Center.

**119.** The court notes that throughout the following discussion, the years of comparison between the revenues generated from the treatment of New York patients may be slightly different than those used ·to· determine each hospital Defendant's overall revenues from the treatment of patients. When such a disparity is present, this court has used a shorter time period for the overall patient charges in determining the percentage of income derived from New York patients. Additionally, the figures provided have been rounded up or down to the nearest dollar.

Forsyth Memorial Hospital charged approximately $322,767 for the treatment of New York patients from fiscal 1990 through fiscal 1994.[120] Plaintiffs' Memorandum of Law at III–45; Appendix Volume 12, Exhibit 4, Supplemental Answer to Interrogatory No. 7. The hospital's total gross revenues for the same period exceed $1.2 billion. Plaintiffs' Memorandum of Law, Appendix Volume 12, Exhibit 4, Supplemental Answer to Interrogatory No. 7. As such, the hospital's gross revenues from New York patients amount to .03% of its total revenues.

From 1987 through June of 1994, Loma Linda University Medical Center received $2,834,192 in gross revenues from New York patients. Plaintiffs' Memorandum of Law at III–77, Appendix Volume 12, Exhibit 8, Response to Interrogatory No. 7. The medical center's gross revenues for the period from 1987 through 1993 totalled over three billion dollars. *Id.* Thus, the medical center derives approximately .08% of its revenues from the treatment of New York patients.

Lutheran General Hospital received $543,713 in revenues for the treatment of New York residents from 1987 to 1994. Plaintiffs' Memorandum of Law at III–21. However, the net patient revenue of the hospital from fiscal 1990–1991 through fiscal 1991–1992 was nearly $526,000,000. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 7, Doc. Nos. LL05 885, LL05 890. Thus, the revenue Lutheran General received from providing services to New York patients amounted to less than .1% of its income.

Plaintiffs assert that from fiscal 1991 through fiscal 1994, Medical College of Pennsylvania and Hospital received $1,915,560 in revenues from the treatment of New York patients. Plaintiffs' Memorandum of Law at III–33. The hospital's gross patient revenues, including hospital charges and professional fees, from fiscal 1991–1992 and fiscal 1992–1993 total $752,049,000. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 1, Doc. Nos. LL06 790, LL06 806.

Thus, the revenue the medical college and hospital received for services provided to patients from New York was less than .25% of its revenues.

Mercy Catholic Medical Center—Misericordia Division indicates that in 1992, 3.26% of its gross patient charges were attributable to the treatment of New York patients, in 1993, the figure was 2.28%, and in 1994, 2.03%. Plaintiffs' Memorandum of Law at III–37; Appendix Volume 12, Exhibit 11, Response to Interrogatory No. 7.

Methodist Hospital of Indiana charged nearly $575,000 for services rendered to New York patients for the period from fiscal 1991 through fiscal 1994. Plaintiffs' Memorandum of Law at III–41. The hospital's total patient charges from fiscal 1991 through fiscal 1994 total $52,591,051. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 3, Doc. Nos. LL08 617, LL08 657. Therefore, the revenue received from New York patients amounts to 1.09% of the hospital's total patient charges for that period.

In this case, Ohio State University Hospital received nearly $200,000 in gross revenues from 1991 to 1993 from treating New York patients, however, the net patient revenue of the hospital for the same period of time exceeded $500 million. Plaintiffs' Memorandum of Law, Appendix Volume 8, Exhibit 3, Doc. No. 85. Therefore, the revenues received from patients from New York amount to .04% of the hospital's net revenues. Additionally, of the over 110,000 total patients treated at the university hospital since July of 1990, only seventy patients were from New York. Ohio State University Hospital's Memorandum of Points and Authorities, filed May 2, 1994, p. 24.

Oregon Health Sciences University Hospital generated $359,132 in gross revenues from New York patients between 1987 and 1994. Plaintiffs' Memorandum of Law at III–72, Appendix Volume 13, Exhibit 15, Response to Interrogatory No. 6. For the same period of time, the hospital received $1,759,-

---

**120.** The court notes that although Plaintiffs state $322,497 in gross revenues was attributed to New York patients, when tallying the numbers presented in Forsyth Memorial Hospital's Answer to Interrogatory No. 7, the total gross reve-

nues for New York patients is $322,767. Plaintiffs' Memorandum of Law, Appendix Volume 12, Exhibit 4, Supplemental Answer to Interrogatory No. 7.

442,000 in gross revenues. *Id.* Therefore, the university received only .02% of its revenues for the period from July 1, 1987 through February 28, 1994.

Plaintiffs assert that Saint Francis Medical Center derived at least $298,752 in revenues from the treatment of patients from New York. Plaintiffs' Memorandum of Law at III–60. As the hospital's total gross revenue for the same period, not including the outpatient revenues for the years 1987 through 1989, is over $1.8 billion, the hospital's revenues from New York patients amount to less than .02%. Plaintiffs' Memorandum of Law, Appendix Volume 13, Exhibit 18, Exhibit A to Interrogatory Answers.

St. Anthony Hospital received $1,229,365 from May of 1990 to June of 1994 for treating patients from New York. Plaintiffs' Memorandum of Law at III–71, Appendix Volume 13, Exhibit 17, Response to Interrogatory No. 7. For the period from fiscal 1990 through fiscal 1993, the hospital received $755,799,000 in gross revenues, which means that .16% of the hospital's revenues were derived from the treatment of New York patients. *Id..*

University of California (Los Angeles) Medical Center charged nearly $5.5 million for services rendered to New York patients for the period from fiscal 1991–1992 through fiscal 1993–1994. Plaintiffs' Memorandum of Law at III–74. However, the net patient revenue of the hospital from fiscal 1991–1992 through fiscal 1992–1993 exceeded $750,000,-000. Plaintiffs' Memorandum of Law, Appendix Volume 6, Exhibit 2, Doc. No. LL13 00379. Thus, the revenue the medical center received from providing services to New York patients amounted to .73%, of its income.

Plaintiffs assert that since 1991, University of California (Irvine) Medical Center treated 334 New York patients which resulted in over $900,000 in total revenues for the hospital. Plaintiffs' Memorandum of Law at III–82. The medical center's net patient revenue for the fiscal 1992–1993 period was $181,300,-000; limiting the revenue figure for one year, the revenue received for services provided by the medical center to New York patients is only .5%. Plaintiffs' Memorandum of Law,

Appendix Volume 5, Exhibit 6, Doc. No. LL11 1115.

University of California (San Diego) Medical Center charged nearly $7 million to New York patients between fiscal 1990–1991 and fiscal 1993–1994. Plaintiffs' Memorandum of Law at III–81. However, over the same period, the medical center's total gross revenues amounted to nearly two billion dollars, Plaintiffs' Memorandum of Law, Appendix Volume 13, Exhibit 23, Supplemental Answers at p. 3, indicating that only .36% of the medical center's revenue was from New York.

Between 1990 and 1993, University of Massachusetts Medical Center generated $4,135,-000 in revenues for treatment of New York patients. Plaintiffs' Memorandum of Law at III–54. However, for the same period, the medical center received over one billion dollars in total patient revenues, Plaintiffs' Memorandum of Law, Appendix Volume 13, Exhibit 24, Response to Interrogatory No. 7, hence, only .39% of the medical center's revenue was generated from the treatment of New York patients.

Between 1988 and 1993, University Medical Center (Tucson) generated $1,951,516 in revenues for treatment of New York patients. Plaintiffs' Memorandum of Law at III–69, Appendix Volume 7, Exhibit 1, Doc. Nos. LL15·12 – LL15 17. However, the net patient revenues for the period from 1988 through 1992 total $615,291,000, which represents less than .32% of the hospital's total revenues being derived from charges to New York patients. *Id.* at LL15 228, LL15 596.

Thus, even if the court assumes that each of these hospital Defendants successfully solicited patients from New York state, this argument fails to establish the threshold requirement for application of the solicitation plus rule, as none of the Defendants discussed above received over 3.26%, and most less than one percent, of their gross revenues from the treatment of patients from New York. Therefore, the court is not persuaded that these Defendants engaged in substantial solicitation of patients from New York, *see Rolls–Royce Motors,* 657 F.Supp. at 1047, as the minuscule revenue percentages attrib-

uted to New York patients undermine the contention that these hospitals solicit business in New York.

Further, Plaintiffs' assertion, without evidence, that these Defendant hospitals treated New York residents which they solicited is irrelevant, as here the services rendered were performed outside of New York state, after the New York resident voluntarily traveled elsewhere to benefit from the services offered or were treated on an emergency basis. *See Wolf v. Richmond County Hospital Authority*, 745 F.2d 904, 911 (4th Cir. 1984) (citing *Gelineau v. New York University Hospital*, 375 F.Supp. 661, 667 (D.N.J. 1974) ("the residence of a recipient of personal [physician or hospital] services rendered [outside the forum] is irrelevant")). Moreover, "[a]ccepting numerous [New York] patients in [Defendant] hospital[s] and treating them … over the years is not a business activity within [New York]," as the hospital performed no services within New York, and did not avail itself of the privileges or benefits of New York laws. *Walters v. St. Elizabeth Hospital Medical Center*, 543 F.Supp. 559, 560 (W.D.Pa.1982). *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–1240, 2 L.Ed.2d 1283 (1958) ("it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws") (citing *International Shoe*, 326 U.S. at 319, 66 S.Ct. at 159–160). *See also Jackson v. Shepard*, 609 F.Supp. 205, 207 (D.Ariz.1985) (a "hospital is not doing business in Arizona by attempting to collect debts acquired in California … [n]or does the fact that a California hospital accepts Arizonans for treatment constitute doing business by the hospital within Arizona") (citing *California Brewing Co. v. Rino*, 143 F.Supp. 801, 803 (D.Idaho 1956) and *Walters, supra*, at 560).

■ In arguing that the hospital Defendants meet the solicitation plus requirement under Section 301, Plaintiffs also urge that several of the physicians, residents, and medical staff at various hospitals came from New York or attended medical school in New York, and may have been recruited. Plain-

tiffs' Memorandum of Law at III–55 – III–56, III–65, III–81. To hold that these hospital Defendants have subjected themselves to the jurisdiction of New York by the simple act of employing New York residents to perform services outside the state would be totally inconsistent with Fourteenth Amendment due process requirements as it fails to demonstrate a purposeful availing of the benefits and protections of New York state. *See Hanson, supra*, at 253, 78 S.Ct. at 1239–1240; *Johnston v. Frank E. Basil, Inc.*, 802 F.2d 418, 420–21 (11th Cir.1986). *See also Farbman v. Esskay Mfg. Co.*, 676 F.Supp. 666, 669 (W.D.N.C.1987) (case dismissed for lack of personal jurisdiction where there was no relationship between the defendant and the forum "except for the fortuitous circumstance that plaintiff was a citizen of the forum when hired").

Plaintiffs also rely upon the fact that other persons from New York applied to the hospital Defendants' emergency medicine residency programs. Plaintiffs' Memorandum of Law at III–55 – III–56, III–65. While some hospital Defendants have mailed promotional materials to medical schools located in New York, Plaintiffs' Memorandum of Law at III–55, III–76, III–81, III–82, and advertised in nationally distributed publications, these contacts fail to create substantial and continuous activity in New York. *Johnston, supra*, at 420 (an advertisement in a state newspaper offering employment opportunities outside the state, or sending an individual to interview the resident does not satisfy due process considerations for purposes of personal jurisdiction); *Schenck v. Walt Disney Co.*, 742 F.Supp. 838, 841 (S.D.N.Y.1990) (defendant not subject to jurisdiction under Section 301 on the basis of its solicitation of business through New York representatives by way of advertisements, sending promotional materials, maintaining a contract with a New York advertising firm, and paying commissions to travel agents where all reservations had to be confirmed by the corporation in Florida).

Additionally, the filing of applications for admission to Defendants' emergency medicine residency programs is often the result of unilateral activity initiated by the prospective resident, rather than the residency program.

*See Selman,* 494 F.Supp. at 611 (the administration of defendant association of medical colleges admission test on a regular basis in New York, along with the mailing of applications to New York medical schools, is insufficient to support jurisdiction under Section 301). *Cf. Kingsepp,* 763 F.Supp. at 27 (Dartmouth engaged in a continuous and systematic course of conduct sufficient to find that it was doing business under Section 301 as it actively solicited students by sending representatives to 44 secondary schools in the state yearly, engaged in substantial commercial activity in the state, had a banking relationship with Chase Manhattan Bank since 1982, with at least two bank accounts, issued bonds through Goldman Sachs on at least four occasions, and owned real property in the state). Here, in the absence of evidence particularizing whether medical staff members were in fact recruited by any hospital Defendants in New York, such a finding would be based on inadmissible speculation.

■ Further, as New York is the second most populated state in the country and has several medical schools located within it, it is reasonable to infer that hospital residency programs operated in other states will receive a significant number of New York applicants, and that numerous New York educated physicians or previous residents of New York are practicing in hospitals throughout the country. Thus, the number of physicians who graduated from New York medical schools or were New York residents before practicing at one of the hospital Defendants is irrelevant in the determination of whether these hospitals are subject to personal jurisdiction as it fails to demonstrate the purposeful availing of benefits of New York state essential to a properly based finding of doing business. *See Hanson, supra,* at 253, 78 S.Ct. at 1239–1240. Moreover, the number of applications received from medical students and physicians who resided or were trained in New York seeking positions or privileges at one of the Defendant hospitals is not, as explained, a contact that supports the exercise of personal jurisdiction absent evidence of advertent recruitment.

■ Plaintiffs rely on the issuance of bonds through New York financial markets to raise capital as a contact with New York sufficient to find jurisdiction under Section 301. Plaintiffs' Memorandum of Law at III–13 – III–80. However, the location in New York of service organizations, such as law firms or investment banking companies, which perform financial and related legal services for the hospital Defendants in connection with such offerings, does not represent activity in New York by the hospital Defendants for jurisdictional purposes. *Bush v. Stern Brothers & Co.,* 524 F.Supp. 12, 14 (S.D.N.Y.1981) (the location in New York of firms, such as law firms and investment services, which perform services for a defendant for a fee does not represent activity by the defendant in New York for jurisdictional purposes). *See Stark Carpet, supra,* at 506. *Compare Kingsepp, supra,* at 27 (although the court found that Dartmouth College was doing business in New York, the court did not indicate that the college's issuance of four bond offerings without the remaining contacts, sending representatives to forty-four New York schools each year, engaging in substantial commercial activity in the state, maintaining two bank accounts, and owing a remainder interest in real property in New York, would be sufficient to allow jurisdiction under Section 301.) Thus, the retention of these firms for legal and financial services in connection with occasional bond issues is distinguishable from the retention of accountants and attorneys in New York on a continuous basis for purposes of finding jurisdiction pursuant to Section 301. *Bush, supra,* at 14. *See also Nordic Bank PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 566 (S.D.N.Y.1985) (where defendants each marketed in excess of $100 million of commercial paper through New York brokerage firms, but did not sell the notes directly to the public (the banks sold them to New York commercial paper dealers who then reoffered them to United States investors), and the sale of commercial paper was an essential aspect of the defendants' business, such contacts with New York were considered limited, sporadic, and not so substantial and continuous as to support a finding of doing business). Further, the defendants in *Nordic Bank* had also underwritten several multi-million dollar securities offerings and designated New York brokerage

firms to represent them in connection with these offerings. *Id.* at 566 n. 23. However, "these infrequent forays into investment banking were neither substantial nor continuous enough to establish the corporate defendants' presence in New York." *Id.* at 566.

As with most businesses, borrowing money for capital or operating purposes is an activity incidental to the hospital Defendants' primary business, thus, the Defendants' issuance of bonds to obtain capital, and visits by each Defendant to help consummate the bond sales do not amount to the continuous business necessary to support jurisdiction under Section 301. *See Crucible Ventures, supra,* (the solicitation and execution of business loans, where defendant's president visited the state twenty-five times over a three year period to obtain the business loans, did not constitute doing business with the requisite measure of permanence and continuity to confer jurisdiction pursuant to Section 301). *See also PaineWebber Inc. v. Westgate Group, Inc.,* 748 F.Supp. 115, 120 (S.D.N.Y. 1990) (defendant's "desire to get a big 'New York' Investment house is not a purposeful availment of New York as a forum," thus, defendant's contacts with New York were held not to establish jurisdiction).

Therefore, each hospital Defendant's use of New York companies in issuing bonds to raise capital, the use of investment advisors or other New York professional organizations, and the hiring of New York attorneys by Defendants Ohio State University Hospital and the University of Massachusetts Medical Center in connection with defending against suit, are not sufficient contacts with New York to provide for jurisdiction under the solicitation plus doctrine. Additionally, the business trips taken by Defendants' executives to negotiate and conclude the bond offerings are also insufficient to establish jurisdiction over the hospital Defendants. *PHLCORP, Inc. v. Wichita Mortgage Corporation,* 1991 WL 12328, *3 (S.D.N.Y.1991) (ten business trips taken by three executives over a period of fourteen months were not

sufficient to establish systematic and continuous presence within the state); *Hoffritz for Cutlery,* 763 F.2d at 57–58 (fifty-four visits to New York to discuss business with plaintiff insufficient).

▇▇▇▇ Plaintiffs also contend that charitable contributions received by the hospital Defendants from residents of New York support subjecting the hospitals to jurisdiction in New York. Plaintiffs' Memorandum of Law at III–31, III–63, III–74 n. 28, III–81. However, there is no indication or evidence presented in this record that explains how or whether such contributions were solicited or were received.[121] Although the court must draw all reasonable inferences in favor of the Plaintiffs, the court cannot infer conclusions that do not have any reasonable basis in fact. *See Hoffritz for Cutlery, Inc.,* 763 F.2d at 57; *Marine Midland Bank,* 664 F.2d at 904. If there was any solicitation of gifts from New York, such donations more likely occurred as the result of requests through the mails from the state in which each hospital Defendant is located or from unsolicited gifts. Further, it is unreasonable to assert that the charitable contributions received by any of the hospital Defendants were sufficient to confer jurisdiction over the Defendants,[122] as these contributions were not substantial, and did not result in or from continuous and systematic activity in New York. *Hutton v. Piepgras,* 451 F.Supp. 205, 209 (S.D.N.Y.1978) (Mayo Clinic's receipt of charitable contributions, open laboratory facilities available nationwide, toll-free telephone service and nationwide circulation of free medical publications did not amount to presence in the state under Section 301). *See also Steego Corporation v. Ravenal,* 830 F.Supp. 42, 50–51 (D.Mass.1993) (making donations by resident of forum state to non-resident charitable institutions does not constitute continuous and systematic activity in the forum state to confer personal jurisdiction).

---

121. As discussed above, Discussion Section II(b)(1)(a), *supra,* Johns Hopkins Hospital maintains a New York office through which it actively solicits contributions from patients in the northeast. Sekulow Affidavit at ¶¶ 1–10.

122. With the exception of Johns Hopkins Hospital, as discussed in Section II(b)(1)(a), *supra.*

■ Another factor which will support a finding of jurisdiction under Section 301 is the in-state presence of employees engaged in business activity. *Lane,* 750 F.Supp. at 125; *Pellegrino v. Stratton Corporation,* 679 F.Supp. 1164, 1171 (N.D.N.Y.1988). Plaintiffs argue that a defendant, such as University of California (Los Angeles) Medical Center, which attended a nursing job fair in New York in 1991, supports finding jurisdiction.[123] Plaintiffs' Memorandum of Law at III–55, III–76. Further, Plaintiffs assert that trips to New York for professional meetings, seminars, continuing education courses, training, or other such reasons demonstrates presence within New York. Plaintiffs' Memorandum of Law at III–22, III–26, III–32, III–42 – III–43, III–46, III–48, III–56, III–58, III–64, III–68, III–73. However, it is clear that these contacts are not systematic and continuous, and will not be sufficient to constitute presence in New York in order to obtain jurisdiction under Section 301. *Lane, supra,* at 125 (sending employees to two trade shows in the forum state is not sufficient for jurisdiction under Section 301, further, if the employees solicited reservations at the two trade shows, this would nevertheless be insufficient to meet the in-state activity test as the two occasions cannot be characterized as continuous or permanent activity). *See Landoil Resources,* 918 F.2d at 1045–1046 (occasional forays into the jurisdiction do not constitute continuous presence or the substantial activities justifying application of the solicitation plus doctrine under Section 301).

■ Under the solicitation plus test, presence is established when substantial solicitation is coupled with other New York contacts of a continuous nature, such as a New York certificate of incorporation, bank account, or phone number. *Gonzalez v. Press Parts, Inc.,* 1995 WL 608307, *3 (S.D.N.Y.1995) (citing *Rolls–Royce Motors, supra,* at 1044). As the record in this case does not permit an inference of the extensive solicitation required under Section 301 to support finding personal jurisdiction over any of the hospital Defendants except for Johns Hopkins Hospital, Plaintiffs have failed to demonstrate substantial solicitation by a preponderance of the evidence. Thus, the solicitation plus doctrine does not establish personal jurisdiction in this court over any of the remaining hospital Defendants.

As the contacts listed by Plaintiffs have failed to demonstrate substantial solicitation by any of the Defendants, except for Johns Hopkins Hospital, the court need not address the remaining contacts alleged to satisfy the "plus" portion of the New York solicitation plus doctrine. However, for purposes of completeness, the court will briefly address the "plus" contacts alleged by Plaintiffs.

The remaining contacts asserted by the Plaintiffs for the "plus" portion of the Section 301 solicitation plus test include contracting for temporary nursing services, contracting for local advertising services with an agency that has a New York office, participating in multi-center trials or a study with a New York site, participating in a consortium, purchasing supplies from New York companies, affiliations with New York entities, participating in "on-line" national databases, sporadically printing advertisements in local publications, maintaining New York bank accounts, or maintaining a toll-free number which may be accessible from New York. Plaintiffs' Memorandum of Law at III–13 – III–80. Although these activities, except participating in the MATCH and FREIDA database services, constitute contacts with New York, to predicate jurisdiction pursuant to Section 301 on these facts would ascribe undue significance to essentially tenuous and intermittent contacts. *See Landoil,* 918 F.2d at 1043; *Vendetti,* 802 F.Supp. at 889. *See, e.g., Maresca v. Holiday Inns,*

---

**123.** Forsyth Memorial has participated in a New York job fair for physical therapists, Medical College of Pennsylvania and Hospital sent representatives to a job fair at SUNY at Buffalo in 1993 to recruit nurses, Riverside Methodist Hospitals sent human resources personnel to job fairs in 1988, 1991, 1992, and 1993 to recruit nurses, therapists, or technologists, the University of Massachusetts Medical Center sent employees to two job fairs in New York in 1988 to recruit for research and nursing positions, and University Medical Center (Tucson) sent representatives for each of the past four years to job fairs to recruit physical and occupational therapists.

*Inc.,* 1993 WL 8166, 1993 U.S.Dist. LEXIS 57, at *8 (S.D.N.Y.1993) (Virginia hotel which participates in a national franchise system that includes a nationwide database and a toll-free reservations number was not amenable to jurisdiction in New York); *Walsh v. Maryland Bank, N.A.,* 806 F.Supp. 437, 441 (S.D.N.Y.1992) (credit card issuer located in Maryland was not doing business in New York for purposes of long-arm statute by virtue of maintaining a toll-free number for customers in the state to request credit card applications and to utilize payment services membership association which was based in New York); *Vendetti, supra,* at 894 (no Section 301 jurisdiction over defendant with eight New York bank accounts); *Grove Valve & Regulator Co. v. Iranian Oil Services Ltd.,* 87 F.R.D. 93 (S.D.N.Y.1980) (English corporation's maintenance of local bank accounts does not, without more, amount to doing business in the state); *Stark Carpet, supra,* at 506 (the location of a defendant's suppliers does not represent any activity by the defendant in New York); *Weinberg v. Colonial Williamsburg, Inc.,* 215 F.Supp. 633, 639–40 (E.D.N.Y.1963) ("Certainly the mere existence of a bank account is not conclusive as to the fairness of subjecting defendant to suit in this forum"); *Fremay, Inc. v. Modern Plastic Mach. Corp.,* 15 A.D.2d 235, 222 N.Y.S.2d 694, 700 (1st Dep't.1961) ("existence of a bank account in New York by itself" is not sufficient to show that a foreign corporation is doing business in New York). *Compare Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 448, 72 S.Ct. 413, 419–420, 96 L.Ed. 485, *reh'g denied,* 343 U.S. 917, 72 S.Ct. 645, 96 L.Ed. 1332 (1952) (While defendant's operations in the Philippine Islands were shut down during the Japanese occupation of the Philippine Islands, the president of the company maintained an office in Ohio from which he carried on his personal business and kept company files, carried on correspondence relating to the company and its employees, drew and distributed salary checks on behalf of the company for himself and two secretaries, maintained active bank accounts carrying substantial balances of company funds, an Ohio bank acted as transfer agent for the company stock, several directors meetings were held in Ohio, and the president supervised policies for the rehabilitation of company properties in the Philippines and dispatched funds to cover purchases of the machinery necessary for the rehabilitation. The Supreme Court held that these Ohio contacts constituted continuous and systematic supervision of the necessarily limited wartime activities of the company, thus, Ohio could exercise jurisdiction over the corporation.); *United Rope Distributors, Inc. v. Kimberly Line,* 785 F.Supp. 446, 450 (S.D.N.Y.1992) (distinguished several cases as they concerned bank accounts which were incidental to the business activities of the corporations that owned them, rather than a bank account which "represents a more substantial voluntary activity in New York" such as one for the receipt of "substantially all of the income of a foreign corporation for the payment of substantially all of its business expenses"). These activities do not demonstrate a continuous and systematic presence in New York of any by the hospital Defendants, and, therefore, fall short of demonstrating jurisdiction under the solicitation plus doctrine.

■ Plaintiffs also assert that Dr. Bock, Dr. Chisholm, Dr. Strange, and Dr. Wagner's activities in connection with the RRC–EM and its review of the emergency medicine residency programs is another contact which supports jurisdiction over Detroit Receiving Hospital and University Health Center, Medical College of Pennsylvania and Hospital, Mercy Hospital and Medical Center, and Methodist Hospital of Indiana in this district. Plaintiffs' Memorandum of Law at III–35 – III–36, III–42, III–48, III–58. However, Plaintiffs have not shown that any action by these physicians with respect to RRC–EM was undertaken on behalf of their respective hospitals. *Chrysler Capital Corp.,* 778 F.Supp. at 1266 (citing *Marine Midland Bank, supra,* at 904). Accordingly, such review activities are not attributable to the respective hospital Defendants with which these physicians are affiliated.

Additionally, jurisdictional contacts must exist at or near the time of filing of the summons and complaint, *Andros,* 714 F.Supp. 669, in this case, January 13, 1994. As a result, some of the contacts alleged by the Plaintiffs are too stale to be sufficient to obtain personal jurisdiction. Thus, the fact that Mercy Hospital and Medical Center had a one million dollar certificate of deposit account at a New York bank from November of 1990 through November of 1991, which was closed over two years before the Second Amended Complaint was filed, does not help establish jurisdiction over the medical center. The existence of a bank account is alone not a sufficient basis for jurisdiction. *See Holtzman v. Lauder,* 1994 WL 88013, *4 – *5 (S.D.N.Y.) *reargument denied,* 1994 WL 118786 (S.D.N.Y.1994) (general maintenance of a bank account in New York without more does not constitute doing business under Section 301); *Grove Valve & Regulator Co. v. Iranian Oil Servs. Ltd.,* 87 F.R.D. 93 (S.D.N.Y.1980) (English corporation's maintenance of local bank accounts does not, without more, amount to doing business in the state); *Weinberg v. Colonial Williamsburg, Inc.,* 215 F.Supp. 633, 639–40 (E.D.N.Y.1963) ("certainly the mere existence of a bank account is not conclusive as to the fairness of subjecting defendant to suit in this forum."); *Hastings v. Piper Aircraft Corp.,* 274 A.D. 435, 84 N.Y.S.2d 580, 583 (1st Dep't.1948) (nonresident manufacturer that solicits no business in New York but has account in local bank not doing business in New York). *Compare United Rope Distributors, Inc. v. Kimberly Line,* 770 F.Supp. 128, 132–33 (S.D.N.Y.1991), adhered to on consideration, 785 F.Supp. 446, 449–50 (S.D.N.Y.1992) (personal jurisdiction upheld over a foreign corporation on the basis of a New York bank account, where the bank account was used for the receipt of substantially all of the income of the business and payment of substantially all of its expenses; in effect, the foreign corporation was "conducting its business" through the New York account).

As Plaintiffs have failed to demonstrate that the hospital Defendants, except for Johns Hopkins Hospital, systematically and continuously solicited business in New York as required under the solicitation plus test, personal jurisdiction is not established over these Defendants pursuant to Section 301.

### Council of Emergency Medicine Residency Directors

The Council of Emergency Medicine Residency Directors ("CORD") is an organization whose membership consists solely of emergency medicine residency training programs. Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. No. C3. Each member program may have two representatives consisting of the residency director and a designee of the program. *Id.* The purposes of CORD include the improvement of the quality of emergency medical care, establishing and maintaining high standards in emergency medicine training programs, enhancing the quality of instruction in emergency medicine residency programs, and improving communications between faculty members of various emergency medicine training programs. *Id.*

In demonstrating that CORD is subject to personal jurisdiction pursuant to Section 301, Plaintiffs assert several contacts that CORD has with New York, including the fact that (1) Dr. Peter Viccellio of Defendant SUNY at Stony Brook University Hospital, located in New York, has been a member of CORD's Board of Directors since May of 1994, and is currently the liaison to the CORD program committee, which plans the programs for all national CORD meetings,[124] (2) CORD conducts its business through its directors, committees and members by telephone conference calls and sending out materials to members, including New York residents, (3) Dr. Viccellio has participated in at least one, and perhaps several conference calls as a member of the CORD board of directors, (4) the CORD Task Force on Overcrowding in 1990 and 1991 was headed by Dr. Nina Mazur, of the Brooklyn Hospital Center, with participating members from Bellevue Hospital in New York City and

---

**124.** This contact is not relevant for purposes of determining personal jurisdiction as it occurred after service of the summons and complaint.

Stony Brook University Hospital, (5) Dr. Mazur conducted conference calls in conjunction with the activities of the task force and prepared a survey to be sent to all CORD member programs, (6) Dr. Chisholm indicated that in connection with his membership in CORD, he has had telephone conversations with CORD members in New York, (7) Dr. Viccellio and Dr. Mazur were both members of the CORD Ad Hoc Committee on Alternative Pathways,[125] and participated in conference calls on December 19, 1991 and January 23, 1992 to discuss issues related to this litigation, Dr. Viccellio also participated in a third conference call on February 6, 1992, which may have been with any of thirteen other New York physicians, (8) the CORD Ad Hoc Committee on Alternative Pathways surveyed all 162 representatives of its member programs, including twelve New York member hospitals, one hundred of these surveys were returned, (9) twelve CORD member institutions are located in the state of New York, thus, representative forms and dues are collected from each of these twelve members, (10) the State University of New York at Buffalo, located within this district, became a member in October of 1993,[126] and its representative, Dr. G. Richard Braen, is the current president of ABEM, (11) CORD solicited Buffalo's membership by sending it materials when its residency program received accreditation, including an application and forms for naming the program's representatives, and (12) CORD sends each of the twelve member programs in New York, as well as all of its other members, newsletters, president's messages, reports, notices of meetings, educational materials, slide bank slides, minutes, agendas, surveys, and invoices for dues through the mails. Plaintiffs' Memorandum of Law at III–83 – III–86.

Although Plaintiffs have enumerated several contacts with New York, they have failed to demonstrate a continuous course of conduct by CORD upon which to predicate personal jurisdiction. The only solicitation in New York alleged by the Plaintiffs is that CORD solicited its members by sending them each materials after the emergency medicine residency program received accreditation from the RRC–EM. However, merely sending an application and information through the mail on a sporadic basis is not a sufficient contact for personal jurisdiction. *Landoil Resources,* 918 F.2d at 1043; *Vendetti,* 802 F.Supp. at 889; *Tauza,* 115 N.E. at 917. Further, CORD has no other business contacts with New York, as it does not own, lease, or occupy any real or personal property located in New York, it does not authorize representatives to act on its behalf in New York, it has never held any meetings in New York, it pays no taxes in New York, has no employees, addresses or telephone listings in New York, and has no license to do business in New York. CORD's Motion to Dismiss, filed May 12, 1994, Affidavit of Steven Dronen, M.D., at ¶¶ 2–3 ("Dronen Affidavit").

CORD does have a few members in New York, receives dues from these members, and sends materials to its members in the district. However, these contacts are not sufficient under Section 301 to support a finding of jurisdiction. *Selman,* 494 F.Supp. at 610–11 (no personal jurisdiction over the Association of Medical Colleges ("AAMC") under Section 301 despite the fact that twelve of its 125 members were New York medical schools, it helped create the Medical College Admission Test, which was administered in New York, it sponsored centralized applications processing for medical students, including those from New York, mailed applications to New York medical schools, and published journals, conducted research, and held meetings and forums for the advancement of medical education). Based on the foregoing, the court finds no jurisdiction over CORD under Section 301.

**2. *Jurisdiction for Transacting Business under Section 302(a)(1)***

██ A defendant not "doing business" in New York within the meaning of Section 301

---

**125.** This special committee considered whether to recommend to ABEM an alternative to its residency training requirement for certification.

**126.** Defendants argue that as SUNY Buffalo did not pay its dues until February of 1994, and the receipt of dues is necessary to become a member of CORD, that SUNY Buffalo was not a member of CORD until after this suit was filed.

may nevertheless be subject to jurisdiction in New York on a lesser showing of contacts with this state if the cause of action arises from those contacts. *See* N.Y.Civ.Prac.L. & R. 302; *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 763 (2d Cir.1983). Section 302(a)(1) provides that a court may exercise personal jurisdiction over any nondomiciliary who in person or through an agent "transacts business within the state or contracts anywhere to supply goods or services in the state." N.Y.Civ.Prac.L. & R. § 302(a)(1) (McKinney 1990). "If the defendant has 'transacted business' in New York, it is suable on any cause of action that arises out of the transaction." *Hoffritz for Cutlery, Inc., supra,* at 58. *See* N.Y.Civ.Prac.L. & R. § 302(a)(1).

■ Demonstrating that a defendant "transacted business" in New York and is suable on a cause of action arising from that transaction requires considerably less contact with New York than is necessary to establish that a defendant is doing business, which renders the defendant subject to suit on unrelated causes of action. *Beacon Enterprises, Inc., supra,* at 763. Section 302(a)(1) is a "single act statute" and "proof of one transaction in New York is sufficient to invoke jurisdiction, even [if] the [defendant] never enters the state, so long as the [defendant's] activities [in New York] were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40, 43 (1988). *See Beacon, supra,* at 764 ("defendant's transaction of business in New York must 'bear a substantial relationship to the transaction out of which the instant cause of action arose' ") (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981)); *Fontanetta v. American Board of Internal Medicine,* 421 F.2d 355, 357 (2d Cir.1970) (section 302 requires a direct relation between the cause of action and the in-state conduct).

■ In making the determination of whether a defendant is transacting business under Section 302(a)(1), the court must examine the totality of defendant's activities with the forum state. *Eck v. United Arab Airlines, Inc.,* 360 F.2d 804, 810–11 (2d Cir. 1966); *Falik v. Smith,* 884 F.Supp. 862, 866–67 (S.D.N.Y.1995) (citing *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co.,* 782 F.Supp. 763, 769 (W.D.N.Y.1991)). If, under the totality of the circumstances, a defendant purposefully availed itself of the privilege of conducting business in New York, thereby invoking the benefits and protections of its laws, the defendant "transacts business." *Broadcasting Rights International Corp. v. Societe du Tour de France, S.A.R.L.,* 675 F.Supp. 1439, 1443 (S.D.N.Y. 1987) (citations omitted).

■ Plaintiffs assert that each of the hospital Defendants "have purposeful, systematic, and routine contacts with New York medical students and medical schools" through FREIDA and the MATCH, Plaintiffs' Memorandum of Law at IV–1 – IV–3, and their claims are sufficiently related to the Defendants' participation in these programs so that it is "not unfair" to find that Plaintiffs' claims arise out of such participation. Plaintiffs' Memorandum of Law at IV–2. Defendants maintain that FREIDA and the MATCH do not grant them access to residents, and thus do not constitute the transaction of business in New York. Defendants' Joint Reply Memorandum at p. 39. Defendants further argue that "ABEM's closure of the practice track—the source of Plaintiffs' injury—bears no 'direct relation' to the administrative services afforded by FREIDA and the Match." Defendants' Joint Reply Memorandum at p. 39.

The present controversy arose as the result of ABEM's closure of the practice track, thereby denying Plaintiffs eligibility to sit for ABEM's emergency medicine certification examination, and from working for hospitals which require physicians practicing emergency medicine to be ABEM certified or eligible. Second Amended Complaint at ¶¶ 3–12. While Plaintiffs argue that the hospital Defendants participated in ABEM's conspiracy by accepting only ABEM certified or eligible physicians to practice in their emergency departments, and used services such as FREIDA and the MATCH to recruit residents for their residency programs, such conduct is not the transacting of business in New York and, hence, is insufficient to per-

mit jurisdiction over the hospital Defendants under Section 302(a)(1).

■ Plaintiffs' cause of action, moreover, did not arise as the result of any of the Defendants' participation in FREIDA or the MATCH. As discussed, Discussion Section II(b)(1), *supra*, FREIDA is an informational database. Hedrick Affidavit at ¶¶ 3, 5. All activities related to FREIDA are performed in Illinois by the AMA, including collection of information, publication and marketing, and sales. Hedrick Affidavit at ¶ 7. The MATCH is an independent nonprofit organization located in Washington D.C. Randlett Affidavit No. 1 at ¶ 3. The MATCH service is offered, for a fee, to residency programs in the United States, and prospective resident physicians worldwide. Randlett Affidavit No. 2 at ¶ 4. The service performed by the MATCH occurs at the close of the residency application process, and the MATCH only sorts the ranking preferences of the programs and the applicants. Randlett Affidavit No. 1 at ¶ 3; Randlett Affidavit No. 2 at ¶ 5. Moreover, no hospital or residency program has any control or responsibility for either FREIDA or the MATCH. Hedrick Affidavit at ¶ 7; Randlett Affidavit No. 2 at ¶ 3. Significantly, as relevant to jurisdictional considerations, utilization of these services must first be initiated by the individual medical student applicant. Randlett Affidavit No. 1 at ¶ 3; Randlett Affidavit No. 2 at ¶¶ 5, 7; Grenholm Affidavit at ¶ 2. None of the remaining contacts alleged by the Plaintiffs for jurisdiction under Section 301 are sufficiently related to the cause of action to sustain jurisdiction under Section 302(a)(1). For example, advertising campaigns, intermittent recruiting activity, travel to New York for professional meetings or seminars, participation in multicenter research trials, receipt of charitable donations, the treatment of New York residents, the issuance of bonds or use of professional services in New York, and the employment of physicians or residents who attended New York medical schools or resided in New York are insufficiently related to Plaintiffs' cause of action to allow jurisdiction pursuant to Section 302(a)(1). *See Muollo v. Crestwood Village, Inc.*, 155 A.D.2d 420, 547 N.Y.S.2d 87, 88 (2d Dep't.1989) (relationship between defendant's filing of prospectus and advertising in New York regarding the sale of a condominium and prospective purchaser's injury while inspecting defendant's New Jersey condominium insufficient for jurisdiction under Section 302(a)(1)); *Apicella v. Valley Forge Military Academy & Junior College*, 103 A.D.2d 151, 478 N.Y.S.2d 663, 665 (2d Dep't.1984) (tort claim for harm to New York resident attending New Jersey school did not arise out of recruitment visits to New York by school employees and advertisements for the school in a New York newspaper); *Selman*, 494 F.Supp. at 612 (nexus requirement satisfied only if defendant associations' officers were in New York in an official capacity relating to the cause of action).

Accordingly, the court finds no identifiable nexus or substantial relationship between the hospital Defendants' contacts with New York and Plaintiffs' cause of action sufficient to predicate jurisdiction under Section 302(a)(1).

### 3. *Conspiracy Jurisdiction under Section 302(a)(2)*

Having concluded that the hospital Defendants and CORD are not transacting business in New York thereby warranting exercise of personal jurisdiction under Section 302(a)(1), the court must next consider Plaintiffs' contention that these Defendants are subject to New York jurisdiction under Section 302(a)(2), providing for jurisdiction over a non-domiciliary who commits a tortious act within the state. N.Y.Civ.Prac.L. & R. § 302(a)(2) (McKinney 1990).

■ "[I]t is basic that the burden of proving jurisdiction is upon the party who asserts it and that he must show by the complaint and supporting affidavits the essential requirements of the jurisdictional statute." *Lehigh Valley Industries v. Birenbaum*, 527 F.2d 87, 92 (2d Cir.1975). To establish jurisdiction under Section 302(a)(2) on the basis of conspiratorial acts, Plaintiffs must make a factual showing of a conspiracy by a preponderance of the evidence, and allege specific facts warranting the inference that each defendant was a member of the conspiracy. *Chrysler Capital Corporation v. Century Power Corporation*, 778 F.Supp.

1260, 1266 (S.D.N.Y.1991) (citing *Marine Midland Bank,* 664 F.2d at 904). In addition, "[a] plaintiff must also show that the defendant's co-conspirator committed a tortious act in New York." *Chrysler Corp., supra,* at 1266. Further, to impute conduct, for the purposes of establishing personal jurisdiction under Section 302(a)(2) over an out-of-state defendant co-conspirator, it must also be shown that (1) each defendant had an awareness of the effects in New York of its activity; (2) the activity of the co-conspirators in New York was to the benefit of each of the out-of-state conspirators as to whom personal jurisdiction is sought; and, (3) the co-conspirators acting in New York acted "at the direction or under the control," or "at the request of or on behalf of" the non-resident defendants. *Chrysler Corp., supra,* at 1269.

 It is well established that acts committed in New York by a co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the defendant to jurisdiction under Section 302(a)(2). *Chrysler Capital Corp., supra,* at 1266. However, it is also settled that existence of a civil conspiracy alone does not qualify as an independent tort in New York for jurisdictional purposes under New York law. *Durante Brothers and Sons, Inc. v. Flushing National Bank,* 755 F.2d 239, 251 (2d Cir.), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985) (New York law does not recognize a substantive tort of conspiracy); *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir.1981); *Chrysler Corp., supra,* at 1267 n. 8; *ABKCO Industries, Inc. v. Lennon,* 52 A.D.2d 435, 384 N.Y.S.2d 781, 784 (1st Dep't.1976). Therefore, to sustain jurisdiction under Section 302(a)(2) Plaintiffs must first demonstrate that one of the Defendants, as a co-conspirator, committed a tortious act in New York state. *East Coast Novelty Company, Inc. v. City of New York,* 842 F.Supp. 117, 122 (S.D.N.Y.1994) (citing *Valdan Sportswear v. Montgomery Ward & Co.,* 591 F.Supp. 1188 (S.D.N.Y.1984)); *Chrysler Corp., supra,* at 1267. To cross this threshold Plaintiffs focus on ABEM, contending

that as ABEM committed a tortious act within New York state resulting from its wrongful denial of Plaintiffs' applications to obtain ABEM certification, this tortious act is, for Section 302(a)(2) purposes, imputed—under the prevailing substantive law defining liability of co-conspirators—to each of the out-of-state, non-resident Defendants including each of the hospital Defendants and CORD, as members of a conspiracy to restrain trade, thereby creating a basis for personal jurisdiction in New York under Section 302(a)(2). Plaintiffs' Memorandum of Law at Section V.

### a. *Tortious Act Within New York*

 Plaintiffs urge that ABEM's denial of the opportunity to Plaintiffs to gain ABEM certification is "the heart of plaintiffs' claims for violations of the antitrust laws, which the Court determined were 'in the nature of a tort,'" and therefore that Defendant ABEM committed a tortious act in New York,[127] Plaintiffs' Memorandum of Law at V–2, forming the legal predicate for Section 302(a)(2) jurisdiction. It is contended that ABEM committed a tort within New York by corresponding with Dr. Daniel and other New York based Plaintiffs, by mail and telephone, regarding their applications for certification as ABEM Diplomates. Plaintiffs' Memorandum of Law at V–2; Appendix Volume 1, Exhibits 4, 5. To sustain Section 302(a)(2) jurisdiction, a defendant need not be physically present in New York in order to commit the required tortious act. *See Pilates, Inc. v. Pilates Institute, Inc.,* 891 F.Supp. 175, 180 (S.D.N.Y.1995) (in cases of trademark infringement, the wrong takes place where goods are passed off to the consumer, rather than where deceptive labels are affixed or where goods are wrapped in misleading packaging). Although the federal courts in this circuit have held that the transmission of a communication by mail or telephone from outside the state into New York is generally not an act committed within the state for purposes of jurisdiction under Section 302(a)(2), *Van Essche v. Leroy,* 692 F.Supp. 320, 324 (S.D.N.Y.1988) (citing cases), an action alleging violations of anti-

---

**127.** The court has previously determined that ABEM is subject to jurisdiction in New York under Section 12 of the Clayton Act. *Daniel v.*

*American Board of Emergency Medicine,* 802 F.Supp. 912, 919 (W.D.N.Y.1992).

trust laws is considered a claim for injuries sustained in New York,[128] and thus is in the nature of a tort supporting long-arm jurisdiction under Section 302(a)(2). *Daniel, supra,* at 919 (citing *Fashion Two Twenty, Inc. v. Steinberg,* 339 F.Supp. 836, 841 (E.D.N.Y. 1971)); *Albert Levine Associates v. Bertoni & Cotti, S.p.A.,* 314 F.Supp. 169, 171 (S.D.N.Y.1970) ("The injury flowing from the conspiracy is the tort. The claim, therefore, arises where the plaintiff suffered injury to his business"). *See also Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946) (antitrust violations are essentially tortious acts); *Rios v. Marshall,* 530 F.Supp. 351, 367 n. 16 (S.D.N.Y.1981) (an antitrust violation is characterized as a tortious act for purposes of personal jurisdiction). *Contra Van Essche, supra,* at 324 (in a suit alleging prima facie tort, intentional infliction of emotional distress and tortious interference with employment relationship, the court explained that " '[t]he mere occurrence of the injury in [New York] certainly cannot serve to transmute an out-of-state tortious act into one committed [in New York]' ") (quoting *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 20–21, 209 N.E.2d 68, 77 (1965), *cert. denied sub nom., Estwing Manufacturing Co., Inc. v. Singer,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965)). Thus, if Plaintiffs suffered antitrust injuries in New York,[129] the injury occurring in New York is sufficient to meet the requirement that a tortious act take place in New York under Section 302(a)(2). *See* N.Y.Civ.Prac.L. & R. § 302(a)(2) (McKinney 1990) (requiring that the defendant commit a tortious act within the state).

In this case, Plaintiffs' have claimed that ABEM's denial of several of the individual Plaintiffs' applications to sit for ABEM's certification examination, while they resided in New York, and the denial of their appeals, caused injuries in New York state. Plaintiffs' Memorandum of Law at V–2 – V–3; Appendix Volume 1, Exhibits 4, 5; Appendix Volume 2, Exhibit 3; Appendix Volume 3. Plaintiffs claim that they have received less remuneration than ABEM-certified physicians, have been unable to apply for or denied positions, promotions, or professionally related directorships based on lack of ABEM certification, and that a manpower shortage in the medical specialty of emergency medicine has been created as the result of the alleged conspiracy. *Id.* As these injuries flow from the alleged conspiracy and are factually supported by the Plaintiffs' declarations, Plaintiffs' Memorandum of Law, Appendix Volume 1, Exhibits 4 and 5, Plaintiffs have demonstrated that they have suffered injuries within New York.

Plaintiffs also assert that a tortious act was committed by ABEM in New York because ABEM's current president, Dr. G. Richard Braen, is a residency director at the State University of New York at Buffalo. Plaintiffs' Memorandum of Law at V–3. However, the fact that the president of ABEM, a Michigan corporation, is a New York resident does not demonstrate that any tortious acts by ABEM took place in New York. *See Allstate Life Insurance Co. v. Linter Group, Ltd.,* 782 F.Supp. 215, 221 (S.D.N.Y.1992), *aff'd,* 994 F.2d 996 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993) (" 'the mere presence of one conspirator [in a forum state] ... does not confer jurisdiction over another alleged conspirator' ") (quoting *Leasco,* 468 F.2d at 1343). Moreover, it is ABEM and not Dr. Braen

---

**128.** The Sherman Act was enacted to assure competition by protecting the economic freedom of participants in the relevant market and therefore protects only against injuries sustained as the result of anticompetitive activities. *Bhan v. NME Hospitals, Inc.,* 669 F.Supp. 998, 1012 (E.D.Cal.1987) (citing *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897 908–09, 74 L.Ed.2d 723 (1983)). *See also* 15 U.S.C. § 15(a).

**129.** Plaintiffs have asserted several antitrust injuries, including "the loss of jobs, the loss of promotions and directorships, the inability to apply for new positions, and discrimination in remuneration and conditions of employment in the New York hospitals in which they practice." Plaintiffs' Memorandum of Law at V–137; Second Amended Complaint at ¶¶ 57, 64, 66, 91–110, 124–126. Plaintiffs also contend that the alleged conspiracy has resulted in a manpower shortage in the field of emergency medicine, which affects the needs and interests of the public in New York. Plaintiffs' Memorandum of Law, Appendix Volume 1, Exhibit 4, ¶¶ 4–5; Exhibit 5.

which is alleged to be a member of the conspiracy.

 Further, the Plaintiffs' conspiracy claim is, in itself, insufficient to support jurisdiction under Section 302(a)(2) as "conspiracy is merely the string which serves to connect defendants to the actionable wrong and the overt acts which caused injury." *Chrysler Corp., supra,* at 1267 n. 8 (citing *Kajtazi, v. Kajtazi,* 488 F.Supp. 15, 21 (E.D.N.Y.1978) and *Rutkin v. Reinfeld,* 229 F.2d 248, 252 (2d Cir.), *cert. denied, Kaplow v. Reinfeld,* 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956)). *See Allstate, supra,* at 221 (to establish jurisdiction on the basis of conspiracy plaintiffs must demonstrate that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in New York). Therefore, although the Plaintiffs' conspiracy allegations standing alone are insufficient to constitute an independent tort under New York law, *Chrysler Capital Corp., supra,* at 1267, assuming the truth of Plaintiffs' other allegations and drawing every reasonable inference in Plaintiffs' favor, as is required on this motion, *Marine Midland Bank, supra,* at 904, Plaintiffs have made a sufficient showing that ABEM committed a tortious act, based upon the infliction of antitrust injuries in this state, to support personal jurisdiction under Section 302(a)(2). Should, however, Plaintiffs fail to prove at trial the alleged antitrust violation, *i.e.,* the existence of a conspiracy or agreement in restraint of trade, there would be no basis for jurisdiction under Section 302(a)(2), and Defendants' affirmative defense of lack of personal jurisdiction would be sustained.

#### b. *Factual Showing of a Conspiracy in Restraint of Trade*

The antitrust conspiracy alleged in Plaintiffs' Second Amended Complaint grows out of a scheme conducted by physicians and the hospitals with which they are affiliated to unreasonably restrict competition in emergency medicine by denying other practicing, experienced, and qualified physicians eligibility to obtain ABEM certification.

When ABEM was established in 1976, the two available roads for achieving eligibility to become certified for ABEM's Diplomate status were the "residency" path, whereby the applicant physician was required to complete an approved three-year residency training program in emergency medicine, and the "practice track," which required the applicant to complete seven thousand hours and sixty months of practice in emergency room medicine, with twenty-four months of continuing emergency medicine practice. In accordance with its original charter provisions, ABEM discontinued the "practice track" on June 30, 1988 and now relies exclusively on the residency path for eligibility to sit for ABEM's examination. To become ABEM certified, upon completion of the initial qualification, following either the former "practice track" or the current residency path, physicians must also pass a certification examination. Plaintiffs allege that by promoting ABEM certification as the benchmark of quality and fitness to practice emergency medicine within the national health marketplace and then closing the practice track, ABEM and its co-conspirators ensured a high demand for the emergency medicine resident training programs now required by ABEM and offered by the hospital Defendants.[130]

Plaintiffs' conspiracy theory, upon which they seek to predicate jurisdiction in conformance with their burden, posits that the hospital Defendants, acting through their individual physician "agents," as alleged by Plaintiffs, control several emergency medicine standard setting organizations, including ABEM, CORD, the American College of Emergency Physicians ("ACEP"),[131] and the

---

**130.** Defendants Children's Hospital (San Diego), Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Lutheran General Hospital, Mercy Catholic Medical Center—Misericordia Division, Riverside Methodist Hospitals, St. Anthony Hospital, and Tri–City Medical Center do not operate residency programs in emergency medicine; they do, however, allow residents from other residency programs to "rotate" through their emergency departments as part of their training.

**131.** The ACEP is an academic organization for practicing emergency physicians which sponsors continuing medical education programs and a professional journal, the Annals of Emergency Medicine.

Residency Review Committee for Emergency Medicine ("RRC–EM"),[132] and acting through these organizations, agreed to close the ABEM practice track, thereby excluding competitor non-ABEM certified emergency physicians from the market. This conspiracy, according to Plaintiffs, among the hospital Defendants, ABEM, CORD, and the other emergency medicine organizations, ACEP, the Society for Academic Emergency Medicine ("SAEM"),[133] the University Association for Emergency Medicine ("UA/EM"),[134] the Society for Teachers of Emergency Medicine ("STEM"),[135] the Association of Academic Chairs in Emergency Medicine ("AAC-EM"),[136] the American Medical Association's ("AMA") Section on Emergency Medicine,[137] and the RRC–EM, also involved an agreement not to permit any alternative routes to attain ABEM certification, required that all directors, faculty, and attending physicians in emergency medicine be ABEM certified, and promoted ABEM certification as the sole standard of competency for emergency department physicians. Plaintiffs' Memorandum of Law at V–8 – V–59.

Plaintiffs argue that each hospital Defendant is both a principal and beneficiary of the conspiracy, as each hospital has created and implemented policies to employ only ABEM certified physicians, thereby excluding many emergency physicians who have more experience, knowledge, and skill than those with ABEM certification. Second Amended Complaint at ¶¶ 78–82, 89, 108–110.

Plaintiffs also assert that ABEM has a monopoly over the market for board certified emergency medicine physicians, and that the exclusion of other qualified emergency medicine physicians from the market for board certified emergency medicine physicians is an unreasonable restraint on trade. Second Amended Complaint at ¶¶ 122–135. In Plaintiffs' view, this exclusion results in the suppression of competition with ABEM Diplomates. Plaintiffs also maintain that the resultant diminished supply of emergency medicine Diplomates has inflated the cost and thus price for emergency medical services, and created a manpower shortage in the field of emergency medicine. Plaintiffs' Memorandum of Law at V–60 – V–68. To find jurisdiction based upon Section 302(a)(2) in this case, it is therefore necessary to determine whether Plaintiffs have established by a preponderance of the evidence that the alleged conspiracy among ABEM, CORD, and the other non-defendant professional emergency medicine organizations and the hospital Defendants was in violation of the antitrust laws, an overt act was committed in its furtherance, and that each Defendant over whom jurisdiction under Section 302(a)(2) is sought intentionally participated in furtherance of the plan. *See Chrysler Capital Corp., supra,* at 1267.

### i. *Corrupt Agreement*

The Sherman Act prohibits unlawful or corrupt agreements, meaning every contract, combination, or conspiracy "in restraint of trade or commerce among the several

---

**132.** The RRC–EM is a committee of the Accreditation Council for Graduate Medical Education which reviews, sets standards for, and accredits emergency medicine residency programs such as those operated by the hospital Defendants, except Children's Hospital (San Diego), Detroit Receiving Hospital, Forsyth Memorial Hospital, Lutheran General Hospital, Mercy Catholic Medical Center—Misericordia Division, Riverside Methodist Hospitals, St. Anthony Hospital, and Tri-City Medical Center.

**133.** SAEM is a society for academic emergency physicians who are faculty members at medical schools and teaching hospitals.

**134.** UA/EM is an organization for academic emergency physicians who are faculty members and administrators at medical schools and teaching hospitals. UA/EM merged with the Society

for Teachers of Emergency Medicine in 1988 to form SAEM.

**135.** STEM is an organization for academic emergency physicians who are faculty members at medical schools and teaching hospitals. STEM merged with UA/EM in 1988 to form SAEM.

**136.** The AACEM is an association of individuals who hold chairmanship positions in academic departments of emergency medicine at teaching hospitals and medical schools. The AACEM was formed in 1989 by SAEM.

**137.** In order for the specialty of emergency medicine to be officially recognized by the AMA, representatives of the AMA must establish a specialty section prior to recognition by the American Board of Medical Specialties as a primary specialty board.

States," 15 U.S.C. § 1, and also prohibits monopolizing "any part of the trade or commerce among the several States." 15 U.S.C. § 2.

To prove a violation of Section 1 of the Sherman Act, a plaintiff must establish the existence of a contract, combination or conspiracy which constitutes a restraint of trade and has an impact on interstate commerce. *See Standard Oil of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Plaintiffs carry the burden of presenting sufficient evidence to permit the inference of concerted action, and evidence that tends to exclude the possibility that the defendants were acting independently. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Monsanto v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1986). Thus, an "antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto, supra*, at 764, 104 S.Ct. at 1470–71 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). To be actionable under the Sherman Act, a conspiracy cannot be inferred from similar conduct absent an examination of "the [anticompetitive] motivation of the alleged conspirators, [but] proof of [such] motivation is not required when there exists either direct evidence of collaboration or other probative circumstantial evidence (beyond evidence of mere parallel and innocent conduct) from which to infer an [anticompetitive] agreement." *Bhan, supra*, at 1015 (citing *Wilson Indus., Inc. v. Chronicle Broadcasting Co.*, 794 F.2d 1359, 1365 (9th Cir.1986) and VI P. Areeda, *Antitrust Law* ¶¶ 1412a, 1425b (1986)).

▮▮▮ According to Plaintiffs, the conspiracy involves an agreement among ABEM, CORD, and the hospital Defendants which included the elimination of the practice track by ABEM,[138] the rejection by various professional organizations of "alternative pathways" to residency programs to attain ABEM certification, RRC–EM's setting of special requirements including ABEM certification for faculty in emergency medicine residency programs, ACEP and ABEM's encouragement of hospitals to hire ABEM certified emergency physicians, and the refusal of each hospital Defendant to hire emergency physicians who are not ABEM certified or eligible. Plaintiffs' Memorandum of Law at V–8 – V–11; V–102 – V–103.

Plaintiffs contend that each of these actions was effected by one or more of the emergency medicine professional organizations which Plaintiffs claim are co-conspirators of Defendants although not named as parties in this action. However, none of the hospital Defendants are members or participants in any of these organizations except for CORD, whose membership consists of individual hospital residency programs accredited by RRC–EM. Each of the other co-conspirator emergency medicine professional organizations, as described by Plaintiffs, including ABEM, ACEP, SAEM, UA/EM, STEM, AACEM, the AMA Section on Emergency Medicine, and the RRC–EM, are physicians' professional associations, whose memberships consist of several individual emergency physicians, some of whom are currently, or were previously, privileged to practice in the emergency department of various hospital Defendants.

Plaintiffs assert that these individual physicians, associated with the various co-conspirator organizations and the hospital Defendants, had "leadership roles in the organizations which collectively control emergency medicine," and have participated in the conspiracy by restricting the supply of ABEM certified physicians, while simultaneously tightening the requirements for employment in a hospital emergency department. Plaintiffs' Memorandum of Law at V–73; Exhibit C. In arguing that hospital Defendants are liable under their con-

---

**138.** It is undisputed that ABEM closed the practice track on June 30, 1988, and has rejected the alternative pathways presented.

spiracy theory, Plaintiffs contend that these Defendants are liable for the acts of their "employee/agent" physicians who participated in the professional organizations which set standards for training and practice of emergency physicians and the accreditation of emergency medicine residency training programs as these acts are "within the scope of their duties and apparent authority as employees of the [Defendant] hospitals." Plaintiffs' Memorandum of Law at V–95.

However, as noted, CORD is the only organization to which any of the emergency medicine residency programs of the hospital Defendants belong.[139] Additionally, the residency directors of accredited residency training programs in emergency medicine are members of a special section of the ACEP for residency directors. Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. Nos. C206–C207. Plaintiffs state that the hospital Defendants have also been represented in ABEM, SAEM, AACEM, the ACEP Academic Affairs Committee, and RRC–EM. Plaintiffs' Memorandum of Law at V–99, Exhibit C ("Interlocking Individual Agents of Defendant Hospitals and Their Participation in the Conspiracy"). In their elaboration of how the hospital Defendants are involved in each of these organizations, the Plaintiffs rely on a list correlating certain individual physicians who practice in the emergency rooms of the hospital Defendants, and the various co-conspirator organizations with which these physicians are or have been

affiliated. Plaintiffs' Memorandum of Law, Exhibit C. Specifically, Plaintiffs, to support this branch of their case for jurisdiction, assert that the hospital Defendants are responsible for the actions of individual physicians affiliated with those hospitals and whom are also members of the described professional emergency medicine organizations, as, in Plaintiffs' view, those Defendants condoned the conduct and involvement of the physicians in the activities and decisions of those professional organizations. Plaintiffs' Memorandum of Law at V–96 – V–102, V–110 – V–130.

When applied to the facts surrounding membership in CORD the Plaintiffs' agency theory is correct, as the physicians attending CORD meetings are sent as representatives of the emergency medicine residency training programs of their respective hospitals, including hospital Defendants which are CORD members. However, mere membership in an independent professional organization is insufficient to establish antitrust liability against a member for the organization's alleged wrongful acts. *See, e.g., Hunt v. Mobil Oil Corp.*, 465 F.Supp. 195, 231 (S.D.N.Y.1978), *aff'd*, 610 F.2d 806 (2d Cir. 1979); *Vandervelde v. Put & Call Brokers & Dealers Association*, 344 F.Supp. 118, 154 (S.D.N.Y.1972). It is, moreover, illogical to assert that individual members of professional emergency medicine associations, other than CORD, attend meetings on behalf of any hospital Defendants, and thereby act as their agents.[140] Rather, as the members of

---

**139.** Several of the Defendant hospitals do not belong to CORD, as they do not maintain residency training programs in emergency medicine. *See* Footnote 123, *supra*.

**140.** Plaintiffs argue that the RRC–EM requirement, that physicians participate in professional organizations, and the fact that hospitals often pay for the expenses of the physicians, as well as permit them to use hospital time, office space, staff, and supplies, indicates that the physicians are acting as representatives or agents of the hospital in attending these professional meetings. Plaintiffs' Memorandum of Law at V–110 – V–130. However, hospitals support and encourage affiliation with professional organizations in order to maintain their physicians' contact with new information and ideas in their fields, as well as participation in efforts to advance communication among physicians, resulting in the devel-

opment and advancement of emergency medicine as a whole. *Compare Menzie v. Windham Community Memorial Hospital*, 774 F.Supp. 91, 97 (D.Conn.1991) (physicians may be considered agents or employees of a hospital for purposes of patient care); *Vandervelde, supra,* at 156 (the individual defendants dominated the firms of which they were members and managed the clearing association as well; the nature of this relationship justified a finding that the participation of these dealers in association activities was an integral part of their employment in the industry, resulting in the court's finding that the actions of the individual defendants were within the scope of their authority, and, if the defendants were found liable, that liability could be imputed to their respective firms); *Gilbert v. Sycamore Municipal Hospital*, 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788 (1993) (a hospital may be vicariously liable for the negligent acts of

the AMA, ABEM, ACEP, AACEM, RRC–EM, and other emergency medicine professional organizations are the individual physicians, regardless of any relationships these physicians have with the hospital Defendants, such relationships are inadequate to render these Defendants subject to antitrust liability for the professional organizations' alleged wrongful acts, as such acts cannot be imputed to the physician members on the basis of their mere membership in an organization or on one of its committees. See, e.g., Hunt, supra, at 231 ("to hold one as a participant in a conspiracy, he must by word, deed or conduct intentionally join the illicit enterprise; mere association with conspirators and presence at the scene of a conspiracy, even coupled with knowledge that wrongful conduct by others is being engaged in, are not by themselves sufficient to support the inference of knowing and intentional attachment to an illegal enterprise"); Vandervelde, supra, at 154 (mere membership on a committee is not in itself sufficient proof of connection or ratification of conduct to justify a finding of conspiracy). See also H.L. Moore Drug Exchange v. Eli Lilly and Company, 662 F.2d 935, 941 (2d Cir.1981), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982) (a mere showing of close relations or frequent meetings between the alleged co-conspirators does not sustain a plaintiff's burden absent the inference that these close ties led to an illegal agreement). See also Discussion Section II(3)(d), infra, (rejecting Plaintiffs' argument that the activities of co-conspirators can be imputed to the Defendant hospitals).

Further, the fact that alleged physician representatives of the hospitals are members of the various emergency medicine associations, described by Plaintiffs as co-conspirators with Defendants, does not indicate that these persons formed an agreement to restrain competition in the field.[141] See Hunt,

an emergency room physician under the doctrine of apparent authority). In this case it is clear that most of the medical staffs of the hospital Defendants are not employed by the hospitals, but by the medical schools with which they are affiliated, or by a separate physicians group. Plaintiffs' Memorandum of Law, Appendix Volumes 12 and 13, Exhibits 1 – 26, Responses to Interrogatory No. 18. The authority of the emergency physicians to bind their respective hospitals is limited to the care they provide, see Menzie, supra, and Gilbert, supra; thus, it follows that conduct which occurs outside the hospital, even if it is required by the hospital, does not provide a basis upon which to impute a physician's conduct to the hospital.

Plaintiffs' agency theory is continued by arguing that because the hospital Defendants condone, if not encourage, the participation of physicians in professional organizations, such participation is "part of the job," and therefore, within the scope of employment. Plaintiffs' Memorandum of Law at V–113. However, simply because an employer approves of a certain behavior, such permission or support does not indicate that the conduct is considered a condition of the employment, rather, a hospital's encouragement in such matters is an investment in the continuing medical education of its physicians, which will lead ultimately to better performance of their duties.

141. In fact, CORD indicated that a shortage of residency trained, board certified emergency physicians exists. Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. No. C71. CORD subsequently established a task force to explore the issue of alternative training. C110, C113. The report of the committee which surveyed CORD members regarding alternative pathways to board eligibility summarized the results as follows: approximately 75% of those who responded opposed alternative pathways, 11% did not object to an alternative pathway, but did object to the specific proposal, see Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. Nos. C255–C256, C1065, as they believed it would lead to inadequate patient care, didactics i.e. teaching, and specialty service experience. Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. Nos. C234, C247–C253, C958. CORD then adopted the position that it was not in favor of "any alternative training routes being discussed at this time." Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. Nos. C659. CORD concluded that no emergency physician, regardless of board certification, need fear unemployment as each physician "should be judged by his dedication, performance and compassion rather than his certificates," and that the lowering of standards for residency training and board eligibility would be unacceptable, as it would "suggest that Emergency Medicine is not a specialty and not worthy of study." Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. Nos. C236–C237.

Additionally, minutes from one of the CORD meetings indicate that "[r]elations between academics and practitioners, whether boarded [certified] or not, should be as equals. Evaluation of a physician should be on the basis of his performance." Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. No. C235. Further, CORD stated that residency training has a "format and defined curriculum that is equiva-

supra, at 231; *Vandervelde, supra,* at 154. Moreover, even if the physicians were acting as agents of the hospital Defendants, such status would be insufficient to impute the actions of the organizations of which the physicians are members to either the physicians or the hospitals. *See H.L. Moore, supra,* at 941; *Hunt, supra,* at 231. Thus, *arguendo,* if it were the case that the hospital Defendants permitted or encouraged participation by the physicians listed by Plaintiffs in the emergency medicine professional organizations claimed to be co-conspirators, such would be insufficient to show purposeful joining of the conspiracy. Further, as physician membership in such organizations *simpliciter* is insufficient to create liability as a co-conspirator, there is no liability based upon the status of mere membership to impute to any hospital Defendant.

▮ The next element in Plaintiffs' conspiracy theory involves the RRC–EM.[142] This organization, as noted, sets the standards ("Special Requirements") which emergency medicine residency programs must meet to become and remain accredited by the Accreditation Council for Graduate Medical Education ("ACGME").[143] Plaintiffs' Memorandum of Law at V–32. Over the last several years, the RRC–EM has required more stringent qualifications which culminated, in January of 1995, in the condition to accreditation that all emergency medicine teaching staff at each hospital involved in an emergency medicine residency training program be ABEM certified or eligible for certification. Plaintiffs' Memorandum of Law at V–33 – V–

37; Appendix Volume 2, Exhibit 1, Doc. Nos. ABEM2130–ABEM2131. Plaintiffs assert that the requirement of ABEM certification or eligibility has resulted in the loss of employment or diminished advancement opportunities for many emergency physicians having training and experience equivalent to that of ABEM certified physicians. Plaintiffs' Memorandum of Law at V–35. Further, the hospitals' failure to comply with RRC–EM's qualifications risks loss of accreditation, the consequences of which were not explained in the record. Plaintiffs' Memorandum of Law at V–35.

Plaintiffs point out that RRC–EM submitted its Special Requirements, including the requirement that all emergency medicine teaching staff be ABEM certified or eligible, to the co-conspirator organizations, including CORD, for review and approval before submitting them to the Accreditation Council for Graduate Medical Education,[144] *see* Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. C755–C779, and that the co-conspirator professional organizations also sought to eliminate competition for emergency physician jobs at all teaching hospitals, regardless of whether they have emergency medicine residencies, by issuing reports and resolutions stating that all emergency medicine should be taught in medical schools and residency programs by ABEM certified faculty. Plaintiffs' Memorandum of Law at V–42 – V–44.

Plaintiffs argue that ABEM and ACEP tried to persuade hospitals to require ABEM certification by announcing as their policy

---

lent at all programs," thus ensuring the adequacy of training and competency of residents in emergency medicine. Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. No. C235.

**142.** ABEM, ACEP, and the AMA Council on Medical Education became the sponsors of RRC–EM in 1982, and continue to nominate representatives to serve as members of RRC–EM. Plaintiffs' Memorandum of Law at V–32.

**143.** The ACGME is sponsored by the American Board of Medical Specialties, the American Medical Association, the Association of American Medical Colleges, and the Council of Medical Special Societies. The ACGME is an organization which accredits residency training programs

through the use of Residency Review Committees for each specialty. Thus, with respect to emergency medicine, the RRC–EM reviews the residency training programs of various hospitals and recommends them for accreditation to the ACGME.

**144.** CORD assisted RRC–EM with its special requirements for emergency medicine by submitting comments on the proposed changes. CORD suggested that the RRC–EM change its requirement that all faculty be certified by ABEM by allowing physicians additional time to become ABEM certified, and that RRC–EM remove the requirement of residency training. However, this suggestion was not adopted. Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, C757, C760, C763, C772, C777.

that "[h]ospitals should be influenced to hire emergency physicians who are appropriately trained and credentialed." Plaintiffs' Memorandum of Law at V–44; Appendix Volume 3, Doc. No. 1414. ABEM acknowledged that its policy regarding the credentialing requirements imposed by hospitals states that "ABEM certification is the recognized standard of competency in Emergency Medicine. It is the only certification that merits consideration by medical credentialing committees." Plaintiffs' Memorandum of Law at V–46; Appendix Volume 3, Doc. No.1993. ACEP also developed specific policies stating that emergency physicians should be ABEM certified or eligible. Plaintiffs' Memorandum of Law at V–46 – V–48; Appendix Volume 3, Doc. Nos. 69, 81, 91–92, 130, 1209, 1414, 1772–1773, 1780, 1799–1800, 2903. Plaintiffs assert that the co-conspirators were successful in influencing hospitals to begin requiring ABEM certification for medical staff credentialing, which caused many experienced and committed emergency physicians to lose their jobs, be demoted, or lose opportunities for advancement in emergency medicine. *See, e.g.,* Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 2284–2289, 2421–2423.

Plaintiffs contend that as the result of the alleged shortage of ABEM certified or eligible physicians, there have been significant increases in ABEM certified or eligible emergency physicians' incomes, and a high demand for board certified or eligible physicians, and for positions in emergency medicine residency programs. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 1723, 1802. An ACEP Accreditation Study in August of 1991 indicated that 77% of hospitals did not require ABEM certification or eligibility of their emergency physicians, however, according to this study, many physicians believed that within a few years, ABEM certification would be a requirement at 50% of the hospitals. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 1803, 1820, 1833–1836. After the survey, ACEP investigated the feasibility of creating a graduate medical education track in order to allow those physicians who were not eligible to take the ABEM examination another route to ABEM certification. Plain-

tiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 1803, 1820, 1833–1836. However, the members of ACEP ultimately were unwilling to endorse any such alternative proposals. *See, e.g.,* Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 1884–1886. Additionally, as noted, CORD voted unanimously to oppose alternative methods of residency training that would ultimately lead to ABEM certification. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. No. 1909. CORD so voted because the program directors "believe training that is not equivalent [to emergency medicine residency training] undermines the legitimacy and credibility of the residency training programs." Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. No. 1909.

Despite Plaintiffs' contentions, and the factual support presented, the Plaintiffs have failed to demonstrate by a preponderance of the evidence that the hospital Defendants and CORD had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. Taken most favorably to Plaintiffs, the evidence suggests that ABEM's objective was to secure its certification as the "recognized standard of competency in Emergency Medicine." CORD's purpose was to avoid any dilution of the "legitimacy and credibility of the [emergency medicine] residency training programs." ACEP does support ABEM's objective of continuing as the sole credentialing agent for emergency medicine, but it has no apparent direct influence upon CORD, ABEM, or the hospital Defendants. Thus, while ABEM, CORD and ACEP can be said to have related purposes as to ABEM certification, they are not objectively common.

Apart from the Plaintiffs' contention that the hospital Defendants enforced or adhered to ABEM's primacy as the nation's sole emergency medicine credentialer, discussed below, there is no evidence that any hospital Defendant's objective was to maintain such exclusivity at the expense of Plaintiffs. Rather, the record more reasonably supports the inference that in order to maintain both their accredited status and high quality care

in their respective emergency departments, hospital Defendants independently chose to implement the credentialing requirement of ABEM certification in some aspects of their residency programs.[145] As such, there is no preponderance or other showing of a common unlawful purpose among the Defendants.

 Plaintiffs must also demonstrate factual support for their assertion that each hospital Defendant refused to hire emergency physicians unless they were ABEM certified or eligible. Plaintiffs' Memorandum of Law at V–53 – V–59. To support this contention, Plaintiffs list each hospital Defendant and describe the policy or practice which they contend forbids the employment of emergency physicians who are not ABEM certified or eligible. Plaintiffs' Memorandum of Law at V–54 – V–5. This evidence is summarized as follows:

> **Children's Hospital (San Diego)** requires its faculty and staff to be board certified in either pediatrics or emergency medicine. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 4, Doc Nos. LL02 347–348.

> **Forsyth Memorial Hospital** requires its emergency department physicians to be "board certified by the American College of Emergency Physicians or be residency trained in Emergency Medicine."[146] Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 1, Doc. No. FMH27; Affirmation of Denise M. Jennings, filed January 27, 1995, Exhibit A, Doc. No. FMH44 (each new applicant for privileges at Forsyth Memorial must be board certified or qualified by training in the specialty for which he is applying for privileges).

> **Johns Hopkins Hospital, Part of Johns Hopkins Health System's** Medical Staff Bylaws provide that specialty board certification or eligibility, or the equivalent is required to become a member of the hospital's active, courtesy, or associate staff. Johns Hopkins' Medical Staff Bylaws, §§ 3.01, 3.02, 3.03.

> **Loma Linda University Medical Center** contracts with the Loma Linda Emergency Medical Group, Inc. to staff the emergency department. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 6, Doc. Nos. LL04 867–LL04 886. The agreement between the medical center and the Emergency Medical Group provides that the medical director is responsible for the recruitment of ABEM certified or eligible physicians for faculty appointments. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 6, Doc. No. LL04 870. Additionally, Plaintiffs have identified several job advertisements for positions at Loma Linda University Medical Center which require board certified emergency physicians. *See, e.g.,* Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 2350, 2392, 2437, 2457. However, the medical center has not followed this policy in all cases, as the "practice has been to hire both board certified and non-board certified physicians who are qualified to practice emergency medicine." Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 44, pp. 18, 21–22, 34.

> **Lutheran General Hospital's** Medical Staff Bylaws provide that physicians must be certified by the appropriate board, or eligible to take the board examination. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 7, Doc. Nos. LL05 1182–LL05 1183; Volume 11, Exhibit 57, pp. 33–34. However, board certification, or its equivalent, can be waived by the credentialing committee for good cause shown. *Id.* at LL05 1182. Plaintiffs have also

---

145. The Plaintiffs have not extended the logic of their argument to postulate that the hospital Defendants' adoption of or acquiescence to RRC–EM's Special Requirements constituted conspiratorial behavior. *See* Plaintiffs' Memorandum of Law at V–102 – V–110. However, even if such an assertion were established, there is an absence of evidence that the hospital Defendants benefitted from any monopoly power as the result of such behavior, and could not therefore be subjected to

jurisdiction under such a theory. *See* Plaintiffs' Memorandum of Law, Section V.

146. However, an exemption from the requirement of board certification exists for physicians who were practicing at the hospital at the time of the agreement to contract emergency medicine physician services, January 15, 1993. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 1, Doc. Nos. FMH26–FMH27.

shown that when Lutheran General has advertised job opportunities for emergency physicians, it has required that the applicants be board certified or eligible. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 3395, 3400, 3403.

**Mercy Hospital and Medical Center's** Criteria for Physicians in the Department of Emergency Medicine requires all attending and adjunct staff physicians to be board certified or eligible, and to become certified within four years of eligibility. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 2, Doc. No. LL07 223; Volume 10, Exhibit 10, pp. 53–59; Volume 11, Exhibit 68, pp. 55–56. Additionally, various advertisements for emergency physician faculty positions at Mercy Hospital require board certification or eligibility. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 3396, 3398, 3408.

The **Methodist Hospital of Indiana** requires all members of its medical staff to be board certified or eligible in their respective specialties. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 9, p. 50. Further, as of 1994, all eighteen full-time emergency medicine faculty physicians in the emergency department were ABEM Diplomates. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 3, Doc. No. LL08 481.

**Ohio State University Hospital's** Medical Staff Bylaws provide that all applicants for membership must be board certified in their specialty. Ohio State University Hospital's Memorandum of Points and Authorities, filed May 2, 1994, Exhibit B, Chapter 3335–43–04(A)(4) Plaintiff's Memorandum of Law, Appendix Volume 11, Exhibit 43, pp. 40–44. Applicants who are board eligible have three years from the date of eligibility to become certified. *Id.* However, upon the recommendation of the credentials committee or the medical director, the medical staff administrative committee may waive the certification requirement, although no such exception has been made. Ohio State University Hospital's Memorandum of Points and Authorities, filed May 2, 1994, Exhibit B, Chapter 3335–43–04(A)(4) Plaintiffs' Memorandum

of Law, Appendix Volume 11, Exhibit 43, pp. 42–44.

**Riverside Methodist Hospitals'** Department of Emergency Medicine Rules and Regulations require emergency physicians seeking clinical privileges to be ABEM certified or eligible. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 1, Doc. Nos. R1279, R1283. *See also* Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 1, Doc. Nos. R895–R896.

**Saint Francis Medical Center's** director of emergency services stated that St. Francis Medical Center requires a person to be ABEM certified or eligible, however, the hospital has practicing physicians who are not board certified. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 45, pp. 50–51. Further, the medical center's emergency department has approved exceptions to the ABEM certification requirement and allowed physicians certified by the American Board of Family Practice and the American Board of Internal Medicine to practice in the emergency department. *Id.* When Saint Francis Medical Center has advertised opportunities for emergency physicians, the advertisements have indicated that board certified physicians are sought. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 3370, 3372, 3374, 3399, 3405, 3407.

**Tri–City Medical Center's** Department of Emergency Medicine Rules and Regulations indicate that the medical center's contracts with the Tri–City Emergency Medical Group for emergency medicine physicians. Plaintiffs' Memorandum of Law, Appendix Volume 9, Exhibit 4, p. 1. Tri–City Medical Center requires the physicians who practice in its emergency department to be ABEM certified or eligible. *Id.* at pp. 1, 3.

**University of California (Los Angeles) Medical Center's** medical staff bylaws require physicians to have board certification or its equivalent, which includes, but is not limited to, the satisfactory completion of a training program. Plaintiffs' Memoran-

dum of Law, Appendix Volume 6, Exhibit 2, Doc. Nos. LL13 469, LL13 1974.

**University of California (San Diego) Medical Center's** bylaws, rules, and regulations also require its medical staff to be board certified. Plaintiffs' Memorandum of Law, Appendix Volume 6, Exhibit 1, Doc. No. LL12 1421. Further, all of the medical center's emergency department faculty are either board certified or eligible. *Id.* at LL12 1257–LL12 1259.

Plaintiffs agree that, unlike those hospital Defendants listed above, Kettering Medical Center, Oregon Health Sciences University Hospital, and University of California (Irvine) Medical Center have no certification requirement, however, in fact they only employ ABEM certified or eligible physicians. Plaintiffs' Memorandum of Law at V–56. These practices are summarized below:

**Kettering Medical Center** requires its emergency physicians to be eligible to take the ABEM examination or have at least two years of post-graduate training in a specialty relevant to emergency medicine, or two years of experience through the full time practice of emergency medicine. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 2, Doc. No. K405993.

**Oregon Health Sciences University Hospital's** emergency services department physicians are all ABEM certified or have completed emergency medicine residencies. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 4, Doc. Nos. LL09 597–LL09 601. Further, advertisements for fellowship positions provide that the persons will work "under the supervision of ACMT or ABEM certified faculty." Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 2455, 2513, 2808, 3387.

**University of California (Irvine) Medical Center,** in August of 1994, had seven full time faculty members in emergency medicine; five of the seven were ABEM certified, and the remaining two were board eligible. Plaintiffs' Memorandum of Law, Appendix volume 10, Exhibit 36, pp. 25–26. Further, the medical center has placed several advertisements for board certified or eligible physicians in emergency medicine journals. Plaintiffs' Memo-

randum of Law, Appendix Volume 3, Doc. Nos. 2113, 2307, 3095, 3377, 3381. These advertisements indicate that all applicants must be ABEM certified or eligible. *Id.* The medical center also has twelve part time attending emergency physicians, however, there is no indication whether or not these physicians were board certified or eligible.

Finally, Plaintiffs assert that although the Children's Hospital of Michigan, Detroit Receiving and University Health Center, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, St. Anthony Hospital, University Hospital at the University of New Mexico School of Medicine, University of Massachusetts Medical Center, and University Medical Center (Tucson) employ emergency physicians who are not ABEM certified or eligible, the hospitals discriminate against these physicians by granting preferences to certified physicians. Plaintiffs' Memorandum of Law at V–57. The asserted exclusionary practices of these hospital Defendants are as follows:

**Children's Hospital of Michigan's** medical staff membership qualifications provide that board certification in a specialty is evidence that a practitioner has assimilated knowledge essential to practice. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 3, Doc. Nos. LL01 913–LL01 914. However, appointment to the medical staff at the hospital is not dependent solely on certification by a medical specialty board, or the completion of an approved training program; rather, experience, background, training, skills and ability, among several other factors, are the basis of granting privileges to a physician at the hospital. *Id.* However, the hospital's chief of staff stated that board certification is a factor which may be utilized in determining compensation and "favorably looked upon by promotion committees" and is "often a requirement for admission to the medical staff." Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 17, pp. 24–25, 35.

**Detroit Receiving Hospital and University Health Center's** Criteria for Admission to the Medical Staff requires ac-

tive staff members to be ABEM certified, or have completed an accredited residency program in emergency medicine, or have three or more years of postgraduate training with demonstrated advanced ability in the management of emergency patients, cardiac and trauma resuscitation. Plaintiffs' Memorandum of Law, Appendix Volume 4, Exhibit 5, Doc. Nos. LL03 475 – LL03 476. Although initial appointment to the staff does not require certification, the physician must, within six years, be certified in his primary discipline or he will not be eligible for reappointment. *Id.* at LL03 476. Further, the Chairman of the Department of Emergency Medicine at the hospital, stated that the hourly compensation for emergency physicians varies depending on certification and experience. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 5, p. 46. However, the hospital's response to Interrogatory 31 of Plaintiffs' Interrogatories to Hospital Defendants Asserting Personal Jurisdiction Defenses indicates that only five of the hospital's emergency physicians are ABEM certified. Plaintiffs' Memorandum of Law, Appendix Volume 12, Exhibit 3, Doc. No. LL03 568.

**The Medical College of Pennsylvania and Hospital's** Faculty Bylaws provide that qualifications for the position of professor, associate professor, or assistant professor should include certification by the appropriate specialty board. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 1, Doc. No. LL06 922.

All appointments of faculty to **Mercy Catholic Medical Center, Misericordia Division** "shall be effected pursuant to [the Medical College of Pennsylvania's] Bylaws." Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 1, Doc. No. LL06 100. Thus, Mercy Catholic Medical Center—Misericordia Division's professors, associate professors, and assistant professors qualifications should include certification by the appropriate specialty board, as discussed in the Medical College of Pennsylvania's bylaws. *Id.* at LL06 922.[147]

**St. Anthony Hospital's** Medical Staff Rules & Regulations establish three classes of emergency physicians. Plaintiffs' Memorandum of Law, Appendix Volume 5, Exhibit 5, Doc. Nos. LL10 1035– LL10 1036. Class I and II physicians need not be board certified, but they work under the direct supervision of a Class III physician, who must be board certified in emergency medicine, family practice, surgery, or internal medicine, or have three years of postgraduate training in one of these specialties, or one year of training and three years of full-time primary care. *Id.* In 1992, a proposal for changing this requirement was suggested, which limited the practice of emergency medicine at St. Anthony's to physicians who are ABEM or family practice certified or eligible. *Id.* at LL10 1272–LL10 1273.

**The University Hospital at the University of New Mexico School of Medicine** requires that the physicians practicing in the emergency department be board certified in either emergency medicine or another specialty, such as internal medicine, family medicine, or pediatrics. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 66, pp. 61–62. Additionally, in advertising for a faculty position in emergency medicine, the school of medicine required ABEM certification or eligibility. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. No. 3379.

**University of Massachusetts Medical Center's** Bylaws do not require emergency physicians to be ABEM certified or eligible. Plaintiffs' Memorandum of Law, Appendix Volume 6, Exhibit 3, Doc. Nos. LL14 205–LL14 209. However, advertisements for fellowship positions provide that the medical center's emergency department is staffed with "three ABMT/ABEM diplomates." Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 2455, 3100. Further, when advertising for op-

---

147. Neither the Medical College of Pennsylvania and Hospital nor Mercy Catholic Medical Center—Misericordia Division provided Plaintiffs with the emergency physicians on their staff who are ABEM certified. Plaintiffs' Memorandum of Law at V–58; Appendix Volume 12, Exhibits 10, 11.

portunities in emergency medicine, the medical center sought a board certified or prepared emergency physician to fill the vacancy. *Id.* at Doc. Nos. 2113, 2354, 2395.

**University Medical Center (Tucson)** has ten emergency medicine faculty members, only one of which is not ABEM certified or eligible. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 33, pp. 21–22. Additionally, when advertising for faculty positions, the hospital requires ABEM certification or eligibility. Plaintiffs' Memorandum of Law, Appendix Volume 3, Doc. Nos. 2351, 2393, 2438, 2457.

Plaintiffs argue that each of the hospital Defendant's refusal to hire or discrimination against physicians who are not ABEM certified or eligible constitutes "[a] pattern of uniform conduct or parallel behavior where it would be improbable that the conduct would be uniform, in the absence [sic] of an illegal agreement, [and that this] factor [is] weighed heavily, along with other facts and circumstances, to support an inference of concerted action." Plaintiffs' Memorandum of Law at V–53 (citing *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946) and *Apex Oil Co. v. Di Mauro,* 822 F.2d 246, 253–54 (2d Cir.), *cert.denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987)).

However, such "parallel" conduct even if entered upon with awareness that other competitors were acting simultaneously, sometimes referred to as "conscious parallelism," [148] by competitors alone does not demonstrate that a conspiracy is present, rather, courts need some basis, beyond mere parallel conduct, to suggest that an independent actor would otherwise not have acted as the putative conspirators did. *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954). The most significant evidence tending to show that a con-

spiracy exists is when the parties' "parallel" actions would be against their individual self-interest absent an agreement. *See Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1456–57 (11th Cir.1991) (court refused to infer a conspiracy from radiologists' recommendation and hospital's denial of additional privileges to plaintiff doctor where facts alleged did not "exclude the possibility that the hospital acted unilaterally, and procompetitively, ... [by] denying [plaintiff] the privileges he requested" in order "to foster competition and to serve its own economic interest" in higher productivity and safety); *Houser v. Fox Theatres Mgt. Corp.,* 845 F.2d 1225, 1232 (3d Cir.1988); *Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 726 (7th Cir.1986). *See also Bolt v. Halifax Hospital Medical Center,* 891 F.2d 810, 826 (11th Cir.), *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990) ("evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff establishes that each defendant engaging in the parallel action acted contrary to its economic self interest").

For example, in the *Interstate Circuit* case, eight film distributors acceded to the demands of Interstate, a movie theater chain with first-run theatre monopolies in major Texas cities, that the distributors impose certain price restrictions on other second run exhibitors of high demand films to be shown by Interstate. *Interstate Circuit, supra.* Each of the distributors was aware that Interstate had made identical demands to the others. The Court accepted an inference of a conspiracy from the fact that "without substantially unanimous action with respect to the restrictions ... there was risk of a substantial loss of the business and goodwill of [other] exhibitors, but that with it there was the prospect of increased profits." *Id.* at 222, 59 S.Ct. at 472. *See also American Tobacco Co., supra,* at 805–806, 66 S.Ct. at 1137 (the Supreme Court relied on evidence

---

**148.** Conscious parallelism is uniform business conduct by competitors that permits a court to infer the existence of a conspiracy between these competitors. *See, e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939). The idea behind this theory is that competitors' parallel business decisions are probative of the existence of a conspira-

cy between these competitors. To ensure that a court does not punish unilateral conduct, more than mere evidence of parallel conduct is required to support an inference of conspiracy; an agreement is properly inferred from conscious parallelism only when "plus factors" exist. *Interstate Circuit, supra,* at 222–223, 59 S.Ct. at 472–73.

of price increases in the face of declining costs and a depressed economy to support an inference of conspiracy). Other "plus factors" include the presence or absence of a motive on defendant's part to enter the alleged conspiracy, *Matsushita Elec. Indus.*, 475 U.S. at 596–97, 106 S.Ct. at 1361–62 ("Lack of motive bears on the range of permissible conclusions that may be drawn from ambiguous evidence: if defendants had no rational economic motive to conspire and if the conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy"), or if the alleged motive for restraint was pretextual. *Bolt, supra*, at 822 (evidence that defendant's reasons for revocation of doctor's staff privileges were pretextual was admissible to prove the existence of a contract, combination or conspiracy). *But cf. H.L. Moore Drug Exchange*, 662 F.2d at 943 (fact that stated reason for termination of wholesaler might have been pretextual, does not itself establish a conspiracy, as "[t]he fact that [defendant] may have had other reasons to terminate [plaintiff] makes it neither more nor less probable that [defendant] acted in concert with others rather than unilaterally"). Additionally, when a plausible business justification for the parallel conduct is apparent and no evidence is presented to support an alternative explanation, evidence of conscious parallelism is insufficient to prove a conspiracy. *See also* Clark C. Havighurst & Peter M. Brody, *Accrediting and the Sherman Act*, 57 Law & Contemp.Probs. 199 (1994) (analyzing the difficulty in determining whether accrediting and credentialing standards violate antitrust laws).

As to the hospital Defendants' decisions regarding any emergency medicine certification requirements, however, Plaintiffs have not demonstrated that any of these "plus factors" exist. For example, the record contains no indication that any hospital Defendant would, but for its knowledge of the fact that other hospital Defendants were choosing to require ABEM certification for their emergency medicine staff, have chosen not to do so. Nor does it show that any hospital Defendant has any motive to join the purported conspiracy. The absence of evidence of such motive can readily be explained by the fact that none of the hospital Defendants have been shown to be in competition with each other. The provision of emergency medical services by its nature is constrained by the need for immediate treatment and the proximity of an emergency treatment facility; the record is simply devoid of any evidence of competition among these Defendants (although some Defendants are located in the same area, *e.g.* Children's Hospital (San Diego), Tri–City Medical Center (San Diego), University of California (San Diego) Medical Center) for such services. *Compare Interstate Circuit, supra.* Moreover, it does not follow, as Plaintiffs strongly argue, that the hospital Defendants support the conspiracy to assure a steady supply of cheaper labor to staff their emergency medicine residency programs, as there is also no evidence in the record suggesting that without the disputed ABEM based requirements the supply of candidates to these programs would be reduced or that the wages of those selected would necessarily be higher. Further, although each of the hospital Defendants may have decided to require ABEM or other certification as prerequisites to practice emergency medicine, there is no indication that this requirement was imposed for any anticompetitive reason, rather, the hospital Defendants could reasonably believe that ABEM certification demonstrates that a physician so certified is well-trained and less likely to make mistakes leading to liability of the hospital. *See Todorov, supra.*

Further, as discussed, Discussion Section II(b)(3), *supra*, to hold a defendant as a participant in a conspiracy, the defendant "must by word, deed or conduct intentionally join the illicit enterprise; mere association with conspirators and presence at the scene of a conspiracy, even coupled with knowledge that wrongful conduct by others is being engaged in, are not by themselves sufficient to support the inference of knowing and intentional attachment to an illegal enterprise." *Hunt*, 465 F.Supp. at 231. In this case, even if the Plaintiffs demonstrated that a conspiracy existed and involved some of the physicians listed by Plaintiffs or the hospital Defendants, "the fact that the other [defendants] attended meetings at which the

subject of the conspiracy was discussed would not by itself establish intentional membership in the conspiracy." *Id.*

While Plaintiffs' allegations initially appear to suggest that a corrupt agreement or conspiracy may exist, upon closer scrutiny, the Plaintiffs have failed to demonstrate and provide factual support that ABEM, CORD, and the hospital Defendants, as discussed, have a knowing and intentional attachment to some illegal agreement. As the Plaintiffs have not met their burden of proof in demonstrating that the hospital Defendants are involved in any corrupt agreement, combination, or conspiracy, having a common illegal purpose, they have failed to demonstrate even a prima facie case of conspiracy sufficient to form a predicate for personal jurisdiction under Section 302(a)(2) as to all of the Defendants.

### ii. *Overt Act in Furtherance of Agreement*[149]

As an additional prerequisite to personal jurisdiction under Section 302(a)(2), there must have been at least one overt act by one of the co-conspirators in furtherance of the unlawful plan. *Chrysler Capital Corp.*, 778 F.Supp. at 1267 (any act by a conspirator in furtherance of the unlawful plan is an overt act). Plaintiffs assert that the primary corrupt agreements and overt acts in which the hospital Defendants' agents participated are the closure of the practice track, the refusal to extend the cutoff date or reopen the practice track, the creation of new practice tracks for internal medicine physicians only, imposing the RRC–EM's requirements for faculty and staff of emergency medicine residency training programs, the rejection of alternative residency programs, establishing policies encouraging the public to seek services of board certified physicians and hospitals to employ only board certified physicians, and the refusal of the hospitals to hire qualified, experienced emergency physicians solely because they are not ABEM certified or eligible. Plaintiffs' Memorandum of Law at V–102 – V–103. Plaintiffs allege that each of these overt acts "was committed

for the purpose of protecting the residency programs, ensuring a high demand for the defendant hospitals' residency training program and protecting the graduating residents from competition in the marketplace, in order to ensure continuing demand for the defendants' programs in the future." Plaintiffs' Memorandum of Law at V–103. Assuming that a corrupt conspiracy or combination, in which Defendants participate, exists, the acts alleged by the Plaintiffs should be considered overt acts in furtherance of this agreement. However, as discussed, the Plaintiffs have failed to present facts demonstrating that the hospital Defendants agreed among themselves, or through the various co-conspirator professional emergency medicine organizations, to impose certification requirements for positions or privileges within each individual institution directly affecting Plaintiffs.

### iii. *Parties' Intentional Participation in Furtherance of Plan or Purpose*

Plaintiffs must also show that for each Defendant, against whom personal jurisdiction is sought, based upon Section 302(a)(2), such Defendant intentionally participated in the common plan for purposes of advancing their illegal goal. However, rather than alleging and discussing specific facts pertinent to each Defendant, the Plaintiffs attempt to meet this requirement by pointing out that the hospital Defendants became members of the conspiracy through the participation of their respective staff or faculty physicians in the co-conspirator professional organizations. Plaintiffs' Memorandum of Law at V–95. But, again as discussed, Discussion Section II(3)(b)(i), it cannot reasonably be inferred that with the exception of the physicians sent to CORD meetings, the individual physicians affiliated with the hospital Defendants participated in these professional organizations as representatives or agents of the hospitals or, even assuming antitrust misconduct by the various professional organizations, that such

---

**149.** If the district judge agrees that Plaintiffs have not demonstrated a conspiracy by a preponderance of the evidence, the court need not further consider whether Plaintiffs have met their burden to also show an overt act, intentional

participation, resulting injuries, and the other prerequisites for jurisdiction under Section 302(a)(2) enunciated in *Chrysler Capital Corp.*, *supra,* and discussed below.

can be attributed to the member physicians. *See* Discussion Section II(3)(b)(i), *supra.*

Plaintiffs advance agency theories to illustrate why the hospital Defendants are liable for the acts of the individual physicians affiliated with them. Specifically, Plaintiffs contend that the physicians had apparent authority from the hospitals to participate in professional organizations which set the standards for training, practice, and accreditation of emergency physicians and residency programs. However, under New York law, to recover on a theory of apparent authority, a third party must establish that the principal was responsible for the appearance of authority in an putative agent to conduct a transaction on behalf of the principal to be bound, and the third party must reasonably rely on the representations of the agent. *Herbert Construction Co. v. Continental Ins. Co.*, 931 F.2d 989, 993 (2d Cir.1991) (citing *Ford v. Unity Hospital*, 32 N.Y.2d 464, 346 N.Y.S.2d 238, 244–45, 299 N.E.2d 659, 664 (1973) and *Hallock v. State*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513–14, 474 N.E.2d 1178, 1181 (1984)).

In this case, there is no indication that, except as to CORD, the hospital Defendants granted individual staff or faculty physicians authority to participate in professional organizations *on behalf of the hospitals.* Further, even if the hospitals had granted the physicians authority, or made it appear to a third party that these physicians had authority to participate in professional organizations on behalf of their respective hospitals, there is no evidence in the record that anyone reasonably relied on any representations to this effect made by any of the individual physicians named by Plaintiffs. Significantly, for example, Plaintiffs have not established that the co-conspirator professional organizations would not have taken the actions, in the form of policies, requirements, and the like, which Plaintiffs rely upon to demonstrate concerted action and overt acts, unless the individual physician members also spoke for and could vouch for the concurrence of their institutions in such actions.

Plaintiffs offer *Seligson v. New York Produce Exchange*, 378 F.Supp. 1076 (S.D.N.Y. 1974), and *Vandervelde v. Put & Call Brokers & Dealers*, 344 F.Supp. 118 (S.D.N.Y. 1972), in support of their agency theories, however, both cases are clearly distinguishable from that at bar. *Vandervelde* was a civil antitrust action by a dealer against an association of put and call dealers, the association's individual members, and the firms associated with the individual members. *Vandervelde, supra*, at 125. The association was made up entirely of individual members, so that a corporation involved in the put and call business could become an associated member and use the association's facilities only if one of its executive officers was a member. In finding certain of the put and call firms liable, the court set guidelines for the imputation of liability from individual members of the defendant association to their respective firms. The court held that mere membership in the association or on a committee of the association was not sufficient proof of connection or ratification of illicit conduct, rather, to link a member firm to the acts of an organization, the plaintiff must demonstrate that the member knew of and condoned the acts in issue. *Vandervelde, supra*, at 155. Thus, the evidence in *Vandervelde* "clearly indicat[ed] that the activities of the individual defendants in the management of the Association were well within the scope of their authority [as principals of the broker-dealer defendants] from the firms they represented; indeed in most cases the firms were dominated by these individuals and they managed the Association as well." *Vandervelde, supra*, at 156. The court also found that the nature of the relationship between the firms and the association justified a finding that the participation of option brokers and dealers in the activities of the association was an integral part of their employment in the industry, and, further, the firms had a direct interest in the subject matter of the controversy. *Vandervelde, supra*, at 156.

*Seligson* involved an action filed against the New York Produce Exchange, its officers and board of managers and the clearing association, its officers and board of managers, to recover for the alleged failure of the exchange and association to maintain an orderly market, failure to regulate the member-

broker's wrongful conduct, and antitrust violations. After a decline in the market, a company holding a significant number of contract options was forced into bankruptcy. The exchange's executive committee and the association's board of directors met and determined that both the bankrupt company, and another affiliated with it would not be able to meet their margin requirements if the market continued to drop, therefore, after discussions with several members of the exchange's board of managers, the executive committee recommended to the exchange board that trading be suspended in that particular futures market; the board of managers formally ratified this decision the next day. *Seligson, supra,* at 1082. Plaintiff charged that the defendants failed to prevent the manipulation of prices when they should have known that the bankrupt organization's accumulation of futures artificially affected prices and threatened the market. The plaintiff argued that although defendants knew that immediate suspension of trading was necessary to preserve the market, the market was kept open for six days so that prices could decline, and then trading was suspended in order to protect the defendants' interests. *Seligson, supra,* at 1083. Plaintiff asserted that the defendants conspired to control and fix the prices of certain types of contracts, and profit as the result. *Seligson, supra,* at 1083. Several facts led the court to determine that there was a partnership between the association and the exchange in regulating the futures market, including the fact that the association's board of directors met with the exchange executive committee in order to decide whether trading should be suspended. *Seligson, supra,* at 1087. As the result of the functional relationship between the association and the exchange, the court found that the guidelines developed for imputation of liability in *Vandervelde* were well-suited to the case. *Seligson, supra,* at 1088–1089.

This case, unlike *Vandervelde* and *Seligson,* involves physicians who work or are granted privileges to practice in the emergency departments of the hospital Defendants. Regardless of the fact that the hospitals allow and support affiliations with professional organizations which relate to the professional activities of the physicians and whose activities also have professional significance to the operation of the hospital, such membership does not impute liability to the hospitals for any actions taken by these professional organizations. *Hunt,* 465 F.Supp. at 231. Moreover, based on the record, any particular hospital Defendants' authorization and approval of a physician's participation in such professional organizations does not constitute authority to engage in tortious acts nor for any acts, particularly tortious acts, on behalf of the hospital. In contrast to *Vandervelde,* there is no evidence here that the physicians are senior executives or principals of their respective hospitals or, except as to CORD, that the hospital Defendants sponsor or control the professional groups in question. These physicians, because of their positions with respect to the provision of emergency medical services by the hospitals, may well influence the decisions taken by the officers of the hospital Defendants, but, so far as the record shows, they do not exercise such executive authority as to hospitals themselves. Further, unlike the direct involvement in defendant's decision making by the principals in *Seligson,* there is no evidence that any hospital Defendant directly collaborated with ABEM in its individual decision to close the practice track.

Thus, the Plaintiffs' agency theories—to establish the required degree of participation in the conspiracy—cannot prevail in this case, as the relationship between the hospital Defendants and the co-conspirator professional organizations, other than CORD, is too attenuated to permit the conduct of individual physicians, as members, to be imputed to the hospital Defendants. Additionally, as noted, the Plaintiffs have not presented evidence showing how each hospital Defendant induced these organizations to believe that staff physicians affiliated with the hospitals had authority to act on behalf of their respective hospitals, and that the Plaintiffs were injured by representations made by the emergency physicians because they acted on those representations.

With respect to the hospital Defendants' affiliation with CORD, whose members are

the hospital emergency medicine residency programs,[150] the fact that the physicians represented the hospital Defendants' residency programs at CORD meetings is also insufficient to establish intentional membership on the part of the hospital Defendants in the alleged conspiracy, even if the subject of the conspiracy was discussed at those meetings. *Hunt, supra,* at 231 (the fact that others attended meetings at which the subject matter of the conspiracy was discussed does not establish intentional membership in the conspiracy). Further, if affiliation with CORD was enough to demonstrate that each hospital Defendant was involved in a conspiracy against non-ABEM certified or eligible physicians, then all hospitals which maintain accredited emergency medicine residency programs and send representatives to CORD meetings would be involved in the conspiracy, *see Merkel Associates, Inc. v. Bellofram Corporation,* 437 F.Supp. 612, 618 (W.D.N.Y. 1977) (merely showing the business relationship of the defendants without more is insufficient to demonstrate a conspiracy, otherwise, all interrelated groups could be charged with conspiracy when any one member of the group acts), a fact Plaintiffs have, thus far, not alleged. *See* Plaintiffs' Memorandum of Law, Appendix Volume 2, Exhibit 3, Doc. Dos. C138 – C139, C258 – C262, C299 – C304, C364, C384 – C385, C429 – C595.

#### iv. *Resulting Damage or Injury*

■ Plaintiffs have the burden of demonstrating that the Defendants' action interfered with competition. *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984). Although certain individual Plaintiffs have declared that they were personally damaged, injury to an antitrust plaintiff is insufficient to prove injury to competition. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Volmar Distributors, Inc. v. The New York Post Co., Inc.,* 825 F.Supp. 1153, 1159–60 (S.D.N.Y.1993). *See also* Daniel C.

Richman, *Antitrust Standing, Antitrust Injury, and the Pro Se Standard,* 93 Yale L.J. 1309, 1309–10, 1312 (1984) (antitrust laws protect competition as a whole, not individual competitors, thus, an antitrust plaintiff must relate his private injury to a more public wrong, a threat to competition in his own market). Plaintiffs must instead prove that competition in a relevant market has been harmed. *Jefferson Parish, supra,* at 29, 104 S.Ct. at 1567.

■ In this case, the relevant market is the market for ABEM certified and ABEM eligible emergency physicians. Second Amended Complaint at ¶¶ 91–92; Plaintiffs' Memorandum of Law at V–60 – V–73. Plaintiffs assert that the Defendants' and co-conspirators' unlawful actions restricted output and reduced competition in the market for ABEM certified or eligible physicians, thereby artificially raising the price of ABEM certified or eligible physicians and reducing competition by restricting the supply of emergency physicians eligible to sit for the certification examination. Second Amended Complaint at ¶ 92. Further, by restricting the supply of ABEM certified and eligible physicians, while the demand for emergency medical services continues to rise, hospital emergency departments have, according to Plaintiffs, become overcrowded. Second Amended Complaint at ¶¶ 97–102. Thus, Plaintiffs allege that the professional organization co-conspirators and Defendants possess market power within the relevant market and have unlawfully exercised that market power. *Id.* at ¶ 93.[151]

To establish this antitrust injury, the Plaintiffs have presented data indicating that there are, in the United States, approximately 25,000 non-certified emergency physicians whereas there are only 8,000 practice track certified emergency physicians, and 4,400 residency trained and certified emergency physicians. Plaintiffs' Memorandum of Law at V–61; Appendix Volume 3, Doc. Nos.

---

150. *See* Footnote 123, *supra.*

151. Although Plaintiffs' definition of the relevant market, *i.e* . ABEM certified emergency physicians, in relation to ABEM's asserted monopoly, may appear tautological, Plaintiff has, on these

motions, nevertheless clearly established (a) a demand for physicians specializing in emergency medicine who are "board certified," and (b) that ABEM is presently the only entity available to provide such certification.

1720–1722, 1951–1955, 3205. Plaintiffs nevertheless assert that there is an inadequate supply of certified emergency physicians, as ABEM and its co-conspirators closed the practice track to physicians whose qualifications are equivalent or superior to those of ABEM certified or eligible physicians. Plaintiffs' Memorandum of Law at V–64 – V–68; Appendix Volume 1, Exhibits 4, 5. This purported shortage of board certified emergency medicine physicians has resulted in overcrowding in emergency departments, which effects the needs and interests of the public. Plaintiffs' Memorandum of Law, Appendix Volume 1; Exhibit 4 ¶¶ 4 – 5, Exhibit 5, Appendix Volume 3, Doc. No. 284, 851, 1491–1492, 1723, 1730–1731, 1798–1800, 1951–1955, 2463, 2825, 2914, 2919, 2926–3927, 3144–3145. Thus, Plaintiffs have for purposes of this matter sufficiently shown an injury to competition by demonstrating that closing the practice track mode of eligibility has caused a shortage of certified physicians in the field of emergency medicine, as more hospitals are requiring ABEM certification or eligibility for staff physicians, and that this shortage has affected the need and interests of consumers.

### c. *Specific Facts Alleged Warranting Inference that Each Defendant is a Member of the Conspiracy*

Plaintiffs must not only establish for purposes of these motions their claim of conspiracy by a preponderance of the evidence, but they must show a sufficient relationship between each Defendant and the conspiracy to warrant the inference that each hospital Defendant was a member of the conspiracy and set forth evidentiary facts to connect the Defendants with transactions related to the conspiracy. *Chrysler Capital Corp., supra,* 778 F.Supp. at 1268–69. In Discussion Section II(3)(b)(i), this court addressed the Plaintiffs' allegations that each hospital Defendant participated in the conspiracy by refusing to hire emergency physicians unless they were ABEM certified or eligible. However, as the Plaintiffs have failed, on the instant motion, to demonstrate that any corrupt agreement or conspiracy exists involving the non-resident hospital Defendants, the facts alleged regarding each such hospital's

refusal to hire non-ABEM certified or eligible emergency physicians are necessarily insufficient to tie such Defendants to the conspiracy as alleged.

### d. *Imputing Conduct to Out–of–State Co-conspirators*

The Second Circuit has held that an antitrust plaintiff need not demonstrate a formal agency relationship between the defendant and its co-conspirators to impute activity of a co-conspirator in New York, whether the co-conspirator is then physically within the state or not, to the non-resident defendant provided the plaintiff shows that (i) the defendant had an awareness of the effects of the conspiracy in New York, (ii) the activity of the co-conspirators in New York was to benefit the out-of-state co-conspirators, and (iii) the co-conspirators who acted in New York acted at the direction, under the control, at the request of, or on behalf of the out-of-state defendants. *Lehigh Valley Industries,* 527 F.2d at 90 n. 3; *Chrysler Capital Corp., supra,* at 1269 (citations omitted); *Dixon v. Mack,* 507 F.Supp. 345, 350–51 (S.D.N.Y.1980).

### i. *Defendants' Awareness that its Activity had Effects in New York*

As indicated by the Defendants, Plaintiffs have incorrectly stated the first section of the test for determining the required quality of awareness by suggesting that Plaintiffs only need to show that the "hospital defendants and CORD had an awareness of the effects of the conspiracy in New York." Plaintiffs' Memorandum of Law at V–133; Defendants' Joint Reply Memorandum at p. 47. The test, however, requires that Plaintiffs demonstrate that each Defendant over whom jurisdiction is sought "have an awareness of the effects in New York of *its activity.*" *Chrysler Capital Corp., supra,* at 1269; *Dixon, supra,* at 350 (emphasis added). *See Chrysler Capital Corp., supra,* at 1269 (where defendant in California was familiar enough with a sale and leaseback transaction to know that a New York-based investor was involved in the transaction or that the negotiations and closing were to take place in New York, its activities with

respect to the transaction would be known to have an effect in New York).

In this case, Plaintiffs identified only two activities in New York connecting the hospital Defendants and CORD to the conspiracy: such Defendants knew that requiring ABEM eligibility affected physicians in every state, and physicians practicing at some of the hospital Defendants are affiliated with various emergency medicine professional organizations. However, as none of the hospital Defendants pertinent to this issue are located in New York,[152] it is reasonable to find that the non-resident hospital Defendants would not perceive that their hiring requirements would affect physicians outside the state in which each such hospital Defendant is located. Plaintiffs, moreover, have adduced no evidence to support an inference that each non-resident hospital Defendant had any awareness that its credentialing policies for emergency medicine physicians would involve New York resident physicians. Further, it is even more speculative to assert that the hospital Defendants would believe or have any reason to believe that their faculty members' memberships in the various professional organizations discussed would have an effect on employment of emergency physicians in New York, including any of the Plaintiffs. The court therefore finds that Plaintiffs have not shown that any of the Defendants asserting personal jurisdiction defenses have participated in an activity in connection with the described conspiracy which would lead these Defendants to have an awareness of the effects of their actions in New York.

### ii. *Benefit of the Activity in New York*

Plaintiffs assert that ABEM's activities in New York, including wrongfully rejecting applications and denying the appeals of New York resident Plaintiffs, benefitted the co-conspirator Defendants by increasing the demand for emergency medicine residency programs, the benefits received by those programs, and the competitive advantages provided to board certified emergency physicians by ABEM certification. Plaintiffs' Memorandum of Law at V–134. However, as discussed, Discussion Section II(3)(a), *supra*, ABEM's actions did not take place in New York as required by the caselaw interpreting Section 302(a)(2), *compare Chrysler Capital Corp.*, *supra*, (defendant's co-conspirators delivered warranties and representations and participated in closing, therefore financial transaction in New York), rather, the injuries resulting from ABEM's denials of some of the Plaintiffs' applications occurred in New York. *See* Discussion Section II(3)(a). Even assuming ABEM's application denials do constitute activities within New York for jurisdictional purposes, any relationship between these denials and the increasing demand for emergency medicine residency training programs which may be of some benefit to a hospital Defendant and ABEM certified physicians is tenuous at best. Plaintiffs' Memorandum of Law at V–134 – V–135. The evidence presented strongly points to a finding that the vast majority of available emergency medicine training residencies for any of the hospital Defendants are filled by persons from places other than New York. Plaintiffs' Memorandum of Law at III–13 – III–80. There is, moreover, no evidence to suggest that the hospital Defendants are enjoying a higher rate of applications, that the applicants are of better quality or that they are paid lower wages by hospital Defendants than had been the case prior to ABEM's closing the practice track.

Thus, the Plaintiffs have failed to show that the activity of the co-conspirator ABEM in New York was to the benefit of any of the out-of-state hospital Defendant conspirators.

### iii. *Exercise of Discretion or Control*

Plaintiffs allege that ABEM was a co-conspirator which closed the practice track, and subsequently rejected applicants who did not meet the practice track requirements by June 30, 1988. Plaintiffs' Memorandum of Law at V–135. Plaintiffs further assert that RRC–EM and ACEP policies ap-

---

**152.** Lincoln Medical and Mental Health Center, Our Lady of Mercy Medical Center, and State University of New York at Stony Brook University Hospital undisputedly reside in New York and are thus irrelevant to this discussion. Further, Plaintiffs have not alleged any overt acts in New York that these in-state Defendants committed in furtherance of the alleged conspiracy.

plied to and affected hiring practices in New York. *Id.* Although some of the hospital Defendants followed the requirements set by RRC–EM and ACEP, *see* Discussion Section II(b)(3)(b)(i), *supra,* Plaintiffs have failed to demonstrate that these hospital Defendants exercised discretion or control over ABEM, the co-conspirator acting in New York, or that ABEM acted at the request of or on behalf of the other out-of-state hospital Defendants. Accordingly, the conduct of any co-conspirator in New York may not, under the test established in *Chrysler Capital Corp., supra,* be imputed to those out-of-state hospital Defendants.

As Plaintiffs have not presented proof sufficient to demonstrate that the hospital Defendants and their co-conspirators were acting as the result of a "conscious commitment to a common scheme designed to achieve an unlawful objective," they have failed to establish an antitrust conspiracy justifying a finding of personal jurisdiction in New York pursuant to Section 302(a)(2) by a preponderance of evidence. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470–71. *See Chrysler Capital Corp., supra,* at 1266 (plaintiff has the ultimate burden of establishing jurisdiction over the defendant by a preponderance of the evidence where there has been discovery on jurisdictional issues) (citing *Marine Midland Bank,* 664 F.2d at 904).

Assuming that a corrupt conspiracy or agreement did exist, Plaintiffs have demonstrated that several acts of the Defendants could be considered overt acts in furtherance of the illegal agreement and that an antitrust injury exists. However, the Plaintiffs failed to establish the intentional participation of the parties in furtherance of the antitrust conspiracy, and specific facts warranting the inference that each Defendant is a member of the conspiracy. For these reasons, the court finds that personal jurisdiction, under Plaintiffs' conspiracy theory, should not exist over any of the hospital Defendants or CORD.

### 4. *Jurisdiction Based on Tortious Acts under Sections 302(a)(3)(i) and 302(a)(3)(ii)*

Plaintiffs also argue that the Defendants are subject to personal jurisdiction under Section 302(a)(3) of the New York Civil Practice Law and Rules, which provides jurisdiction over a nondomiciliary if such nondomiciliary (1) commits a tortious act outside the state of New York that causes injury to a person or property inside the state, and (2) either (a) regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or services rendered in the state, or (b) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. N.Y.Civ.Prac.L. & R. § 302(a)(3) (McKinney 1990).

 The occurrence of a tortious injury in New York by itself is insufficient to provide the basis for personal jurisdiction under Section 302(a)(3). N.Y.Civ.Prac.L. & R. § 302(a)(3) (McKinney 1990) (Practice Commentaries C302.19, McLaughlin). The purpose of the additional requirements of Sections 302(a)(3)(i) and (ii) is to ensure that a defendant has sufficient contacts with New York that the defendant could reasonably anticipate being haled into a New York court. *Montalbano v. Easco Hand Tools, Inc.,* 766 F.2d 737, 739 (2d Cir.1985); *Martinez v. American Standard,* 91 A.D.2d 652, 457 N.Y.S.2d 97, 98–99 (2d Dep't.1982), *aff'd,* 60 N.Y.2d 873, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983). Plaintiffs contend that the Defendants and their professional emergency medicine organization co-conspirators have committed numerous acts in furtherance of the conspiracy which have caused injury in New York, including the loss of jobs, promotions, and directorships, discrimination in remuneration and conditions of employment, the inability to apply for new positions, and also injuries to the public, such as overcrowding and higher costs in emergency medicine departments. Plaintiffs' Memorandum of Law at V–136 – V–137. Plaintiffs assert that many of the overt acts which have caused tortious injury in New York occurred during meetings of CORD, SAEM, ACEP, and other co-conspirator professional organizations. Plaintiffs' Memorandum of Law at V–136.

 However, as discussed, *see* Discussion Section II(3)(b)(i), *supra,* the acts

of these organizations cannot be imputed to the Defendant hospitals. Moreover, even if the hospital Defendants rejected applicants for jobs from New York on the grounds that the physicians were not ABEM certified or eligible, this would not be a sufficient showing to subject the defendants to personal jurisdiction in New York, as an injury does not occur within the state simply because the plaintiff is a resident.[153] *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir.1990); *Benjamin Sheridan Corporation v. Benjamin Air Rifle Company*, 827 F.Supp. 171, 178 (W.D.N.Y. 1993). The situs of an injury is the "'location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.'" *Mareno, supra*, at 1046 (quoting *Carte v. Parkoff*, 152 A.D.2d 615, 543 N.Y.S.2d 718, 719 (2d Dep't.1989)); *Benjamin Sheridan, supra*, at 178; *United Bank of Kuwait, PLC v. James M. Bridges, Ltd.*, 766 F.Supp. 113, 116 (S.D.N.Y.1991) ("New York courts uniformly hold that the situs of a nonphysical commercial injury is 'where the critical events associated with the dispute took place'") (quoting *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433 (2d Cir.1971)); *Spectacular Promotions, Inc. v. Radio Station WING*, 272 F.Supp. 734, 737 (E.D.N.Y.1967). Here, the "critical events" pertaining to Plaintiffs' claims occurred at ABEM's office in Michigan. As the "occurrence of financial consequences in New York due to the fortuitous location of the plaintiffs in New York is not a sufficient basis for jurisdiction under [Section] 302(a)(3)," *Benjamin Sheridan, supra*, at 178, Plaintiffs have failed to demonstrate that the Defendants' out-of-state acts resulted in an injury in New York.

Further, even if Plaintiffs demonstrated an injury in New York, they have failed to show that the Defendants solicit or are doing business in New York,[154] or that any of the Defendants receive substantial revenues from services rendered in New York, therefore, they must show that each of the Defendants should reasonably expect that their acts would have consequences in New York and that they derive substantial revenue from interstate commerce. N.Y.Civ.Prac.L. & R. § 302(a)(3)(ii) (McKinney 1990).

▪ Plaintiffs contend that the Defendants should expect that their acts committed in furtherance of the conspiracy would have consequences in New York. Plaintiffs' Memorandum of Law at V–137–V–138. However, the only acts which are attributed to the hospital Defendants are requiring physicians to be ABEM certified or eligible and having staff physicians who participate in the professional organizations discussed.[155] As the test of whether a defendant expects or should reasonably expect his act to have consequences within the state is an objective one, *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dep't. 1974), the hospital Defendants in this case had no reason to believe or foresee that establishment of a general credentialing prerequisite for employment of an emergency medicine physician (including the denial of a position as an emergency physician) or the

---

153. As the Plaintiffs failed to make a sufficient showing of an antitrust conspiracy, the antitrust violations and injuries discussed in Section II(3)(a) of this Report and Recommendation should not be treated as injuries occurring in New York for purposes of considering personal jurisdiction under Section 302(a)(3). Alternatively, should the District Judge find that an antitrust conspiracy for jurisdictional purposes has been made out, the antitrust injuries sustained by those Plaintiffs residing in New York at the time their application to ABEM were denied would satisfy the threshold requirement of injury for purposes of Section 302(a)(3).

154. The business requirement under this provision requires a nondomiciliary to have less connection with the forum state than is required by the concept of "doing business" under N.Y.

CPLR Section 301. *Tabacco v. Spray Products Corp.*, 1993 WL 356850, 1993 U.S. Dist. LEXIS 12425, *4 (S.D.N.Y.1993). However, the Plaintiffs must nonetheless demonstrate that the Defendants' contacts with New York are substantial enough to make it reasonable to subject the nonresidents to jurisdiction. *Id.* at *5 (citing *Murdock v. Arenson Intern. USA, Inc.*, 157 A.D.2d 110, 554 N.Y.S.2d 887, 888 (1st Dep't.1990)). Regardless, the minimal contacts of the Defendants with New York, except the Johns Hopkins Hospital, as discussed in Section II(b)(1)(a), *supra*, are insufficient to subject the Defendants to jurisdiction under this standard.

155. The Plaintiffs have not alleged any tortious acts of CORD or any of the nonparty co-conspirator professional emergency medicine organizations which resulted in injury in New York.

membership of its faculty in outside professional organizations would cause any consequences in New York. To suggest that foreseeable consequences spring from the mere possibility that New York residents may be thereby rendered ineligible for employment elsewhere substitutes logic for fact and, if followed, would render any hospital Defendant subject to personal jurisdiction in practically every state under a comparable long-arm provision. Thus, the hospital Defendants cannot be subjected to jurisdiction in New York on the basis of the acts alleged by Plaintiffs. *See* N.Y.Civ.Prac.L. & R. § 302(a)(3) (McKinney 1990) (Practice Commentaries C302:24, McLaughlin) (Section 302(a)(3) requires that the consequences in New York be foreseeable and other collateral activities occur, such as substantial interstate commerce).

■ Finally, whether a defendant derived substantial revenue from interstate commerce is determined by using both quantitative and qualitative approaches. *Allen v. Canadian General Electric Company, Ltd.*, 65 A.D.2d 39, 410 N.Y.S.2d 707, 709 (3d Dep't.1978). Hence, if a defendant's New York income is a substantial sum of money or a large proportion of its revenues, the income is sufficient to support jurisdiction. N.Y.Civ. Prac.L. & R. § 302(a)(3)(ii) (McKinney 1990) (Practice Commentaries C302:23, McLaughlin). *See, e.g., Auto Specialties Mfg. Co.,*

*supra,* at 550 (comparing a defendant's gross revenue from interstate commerce with its total gross revenue, and its net profit from interstate commerce with its total net profit); *Canadian General Electric, supra,* at 709 (although only 1% of defendant's gross income was from New York sources, it amounted to over $8 million, and was deemed substantial enough to support jurisdiction).

■ In this particular case, each of the hospital Defendants is an entity which produces millions of dollars in revenue each year. Plaintiffs' Memorandum of Law, Exhibit F. Therefore, each of these Defendants collects a great deal of money for services provided in the state in which its respective hospital is located, although some of this money also derives from patients residing outside of the state. *Id.* Based on the documents and exhibits presented by Plaintiffs, each hospital Defendant appears to receive sufficient out-of-state revenues to meet the requirement of Section 302(a)(3)(ii).[156] *See e.g.,* Plaintiffs' Memorandum of Law, Exhibit F; Appendix Volumes 12 and 13, Responses to Interrogatory 7. However, as the Plaintiffs have failed to demonstrate sufficient facts to establish the remaining jurisdictional prerequisites under Section 302(a)(3), personal jurisdiction over the Defendants does not exist under that section.

---

**156.** Forsyth Memorial Hospital received $6,618,437 in out-of-state revenue in fiscal 1994; Johns Hopkins Hospital received $35,529,338 in out-of-state revenue in 1993; Loma Linda University Medical Center received $10,057,000 in out-of-state revenue in 1993; Lutheran General received $123,744 in revenues from New York in 1993; Medical College of Pennsylvania and Hospital received $19,912,068 in out-of-state revenue in 1993; Mercy Catholic Medical Center—Misericordia Division received 7% of its total revenue from out-of-state sources in 1993; Methodist Hospital of Indiana received $1,322,294 in out-of-state patient charges in 1994; Ohio State University Hospital received $73,417 in revenues from New York in 1992–1993; Oregon Health Sciences University Hospital received $44,540,966 in out-of-state revenue for fiscal 1994 through February 28, 1994; Saint Francis Medical Center received $4,519,903 in out-of-state revenue in 1993; St. Anthony Hospital received $21,501,811 in out-of-state revenue in 1993; University of California (Los Angeles) medical Center received $40,703,669 in out-of-state patient charges in 1993–1994; University of California (Irvine) Medical Center received $4,829,228 in out-of-state patient charges in 1993–1994; University of California (San Diego) Medical Center received $21,930,522 in out-of-state revenue in 1993–1994; University of Massachusetts Medical Center received $30,083,205 in out-of-state revenue in 1993; University Medical Center (Tucson) received $14,573,231 in out-of-state revenue in 1992–1993. The remaining hospital Defendants, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital, Kettering Medical Center, Mercy Hospital and Medical Center, Riverside Methodist Hospitals, Tri–City Medical Center, and University Hospital at the University of New Mexico School of Medicine did not provide information regarding out-of-state revenues as opposed to total revenues, however, based on the total revenues of each of these hospital Defendants, it is reasonable to infer that they too receive sufficient out-of-state revenues to meet the requirements of Section 302(a)(3).

*Summary of Findings Regarding Personal Jurisdiction*

Under Section 12 of the Clayton Act, each of the Defendants which is a domestic corporation is subject to personal jurisdiction in this district, including the Council of Emergency Medicine Residency Directors, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Oregon Health Sciences University Hospital, Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital, and University Medical Center (Tucson). Thus, the motions to dismiss for lack of personal jurisdiction as to these Defendants should be denied.

Alternatively, pursuant to Section 301 of the New York Civil Practice Law and Rules, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, is subject to personal jurisdiction as doing or soliciting business in New York. Plaintiffs failed to demonstrate that the remaining Defendants who have moved to dismiss for lack of personal jurisdiction are doing or soliciting business so as to subject them to jurisdiction under this statute.

Section 302(a)(1) does not provide a basis for personal jurisdiction over any of the Defendants objecting to jurisdiction as none of them is transacting business in New York within the meaning of the section. Plaintiffs also failed to demonstrate conspiracy jurisdiction over CORD and the hospital Defendants pursuant to Section 302(a)(2) of the New York CPLR. Finally, none of the Defendants is subject to personal jurisdiction under Section 302(a)(3) as Plaintiffs did not

show that a tortious act outside New York caused injury within the state as required by the statute.

Therefore, the motions to dismiss for lack of personal jurisdiction as to Ohio State University Hospital, Tri–City Medical Center, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center should be granted as personal jurisdiction does not exist over these Defendants.

### III. *Venue*

Venue requirements serve to protect a defendant from the inconvenience of defending an action in a court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred.[157] *VE Holding Corporation v. Johnson Gas Appliance Company,* 917 F.2d 1574, 1576 (Fed.Cir.1990) (citing 1A(2) Moore's Federal Practice ¶ 0.340). The federal venue rules achieve this purpose by limiting the plaintiff's choice of forum to certain courts among all those which might otherwise acquire personal jurisdiction over the defendant. *VE Holding Corporation, supra,* at 1576.

In considering motions challenging venue under Fed.R.Civ.P. 12(b)(3), the plaintiff has the burden of establishing venue for each claim set forth in the complaint. *French Transit, Ltd. v. Modern Coupon Systems, Inc.,* 858 F.Supp. 22, 25 (S.D.N.Y.1994); *Pocahontas Supreme Coal Company, Inc. v. National Mines Corp.,* 90 F.R.D. 67, 69 (S.D.N.Y.1981). Plaintiffs claim that venue is established in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and the general venue statute, 28 U.S.C. § 1391(b). In applying the antitrust venue provisions, courts have concluded that Congress' intent was to enlarge the plaintiff's choice of forum

---

**157.** A motion to dismiss for improper venue is considered dispositive, as opposed to a motion to transfer, which a magistrate judge has the authority to hear and determine pursuant to a referral under 28 U.S.C. § 636(b)(1)(A). *See Mi-*

*chelli v. City of Hope,* 1994 WL 410964, *6 n. 1 (S.D.N.Y.1994); *O'Brien v. Goldstar Technology, Inc.,* 812 F.Supp. 383 (W.D.N.Y.1993); *Russell v. Coughlin,* 1992 WL 209289, *1 (S.D.N.Y.1992).

by reading the Clayton Act's venue provisions as supplemental to, rather than superseding, the general venue provisions. *Go–Video*, 885 F.2d at 1409; *Kingsepp*, 763 F.Supp. at 27–28. *See Pure Oil Co. v. Suarez*, 384 U.S. 202, 205, 86 S.Ct. 1394, 1396, 16 L.Ed.2d 474 (1966) (the liberalizing purpose underlying the enactment of Section 1391(c) on special venue provisions and the generality of Section 1391(c)'s language support the view that it applies to all venue statutes using residence as a criteria). *See also Bucyrus–Erie Co.*, 550 F.Supp. at 1039, 1042 ("[w]e find the availability of [Clayton Act] Section 12 service and personal jurisdiction do not depend on the venue requirements of section 12 being met and that satisfaction of venue under section 1391(d) is sufficient"). Thus, the court must determine whether Plaintiffs have pleaded facts sufficient to satisfy either a general, or the specific antitrust, venue statute. *Go–Video, supra*, at 1409 (citations omitted).

Several Defendants have moved to dismiss for improper venue, including ABEM, CORD, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Johns Hopkins Hospital, Loma Linda University Medical Center, Lutheran General, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Oregon Health Sciences University Hospital, St. Anthony Hospital, University Hospital at the University of New Mexico School of Medicine, University of Massachusetts Medical Center and University Medical Center (Tucson).[158]

### a. *Venue in Antitrust Actions*

Section 12 of the Clayton Act provides that:

> Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (1988).

■■■■■ Although this provision sets out three distinct bases for venue of an action against a corporate defendant, including the ability to sue in any district in which the defendant is an inhabitant, is found, or transacts business, the Plaintiffs only contend that venue is proper here as the Defendants transact business in this district. Plaintiffs' Memorandum of Law at II–1 – II–29. In determining whether venue is proper under the Clayton Act, the court performs an analysis similar to that required for personal jurisdiction. *See Grosser v. Commodity Exchange, Inc.*, 639 F.Supp. 1293, 1313 (S.D.N.Y.1986), *aff'd*, 859 F.2d 148 (2d Cir. 1988) (transacting business for purposes of venue requires at least as much as the transacting business prong of New York CPLR Section 302(a)(1)); Charles S. Ryan, *The Expansion of Patent Venue under the Judicial Improvements and Access to Justice Act*, 77 J.Pat. & Trademark Off. Soc'y 85, 98 (1995).

■■■■■ The term "transacts business" in the venue provision of Section 12 of the Clayton Act was designed to broaden the jurisdiction of federal district courts in adjudicating antitrust cases.[159] *United States v. Scophony Corp.*, 333 U.S. 795, 807, 809, 68

---

**158.** Defendants Forsyth Memorial Hospital, Kettering Medical Center, Lincoln Medical & Mental Health Center, Ohio State University Hospital, Riverside Methodist Hospitals, Saint Francis Medical Center, Tri–City Medical Center and Stony Brook University Hospital waived the defense of improper venue. Forsyth Memorial Hospital, Ohio State University Hospital, and Riverside Methodists Hospitals subsequently moved to add this affirmative defense, however, these motions have been denied. Decision and Order, dated January 16, 1996.

The University of California Medical Centers also moved to dismiss for improper venue under 28 U.S.C. § 1406(a), as discussed in the next section.

**159.** Under the Sherman Act, prior to enactment of the Clayton Act, an antitrust plaintiff was required to sue in a defendant corporation's state of inhabitance, *i.e.*, place of incorporation. 3 Kintner, *Legislative History of the Federal Antitrust Laws and Related Statutes*, at 2770–73 (1978).

S.Ct. 855, 861–62, 862, 92 L.Ed. 1091 (1948); *Eastman Kodak Company of New York v. Southern Photo Materials Co.,* 273 U.S. 359, 372, 47 S.Ct. 400, 403, 71 L.Ed. 684 (1927). As the statutory standard, transacting business is therefore not intended to have a technical or legalistic meaning, rather, "a corporation is engaged in transacting business in a district ... if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character." *Eastman, supra,* at 373, 47 S.Ct. at 403. Hence, the practical everyday business or commercial concept of doing or carrying on business of any substantial character became the test of venue under Section 12. *Scophony, supra,* at 807, 68 S.Ct. at 861–62; *Eastman, supra,* at 373, 47 S.Ct. at 403. Even though the adoption in Section 12 of the term "transacts business" was intended to broaden venue in federal antitrust cases, it is not without limitation, for the Supreme Court and lower courts have interpreted the statute to require, for proper venue, some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district. *Scophony, supra; Eastman, supra.*

▮▮ For a corporation to transact business under Section 12 of the Clayton Act, only a finding that the defendant is "engaging in any substantial business operations" within the jurisdiction is required. *Scophony, supra,* at 807, 68 S.Ct. at 861–62; *Pocahontas, supra,* at 69. In determining, therefore, whether a corporate defendant is transacting business, the court must "look to 'the actual unity and continuity of the whole course of [the defendant's] conduct' " at the time the complaint was served on the defendant.[160] *Scophony, supra,* at 817, 68 S.Ct.

at 866. Among the factors to be considered are the existence of an office in the state, solicitation of business in the state, presence of employees in the state, presence of bank accounts or other property in the state, listing of a phone number, public relations or publicity work, sales, advertising, conducting litigation, planning and executing business tactics and strategy, obtaining commercial credit arrangements, and other business activities occurring in New York. *Agra Chemical Distributing Co., Inc. v. Marion Laboratories, Inc.,* 523 F.Supp. 699, 702 (W.D.N.Y. 1981).[161] In determining whether the Defendants are subject to venue in this district, the court must review each corporate Defendant's contacts with New York. Further, the totality of the circumstances must be taken into account, considering as a whole all acts and conduct of a corporation within a particular district, rather than separately considering isolated and fragmented contacts. *Scophony, supra,* at 817, 68 S.Ct. at 866 (the determination of whether venue is proper over an entity must not be made "by atomizing [the acts of the defendant] into minute parts or events, in disregard of the actual unity and continuity of the whole course of conduct"); *Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d 426, 438 (5th Cir. 1977) (all contacts must be considered together to determine whether they constitute the transaction of business in the district in the ordinary and usual sense). In *Scophony,* the Court carefully analyzed the defendant's business purpose and found activity by its agents in New York in furtherance of that purpose to suffice for a finding of venue despite the fact that no revenue producing transactions occurred and no goods were shipped into the state as a result.

---

160. In a state with multiple judicial districts and in which a corporate defendant is subject to personal jurisdiction at the time the action is commenced, the corporation "shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts." 28 U.S.C. § 1391(c).

161. Defendants rely on this case for the proposition that, as stated by the court, the test for

transacting business for venue purposes under Section 12 is "co-extensive with the test for personal jurisdiction under New York CPLR § 302." Defendants, Joint Reply Memorandum of Law at p. 86. However, the court in *Agra* did not cite any authority to support this proposition, nor did it review the legislative history of Section 12 of the Clayton Act in coming to this determination. Thus, to the extent that this statement purports to be prevailing law, this court finds it inconsistent with the criteria for finding venue under Section 12 as enunciated in both *Eastman, supra,* and *Scophony, supra.*

■ As the Plaintiffs assert that several contacts apply to all of the hospital Defendants, including the recruitment of physicians for emergency medicine residency programs through FREIDA, the MATCH, and phone calls and letters to the applicants, national advertising for employment positions, and the effect of the conspiracy on physicians and consumers in this district, Plaintiffs' Memorandum of Law at II–4 – II–8, the court will address these contacts first.

In Discussion Section II(b)(1), *supra*, it was explained that FREIDA and the MATCH were electronic information systems based in Illinois and Washington D.C., respectively. FREIDA is exclusively an informational database which provides students, residents and fellows with information about hospital residency programs. The MATCH is solely a service available to students and residency programs which sorts preferences after the recruitment process, in which neither FREIDA nor the MATCH is directly involved, is complete. Although both programs are utilized by students and residency programs throughout the country, no hospital or residency program has control over or responsibility for the programs. Thus, even when students are ranked and matched with respect to a particular residency program, this contact does not occur in the state in which the student or program is located, rather, the contact occurs in Washington D.C., where the sorting process takes place. *See Selman*, 494 F.Supp. at 610, 612 (no personal jurisdiction pursuant to Section 302(a)(2) where the Association of American Medical Colleges sponsored the Coordinated Transfer Application System, located in Washington, D.C., which is a centralized application processing service for applicants to particular schools). Therefore, the mere ranking or matching of a student residing in this district at that time is not a sufficient basis to support a finding of venue in this district.[162] Further, the phone calls and letters sent to "recruit" physicians to the hospi-

tal Defendants' residency programs present *de minimus* contacts with this forum and are insufficient to support venue. *See American Medicorp, Inc. v. Humana, Inc.*, 445 F.Supp. 573, 579 n. 2 (E.D.Pa.1977) (recruitment visits, advertisements, letters, and attendance at industry meetings are clearly *de minimus* contacts, and lack merit as a basis for establishing venue) (citing *Latch String, Inc. v. Rouse Co.*, 1977–1 Trade Cases ¶ 61,235, 1977 WL 1346 (D.D.C.1977)).

Plaintiffs also assert that many of the Defendants have placed advertisements in nationally distributed journals and publications, however, for purposes of Section 12, " '[n]ational advertising which finds its way into a particular jurisdiction is insufficient to support a finding of transaction of business.' " *San Antonio Telephone Co., Inc. v. American Telephone and Telegraph Company*, 499 F.2d 349, 351 n. 5 (5th Cir.1974) (quoting *Albert Levine Assoc. v. Bertoni & Cotti*, 309 F.Supp. 456, 460 (S.D.N.Y.1970)). Thus, advertisements placed in nationally distributed magazines and journals do not establish venue in any particular district.

Plaintiffs argue that the Defendants which are corporations can be regarded as transacting business in this district as the effects of the conspiracy in violation of antitrust laws impacted upon emergency medicine physicians and on consumers in this district. Plaintiffs' Memorandum of Law at II–7 – II–8. However, even if the Plaintiffs established their conspiracy theory, this is an insufficient contact to support venue, as such a theory has been specifically rejected for establishing venue. *San Antonio Telephone, supra,* at 351 n. 3; *Albert Levine, supra,* at 461 (citing *Bertha Building Corp. v. National Theatres Corp.*, 248 F.2d 833 (2d Cir.1957), *cert. denied*, 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958)). *See also Intermountain Ford Tractor Sales Company v. Massey–Ferguson Limited*, 210 F.Supp. 930, 933 (D.Ut.1962), *aff'd*, 325 F.2d 713 (10th Cir.), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1334, 12 L.Ed.2d 296

---

162. Even if the MATCH could be considered a contact with this district, some Defendants do not participate in the MATCH, Discussion Section II(b)(1), *supra*, and, with respect to the hospital Defendants that do participate in the MATCH, some Defendants have had no matches with persons in this district from 1992 – 1994, and no program had more than nine matches during this three year period. Plaintiffs' Memorandum of Law, Appendix Volume 1, Exhibit 2, pp. 3–23.

(1964) (a conspiracy which has an impact within the district does not constitute transacting business for purposes of venue under Section 12).

As none of these contacts, proffered by Plaintiffs, cumulatively provide a sufficient basis to support a finding of venue, based upon the transaction of business in this district, the court will review the remaining contacts asserted with respect to each Defendant to determine whether venue is proper here.

### 1. *American Board of Emergency Medicine*

Plaintiffs, at the outset, contend that ABEM failed to assert the affirmative defense of improper venue in its response to the First Amended Complaint, participated in this action for several years, and then, for the first time, asserted improper venue in its Answer to the Second Amended Complaint, filed February 28, 1994. Plaintiffs' Memorandum of Law at II–26 n. 7. Plaintiffs further argue that even after ABEM asserted improper venue, ABEM failed to timely move to dismiss on this ground. *Id.*

ABEM demurs that it did not contest venue with respect to the First Amended Complaint as, at that time, "it was arguable that a substantial part of the events giving rise to the claim occurred in this District;" the case was then a suit between one Western District of New York resident and ABEM. ABEM's Memorandum of Law in Support of Motion to Dismiss, filed July 22, 1994, at p. 2 n. 2. Now, however, the case involves nearly two hundred individual Plaintiffs from thirty-four states and the District of Columbia, and ABEM believes that this district is no longer a dominant or even significant locus of relevant events. *Id.*

Although generally a defense of improper venue is waived if it is neither made by motion under Fed.R.Civ.P. 12, nor included in a responsive pleading, the Second Circuit has stated that "a party cannot be deemed to have waived objections or defenses which are not known to be available at the time they could first have been made." *Holzsager v. Valley Hospital,* 646 F.2d 792, 796 (2d Cir. 1981). Thus, when Plaintiffs filed their Second Amended Complaint in January of 1994, adding one hundred and seventy-five additional Plaintiffs,[163] and twenty-eight hospitals as Defendants, and deleting Dr. Daniel's Human Rights Law claim, the nature of the suit changed, including the arguable locus of relevant events.[164] Courts frequently excuse the failure to assert an affirmative defense which was not available at the time of the defendant's original answer. *See, e.g., Glater v. Eli Lilly & Co.,* 712 F.2d 735, 738–39 (1st Cir.1983) (defense of lack of personal jurisdiction not originally available because plaintiff's complaint did not set forth sufficient facts to put defendant on notice that her domicile was questionable); *Holzsager, supra,* at 796 (where the law of the circuit changed, defendant was allowed to assert objections or defenses at the first time they could have been made). Therefore, as ABEM declared its defense of improper venue in its Answer to the Second Amended Complaint, the defense was asserted at the earliest time it was known to be available, thus, the defense was properly included in ABEM's Answer.

However, Plaintiffs also argue that ABEM filed an untimely motion to dismiss for improper venue, as the motion was not filed until July 22, 1994, two months after this court's deadline for the filing of motions to dismiss based on lack of jurisdiction. Plaintiffs' Memorandum of Law at 11–26 n. 7. In

---

**163.** The court notes that the addition of multiple plaintiffs to this lawsuits has not altered the nature of the action. *Cf. Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (where plaintiffs in a diversity action adds a claim against a third-party defendant who is not diverse, the nature of the suit has been altered).

**164.** Although the court disagrees with ABEM's assumption that the number of plaintiffs varies the nature of the action, *see* 28 U.S.C. § 1391(b)

(in a civil action not founded solely on diversity, suit "may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by laws"), nevertheless, as ABEM had no apparent reason to challenge venue, since Dr. Daniel's Human Rights Law claim was part of the action, this court gives ABEM the benefit of the doubt and will allow ABEM to assert its defense of improper venue.

response, ABEM contends that its motion to dismiss for improper venue was not subject to the deadline set by this court. ABEM's Memorandum in Support of Motion to Dismiss, filed July 22, 1994, at p. 1 n. 1. Although a motion attacking venue may be akin to a jurisdictional challenge thus giving some force to Plaintiff's contention, nevertheless, the court's scheduling order filed April 29, 1994, on its face does not specifically purport to address venue motions as such. As noted, ABEM did timely assert venue as an affirmative defense in its Answer to the Second Amended Complaint, filed February 28, 1994 at ¶ 139. Therefore, as the affirmative defense of improper venue was seasonably raised as required by Fed.R.Civ.P. 12(h), ABEM did not waive the defense, and the court will address its merits.

■ ABEM is a not-for-profit corporation organized under the laws of Michigan, with its principal place of business in East Lansing, Michigan.[165] ABEM's Motion to Dismiss, filed July 22, 1994, Affidavit of Benson S. Munger, Ph.D., in Support of Motion to Dismiss at ¶ 3 ("Munger Affidavit"). ABEM does not own, rent, or lease any real estate located in New York, maintains no offices, places of business, mailing addresses, telephone listings or bank accounts in New York, and has no employees or registered agent in the state. Munger Affidavit at ¶ 7. Further, ABEM pays no taxes, carries on no operations, and does not engage in public relations activities in New York. Munger Affidavit at ¶ 7.

ABEM is not a membership organization which provides services to its members, rather, it primarily administers written and oral examinations in the field of emergency medicine and issues its certification which recognizes the special training, knowledge and skill of certain physicians who are able to qualify for this distinction. Munger Affidavit

at ¶ 3. ABEM has never administered any of its required written or oral examinations in this district, or anywhere else in New York state. Munger Affidavit at ¶ 4.

Plaintiffs argue that ABEM mailed applications to this district and otherwise corresponded with Dr. Daniel and other Plaintiffs by mail and telephone,[166] and that Defendant Thiede, a former director of ABEM, and Dr. G. Richard Braen, the president of ABEM as of July of 1994, reside in this district and perform ABEM related activities here. Plaintiffs' Memorandum of Law at II–28 – II–29.

■ The test for venue under Clayton Act Section 12 as reiterated in *Scophony, supra,* and as stated *Eastman, supra,* "mandates a case by case factual inquiry to determine whether, from a practical business standpoint, some amount of business continuity, more than a few isolated and peripheral contacts with this district exist [ ]." *Bogus v. American Speech & Hearing Association,* 389 F.Supp. 327, 329 (E.D.Pa.1975) (citing *Eastern Pre–Cast Corporation v. Giant Portland Cement Company,* 311 F.Supp. 896, 897 (E.D.Pa.1970)). Courts have found that a corporation transacts business within their forum jurisdictions when a substantial business activity is performed within the jurisdiction with continuity of character, regularity, contemporaneous with the service and not looking toward cessation of business. *C.C.P. Corporation v. Wynn Oil Company,* 354 F.Supp. 1275, 1279 (N.D.Ill.1973). Substantiality is measured by evaluating the importance of the activity to the business purposes of the corporate defendant. *See Scophony, supra.*

An examination of the facts surrounding ABEM demonstrates that through its application and certification process, ABEM maintains continuous contacts which amount to business continuity within this district. As

---

**165.** The factual statements set forth and discussed in Discussion Section III(a)(1) – III(a)(15) are based on the affidavits of representatives of ABEM, CORD and the hospital Defendants. The Plaintiffs have not challenged these representations, and they are accepted by the court. *See King v. Johnson Wax Associates, Inc.,* 565 F.Supp. 711, 715 n. 5 (D.Md.1983) (citing *Smokey's of Tulsa v. American Honda Motor Co.,* 453

F.Supp. 1265, 1272 (E.D.Ok.1978) (factual averments set forth in affidavit accepted as true for purposes of determining venue unless controverted by opposing party)).

**166.** Of the 12,935 certified Diplomates of Emergency Medicine, approximately 643 have mailing addresses in New York. Munger Affidavit at ¶ 8.

ABEM's sole business is to certify physicians throughout the United States, and has its only office in Michigan, it is clear that having certified numerous physicians while they resided in New York, ABEM's communications with physicians in New York were a necessary step in the process of obtaining ABEM's certification, a procedure required as to any candidate regardless of residence. Moreover, 99% of ABEM's revenue consists of the application fees it receives from physicians seeking certification. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 49, p. 20. Thus, ABEM's contacts with this state constituted a substantial transaction of business.

ABEM, as noted, is an organization whose sole function is to certify physicians in the specialty of emergency medicine. In carrying out its goal of maintaining high standards for the profession, ABEM entertains the applications for its certification, and appeals of its denials of certification, of physicians who wish to become certified in emergency medicine by ABEM. ABEM performs its essential function by reviewing applications and determining whether or not a candidate is qualified for certification and thus eligible to sit for its examination, the second step in its certification process. See Myers v. American Dental Association, 695 F.2d 716, 726 (3d Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983) (professional associations are commonly devoted to the advancement and enforcement of standards of conduct, thus, common sense suggests that such an organization is transacting business when it engages in activities on a significant scale which further the association's purposes and objectives).

In Bogus v. American Speech & Hearing Association, 389 F.Supp. 327, 330 (E.D.Pa. 1975), the district court held that neither the low volume of activity conducted in the district as compared with the defendant's total operation, nor the defendant's status as a nonprofit, non-stock corporation, maintaining no office or employee in the forum district, was dispositive of whether the defendant transacted business in the district. Bogus, supra, at 330 (citing Levin v. Joint Commission on Accreditation of Hospitals, 354 F.2d 515, 517 (D.C.Cir.1965)). Rather, finding that the defendant evaluated academic and clinical service programs in the district, certified three hundred ninety-three of its 18,621 members residing in the district, and held workshops on accreditation and supervision in schools in the district, the court held that the association was transacting business for purposes of Section 12 in the district. Bogus, supra, at 328, 330 (the workshops, certification, and accreditation are the means by which the defendant attempted to fulfill its goal of maintaining high standards for professionals providing speech and hearing services, and are sufficient to meet the requirement of transacting business in this district under Section 12).

The fact that the current president of ABEM, and a former director of the corporation presently reside in this district does not demonstrate that these individuals are engaging in any substantial business operations on behalf of ABEM in this district. Although ABEM's current president resides in this district, Dr. Braen did not become the president until July of 1994, six months after the Second Amended Complaint was filed. As contacts which occur after the complaint is filed are not relevant for purposes of determining venue, the fact that ABEM's current president resides in this district is of no significance in this determination. See Greene v. Sha–Na–Na, 637 F.Supp. 591, 600 (D.Conn.1986) (events occurring after the claim is filed are not relevant for purposes of venue). Further, Plaintiffs have not presented any evidence which indicates that the former director, Dr. Thiede, while in this district, was involved in any business dealings with ABEM. Therefore, these two particular contacts with the district are insufficient to support a finding of venue under Section 12.

Plaintiffs also assert that this court previously determined, in its Report and Recommendation dated February 25, 1992, that ABEM transacts business in New York as ABEM mailed an application to Dr. Daniel in New York and corresponded with him by mail and telephone in New York with respect to his request for certification. See Daniel, supra, at 919. See also Lanier v. American

*Board of Endodontics,* 843 F.2d 901 (6th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988) (contacts with plaintiff relating entirely to plaintiff's request for certification as a Diplomate of the American Board of Endodontics held to be the transaction of business for purposes of exercising jurisdiction over the defendant board). Although the issue was not presented to the court at the time of the Report and Recommendation, ABEM would also be subject to personal jurisdiction for transacting business in New York under Section 302(a)(1) of the New York CPLR. The court in *Lanier* was presented with facts similar to those in the case at bar, and Section 302(a)(1) is nearly identical to the Michigan long-arm statute used to sustain jurisdiction over the defendant in that case.[167]

"Transacting business under the New York long-arm statute has been interpreted to require a certain quality, rather than a specific quantity, of contacts with the forum." *United States Theatre Corp. v. Gunwyn/Lansburgh, Ltd. Partnership,* 825 F.Supp. 594, 595 (S.D.N.Y.1993). *See also Scophony,* 333 U.S. at 818, 68 S.Ct. at 866–67; *Longines–Wittnauer Watch Co., Inc. v. Barnes & Reinecke, Incorporated,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 16–19, 209 N.E.2d 68, 74–75 (1965). Whether or not contacts are of the appropriate nature to support venue under Section 12 must be determined by an analysis of the totality of the circumstances. *Scophony, supra,* at 817, 68 S.Ct. at 866.

In this case, ABEM corresponds with physicians through the mail and by telephone. All New York emergency physicians who are interested in becoming certified must send an application and fee to ABEM.[168] As New York is the second most populated state in the country, *The World Almanac and Book of Facts: 1995,* p. 379 (M. Hoffman ed.1995); U.S. Bureau of the Census, *Statistical Abstract of the United States: 1993* p. 28 (113th edition) Washington, D.C., 1993, it is reasonable to infer that ABEM receives a significant number of applications and a substantial amount in related fees from New York applicants.[169] There is no indication that these applications and fees are isolated or sporadic events, rather, the original application and recertification processes result in continuous business contacts with New York, from which ABEM derives substantial revenue.

In *Fontanetta v. American Board of Internal Medicine,* 421 F.2d 355 (2d Cir.1970), relied upon by Defendants, ABEM's Reply Memorandum of Law, filed January 30, 1995, at p. 10, the issue was whether the defendant board, an Iowa non-profit corporation which examines doctors who sought to be certified as specialists in internal medicine, transacted business in New York where the board corresponded by mail with plaintiff in New York regarding his application, plaintiff passed the written examination, a prerequisite to a re-

---

**167.** The Michigan long arm statute provides that if a corporation transacts *any* business within the state, that shall constitute a sufficient basis for personal jurisdiction over the corporation. Mich.Comp.Laws § 600.715(1) (1981) (emphasis added). Similarly, Section 302(a)(1) of the New York CPLR provides that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over a non-domiciliary ... who in person or through an agent ... transacts *any* business within the state...." N.Y.Civ.Prac.L. & R. § 302(a)(1) (McKinney 1990) (emphasis added). If the facts in this case were presented to a New York court, by applying Section 302(a)(1), it would reach the same result as did the court in *Lanier.* Thus, ABEM would be subject to personal jurisdiction for transacting business in New York under Section 302. Regardless, as this court has already indicated, in its Report and Recommendation dated February 25, 1992, that ABEM was transacting business for purposes of personal jurisdiction, and the District Judge has accepted such Report and Recommendation, this finding is the law of the case.

**168.** Telephone and mail contacts alone may form a basis for jurisdiction when a defendant has "projected himself into New York in such a manner that he 'purposefully availed himself *** of the benefits and protections of its laws.'" *United States Theatre Corp., supra,* at 595 (quoting *Parke–Bernet Galleries v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 339–41, 256 N.E.2d 506, 508–509 (1970)).

**169.** Neither side has provided any information regarding the actual number of ABEM certified physicians residing in New York as of the date the action was filed or the number of physicians who, while residing in New York, applied for certification, or related application fees. However, as noted, 643 ABEM certified physicians presently reside in New York.

quired oral examination, in New York, but failed the oral examination, administered several years later on two separate occasions in Philadelphia and St. Louis. *Fontanetta, supra,* at 356–58.

*Fontanetta* does not support Defendants' position. A careful reading of *Fontanetta* shows that the Second Circuit held only that plaintiff's claim arose from events outside of New York state and not from the transaction of business within the state. The court assumed, but did not decide, that had plaintiff's claim arisen from the written examination that was conducted in New York, defendant may well have been found to have transacted business in New York State. *Fontanetta, supra,* at 358. Thus, *Fontanetta* is a holding limited to its facts and does not require acceptance of Defendants' position that ABEM's application procedures relating to Plaintiffs cannot constitute venue in New York under Section 12.

On the other hand, the Supreme Court has made clear that in deciding whether Clayton Act Section 12's venue provision is met, depends upon a careful evaluation of the facts, applying a "practical everyday business or commercial concept of doing or carrying of business." *Scophony, supra* at 807, 68 S.Ct. at 862. *Fontanetta* does not address the question of whether pre-examination activities of a credentialing board, such as ABEM, which lead to certification can be found to be transaction of business for Section 12 venue purposes.

For the reasons discussed, under the flexible test for venue based upon transacting business laid down in *Eastman Kodak* and *Scophony,* the court finds ABEM's contacts with this forum are sufficient for venue under Clayton Act Section 12.

### 2. *Council of Emergency Medicine Residency Directors*

 CORD is a not-for-profit corporation incorporated in Michigan. CORD's Motion to Dismiss, filed May 12, 1994, Affidavit of Steven Dronen, M.D., at ¶ 2 ("Dronen Affidavit"). CORD does not own, lease, or occupy any real or personal property located in the state of New York, it does not authorize any representatives or agents to act on its behalf in the state, and it has never held any meetings in New York. Dronen Affidavit at ¶ 3. Further, CORD does not pay taxes, employ anyone, maintain a mailing address or telephone listing, have a license to do business, or have a registered agent in New York nor does it engage in goodwill or public relations activities or carry on business operations in New York. Dronen Affidavit at ¶ 3.

Plaintiffs assert that CORD has at least one member in this district from which CORD received membership dues, the State University of New York at Buffalo's emergency medicine residency program, and that CORD has sent material to the district, including membership applications, newsletters, monthly president's messages, reports, notices of meetings, educational materials, slides, and other information.[170] Plaintiffs' Memorandum of Law at II–25. However, a national membership organization such as CORD does not transact business in this district simply because it has members in the district and mails journals and other materials to those members. *Golf City, supra,* 555 F.2d at 437–38 (defendant's contacts with the district were too tenuous a connection to constitute transacting business for purposes of Section 12 where it had fifty-five members in the state, it provided applications and forms to state residents for membership, and conducted one five day "business school" in the state); *Sherman College of Straight Chiropractic v. American Chiropractic Association, Inc.,* 534 F.Supp. 438, 442 (N.D.Ga. 1982) ("It is settled law that a national membership organization does not 'transact business' under the Clayton Act in a district simply because it has members in the district and mails journals and other materials to those members"); *Academy of Ambulatory Foot Surgery v. American Podiatry Association,* 516 F.Supp. 378, 381 (S.D.N.Y.1981) (the presence of 313 members in New York, and receipt of defendant's literature and publications by those members is not sufficient

---

170. Plaintiffs did not assert that any of the contacts alleged in the personal jurisdiction section of their brief should be discussed for purposes of

finding venue as to any of the Defendants. Plaintiffs' Memorandum of Law, Section II.

to constitute transacting business for purposes of Section 12); *Bogus, supra,* at 330 (a professional association is not transacting business under the Clayton Act in a district merely because some of its members reside in the district; the standard of transacting business requires activity beyond membership and a few sporadic, peripheral, and isolated contacts with the district); *Friends of Animals, Inc. v. American Veterinary Medical Association,* 310 F.Supp. 620, 624 (S.D.N.Y.1970) (professional association does not transact business in a district under Section 12 merely because some of its members reside in the district and receive the association's publications there).

Plaintiffs also allege that CORD acts as a unified voice for the hospital Defendants through which unlawful anticompetitive agreements and acts are committed. Plaintiffs' Memorandum of Law at II–25 – II–26. Continuing this argument, Plaintiffs claim that the co-conspirators' membership and participation in CORD is the means by which the conspiracy is accomplished, and that CORD knew or reasonably should have known that its acts would cause anticompetitive effects in this district. Plaintiffs' Memorandum of Law at II–26. However, the mere allegation of participation by a foreign corporation in a conspiracy within the district does not necessitate the finding that the conspirator was transacting business within the district under the venue provisions of Section 12. *Albert Levine,* 309 F.Supp. at 460–61. Further, the allegation that CORD should reasonably have known that its acts would have anticompetitive effects in this district is of no significance, as, even if Plaintiffs proved that such a conspiracy existed, this theory is unavailable as a basis for establishing venue. Discussion Section III(a), *supra; San Antonio Telephone,* 499 F.2d at 351 n. 3; *Albert Levine, supra,* at 461 (citing *Bertha Building Corp.,* 248 F.2d at 833).

Thus, as the contacts Plaintiffs have discussed related to CORD do not amount to the transaction of business in this district, venue as to it is not proper under Section 12.

### 3. *Children's Hospital (San Diego)*

 The Children's Hospital (San Diego) is a non-profit pediatric hospital incorporated in California, with its sole place of business in San Diego, California. Children's Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of Emanuel Kauder, M.D. in Support of Motion to Dismiss at ¶ 3 ("Kauder Affidavit"). The hospital does not maintain any offices, places of business, employees, or mailing or telephone listings in New York. Kauder Affidavit at ¶ 4. The hospital owns no real estate, bank accounts, or other assets in the state, and does not pay taxes, treat patients, carry on operations, or maintain a registered agent in the state. *Id.* Additionally, the hospital does not engage in any goodwill or public relations activities here. *Id.*

The only remaining contact to sustain venue in this district advanced by Plaintiff, is the hospital's national advertising efforts. Plaintiffs' Memorandum of Law at II–9 – II–10. However, this court has determined that advertising on a national level is insufficient as a basis for venue in any particular district. Discussion Section III(a), *supra.* Accordingly, the action as to this defendant is not within Section 12's venue requirements.

### 4. *Children's Hospital of Michigan*

Children's Hospital of Michigan is incorporated in Michigan, and has its principal place of business in Detroit with additional places of business for out-patient care in Wayne County and Oakland County, Michigan. Children's Hospital of Michigan's Motion to Dismiss, filed May 19, 1994, Affidavit of Norman Rosenberg, D.O., at ¶ 3 ("Rosenberg Affidavit"). The hospital has no office, no telephone listing, no places of business, no real estate, no bank accounts, no mailing address, no employees, and no registered agent in this district. Rosenberg Affidavit at ¶ 5. Further, the hospital pays no taxes and treats no patients in New York. Rosenberg Affidavit at ¶ 5.

The remaining contacts Plaintiffs present to demonstrate that Children's Hospital of Michigan is transacting business in this district include mailing correspondence, promotional materials, and applications to residency applicants and medical schools throughout the country, including New York, sending notices to medical school chairs, and

advertising in journals and other publications which are distributed nationally. Plaintiffs' Memorandum of Law at II–8 – II–9. However, none of these contacts were directed at New York, rather, they were all performed on a national level, and are incidental to the hospital's primary business purposes. Therefore these contacts will not establish venue for the hospital under Section 12 in this district.

### 5. *Detroit Receiving Hospital and University Health Center*

■ Detroit Receiving Hospital and University Health Center is incorporated in Michigan and has its sole place of business in Detroit. Detroit Receiving Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of Edward S. Thomas in Support of Motion to Dismiss at ¶ 3 ("Thomas Affidavit"). The hospital does not own real estate, maintain bank accounts, offices, mailing or telephone listings, or have any employees in New York. Thomas Affidavit at ¶ 6. Further, the hospital pays no taxes in New York, has no registered agent in the state, and does not engage in any goodwill or public relations activities here. Thomas Affidavit at ¶ 6.

Plaintiffs allege that the hospital transacted business in New York through the activities of Dr. Brooks Bock, professor and chairman of the department of emergency medicine of Wayne State University, which is affiliated with the hospital. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 5, pp. 9–10. Plaintiffs assert that Dr. Bock's activities in connection with his review of emergency medicine residency programs through RRC–EM is another contact which supports venue over the hospital in this district.[171] Plaintiffs' Memorandum of Law at II–10; Appendix Volume 10, Exhibit 5, pp. 23–25. However, Plaintiffs have not demonstrated that any action by Dr. Bock with respect to RRC–EM was undertaken on behalf of the hospital.

Plaintiffs also argue that the physician contract group through which Detroit Receiving

Hospital staffs its emergency department "may have transacted business in this district with physicians recruited from New York medical schools . . . through advertisements." Plaintiffs' Memorandum of Law at II–10. In support of this argument, Plaintiffs cite the deposition of Dr. Bock, however, in his deposition, Dr. Bock testified that the physicians group only used national advertising, and stated that the physicians group "never advertised in a paper in New York." Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 5, at pp. 52–53. Further, Plaintiffs again advance as a contact the hospital's utilization of advertising in national publications. Plaintiffs' Memorandum of Law at II–11. However, advertising in a nationally distributed journal or publication is not sufficient to support a finding of venue in a particular district. Discussion III(a), *supra*. Therefore, even when viewed cumulatively, these asserted contacts fail to demonstrate any substantial business activities by Detroit Receiving Hospital sufficient to support venue in this district under Section 12.

### 6. *The Johns Hopkins Hospital, Part of the Johns Hopkins Health System*

■ Johns Hopkins Hospital maintains an office in New York City called the Development Office, which leases property currently located at 420 Lexington Avenue in New York City. Affidavit of Erwin M. Sekulow, filed March 15, 1995, at ¶¶ 2, 9 ("Sekulow Affidavit"). This office has been maintained by Johns Hopkins at various locations in New York City for the last twenty years. Sekulow Affidavit at ¶ 3. The Development Office is part of the Johns Hopkins Institutions, which also include the Johns Hopkins Hospital, as part of the Johns Hopkins Health Care Systems Corporation, and the Johns Hopkins University. Sekulow Affidavit at ¶ 4. The annual budget of the Development Office is between $250,000 and $300,000, of which 15 to 20% is paid by the Johns Hopkins Hospital. Sekulow Affidavit at ¶ 5. The Development Office employs two individuals, and its purpose is to manage fundrais-

---

171. Dr. Bock testified that during his six years on the RRC–EM, the RRC–EM probably reviewed each of the New York emergency medicine residency programs, including those of the hospital Defendants, at least once. Plaintiffs' Memorandum of Law, Appendix Volume 10, Exhibit 5, pp. 24–25.

ing for the northeast region of the United States, including New York, Massachusetts, Connecticut, New Jersey, and parts of Pennsylvania. Sekulow Affidavit at ¶¶ 6–7. The Development Office solicits donations from Johns Hopkins Hospital patients who live in the northeast region of the United States, and maintains a bank account in New York used to maintain petty cash and cover office expenses.[172] Sekulow Affidavit at ¶¶ 8, 10. Thus, Johns Hopkins Hospital continuously carries on substantial activities and has two agents who carry out some of its business activities in New York. As such, Johns Hopkins Hospital, part of John Hopkins Health System, is transacting business sufficient to establish venue pursuant to Section 12 of the Clayton Act.

### 7. *Loma Linda University Medical Center*

 Loma Linda University Medical Center is a non-profit corporation with its place of business in California. Plaintiffs' Memorandum of Law at I–3. The hospital owns no assets, maintains no offices, mailing addresses or telephone listings, treats no patients, has no employees, and does not engage in any goodwill or public relations activities in New York. Loma Linda University Medical Center's Motion to Dismiss, filed May 19, 1994, Affidavit of Larry B. Mellick, M.D. in Support of Motion to Dismiss at ¶ 5 ("Mellick Affidavit"). The medical center pays no taxes in New York, and has no registered agent in the state to accept service of process. Mellick Affidavit at ¶ 5.

The remaining contact which the medical center allegedly has with this forum is that it maintains an "800 number" in connection with its physician referral program, which may be accessible throughout the country. Plaintiffs' Memorandum of Law at II–14; Appendix Volume 11, Exhibit 74, at p. 40. Even if this phone number is in fact accessible from this district, Plaintiffs have failed to demonstrate that the medical center's course of conduct with respect to the "800 number" constitutes substantial business operations in

this district. *See, e.g., King v. Best Western Country Inn,* 138 F.R.D. 39, 42 (S.D.N.Y. 1991) (listing a toll-free telephone number in a local directory does not constitute the transaction of business within New York requisite for jurisdiction pursuant to N.Y. CPLR Section 302(a)(1)) (citing *Ziperman v. Frontier Hotel of Las Vegas,* 50 A.D.2d 581, 374 N.Y.S.2d 697, 700 (2d Dep't.1975)). Therefore, as the sum of the medical center's contacts with this district fail to show that the hospital is transacting business here, venue is not proper under Section 12 of the Clayton Act.

### 8. *Lutheran General Hospital*

 Lutheran General Hospital is incorporated and maintains its sole place of business in Park Ridge, Illinois. Lutheran General Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of Kevin S. Wardell in Support of Motion to Dismiss at ¶ 3 ("Wardell Affidavit"). The hospital does not own any real estate, maintain offices, telephone listings, mailing addresses, bank accounts, or employees in New York. Wardell Affidavit at ¶ 5. It pays no taxes, treats no patients, and does not carry on operations or meetings, or engage in any goodwill or public relations activities in New York. Wardell Affidavit at ¶ 5. Further, Lutheran has no registered agent to accept service of process in the state. Wardell Affidavit at ¶ 5.

Plaintiffs nevertheless emphasize Lutheran General's "continuing business relationship" with companies that are located in this district, namely the Eastman Kodak Company ("Kodak") and the Xerox Corporation ("Xerox"), both headquartered in Rochester, New York. Plaintiffs, Memorandum of Law at II–15. The administrator for trauma and emergency services indicated that the hospital purchases x-ray film from Kodak, however, she stated that she was not aware of whether the film was purchased through Kodak's headquarters in Rochester, or a separate Kodak office located elsewhere. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 65, at pp. 14–15. Kenneth Rojek, the

---

**172.** In 1993, Johns Hopkins raised over $10 million from corporations, foundations, and organizational donors located in New York. Johns Hopkins' Memorandum of Law in Support of Motion to Dismiss, filed January 30, 1995, Exhibit D.

senior vice-president of operations at the hospital indicated that he did not know the specific amount of money expended on the purchases of equipment and supplies from Kodak, however, he assumed that it was less than $100,000. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 60, pp. 11–12. Mr. Rojek also indicated that Lutheran General leased Xerox equipment from a copying equipment supply corporation, not Xerox itself, therefore, the hospital had no direct economic ties to Xerox. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 60, pp. 11–12.

The law is clear that substantial purchasing activity in a district can be the basis of a determination that, for both venue and jurisdictional purposes, a defendant transacts business there, even if those purchases were not related to the claim for relief. *Expoconsul International, Inc. v. A/E Systems, Inc.*, 711 F.Supp. 730, 733 (S.D.N.Y.1989) (defendant was transacting business under Section 12 when business amounted to $59,714 in one year, and $70,500 the next year); *Indian Head, Inc. v. Allied Tube & Conduit Corporation*, 560 F.Supp. 730, 731–32 (S.D.N.Y. 1983) (purchases of over $411,000 in goods and services over a three year period was substantial for purposes of Section 12); *McCrory Corp. v. Cloth World, Inc.*, 378 F.Supp. 322, 324 (S.D.N.Y.1974) (purchases of more than $250,000 over a three year period is substantial for jurisdictional purposes); *Fashion Two Twenty, Inc. v. Steinberg*, 339 F.Supp. 836, 841 (E.D.N.Y.1971) (purchases of $30,000 in materials in New York which defendants sent their own trucks to pick up, with the continuing relationship and sales, was sufficient to constitute transacting business for jurisdictional purposes).

Despite the fact that direct annual purchases by a defendant of $100,000 from Kodak in Rochester would be sufficient for purposes of venue under Section 12, Mr. Rojek stated that he was unsure of the actual amount Lutheran General expends buying x-ray film from Kodak, and that the hospital purchases supplies from companies predominantly located in the midwest who may have offices in New York. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 60, pp.

10–11. Plaintiffs have not submitted evidence or otherwise demonstrating that the hospital engaged in substantial purchasing activities in this district.

Considering all of the hospital's contacts with New York as a whole, the Plaintiffs have failed to make a sufficient showing of any substantial business operations which would allow this court to find under Section 12 that venue as to Lutheran General is proper in this district.

### 9. *Medical College of Pennsylvania and Hospital*

The Medical College of Pennsylvania and Hospital is a nonprofit medical school and hospital incorporated in Pennsylvania, with its sole place of business in Philadelphia. Medical College of Pennsylvania and Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of David K. Wagner, M.D., in Support of Motion to Dismiss at ¶ 2 ("Wagner Affidavit"). The hospital does not own real estate or other assets in New York, maintains no offices, places of business, mailing addresses or telephone listings in the state. Wagner Affidavit at ¶ 4. It has no employees, pays no taxes, carries on no business and holds no meetings, has no registered agent, and engages in no goodwill or public relations activities in New York. Wagner Affidavit at ¶ 4.

Plaintiffs assert that the hospital sent recruiting materials to individuals on a SAEM mailing list and medical schools nationally, and disseminated information about its program in the Green Book and other nationally distributed publications. Plaintiffs' Memorandum of Law at II–16. However, as discussed above, neither contacts with the MATCH or FREIDA, nor advertising or recruiting on a national level are sufficient to form the basis for finding venue in this district. Discussion Section III(a), *supra.*

In 1993, the Medical College of Pennsylvania and Hospital also sent representatives to a job fair in Buffalo, New York, to recruit nurses. Plaintiffs' Memorandum of Law at II–16. However, in order for a corporation to be transacting business under Section 12, the Plaintiff must demonstrate

that the defendant is engaging in substantial business operations. *Scophony*, 333 U.S. at 807, 68 S.Ct. at 861–62. The medical college's attendance at one job fair in 1993 is an isolated contact which fails to show any business continuity, and therefore will not support a finding of venue in this district. *See Eastman*, 273 U.S. at 371, 373, 47 S.Ct. 400, 403; *Albert Levine*, 309 F.Supp. at 460 (citing *Stern Fish Co. v. Century Seafoods, Inc.*, 254 F.Supp. 151, 153 (E.D.Pa.1966) (some amount of business continuity and certainly more than a few isolated contacts are necessary for venue purposes under Section 12)). Thus, the Medical College of Pennsylvania and Hospital does not transact business in this district to the extent necessary to provide for proper venue in this forum under Section 12.

### 10. *Mercy Catholic Medical Center— Misericordia Division*

■ Mercy Catholic Medical Center—Misericordia Division is a non-profit Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Mercy Catholic Medical Center—Misericordia Division's Memorandum of Law in Support of Motion to Dismiss, filed May 12, 1994, at p. 2. The hospital does not maintain any offices or places of business, telephone listings or mailing addresses in New York, and does not pay taxes, treat patients, own property or other assets, carry on operations, engage in goodwill or public relations activities, or have a registered agent in the state. Mercy Catholic Medical Center—Misericordia Division's Memorandum of Law in Support of Motion to Dismiss, filed May 12, 1994, at p. 3.

In addition to the hospital's asserted contacts with this district through national advertising, FREIDA and the MATCH, Plaintiffs also state that the hospital mailed informational brochures regarding its emergency medicine residency program to potential applicants. Plaintiffs' Memorandum of Law at II–17. However, these informational mailings were sent out by Defendant Medical College of Pennsylvania,[173] not Mercy Catholic Medical Center—Misericordia Division, Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 59, at p. 49, and therefore cannot be considered a contact with respect to the medical center. Thus, Plaintiffs have failed to demonstrate any substantial business activity in this district by Mercy Catholic Medical Center— Misericordia Division which constitutes the transaction of business for Section 12 venue purposes.

### 11. *Mercy Hospital and Medical Center*

Mercy Hospital and Medical Center is incorporated in Illinois and maintains its sole place of business in Chicago. Mercy Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of Barbara E. Townsend in Support of Mercy's Motion, at ¶ 3 ("Townsend Affidavit"). The hospital has no office, telephone listing, mailing address, or place of business in New York; further, it is not licensed to do business, and does not have a registered agent in the state. Townsend Affidavit at ¶ 5. The hospital holds no assets, and pays no taxes here. Townsend Affidavit at ¶ 5. The hospital has no employees, treats no patients, holds no meetings, carries on no operations, nor engages in any goodwill or public relations in New York. Townsend Affidavit at ¶ 5.

Plaintiffs contend that Mercy Hospital and Medical Center also transacted business in New York through the activities of Dr. Gray Strange,[174] the emergency medicine residency director of the University of Illinois until February 1993. Plaintiffs' Memo-

---

**173.** Mercy Catholic medical Center—Misericordia Division does not have an emergency medicine residency program, rather, the medical center allows residents from the Medical College of Pennsylvania's emergency medicine residency program to rotate through its medical center.

**174.** Dr. Strange was employed by Mercy Hospital and Medical Center as the director of the department of emergency medicine from 1981–

1986. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 68, p. 9. From 1986–1990, Dr. Strange was the head of the emergency department at the University of Illinois in Chicago, but practiced at Mercy Hospital in relation to the residency program. *Id.* at p. 11. However, after February of 1993, Dr. Strange no longer participated in the residency program. *Id.* at p. 12.

randum of Law at II–18. In 1993, Dr. Strange traveled to this district for RRC–EM to review the University of Rochester's emergency medicine residency program application. Plaintiffs' Memorandum of Law at II–18; Appendix Volume 11, Exhibit 68, pp. 30–33. However, as the Plaintiffs acknowledge that Dr. Strange made this trip to New York as a representative of RRC–EM, rather than an agent of Mercy Hospital, this contact to New York cannot be attributed to the hospital, and Plaintiffs do not provide any basis to find otherwise. *See* Discussion Sections II(b)(1)(k) and II(b)(3), *supra,* explaining that activities of physician members of a professional organization are not imputed to the hospital. Plaintiffs' Memorandum of Law at II–18.

All of Mercy Hospital's contacts with this district viewed together remain insubstantial and demonstrate the irregularity of Mercy Hospital and Medical Center's dealings in this forum, thus, venue has not been established as to the hospital under Section 12.

### 12. *Methodist Hospital of Indiana*

■ Methodist Hospital of Indiana is a not-for-profit hospital which is incorporated in Indiana and maintains its sole place of business in Indianapolis. Methodist Hospital of Indiana's Motion to Dismiss, filed May 19, 1994, Affidavit of Stephen J. Jay in Support of Motion to Dismiss at ¶ 3 ("Jay Affidavit"). The hospital does not own any real estate, nor does it maintain any offices, bank accounts, telephone listings or mailing addresses in New York. Jay Affidavit at ¶ 6. It pays no taxes in the state, does not treat patients, carry on operations, hold meetings, or engage in any goodwill or public relations activities in New York. Jay Affidavit at ¶ 6. Further, the hospital has no license to do business in New York, and does not have a registered agent here. Jay Affidavit at ¶ 6.

Methodist Hospital has participated in a multi-center clinical trial, a medical research project, sponsored by the University of Rochester, located within this district. Plaintiffs' Memorandum of Law at II–19. In order to participate in this multi-center trial, the hospital arranges for and administers patient tests to provide data for the project.

Plaintiffs' Memorandum of Law, Appendix Volume 12, Exhibit 13, Supplementary Interrogatory Response No. 21. The hospital's participation in this clinical trial since 1992 does not demonstrate that it is transacting business in this district. At best, the activity is incidental to the hospital's main business purpose and nothing in the record supports the contrary. Further, although members of the Methodist Hospital of Indiana's medical staff attended a professional education meeting in Buffalo in October of 1991, Plaintiffs' Memorandum of Law at II–19, this contact with the district is too remote in time to be of significance, and fails to demonstrate, even with the remaining contacts, that the hospital was engaged in any substantial business operations in this district.

### 13. *Oregon Health Sciences University Hospital*

Oregon Health Sciences University Hospital is a public benefit corporation incorporated by legislation in the state of Oregon. 1995 Or.Laws ch. 162 §§ 1(2) (a public corporation is an entity created by the state to carry out public purposes); *Id.* § 2 (Oregon Health Sciences University is established as a public corporation). Oregon Health Sciences University has no real estate or other assets in New York, it maintains no offices, places of business, telephone listings, or mailing addresses, engages in no goodwill or public relations activities, and pays no taxes in New York. Oregon Health Sciences University Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of John C. Moorhead, M.D. in Support of Motion to Dismiss at ¶ 7 ("Moorhead Affidavit"). Further, the university hospital treats no patients, has no employees, does not carry on operations or hold meetings, and has no registered agent in New York. Moorhead Affidavit at ¶ 7.

Plaintiffs have provided no additional facts upon which to find venue as to the university hospital pursuant to Section 12 of the Clayton Act and those facts previously asserted are, as discussed in Section III(a) *supra,* insufficient. Plaintiffs' Memorandum of Law at II–1 – II–29.

#### 14. *St. Anthony Hospital*

St. Anthony Hospital is incorporated in Colorado and its sole place of business is located in Denver. The hospital owns no real estate or other assets, does not maintain any offices, places of business, or telephone listings in New York. St. Anthony Hospital's Motion to Dismiss, filed May 19, 1994, Affidavit of Peter Donald in Support of Motion to Dismiss at ¶ 4 ("Donald Affidavit"). St. Anthony Hospital pays no taxes, has no employees, treats no patients, has no meetings and carries on no operations, has no registered agent, and does not engage in any goodwill or public relations activities in New York. Donald Affidavit at ¶ 4.

Plaintiffs assert that St. Anthony Hospital places advertisements in several national publications, as well as advertising for nursing positions in the *Buffalo News,* the only local general circulation newspaper in Buffalo, the largest city in this district, on July 25, 1993. Plaintiffs' Memorandum of Law at II–23; Appendix Volume 5, Exhibit 5, Doc. No. LL10 58; Appendix Volume 11, Exhibit 61, pp. 24–25, 32; Appendix Volume 13, Exhibit 17, Responses to Interrogatories 8 and 13. However, for the hospital to transact business under Section 12, it must engage in substantial business operations, rather than isolated or sporadic contacts. *Scophony, supra,* at 807, 817, 68 S.Ct. at 861–62, 866. The placement of a single advertisement in the local newspaper is far from what is required in order to demonstrate that a defendant is transacting business for purposes of Section 12. *Compare C.C.P. Corp. v. Wynn Oil Co.,* 354 F.Supp. 1275, 1279 (N.D.Ill.1973) (corporation which spent $26,000 on advertising within the district during a one and one-half year period was transacting business as it conducted additional business activities in the state); *Fulton Company, Inc. v. Beaird–Poulan, Inc.,* 54 F.R.D. 604, 608 (N.D.Miss. 1972) (corporation was doing business where defendant regularly advertised in publications circulated within the district and advertised jointly with other dealers in the district, as well as visiting the district to assist with promotion and sales activities); *Chemical Specialties Sales Corp. v. Basic Incorporated,* 296 F.Supp. 1106, 1108 (D.Conn.1968) (where defendant regularly advertised in trade journals in the state, sold and solicited the sale of its products in the district, and purchased materials from the district, continuous and substantial business activities were demonstrated in the district to support a finding of transacting business under Section 12); *Clapper v. Original Tractor Cab Co., Inc.,* 117 F.Supp. 247, 249–50 (S.D.Ind.1953) (foreign corporation engaged in continuous course of business in district by placing numerous ads in local papers, visiting a distributor within the district twice a year, conducting business with the distributor for five years, and selling over $100,000 in products in the district each year).

As Plaintiffs have failed to demonstrate that St. Anthony Hospital is transacting business as required under Section 12, venue is not proper in this district.

#### 15. *University Medical Center (Tucson)*

The University Medical Center is a not-for-profit hospital incorporated in Arizona which maintains its sole place of business in Tucson, Arizona. University Medical Center's Motion to Dismiss, filed May 19, 1994, Affidavit of James W. Richardson in Support of University Medical Center's Motion, at ¶ 3 ("Richardson Affidavit"). The medical center does not maintain any offices, telephone listings, bank accounts, mailing addresses, or places of business in New York, is not licensed to do business in New York, and has no registered agent in the state. Richardson Affidavit at ¶ 6. Further, the hospital owns no real estate, has no employees, does not carry on operations, hold meetings, or treat patients in New York. *Id.* Nor does the medical center pay taxes in New York, or engage in any goodwill or public relations activities in the state. *Id.*

The medical center maintains an affiliation with D'Youville and Daemen Colleges, both located in this district, in the colleges' physical and occupational therapy programs. Plaintiffs' Memorandum of Law at II–24. In connection with their training requirements in these professional programs, students from the colleges perform clinical rotations at the hospital. *Id.* However, for purposes of determining whether venue is proper under

Section 12, it is important to note that only one student comes to the medical center at a time, and that a student could be from one of several colleges, which happen at present to include two from this district. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 52, pp. 15–18. The court finds that under the *Eastman* standard these contacts are incidental to the medical center's business of providing health services and therefore are too insubstantial to sustain venue. Moreover, permitting such clinical rotations is not central to the center's core business of providing general hospital services. Thus, this contact could not establish the substantial business operations required upon which to predicate venue as to the medical center in this district pursuant to Section 12.

The University Medical Center also sent representatives to job fairs for each of the last four years to recruit physical and occupational therapists from several colleges located in this district. Plaintiffs' Memorandum of Law at II–24. However, four trips to New York over four years are not sufficient to demonstrate that the center is transacting any substantial business in New York.

Last, Plaintiffs argue that the medical center has used direct mailings to recruit employees. Plaintiffs' Memorandum of Law at II–25. However, the mailings were sent based on a national list, and the market in western New York was not the target. Plaintiffs' Memorandum of Law, Appendix Volume 11, Exhibit 52, pp. 19–22.[175] This activity, therefore, is casual and remote.

Thus, although the medical center does have some contacts with this district, they cannot be viewed individually or cumulatively as establishing venue here as the center's course of conduct with respect to New York at the time the Second Amended Complaint

was served does not demonstrate that the corporation was involved in any substantial business activity in this district.

#### b. *Venue under the General Venue Provisions*

##### 1. *Section 1391*

The general federal venue statute, 28 U.S.C. § 1391(b), permits an action not based on diversity of citizenship to be brought in

> (1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b) (1990).[176] For purposes of venue, a defendant which is a corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.[177] 28 U.S.C. § 1391(c) (1988). Section 1391(c) is intended to determine the residence of a corporation for purposes of applying Section 1391(b). *Sterling Television Presentations, Inc. v. Shintron Company, Inc.*, 454 F.Supp. 183, 190 (S.D.N.Y.1978) (Section 1391(c) supplements Sections 1391(a) and (b), as section 1391(c) allows the determination of whether a defendant resides in a district for purposes of Sections 1391(a) and (b)); *Stephenson v. Jordan Volkswagen, Inc.*, 428 F.Supp. 195, 198 (W.D.N.C.1977) (the purpose of Section

---

**175.** Although the medical center also has one insurance contract with an insurer located in New York, obtains supplies from suppliers and vendors located in New York, and has issued a bond offering which may have required the use of New York based firms, the Plaintiffs have not alleged that these contacts are relevant to the determination of whether venue is proper under Section 12.

**176.** Before the December 1, 1990 amendments to Section 1391(b), the statute provided that "[a] civil action wherein jurisdiction is not founded

solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law." 28 U.S.C. § 1391(b) (1988).

**177.** Defendants Frank A. Disney, M.D., Henry A. Thiede, M.D., Lincoln Medical & Mental Health Center, Our Lady of Mercy Medical Center, and State University of New York at Stony Brook University Hospital all reside in New York state.

1391(c) is to ascertain the residence of a corporation in order to apply Section 1391(b)).

Section 1391(c) states that a corporate defendant "shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c) (1990). Thus, for a defendant to be subject to Section 1391(c), it must first be shown to be a corporation. The definition of a corporation under Section 1391(c) is broader than that contained in Section 12 of the Clayton Act.[178] *See Kingsepp*, 763 F.Supp. at 28.

**178.** Defendants rely on *Grosser v. Commodity Exchange, Inc.*, 639 F.Supp. 1293, 1312–1314 (S.D.N.Y.1986) (Lasker, J.), *aff'd*, 859 F.2d 148 (2d Cir.1988), to show that as Section 12's venue provision has not been satisfied, there can be no personal jurisdiction under Section 12. Defendants' Joint Reply Memorandum at p. 92. However, this particular holding was never appealed to the Second Circuit. The only matter considered by the Second Circuit in the *Grosser* case was Judge Lasker's Order of January 29, 1988, which adopted a plan for distribution of the proceeds of a pre-certification settlement. *See* Grosser and Greenberg Briefs to the Second Circuit, filed May 12, 1988, July 1, 1988, and August 9, 1988 (Docket No. 88 Civ. 7290). Further, this court has determined that the section's clause pertaining to venue should be read to be independent of the clause providing for service of process. *See* Discussion Section II(a), *supra*. Thus, the court does not find the reasoning in *Grosser* to be persuasive with respect to the requirements for establishing personal jurisdiction and venue under Section 12. Moreover, the reasoning in *Grosser* is too narrow to support the broad proposition Defendants advocate. The only holding reached in *Grosser* relevant to this case was that the defendant Mid-America Commodity Exchange had no measurable contacts with New York and hence transacted no business in New York sufficient to support long-arm jurisdiction under New York CPLR Section 302(a)(1). *A fortiori*, the court found it did not transact any business of a substantial character upon which venue under Section 12 could be based. *Grosser* does not address the issue present here.

The question whether the nationwide service of process clause in Section 12 was conditioned upon satisfying the venue provision was addressed in *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.Supp. 1279 (S.D.N.Y.1989) (Lasker, J.). There the court noted that the Second Circuit in *Goldlawr, Inc. v. Heiman*, 288 F.2d 579 (2d Cir.1961), *rev'd on other grounds*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), stated that "the extra territorial service privilege is given only when the other requirements [of Section 12] are satisfied." *Michelson, supra*, at 1281. While acknowledging the persuasiveness of the contrary reasoning in *General Electric Co. v. Bucyrus–Erie Co.*, 550 F.Supp. 1037 (S.D.N.Y.1982) ("[t]he long sentence of which section 12 consists has two clauses, separated by a semicolon. One relates to venue, the other to service and, as noted, personal jurisdiction;" the service provision of Section 12 is independent of Section 12's venue clause and is always available in antitrust cases), the court nevertheless stated that as the Second Circuit "might conclude differently," the "better course" was to dismiss the complaint against the remaining defendants. It is reasonably clear that in *Michelson* the court's uncertainty as to the merits of the issue influenced the result. Moreover, it has been observed that the language referred to in *Goldlawr* is dicta. *Go–Video*, 885 F.2d at 1411; *Bucyrus–Erie, Co., supra*, at 1041. Further, later cases strongly support a contrary interpretation of Section 12, *see Go–Video, supra*, *Leasco*, 468 F.2d at 1340, *Mariash*, 496 F.2d 1138; *Kingsepp*, 763 F.Supp. 22, an interpretation more consistent with the Clayton Act's legislative history as well. *See* Discussion Section II(a), *supra*. Accordingly, to the extent it can be said that *Michelson* supports the interpretation of Section 12 advanced by the Defendants, for these reasons, this court declines to follow it.

Defendants also contend that the Plaintiffs' application of Section 12 "makes nonsense of the statute" and "strips venue of the protection it affords non-resident defendants." Defendants' Joint Reply at 93. Defendants' argument begs the question of what the statute actually says and what "protection" Congress intended to provide defendants, particularly domestic corporations, through its venue requirements and overlooks precedent that the general venue statute, 28 U.S.C. § 1391, is supplementary to Section 12. *Grosser, supra*, at 1313. *King*, 565 F.Supp. at 719 n. 11; *Bucyrus–Erie Co., supra*, at 1040–41. As discussed in Discussion Section II(a), *supra*, the venue and service of process clauses of Section 12 are not interdependent and therefore so long as venue is also available as to an antitrust defendant under either Section 12 of the Clayton Act or the general venue statute nationwide service of process is available. If as a result of later amendments to Section 1391, venue can be established as to a corporation based upon the availability of jurisdiction, effectively creating venue in any federal judicial district, that is a choice Congress has made, and one consistent with the broad remedial policies which prompted enactment of the Clayton Act. Congress is presumed to be aware of relevant law when it enacts legislation. *Cannon v. University of Chicago*, 441 U.S. 677, 696–697, 99 S.Ct. 1946, 1957–1958, 60 L.Ed.2d 560 (1979). There is therefore no reason as to considerations of venue for the courts to be reticent in permitting parties to utilize the tools Congress has thus provided in the prosecution of federal antitrust claims. *See Go–Video, supra*, at 1410.

Several of the moving Defendants are domestic corporations, including ABEM, CORD, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Oregon Health Sciences University Hospital, Riverside Methodist Hospitals, Saint Francis Hospital, St. Anthony Hospital and University Medical Center (Tucson) As these Defendants are corporations for purposes of Section 1391(c) and were subject to personal jurisdiction under Section 12 at the time this action was commenced, they are deemed to reside in this district pursuant to Section 1391(c) *Kingsepp, supra,* at 28. Section 1391(c) also provides that if a state has more than one judicial district, and a corporation is subject to personal jurisdiction at the time the action was commenced, the corporation "shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(c) (1990). In this case, the court has found, under the nationwide contacts analysis authorized by Clayton Act Section 12, that each of the defendant corporations has sufficient contacts with the United States to be subjected to personal jurisdiction. *See* Discussion Section II(a), *supra.* Therefore, as each of these defendants have sufficient contacts with this district for personal jurisdiction purposes and have been properly served, they also have sufficient contacts with this district for purposes of venue. *See Kingsepp, supra,* at 28. Each of these Defendants as corporations are thus deemed to reside in this district for purposes of Section 1391(c).

Further, if the district court accepts this court's Report and Recommendation, *see* Discussion Sections I and II, *supra,* those Defendants which are not corporations including Ohio State University Hospital, Oregon Health Sciences University Hospital, Tri–City Medical Center, the University of California Medical Centers at Los Angeles, Irvine, and San Diego, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center, would all be dismissed as parties on grounds of Eleventh Amendment immunity, the state action doctrine, Local Government Antitrust Act immunity (as to money damages claimed against Tri–City Medical Center), or lack of personal jurisdiction, and so would be irrelevant to any decision under Section 1391(b)(1) in determining whether all Defendants reside in the same state. 28 U.S.C. § 1391(b)(1) (1990). Thus, as all of the remaining Defendants, as corporations, would be deemed to reside in this district pursuant to Section 1391(c), venue would be proper under Section 1391(b)(1), which provides for venue in a judicial district where any defendant resides, if all defendants reside in the same state. 28 U.S.C. § 1391(b)(1) (1990).

Alternatively, if any of the governmentally sponsored or created Defendants—Ohio State University Hospital, Oregon Health Sciences University Hospital,[179] Tri–City Medical Center, the University of California Medical Centers at Los Angeles, Irvine, or San Diego, University Hospital at the University of New Mexico School of Medicine, or the University of Massachusetts Medical Center, are not dismissed as recommended, this court must determine whether venue is proper in this district.[180]

▆▆▆ For purposes of Section 1391(c), a corporation has been held to include a public trust, *Kingsepp, supra,* at 28, a voluntary association, *see Denver and Rio Grande Western Railroad Co. v. Brotherhood of Railroad Trainmen,* 387 U.S. 556, 562, 87

---

179. As Oregon Health Sciences University Hospital is a public benefit corporation, Section 12 provides for personal jurisdiction over this Defendant, thus, it is also subject to venue pursuant to Sections 1391(c) and 1391(b)(1).

180. Defendants Ohio State University Hospital and Tri–City Medical Center have both waived the improper venue defense, therefore, venue over these defendants is proper in this district.

S.Ct. 1746, 1750, 18 L.Ed.2d 954 (1967), a partnership, *Penrod Drilling Co. v. Johnson,* 414 F.2d 1217, 1220 (5th Cir.1969), and a labor union, *Cable News Network, Inc. v. American Broadcasting Co.,* 528 F.Supp. 365 (N.D.Ga.1981). Regardless of whether the University of California Medical Centers, University Hospital at the University of New Mexico School of Medicine, or University of Massachusetts Medical Center qualify as corporations under Section 1391(c)'s broad definition, proper venue over these Defendants cannot be based on this section, as these Defendants are not subject to personal jurisdiction in New York. *See* Discussion Section II, *supra.* Therefore, if the District Judge accepts this court's recommendations regarding the Eleventh Amendment defenses, the state action doctrine, the Local Government Antitrust Act, or personal jurisdiction defenses, venue will be proper in this district as the remaining Defendants will all reside in this district for purposes of Section 1391(b)(1).

However, if any of these Defendants, the University of California Medical Centers at Los Angeles, Irvine and San Diego, the University Hospital at the University of New Mexico School of Medicine, or University of Massachusetts Medical Center, remain as parties to this action, and venue is not proper in this district under Section 1391(b)(1), as not all Defendants can be found to reside, pursuant to 28 U.S.C. § 1391(c), in the same state. 28 U.S.C. § 1391(b)(1) (1990); *Lightfoot v. Union Carbide Corp.,* 1994 WL 184670, 1994 U.S.Dist. LEXIS 6191, *30 (S.D.N.Y.1994) (venue inappropriate under Section 1391(b)(1) where one defendant was not a resident of New York when the action was commenced).

▮ Plaintiffs also argue that venue is proper in this district pursuant to Section 1391(b)(2), which provides that an action may be brought in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. Plaintiffs' Memorandum of Law at II–32 – II–38. In

demonstrating that a substantial part of the events took place in this district, Plaintiffs assert that ABEM denied the applications and appeals of at least six Plaintiffs residing in this district, deterred four others from even applying to take the ABEM examination, and that the anticompetitive effects of the alleged conspiracy caused economic harm in this district. Plaintiffs' Memorandum of Law at II–34 – II–35.

ABEM's denial of the applications and appeals of Dr. Daniel and five other individual Plaintiffs and the official communication of this action to Plaintiffs in New York is sufficient to constitute a substantial part of the events giving rise to Plaintiffs' claims.[181] *See Monument Builders of Greater Kansas City, Inc. v. American Cemetery Assoc'n.,* 891 F.2d 1473 (10th Cir.1989) (court erred in dismissing Missouri defendants for lack of venue in antitrust case alleging conspiracy to foreclose competition in market for grave marker sales and installations in greater Kansas City area since claim did not arise from individual cemetery's sale of graves but from alleged illegal conduct's adverse impact on consumer welfare within relevant market which covered both Kansas and Missouri); *Grappone, Inc. v. Subaru of America, Inc.,* 403 F.Supp. 123, 133 (D.N.H.1975) (in an action for antitrust violations against a nonresident defendant, the "place of injury" test should be given great weight and consideration by court because failure to do so would enable a foreign corporation to make policy decisions in a distant state which violate antitrust laws and would force the aggrieved part to travel to the wrongdoer's home district to litigate); *Albert Levine Assoc.,* 314 F.Supp. at 171 (venue is proper under Section 1391(b) in action alleging violations of antitrust laws where plaintiff suffered injury to his business); *See also, Woodke v. Dahm,* 70 F.3d 983, 985–86, (8th Cir.1995) (although all trailers involved in the Lanham Act claim were manufactured in the district and the dealership agreement was executed there, no substantial event occurred in the district as there is no claim that trademarks were al-

---

**181.** The court notes that Dr. Daniel has abandoned his New York State Human Rights Law claim, *i.e.* that he was denied the opportunity to take the emergency medicine certification examination on the basis of his race, Amended Complaint, filed February 7, 1991, at ¶¶ 29, 101–108, as it was not reasserted in the Second Amended Complaint, filed January 13, 1994.

tered in the district); *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 868 (2d Cir.1992) (court concluded that the receipt of a collection notice within the district was a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act); *Gaines, Emhof, Metzler & Kriner v. Nisberg,* 843 F.Supp. 851, 854 (W.D.N.Y. 1994) ("[t]he phrase 'events or omissions giving rise to the claim' in 28 U.S.C. § 1391(b)(2) suggests a focus on the actions of the defendant, not on those of the plaintiff"); *Gruntal & Co., Inc. v. Kauachi,* 1993 WL 33345, at *2 (S.D.N.Y.1993) (venue proper in diversity common law fraud action based on telephone calls during which allegedly fraudulent representations were made, where one party to the calls was within the district during calls). As there are 176 Plaintiffs located in thirty-four states and the District of Columbia, and thirty-one Defendants, located in fourteen states, oral and written communications by telephone and mail by ABEM to six Plaintiffs in New York regarding their applications for ABEM certification constitutes a substantial event giving rise to the cause of action. However, the fact that four other Plaintiffs failed to apply to ABEM for certification because they believed it to be futile, Plaintiffs' Memorandum of Law at II–34 n. 10, is not a contact for venue purposes, as no action was taken by any of the Defendants in New York. Moreover, the allegedly illegal acts include ABEM's closure of the practice track, and the later added requirement of ABEM certification or eligibility to practice emergency medicine by several of the Defendants. Even if such decisions may be considered an action for the purposes of Section 1391(b)(2), none of these alleged acts took place in this district.

Plaintiffs also argue that the current president of ABEM, Dr. G. Richard Braen, resides and practices medicine in this district, and Dr. Henry A. Thiede, a former member of the board of directors of ABEM is also a resident of the district. Plaintiffs' Memorandum of Law at II–35. However, the Plaintiffs have not identified any specific activities by either Dr. Braen or Dr. Thiede giving rise to their claims. Moreover, Dr. Braen did not become the president of ABEM until 1994, after the suit was filed, therefore, none of his actions could have contributed to the acts of which Plaintiffs complain. *See Greene,* 637 F.Supp. at 600 (events occurring after the claim is filed are not relevant for purposes of venue). *Fontanetta, supra,* is not to the contrary as in that case the claim arose based on the action of the defendant in relation to plaintiff's oral examinations conducted outside of New York. Here, ABEM's action and Plaintiffs' claims was based upon the application sent by ABEM into New York and returned from within New York, and the relevant decision communicated to Plaintiff in New York.[182]

Thus, as a substantial part of the events with respect to ABEM and Dr. Daniel, as well as five other Plaintiffs, occurred in New York, venue over ABEM is proper in this district.

Finally, in support of finding venue under Section 1391(b)(2), Plaintiffs assert the activities of CORD and the various hospital Defendants in this district, including their participation in FREIDA and the MATCH, and other aspects of the selection process by which medical students are offered residency positions. Plaintiffs' Memorandum of Law at II–36. However, as discussed in Sections II and III, *supra,* finding that no hospital Defendant challenging venue or CORD took any action in New York with respect to Plaintiffs' claims, these activities have no material connection to this district, and cannot support a finding of venue, as these contacts are not substantial events giving rise to Plaintiffs' conspiracy claims.

Although the most substantial events forming the basis for a cause of action need not

---

**182.** Although no conspiracy was established for purposes of personal jurisdiction, *see* Discussion Section II(b)(3), *supra,* ABEM would remain as a defendant with respect to Plaintiffs' antitrust claims, as this court has not addressed the merits of Plaintiffs' Sherman claims. Notwithstanding that this court has not ruled on the pending Rule 12(b)(6) motions, for purposes of determining whether venue exists at this preliminary stage, the court must assume that the Plaintiffs have stated an antitrust claim. Whether the Plaintiffs can establish their Sherman Act claims is another question.

take place in a district for there to be proper venue, *Bates supra*, at 867, the hospital Defendants' and CORD's activities relied upon by the Plaintiffs, viewed alone or collectively, are not sufficient to constitute substantial events giving rise to the Plaintiffs' claims. Therefore, venue over the hospital Defendants and CORD is not proper in this district pursuant to Section 1391(b)(2).

### 2. *Section 1406*

ABEM and the University of California Medical Centers at Los Angeles, Irvine, and San Diego maintain that this action should be dismissed pursuant to 28 U.S.C. § 1406(a) (1988).[183] ABEM's Motion to Dismiss, filed July 22, 1994; University of California Medical Centers' Motions to Dismiss, filed May 19, 1994. Section 1406(a) provides that

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a) (1988). ABEM and the University of California Medical Centers at Los Angeles, Irvine, and San Diego maintain that this district has no relationship to the events underlying this suit, and, therefore, the suit must be dismissed. University of California (Los Angeles) Medical Center's Memorandum of Law in Support of Motion to Dismiss, filed May 19, 1994, at p. 32; University of California (Irvine) Medical Center's Memorandum of Law in Support of Motion to Dismiss, filed May 19, 1994, at p. 31; University of California (San Diego) Medical Center's Memorandum of Law in Support of Motion to Dismiss, filed May 19, 1994, at p. 32; ABEM's Memorandum of Law in Support of Motion to Dismiss, filed July 22, 1994, at p. 5.

Plaintiffs retort that the court must consider whether judicial economy will be served if any of the defendants were dismissed for improper venue. Plaintiffs, Memorandum of Law at II-38. In demonstrating that venue should be proper in this district, Plaintiffs assert that 28 U.S.C. § 1407 provides that multi-district litigation of common questions of law and fact is contrary to the concept of judicial economy and should be avoided in complex litigation.[184] Plaintiffs' Memorandum of Law at II-38 – II-39. Further, Plaintiffs contend that, as this action has been pending in this district for over four years, and the court is intimately familiar with the claims presented in this case, that it should remain in this district rather than being dismissed for lack of improper venue. Plaintiffs, Memorandum of Law at II-39.

As discussed above, Discussion Section III, *supra*, this court finds that ABEM is subject to personal jurisdiction and venue in this district, therefore, ABEM's motion to dismiss pursuant to 28 U.S.C. § 1406(a) should be denied. However, neither personal jurisdiction nor proper venue has been established as to the Defendant University of California medical centers, therefore, if these parties are not dismissed on grounds of immunity or lack of personal jurisdiction, their motions to dismiss pursuant to 28 U.S.C. § 1406(a) must be examined.

It is in the sound discretion of the district court to determine whether dismissal or transfer of a case is appropriate. *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir.1993). In this case, there is no statutory basis for laying venue in this district as to the University of California hospital Defendants. *See* 28 U.S.C. § 1391(b) (1990). Further, personal jurisdiction over the University of California Medical Centers does not exist in this district. *See* Discussion Section II, *supra*. Although this court is familiar

---

**183.** If the district court accepts this court's findings regarding Eleventh Amendment immunity, the state action doctrine, or lack of personal jurisdiction, the University of California Medical Centers' Motions to Dismiss pursuant to 28 U.S.C. § 1406(a) are moot.

**184.** Section 1407(a) provides that when civil actions involving common questions of fact are

pending in different districts, the judicial panel on multidistrict litigation is authorized to transfer the actions for consolidated pretrial proceedings. 28 U.S.C. § 1407(a) (1988); *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993). However, no application in this matter has been made under this procedure.

with the case, and it would serve judicial economy interests if the case against the Defendant University of California medical centers were to remain in this district, the Plaintiffs have failed to demonstrate that venue is proper as to these Defendants, and the case against each of the University of California medical centers at Los Angeles, Irvine and San Diego, should be dismissed.

## IV. *Service of Process*

An action is commenced upon the filing of a complaint with the clerk of the court who forthwith issues a summons to the plaintiff or the plaintiff's counsel who is responsible for service upon the defendant. Fed.R.Civ.P. 4(a) & (b). Fed.R.Civ.P. 4(h) sets forth the manner upon which service may be made on a corporation. Further, pursuant to Fed. R.Civ.P. 4(m), if service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, and the party on whose behalf such service was required cannot show good cause why such service was not made within the 120 day period, the action shall be dismissed, without prejudice.

Both CORD and Mercy Catholic Medical Center—Misericordia Division contend that they were not served with the Second Amended Complaint until February or March of 1994, well beyond the 120 days from the date that this action was originally removed to federal court. CORD Memorandum of Law in Support of Motion to Dismiss, filed May 12, 1994, at p. 5; Mercy Catholic Medical Center—Misericordia Division Memorandum of Law in Support of Motion to Dismiss, filed May 12, 1994, at p. 5. However, as the Second Amended Complaint was filed on January 13, 1994, Plaintiffs had until May 12, 1994 to serve each of these Defendants. Therefore, as CORD's waiver of service was returned executed on February 22, 1994, and Mercy Catholic Medical Center—Misericordia Division's acknowledgement of service was filed on March 30, 1994, both well before the 120 day time limitation expired, CORD and Mercy Catholic Medical Center's motions to dismiss for insufficient service of process should be denied.

Further, CORD filed an answer to the Second Amended Complaint on March 22, 1994. In the answer, CORD asserted the defenses of improper venue and lack of personal jurisdiction, CORD Answer, filed March 22, 1994, ¶¶ 136–141, but did not assert the defense of insufficiency of service of process. These defenses, while related, are not identical. *See Santos v. State Farm Fire and Casualty Co.,* 902 F.2d 1092, 1095 (2d Cir.1990). "Questions of personal jurisdiction go to 'whether the controversy or defendant has sufficient contact with the forum to give the court the right to exercise judicial power over the defendant,' (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351, at 560 (1969)) whereas questions of sufficiency of service concern 'the manner in which the service has been made and not ... the court's power to adjudicate defendant's rights and liabilities.'" *Id.* at § 1353, at 578–79. In *Santos, supra,* the court found that an answer which only raised the affirmative defense of lack of personal jurisdiction did not adequately set forth an affirmative defense for insufficiency of service of process, and that such defense had been waived. *Santos, supra,* at 1095–96. *See also Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 n. 2 (2d Cir.1988) (the failure to plead an affirmative defense results in the waiver of that defense); *Broadcast Music, Inc. v. Marger, Inc.,* No. 93 Civ. 710A (W.D.N.Y. Oct. 12, 1994) (defendants asserted lack of personal jurisdiction, but failed to assert insufficient service of process, thereby waiving the defense); *Federal Home Loan Mortgage Corporation v. Dutch Lane Associates,* 775 F.Supp. 133, 137 (S.D.N.Y.1991) (where defendants filed an answer, raising as a defense lack of personal jurisdiction, and then participated in two pretrial conferences, and settlement negotiations over a seven month period, court held that the raising of a "lack of personal jurisdiction" defense did not preserve an insufficiency of service of process defense, and that such defense had been waived).

Further, the later filing of CORD's motion to dismiss, directed toward the Second Amended Complaint, pursuant to Fed. R.Civ.P. 12(b)(5), was untimely. CORD was entitled to raise its service of process defense by motion, however, Rule 12(b) requires that any such motion be made before any responsive pleading is filed. Fed.R.Civ.P. 12(b). If

the defense of insufficiency of service of process is not included in either a responsive pleading, or in an appropriate motion, the defense is waived. Fed.R.Civ.P. 12(h)(1). *See Caribe Carriers, Ltd. v. C.E. Heath & Co.*, 784 F.Supp. 1119, 1124 (S.D.N.Y.1992).

CORD waived its right to make a motion to dismiss based on improper service by its failure to raise insufficiency of service of process as an affirmative defense in its Answer, filed March 22, 1994. Accordingly, CORD's motion to dismiss based on insufficiency of service of process should denied.

### CONCLUSION

Based on the foregoing, Defendants Ohio State University Hospital, Oregon Health Sciences University Hospital, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital of the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center should be dismissed on grounds of Eleventh Amendment immunity. Alternatively, Defendants Lincoln Medical and Mental Health Center, Ohio State University Hospital, Oregon Health Sciences University Hospital, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital of the State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center, should be dismissed from the suit as they are exempt from federal antitrust laws under the state action doctrine. The action against Lincoln medical and Mental Health Center and Tri–City Medical Center should be dismissed insofar as money damages are requested, under the Local Government Antitrust Act.

This court finds that under Section 12 of the Clayton Act, each of the Defendants which are domestic corporations are subject to personal jurisdiction in this district, namely CORD, Children's Hospital (San Diego), Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center–Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Oregon Health Sciences University Hospital,[185] Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital, and University Medical Center (Tucson). Therefore, as to these Defendants the motions to dismiss for lack of personal jurisdiction should be denied.

Alternatively, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, is subject to personal jurisdiction, pursuant to Section 301 of the New York Civil Practice Law and Rules, as the court finds it is doing or soliciting business in New York. However, Plaintiffs failed to demonstrate that the other Defendants which have moved to dismiss for lack of personal jurisdiction are soliciting business pursuant to Section 301, or that they are subject to personal jurisdiction, pursuant to New York's long-arm statute, Section 302(a)(1), (2) or (3), for transacting business, committing a tortious act within the state, or committing a tortious act outside the state causing injury within the state.

Therefore, even if, based on the District Court's determination of the asserted immunity claims, remaining as parties to this action, the motions to dismiss for lack of personal jurisdiction for Ohio State University Hospital, Tri–City Medical Center, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the University of New Mexico School of Medicine, and University of Massachusetts Medical Center, should be granted as the court finds personal jurisdiction does not exist over these Defendants.

**185.** Should the District Court not find, as recommended, *see* Discussion Sections I(a)(2) and I(b)(3), that Oregon Health Sciences University Hospital is immune from suit under the Eleventh Amendment or the state action doctrine, then it is subject to personal jurisdiction pursuant to Section 12 of the Clayton Act.

The court also finds proper venue over ABEM, CORD and the hospital Defendants which are domestic corporation, exists pursuant to Section 12 of the Clayton Act, however, those Defendants which are not domestic corporations and, if remaining as parties, should not be subject to venue under this section. Should the District Court accept the Report and Recommendation regarding Eleventh Amendment immunity, the state action doctrine, the Local Government Antitrust Act, or lack of personal jurisdiction, Defendants Tri–City Medical Center, University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital at the University of New Mexico School of Medicine, and the University of Massachusetts Medical Center will have been dismissed from the action as parties, leaving the remaining Defendants—CORD, Children's Hospital of Michigan, Children's Hospital (San Diego), Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Kettering Medical Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital, and University Medical Center (Tucson)—subject to venue in this district pursuant to 28 U.S.C. § 1391.

However, the motions to dismiss pursuant to 28 U.S.C. § 1406(a) should, nevertheless, be granted with respect to University of California (Los Angeles) Medical Center, University of California (Irvine) Medical Center and University of California (San Diego) Medical Center, but denied as to ABEM. CORD's and Mercy Catholic Medical Center—Misericordia Division's motions to dismiss for improper service of process should be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys of record.

SO ORDERED.

Jan. 16, 1996,